UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSOCIATION OF AMERICAN PHYSCIANS &amp; )
SURGEONS, INC., )
)
    Plaintiff, )
)
    v. )
)
DEP'T OF HEALTH &amp; HUMAN SERVICES, *et al.,* )
)
    Defendants. )

Civil Action No. 06-0611-ESH

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

In opposition to the defendants' motion to dismiss under Rule 12(c) of the FEDERAL RULES OF CIVIL PROCEDURE and defendants' accompanying memorandum of law, plaintiff Association of American Physicians &amp; Surgeons, Inc., hereby files the attached memorandum of law and proposed order.

Dated: July 14, 2006             Respectfully submitted,

 /signed/ Lawrence J. Joseph
Lawrence J. Joseph, D.C. Bar No. 464777

2121 K Street, NW, Suite 800
Washington, DC 20037
Telephone: (202) 669-5135
Telecopier: (202) 318-2254

*Counsel for Association of American*
*Physicians and Surgeons, Inc.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSCIANS & SURGEONS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>DEP'T OF HEALTH & HUMAN SERVICES, *et al.,*<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 06-0611-ESH

## [Proposed] Order

On considering defendants' motion to dismiss, the memoranda in support thereof and in opposition thereto, and the absence of a record herein, the Court holds that plaintiff has alleged cognizable injuries in fact, that the Court has subject-matter jurisdiction, and that the Court can grant the requested relief. For the foregoing reasons, it is hereby

**ORDERED** that defendants' motion is denied.

Dated: _____, 2006

_____
**UNITED STATES DISTRICT JUDGE**

**Copy to:**

LAWRENCE J. JOSEPH
2121 K Street, NW, Suite 800
Washington, DC 20037
*Counsel for Plaintiff*

SCOTT Y. BRESSLER
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W., Room 7300
Washington, D.C. 20530
*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSCIANS & SURGEONS, INC., | ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 06-0611-ESH |
| DEP'T OF HEALTH & HUMAN SERVICES, *et al.,* | ) ) |
| Defendants. | ) |

**M**EMORANDUM OF **L**AW IN **S**UPPORT OF
**P**LAINTIFF'S **O**PPOSITION TO **D**EFENDANTS' **M**OTION TO **D**ISMISS

Lawrence J. Joseph, D.C. Bar No. 464777

2121 K Street, NW, Suite 800
Washington, DC 20037
Telephone: (202) 669-5135
Telecopier: (202) 318-2254

*Counsel for Association of American
Physicians and Surgeons, Inc.*

Dated: July 14, 2006

TABLE OF CONTENTS

Table of Contents ............................................................................................................. i
Preliminary Statement .................................................................................................... 1
Standards of Review ....................................................................................................... 2
    Judicial Review on Administrative Record ........................................................... 2
    Rule 10(c) ............................................................................................................... 4
    Rule 12(c) ............................................................................................................... 5
    Rule 56 Conversion .............................................................................................. 8
Background ...................................................................................................................... 9
    Statutory and Regulatory Background .................................................................. 9
    Factual Background ............................................................................................. 12
Argument ....................................................................................................................... 12
I.     Subject-Matter Jurisdiction ................................................................................. 12
    A.    Standing ..................................................................................................... 12
        1.    Injuries in Fact .............................................................................. 13
            a.    Informational Injury .......................................................... 14
            b.    Procedural Injury .............................................................. 14
            c.    Program Injury .................................................................. 15
            d.    Economic Injury ............................................................... 19
        2.    Zone of Interests ........................................................................... 21
        3.    Other Factors ................................................................................ 23
    B.    Judicial Review ......................................................................................... 23
        1.    Non-APA Nonstatutory Review .................................................. 25
            a.    This Court's Equity Jurisdiction ....................................... 26
            b.    Mandamus and Venue Act ................................................ 27
            c.    *Ultra Vires* Action ............................................................ 29
            d.    Declaratory Judgment Act ................................................ 29
        2.    APA ............................................................................................... 30
            a.    Final Agency Action ......................................................... 31
            b.    Committed to Discretion by Law ...................................... 32
II.    Application of Subject-Matter Jurisdiction to Specific Counts ........................... 35
    A.    Count I: Imbalance and Undue Influence .................................................. 35
    B.    Count II: Unlawful Contractual Panels ..................................................... 38
    C.    Count III: Unlawful Subcommittees .......................................................... 39
    D.    Count IV: Charter and Determination Violate FACA ............................... 41
    E.    Count V: AHIC Privacy/Security Expert ................................................... 43
    F.    Count VI: Renewal of NCVHS Charter ..................................................... 44
Conclusion ..................................................................................................................... 44

<u>**Preliminary Statement**</u>

In this action, plaintiff Association of American Physicians and Surgeons, Inc. ("AAPS") challenges various agency action and inaction under the Federal Advisory Committee Act ("FACA") by defendants U.S. Department of Health and Human Services and its Secretary, Michael O. Leavitt, in his official capacity and his individual capacity under color of legal authority (collectively, hereinafter "HHS"). This memorandum of law sets forth the applicable standards of review for HHS's motion to dismiss, summarizes the applicable background law and facts, and rebuts HHS's challenges to this Court's jurisdiction.

In summary, the Complaint alleges that HHS's American Health Information Community ("AHIC") represents an unfairly balanced advisory committee, that HHS has undue influence over AHIC, and that AHIC lacks judgment independent of HHS. In chartering AHIC, moreover, HHS made only conclusory determinations, failed to consider numerous overlapping health information technology ("Health IT") panels that render AHIC non-essential, and even failed to comply with the AHIC charter. Finally, HHS circumvented FACA by convening AHIC "work groups" that include private-sector AHIC nonmembers and by contracting for several consensus panels, all without complying with FACA's chartering requirements.

HHS opens its motion to dismiss by quoting a court's summary of FACA's legislative history to demonstrate that Congress intended FACA to prevent special interests like AAPS from dominating advisory committees. Defs.' Mot. at 1. HHS then suggests that AAPS seeks "to turn the statute on its head" by asking this Court to enjoin AHIC. Given that the plain language of FACA §5(b)(3) expressly proscribes "inappropriate[] influence[] by the *appointing authority* or by any special interest" (emphasis added), HHS's indirect resort to legislative history is misplaced. In any event, one person's "special interest" is another's "watchdog," and more than

90% of the American people favor AAPS's view of privacy over HHS's. *See* Compl. ¶78. More-over, FACA demonizes neither "special interests" nor "appointing authorities." Instead, FACA requires that advisory committees reflect a fair balance among interests and viewpoints, and it prohibits advisory committees over which either the appointing authority or a special interest has undue influence. FACA §5(b)(2)-(3), (c).

Given that statutory context, it does not "turn FACA on its head" to question a 17-member panel with 17 yes-men and yes-women. Compl. ¶¶49-53. Nor does AAPS demean the views of the 17 individual *AHIC members,* which reflect the views of almost 10% of Americans. Compl. ¶78. Instead, AAPS questions AHIC's balance *as a committee* and HHS's undue influ-ence *as an appointing authority.* While FACA's fair-balance requirement may not require mathematical precision, the odds of randomly drawing 17 members from less than 10% of the population are less than one in 100 quadrillion (*i.e.,* $1/(10^{17})$). Given the improbability of HHS's position and the conclusory nature of its findings, AAPS credibly alleges that HHS has set up a series of interlocking rubber-stamp alter egos, all to paint its pre-ordained path as the brainchild of "the Community" and consensus. If it prohibits anything, FACA prohibits that.

<u>STANDARDS OF REVIEW</u>

By moving to dismiss under Rule 12(c), HHS contends that AAPS cannot prevail as a matter of law. In doing so, HHS relies in part on materials that fall outside both the pleadings and the administrative record. Citing Rule 10(c), however, HHS contends that it may rely on cer-tain materials on its website because AAPS's complaint cites other parts of HHS's website. This section outlines the standards of review relevant to HHS's motion.

**Judicial Review on Administrative Record**. When a district court reviews the actions of an administrative agency, it essentially sits as an appellate court reviewing the administrative

record on which the agency acted. *Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C. Cir. 1993). Where the record in question is judicially noticeable, the "district court can consult the [administrative] record to answer the legal question before the court" without converting a motion to dismiss into a motion for summary judgment. *Id.* & n.6. In the absence of a judicially noticeable or certified record, however, a court has no basis to go beyond the pleadings. FED. R. CIV. P. 44(a)(1); *Langston v. Johnson,* 478 F.2d 915, 918 n.17 (D.C. Cir. 1973) ("well settled that a certified transcript of… administrative proceedings may be considered on a motion for summary judgment"). Indeed, notwithstanding its "presumptive verity," even a "duly authenticated" record is subject to "impeach[ment if]… an issue as to its accuracy genuinely exist[s]." *Langston,* 478 F.2d at 918.

Significantly, the administrative record "includes all materials compiled by the agency... that were before the agency *at the time the decision was made.*" *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal quotation marks and citations omitted, emphasis added); *Camp v. Pitts,* 411 U.S. 138, 142 (1973) ("focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Burlington Truck Lines v. U.S.,* 371 U.S. 156, 170 (1962) ("an agency's discretionary order [will] be upheld, if at all, on the same basis articulated in the order by the agency itself"); *SEC v Chenery Corp.,* 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency [, which if] inadequate or improper, the court is powerless to affirm"). In the administrative record, agencies must examine the relevant data and articulate a satisfactory explanation for action, including a "rational connection between the facts found and the choice made." *Burlington Truck Lines,* 371 U.S. at 168;

*Sloan v. HUD,* 231 F.3d 10, 15 (D.C. Cir. 2000). Requiring that rational connection has been called an "axiom of administrative law." *Bowen v. Am. Hosp. Ass'n,* 476 U.S. 610, 626 (1986).

Without a certified or judicially noticeable administrative record, this Court cannot evaluate HHS's extra-pleading assertions. *SEC v Chenery Corp.,* 318 U.S. 80, 94 (1943) ("courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review"); *accord Ballard v. C.I.R.,* 544 U.S. 40, 62 (2005) ("the reviewing court shall evaluate the 'whole record'") (*quoting* 5 U.S.C. §706). On the scheduling teleconference on May 11, 2006, HHS indicated that its Rule 12(c) motion would compel dismissal of some (if not all) of the complaint, thereby mooting AAPS's concern for the certification (or discovery) of the administrative record.

**Rule 10(c)**. Rule 10(c) provides that a "copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." FED. R. CIV. P. 10(c). Citing this provision, HHS seeks to introduce uncertified, extra-pleading evidence concerning AHIC's privacy and information-security expert and the renewal of the National Committee on Vital Health Statistics ("NCVHS") charter. Defs.' Mot. at 4-5, 30-32. With regard to the allegedly renewed NCVHS charter, the complaint nonetheless states a claim on which the Court can grant relief, even if that relief is slightly different from the grounds set out in Count VI. *See* Section II.F, *infra.*

HHS does not claim that *AAPS* cited the materials that HHS wishes to incorporate, but instead claims that its materials are connected – via an unspecified number of intermediate hyperlinks – to two internet addresses (called URLs) cited in a declaration attached to the complaint. *See* Defs.' Mot. at 4-5, 30-32. At the outset, it is not clear that URLs are "written documents" for purposes of Rule 10(c). *Ctr. for Democracy & Technology v. Pappert,* 337 F.Supp.2d 606, 615 (E.D. Pa. 2004) ("URL on the World Wide Web only refers to a location where content

can be found" and "not… to any specific piece of static content"); *Norm Thompson Outfitters, Inc. v. Starcrest Prods. of California, Inc.,* 2004 WL 957774, *1-2 (D. Ore. 2004) (plaintiff's website was not so central to allegations contained in complaint that complaint incorporated website by reference); *Bowens v. Aftermath Entertainment,* 254 F.Supp.2d 629, 639 (E.D. Mich. 2003) (DVD referred to throughout complaint and central to case was not incorporated under Rule 10(c) and "[p]lainly" failed qualify as "written instrument").

However the Court resolves the "URL-as-written-instrument" issue, the complaint simply does not cite the materials that HHS identifies and describes in its unsworn brief. The Court need not (and probably cannot) accept the truth of what HHS's motion claims these documents to state. *Henthorn v. Dep't of Navy,* 29 F.3d 682, 687-88 (D.C. Cir. 1994) ("the sparse case law addressing the effect of factual allegations in briefs or memoranda of law suggests that such matters may never be considered when deciding a 12(b)(6) motion"); *Goldman v. Summerfield,* 214 F.2d 858, 859 (D.C. Cir. 1954) ("statements of fact in [legal] memoranda cannot ordinarily be given the dignity of a pleading or deposition, even though no effort is made to controvert them"). In any event, for the reasons explained in Sections II.E and II.F, *infra,* these documents would not entitle HHS to dismissal even if AAPS had incorporated them in its complaint.

**Rule 12(c)**. As this Court recently recognized, courts analyze Rule 12(c) motions under "essentially the same [standard of review as] a motion to dismiss under Rule 12(b)(6)." *Adler v. Vision Lab Telecomms., Inc.,* 393 F.Supp.2d 35, 36 (D.D.C. 2005) (Huvelle, J.); *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C. Cir. 1987) (standards of review are "virtually identical"); *cf.* 5C WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, §1368 ("significant number of federal courts have held that the standard to be applied on a Rule 12(c) motion… is identical to that used on a Rule 12(b)(6) motion") (collecting cases, albeit only district-court cases in this Cir-

cuit). Under that standard, "dismissal is appropriate only where a defendant has shown beyond doubt that the plaintiff can prove no set of facts in support of [their] claim which would entitle [them] to relief. *Adler,* 393 F.Supp.2d at 36 (*citing In re Swine Flu Immunization Prods. Liab. Litig.,* 880 F.2d 1439, 1442 (D.C. Cir. 1989)) (interior quotations omitted, other alterations in original); *Stewart v. Evans,* 275 F.3d 1126, 1132 (D.C. Cir. 2002) ("motion for judgment on the pleadings shall be granted if the moving party demonstrates that it is… entitled to judgment as a matter of law") (interior citations and quotations omitted); *cf. Noel v. Olds,* 149 F.2d 13, 14 (D.C. Cir. 1945) ("if material questions of fact are presented by the pleadings, the remedy by motion for judgment on the pleadings under Rule 12(c) is not available").

The Rule 12(c) and 12(b)(6) motions provide for dismissal "on the pleadings" or for "failure to state a claim upon which relief can be granted" as a matter of law, FED. R. CIV. P. 12(c), 12(b)(6), which operate as a dismissal with prejudice. *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 399 n.3 (1981). Such motions "only test[] whether the claim has been adequately stated in the complaint." 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, §1356 (3d ed. 2004). They are not a ruling on "[w]hether the plaintiff ultimately can prevail on the merits," which is "properly determined on the basis of proof, which means on a summary judgment motion or at trial." *Id.* §1357. Instead, they are a ruling that "the statement of the claim was defective as a matter of the applicable substantive law," *id.,* and appropriate only "only in the relatively unusual case" where the plaintiff's claim encounters an "insuperable bar" (*i.e.,* where "plaintiff has pleaded himself… out of federal court"). *Id.*

With "other things… equal," courts "prefer[] adjudication of cases on their merits rather than on the basis of formalities." *Ciralsky v. CIA,* 355 F.3d 661, 674 (D.C. Cir. 2004). Under that judicial preference, such dismissals are appropriate where a "plaintiff has no claim to state," but

inappropriate where the "plaintiff has imperfectly stated what *may* be an *arguable* claim." *Alley v. Resolution Trust Corp.,* 984 F.2d 1202, 1208 (D.C. Cir. 1993) (emphasis added). "The federal policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading… even [if] the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading." 5B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, §1357.

Courts reject merits dismissal without leave to correct correctable errors. *Id.*; *Rosen v. TRW, Inc.,* 979 F.2d 191, 194 (11th Cir. 1992) ("Where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice"); *Alley,* 984 F.2d at 1208 ("leave to amend is ordinarily in order" for imperfectly plead claims that "may be an *arguable* claim") (emphasis added); *Andrx Pharmaceuticals, Inc., v. Biovail Corp. Int'l,* 256 F.3d 799, 807 (D.C. Cir. 2001) ("[d]ismissal with prejudice should be granted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency") (citations and interior quotations omitted); 5B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, §1357 (plaintiff "generally will be permitted to amend the pleading if the defect can be cured"); *id.* ("dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected"); *Firestone,* 76 F.3d at 1209 ("leave to amend is almost always allowed to cure deficiencies") (citations and interior quotations omitted).

If a complaint alleges facts that entitle the plaintiff to *some* relief – and particularly where the plaintiff included a general plea for "other appropriate relief" – merits dismissal under Rule

12 is inappropriate for pleading defects. *Doe v. U.S. Dep't of Justice,* 753 F.3d 1092, 1104 (D.C. Cir. 1985); *People for the Ethical Treatment of Animals, Inc., v. Gittens,* 396 F.3d 416, 421 (D.C. Cir. 2005) ("the complaint requested 'such other and further relief as the Court may deem just and proper[,' which] permits a district court to award damages for breach of contract even when the plaintiff has not pled a contract claim") ("*PETA*"); *cf.* FED. R. CIV. P. 54(c). Because HHS now claims to have renewed the charter for NCVHS (which the NCVHS website did not claim when AAPS filed its complaint[1]), the fact that AAPS can establish its entitlement to *some* relief provides further basis to deny dismissal. *PETA,* 396 F.3d at 421; Section II.F, *infra.*

**Rule 56 Conversion**. HHS argues that district courts may explore matters outside the pleadings to determine their jurisdiction. Defs.' Mot. at 6 (*citing Land v. Dollar,* 330 U.S. 731, 735 n.4 (1947)). Before doing so, however, a court first must provide notice to the parties and an opportunity to submit affidavits and other materials. *Gordon v. Nat'l Youth Work Alliance,* 675 F.2d 356, 360 (D.C. Cir. 1982); *accord* 5C WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, §1371 ("[w]hen a district court converts a Rule 12(c) motion, however, it must give the parties notice and an opportunity to be heard on the summary judgment question"). Until the Court provides notice and that opportunity, HHS's Rule 12(c) motion stymies AAPS's ability to submit or cite materials beyond the pleadings for any correctable pleading errors.

As AAPS explained on the scheduling teleconference on May 11, 2006, it lacks materials from the administrative record necessary to make its case for summary judgment on certain counts. For that reason, AAPS cannot fully respond to HHS's Rule 12(c) motion because that

---

[1] AAPS's complaint obtained the 2004 charter from the NCVHS website, Compl. ¶62, which certainly suggests that the 2004 charter was the one available from the NCVHS website on February 21, 2006.

risks converting the Rule 12(c) motion to one for summary judgment, which AAPS cannot now support on all counts. *Stearns v. Veterans of Foreign Wars,* 500 F.2d 788, 790-91 & n.9 (D.C. Cir. 1974). HHS has not made a statement of undisputed facts, and "[AAPS] has had no occasion… to make the kind of presentation comprehended by Rule 56 [and] had no right to do so in response to the… Rule 12(c) motion, which challenged the sufficiency of [the] pleadings." *Id.* Accordingly, if the Court accepts any of HHS's arguments for dismissal based on the insufficiency of the facts plead (as opposed to failure *as a matter of law* to state a claim on which relief could be granted), the rules contemplate the Court's providing an opportunity to cure the pleading defect before any dismissal becomes final. *Alley,* 984 F.2d at 1208; *Biovail Corp.,* 256 F.3d at 807.

<u>B<small>ACKGROUND</small></u>

**Statutory and Regulatory Background**. Congress enacted FACA to "enhance the public accountability of [Executive-Branch] advisory committees" and to limit wasteful expenditures for "worthless committee meetings and biased proposals." *Pub. Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 453, 459 (1989) ("*Pub. Citizen v. DOJ*"). To curb the proliferation of advisory committees, Congress expressly found that "new advisory committees should be established only when they are determined to be essential." FACA §2(b)(2).

FACA §3(2) defines "advisory committee" to mean "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereafter in this paragraph referred to as 'committee'),… established or utilized by one or more agencies,… in the interest of obtaining advice or recommendations for… one or more agencies or officers of the Federal Government." In creating an advisory committee, a federal Executive-Branch agency must *inter alia* do the following: (1) ensure that the advisory com-

mittee has a "clearly defined purpose;" (2) require the advisory committee's membership "to be fairly balanced in terms of the points of view represented;" and (3) include "appropriate provisions to assure that the [committee's] advice and recommendations… will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." FACA §5(b)(1)-(3), (c).

FACA §10(a)(1) requires that advisory-committee meetings be open to the public, and FACA §10(a)(3) requires that advisory committees permit the interested public to attend, to appear before, and to file statements with any advisory committee. FACA §10(b) requires that the agency grant the public access to inspect and copy the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents made available to or prepared for or by the advisory committee.

Congress intended FACA §5(b)(2)'s balance requirement to ensure that persons or groups directly affected by an advisory committee's work would have some representation on the committee, with the balance requirement applying to both viewpoint and function. *Cummock v. Gore,* 180 F.3d 282, 291 (D.C. Cir. 1999). FACA §5(b)(3)'s undue-influence provision works in conjunction with FACA §5(b)(2)'s balance requirement to ensure unbiased workproduct, based on the advisory committee's independent deliberations. *Id.* Further, Congress intended FACA §5's "balance" and FACA §10's "openness" requirements as "strong safeguard[s] of the public interest." H.R. Rep. No. 92-1017, reprinted in Fed. Advisory Comm. Act (Pub. L. 92-463), Source Book: Legislative History, Texts, and Other Documents, at 280 (Cong. Res. Serv. 1978).

FACA §9(a)(2) prohibits Executive-Branch agencies' establishing an advisory committee absent a "determin[ation] as a matter of formal record, by the head of the agency… with timely

notice published in the Federal Register, [that the advisory committee is] in the public interest in connection with the performance of duties imposed on that agency by law." FACA §9(c) prohibits an Executive-Branch agency's advisory committee from meeting or taking any action without first filing a charter with the agency head and the standing congressional committees with legislative jurisdiction over the agency. The charter must specify *inter alia* the committee's designation, objectives and scope, duties, the period of time necessary to carry out its purposes, the agency or officer to whom the committee reports, and the number and frequency of committee meetings. FACA §9(c)(A)-(J). FACA §14(b)(1) requires a renewed advisory committee to file a charter pursuant to FACA §9(c), and FACA §14(b)(3) prohibits a renewed advisory committee's taking any action (other than preparing and filing its charter) prior to the date that the renewed charter is filed pursuant to FACA §9(c). FACA requires Executive-Branch agencies to maintain a designated official to attend each meeting of the advisory committee and "authorize[s that officer,] whenever he determines it to be in the public interest, to adjourn any… meeting" of the advisory committee. FACA §10(e).

The General Services Administration ("GSA") implementing regulations require a "description of the agency's plan to attain fairly balanced membership," to "ensure that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee." 41 C.F.R. §102–3.60(b)(3). Further, when a committee "requir[es] technical expertise [, it] should include persons with demonstrated professional or personal qualifications and experience relevant to the functions and tasks to be performed." *Id.* The GSA regulations provide additional standards for determining balance:

> The composition of an advisory committee's membership will depend upon several factors, including: (i) The advisory committee's

11

> mission; (ii) The geographic [or] economic… impact of the advisory committee's recommendations; (iii) The types of specific perspectives required, for example, such as those of consumers, technical experts, the public at-large, academia, business, or other sectors; (iv) The need to obtain divergent points of view on the issues before the advisory committee; and (v) The relevance of State, local, or tribal governments to the development of the advisory committee's recommendations.

41 C.F.R. pt 102–3, subpt B, App. A., at III. With regard to "undue-influence," GSA's regulations provide that the "head of each agency that establishes or utilizes one or more advisory committees must:… (g) Develop procedures to assure that the advice or recommendations of advisory committees will not be inappropriately influenced by the appointing authority…, but will instead be the result of the advisory committee's independent judgment[.]" 41 C.F.R. §102–3.105(g). Before a new or renewed advisory committee can take any action, it must file its charter with the relevant standing committees of the House and Senate and with the Federal Advisory Committee Desk at the Library of Congress. 41 C.F.R. §102–3.70.

**Factual Background**. For HHS's Rule 12(c) motion, the facts are those set forth in the AAPS's complaint, including any reasonable inferences from those facts. 5C WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, §1368 ("In addition to assuming the truthfulness of the pleading's factual allegations for purposes of the Rule 12(c) motion, the extensive case law on the subject makes it very clear that all reasonable inferences and intendments from these facts are drawn in favor of the nonmoving party").

<u>**ARGUMENT**</u>

## I.   SUBJECT-MATTER JURISDICTION

**A.   <u>Standing</u>**. To establish standing, a plaintiff generally must show that: (1) the challenged action constitutes an "injury in fact," (2) the injury is "arguably within the zone of interests to be protected or regulated" by the relevant statutory or constitutional provision, and (3) nothing oth-

erwise precludes judicial review. *Ass'n of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 153 (1970). To establish an "injury in fact," the plaintiff must show: (1) an actual or imminent invasion of a constitutionally cognizable interest, (2) which is causally connected to the challenged conduct, and (3) which likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-62 (1992). Statutes can confer rights, the denial of which constitutes injury redressable by a court. *Warth v. Seldin,* 422 U.S. 490, 514 (1975). For injuries directly caused by agency action, a plaintiff can show an injury in fact with "little question" of causation or redressability, but when an agency causes third parties to inflict injury, the plaintiff also must demonstrate causation and redressability. *Id.* Under these standards, AAPS has standing.

1. **Injuries in Fact**. Injury includes both injury and threatened injury, *Los Angeles v. Lyons,* 461 U.S. 95, 101-02 (1983), which "need not be to economic or… comparably tangible" interests, and an "identifiable trifle" suffices. *Pub. Citizen v. FTC,* 869 F.2d 1541, 1547-48 (D.C. Cir. 1989). Although an abstract or generalized interest (*e.g.,* proper government operation, getting the "bad guys") cannot *establish* standing, the mere fact that many people share an injury cannot *defeat* standing. *FEC v. Akins,* 524 U.S. 11, 23 (1998). As a membership organization, AAPS may establish standing either in its own right or on behalf of its members. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977). Even a membership organization's financial loss outside a statute's zone of interests can support that organization's standing: the "financial nexus between the interests of [the organization] and its constituents coalesces with the other factors [on standing to] assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Hunt,* 432 U.S. at 345 (interior quotations omitted).

      **a.  Informational Injury**. By denying the public (and therefore AAPS) access to FACA-required information, certain of the FACA violations that AAPS alleges clearly injure AAPS. Compl. ¶¶30, 31 & Ex. 1, ¶3; *Pub. Citizen v. DOJ,* 491 U.S. at 449-51; *Akins,* 524 U.S. at 21 (cognizable injury to deprive voters of statutorily required information); *Sargeant v. Dixon,* 130 F.3d 1067, 1070 (D.C. Cir. 1997) ("receipt of information is a tangible benefit the denial of which constitutes an injury").[2] At the purely informational level, a party seeking statutorily required information "need show [no] more than that they sought and were denied specific agency records," *Pub. Citizen v. DOJ,* 491 U.S. at 449, although prudential limits can enter the analysis. *Defenders of Wildlife,* 504 U.S. at 571-72 & n.7 (only a party with an underlying concrete interest can enforce an agency's obligation to create an environmental impact statement); *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883 (1990) (reporting company lacks prudential standing to challenge an agency's failure to comply with a statutory mandate to conduct hearings on the record); *Am. Friends Serv. Comm. v. Webster,* 720 F.2d 29, 55 (D.C. Cir. 1983) (professional researchers and those seeking information for use in possible litigation are within the zone of interests of records-preservation statutes).

      **b.  Procedural Injury**. "The history of liberty has largely been the history of observance of procedural safeguards," *Dart v. U.S.,* 848 F.2d 217, 218 (D.C. Cir. 1988) (*quoting McNabb v. U.S.,* 318 U.S. 332, 347 (1943)), and AAPS alleges HHS's failure to observe several

---

[2] By failing to charter a committee that would qualify as a FACA advisory committee and instead creating it through by contract, an agency inflicts a particularly serious informational injury by removing the otherwise-public materials from the public record. *Compare* FACA §10(b) (FACA "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents" available for public inspection) *with* 48 C.F.R. §52.227-17(d) (restricting contractors' release of data produced under contract).

such safeguards. Compl. ¶¶22-25, 30, 31, 33.[3] AAPS also asserts concrete injuries (*e.g.,* denial of information, imposition of programmatic burdens, threatened economic injury) caused by HHS's actions. Compl. ¶¶21-29, 32; *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664-65 (D.C. Cir. 1996) ("procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest") (*en banc*); *Defenders of Wildlife,* 504 U.S. at 571-72 & n.7 (only parties with an underlying *concrete* interest – *e.g.,* those living next to a proposed dam – can base standing on *abstract* procedural rights). Given these concrete injuries, the redressability and immediacy requirements apply to the *present procedural violation,* which may someday injure the concrete interest, rather than to the concrete (but less certain) future injury. *Nat'l Treasury Employees Union v. U.S.,* 101 F.3d 1423, 1428-29 (D.C. Cir. 1996).

     **c.  Program Injury**. By denying the public (and thus AAPS) certain FACA-conferred statutory benefits within FACA's zone of interests, HHS has imposed various programmatic injuries on AAPS, Compl. ¶¶22-26, 28, 29, which AAPS has standing to challenge here. HHS argues, however, that impaired advocacy is never a concrete, particularized injury. Defs.' Mot. 8 (*quoting Sierra Club v. Morton,* 405 U.S. 727, 739 (1972)). *Morton* concerned whether environmental advocacy qualified the Sierra Club as the environment's guardian *ad litem*, without the Club's needing to allege that its members would suffer injury from a proposed

---

[3] By failing to charter a committee that qualifies as a FACA advisory committee, an agency inflicts a particularly serious injury to FACA participation by denying the opportunity to participate. *Nat'l Anti-Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control,* 711 F.2d 1071, 1073-74 & nn.1-2 (D.C. Cir. 1983) ("[w]hen the [fair-balance] requirement is ignored,… persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue") (*citing* S. Rep. No. 1098, 92d Cong., 2d Sess. 9 (1972) *and* H.R. Rep. No. 1017, 92d Cong., 2d Sess. 6 (1972)).

ski resort in the Sierra Mountains. *Morton,* 405 U.S. at 750 n.8 (Douglas, J., dissenting). In *Morton,* the "setback to… abstract social interests" was clearing a forest, not impairing advocacy. Sierra Club lacked standing because its environmental advocacy did not make deforestation in the Sierra Mountains justiciable in the abstract, without alleging that its members intend to visit that particular forest. 405 U.S. at 739-40. Unlike the environmental statutes in *Morton,* FACA concerns "the 'real world' of Washington policy making" and the oversight and accountability of advisory committees, *Cummock,* 180 F.3d at 291; FACA §§2(b)(5), 9(a)(2), (c), 10, and not the real world of forests and mountains. As such, *Morton* cannot (and certainly does not) stand for the broad proposition that HHS asserts about the types of injuries that AAPS suffers here.

For example, in *Ctr. for Law & Educ. v. Dept. of Educ.,* 396 F.3d 1152 (D.C. Cir. 2005), an advocacy group tried to base its standing on the injury that final rules under the No Child Left Behind Act made the group's lobbying more expensive. 396 F.3d at 1161. Increased lobbying costs have as much relationship to the No Child Left Behind Act as lost court-reporter income has to statutory requirements for hearings on the record: both fall outside the relevant zone of interests. *Nat'l Wildlife Fed'n,* 497 U.S. at 883 (court reporting company would lack prudential standing to challenge the agency's failure to comply with a statutory mandate to conduct hearings on the record). Because "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims asserted,*" *Allen v. Wright,* 468 U.S. 737, 752 (1984) (emphasis added), courts cannot necessarily apply legal reasoning from inherently inapposite cases. Indeed, on opposite facts, *Sierra Club v. Morton* could reach an opposite result. For example, under FACA, the Sierra Club itself could assert advocacy-based standing to challenge duplicative and overlapping FACA committees and denial of information, while an individual Sierra Club member may

16

lack standing merely to "save the trees" used to print the committees' worthlessly biased reports. *Nat'l Wildlife Fed'n,* 497 U.S. at 883.[4]

In *Nat'l Parks Conserv. Ass'n v. Manson,* 414 F.3d 1 (D.C. Cir. 2005) ("*NPCA*"), this Circuit found standing based on federal regulations that legally required third-party state regulators to *consider* (and to *justify* a departure from) a federal adverse-impact determination. *NPCA,* 414 F.3d at 6. Even this low regulatory threshold – requiring only *consideration* and *justification* – nonetheless "alters the legal regime" sufficiently to "undermine[]" the federal government's invocation of third-party standing cases that involve independent actors. *Id.* (*quoting Bennett v. Spear,* 520 U.S. 154, 169 (1997), *distinguishing Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976)).

In the context of federal dissemination of misleading information, an even stronger regulatory threshold similarly compels the conclusion that AAPS has standing, based on republication of HHS's misinformation in third-party, independent media. An overwhelming array of constitutional, statutory, and common-law authorities protect the republication of information contained in government reports. *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.,* 838 F.2d 1287, 1298-99 (D.C. Cir. 1988) (fair report privilege under District of Columbia common law and First

---

[4] HHS also cites *Diamond v. Charles,* 476 U.S. 54, 66-67 (1986), for the proposition that mere interest in a problem does not represent a sufficient "direct stake in the outcome" to establish standing. In that case, Dr. Diamond sought to establish standing to defend the constitutionality of state abortion restrictions based on his "personal status as a doctor, a father, and a protector of the unborn." 476 U.S. at 66. In denying his standing, of course, the Court acknowledged that financially affected doctors or those subject to the coercive aspects of the state law would have standing. *Id.* Cases like *Diamond* are entirely inapposite here because FACA concerns advocacy and other aspects of advisory committees (*i.e.,* the so-called "'real world' of Washington policy making"). In contrast to Dr. Diamond's lack of personal rights to protect unborn babies, AAPS and its members assert rights expressly conferred by FACA in a field that directly affects their practices financially and their physician-patient relationships.

Amendment protect "accurate report of a government proceeding"); *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 739 (D.C. Cir. 1985) (fair report privilege applies to information in government reports); *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 88-90 (D.C. App. 1980) (recognizing privilege to report "official proceedings and public meetings"); RESTATEMENT (SECOND) OF TORTS, §611 (1977).[5] Under *NPCA,* AAPS can premise its standing on vitiating this otherwise-applicable license to republish HHS's misinformation. Unfortunately, moreover, HHS (and other federal agencies) have a pattern and practice of using misinformation to advance their policy initiatives. Compl. ¶71.

As long as HHS uses AHIC and the other FACA-noncompliant panels to create misinformation, these same authorities insulate republishers from an obligation to correct misleading

---

[5] *See also, e.g., Yohe v. Nugent,* 321 F.3d 35, 43-44 (1st Cir. 2003) (Massachusetts' fair report privilege insulates even knowing republication of falsehood in government report); *Cianci v. New Times Pub. Co.,* 639 F.2d 54, 67 (2nd Cir. 1980) (Second Circuit recognizes that media hold a constitutional privilege of neutral reportage); *Medico v. Time, Inc.,* 643 F.2d 134, 138 (3rd Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139 (1981) (Pennsylvania's fair report privilege applies unless "publisher acted for the sole purpose of harming the person defamed"); *Chapin v. Knight-Ridder, Inc.,* 993 F.2d 1087, 1097 (4th Cir. 1993) (recognizing fair report privilege under Virginia law and federal Constitution) ("Most jurisdictions, even at common law, had adopted some variant of the 'fair report' privilege, which… [the Supreme Court] strengthened and [gave] constitutional mettle in *Greenbelt Cooperative Publishing Ass'n v. Bresler* and *Time, Inc. v. Pape*") (citations omitted); *Doe v. Doe,* 941 F.2d 280, 288 & n.9 (5th Cir. 1991) (Louisiana "treats as privileged fair accounts of legislative reports and their ilk"); *Amway Corp. v. Procter & Gamble Co.,* 346 F.3d 180, 185-88 (6th Cir. 2003 (applying Michigan's fair reporting privilege); *Brown & Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 270 (7th Cir. 1983) (Illinois's fair-report privilege applies to summaries and reports on government proceedings and investigations); *Kenney v. Scripps Howard Broadcasting Co.,* 259 F.3d 922, 923 (8th Cir. 2003) (Missouri's fair report privilege protects "fair and accurate" report or abridgement of government proceedings); *Ronwin v. Shapiro,* 657 F.2d 1071, 1075 (9th Cir. 1981) (Arizona law protects publication of "accurate and complete" and "fair abridgement" of government proceedings); *Walker v. City of Oklahoma City,* 203 F.3d 837 (10th Cir. 2000) (Oklahoma's fair report privilege protects reports on official proceedings if "accurate and complete or a fair abridgement of the occurrence reported") (Table).

statements. Because it would prevent republishers' relying on such fair-report privileges, the requested relief qualifies as "ammunition" that AAPS could use against HHS-disseminated misinformation from FACA-noncompliant panels: "Court's declaration that the agency failed to comply with FACA… will give [plaintiff] 'ammunition for [his] attack on the Committee's findings' in subsequent agency proceedings that make use of the [report]." *Byrd v. EPA,* 174 F.3d 239, 244 (D.C. Cir. 1999) (*quoting NRDC v. Pena,* 147 F.3d 1012, 1026 n.6 (D.C. Cir. 1998)). By removing the factual predicate for republishers to rely on the otherwise-applicable constitutional, statutory, and common-law fair-report privileges, the requested relief provides "ammunition" that "alters the legal regime" sufficiently to "undermine[]" the federal government's invocation of third-party standing cases that involve independent actors. *See NPCA,* 414 F.3d at 6 (*quoting Bennett,* 520 U.S. at 169).

      **d.  Economic Injury**. HHS argues that AAPS's threatened economic injuries (Compl. ¶¶21, 27, 32, 80) are too speculative. Defs.' Mot. at 9-12. For example, HHS cites *Metcalf v. Nat'l Petroleum Council,* 553 F.2d 176, 187 (D.C. Cir. 1977), for the proposition that public-interest groups have only a speculative fear that biased advise on petroleum policies from an industry-dominated petroleum council would lead to foreign wars. HHS's arguments are misplaced for several reasons.

      Significantly, AAPS's economic concern with HHS's regulatory and procurement activities has an obvious and direct bearing on AAPS members' livelihood. Unlike the tenuous causal chain in *Metcalf,* AAPS filed this action against HHS to avert what HHS has stated it intends to do to AAPS's members, Compl. ¶¶21, 32, 80, 55 ("I want to make it clear to you that [I] intend, as [S]ecretary, to act"), and for which HHS contends its Health IT initiatives are critical, Compl. ¶¶21, 32; *cf.* 69 Fed. Reg. 24,059 (2004) (establishing Office of National Health Information

Technology Coordinator within HHS to "to provide leadership for the development and nation-wide implementation of an interoperable health information technology infrastructure"). Further, for procedural (and possibly certain informational) standing, *see* Sections I.A.1.b, I.A.1.a, *supra,* the direct regulatory connections between HHS and AAPS's members and the direct causal connections between HHS's Health IT initiatives and AAPS members' livelihoods ensure the Court that AAPS members are not mere aesthetes who seek balance for balance's sake, but individuals actually concerned with and directly affected by HHS actions. In other words, AAPS members live near this particular dam. *Defenders of Wildlife,* 504 U.S. at 571-72 & n.7 (only parties with an underlying *concrete* interest – *e.g.,* those living next to a proposed dam – can base standing on *abstract* procedural rights). Moreover, because AAPS and its members assert first-party injuries, the foregoing direct connections reduce the traceability that AAPS must show to establish its standing. *Warth,* 422 U.S. at 514 (unlike third-party injuries, first-party injuries present "little question" of causation or redressability). Fundamentally, the *Metcalf* plaintiffs invoked the tenuous fear that biased advise here may cause someone else to start a fight. 553 F.2d at 187. HHS raises the equally tenuous defense that AAPS cannot bring suit because HHS has not yet finished beating AAPS up.

Although HHS argues that future regulatory harms are remote until the rulemaking occurs, Defs.' Mot. at 9-11, that both belies HHS's own intention to use government action as a necessary catalyst for adoption of Health IT, Compl. ¶32, and ignores the avenues in which an outcome-oriented HHS can use AHIC approval to eliminate or truncate subsequent procedural steps. For example, under §12(d) of the National Technology and Transfer Act of 1995, Pub. L. No. 104-113, §12(d), 110 Stat. 775, 783 (1996) ("NTTA"), HHS could seek to impose Health IT through federal procurement, without a future rulemaking. *See generally* Office of Management

& Budget Circular A-119, 63 Fed. Reg. 8545 (1998); *see also Byrd,* 174 F.3d at 244 (quoted *supra,* regarding declaratory relief's serving as ammunition in future agency proceedings).

Finally, while AAPS likely cannot sue HHS for antitrust violations, *Sea-Land Serv., Inc., v. Alaska R.R.,* 659 F.2d 243, 246 (D.C. Cir. 1981) (federal government not a "person" covered by antitrust laws); *see also* Compl. ¶80, AAPS members nonetheless face threatened competitive injury from HHS's "public-private" cooperation. Indeed, the earliest history of regulating federal advisory committees concerned the potential for anticompetitive effects through industry leaders' collusion, Compl. ¶80, and the statutory command to consider the "public interest" has been held to require agencies to consider anticompetitive effects and antitrust issues. *U.S. Lines, Inc. v. F.M.C.,* 584 F.2d 519, 528 (D.C. Cir. 1978) ("repeatedly held, by the Supreme Court as well as this court, that the Commission's mandate to guard 'the public interest' requires it to consider the antitrust implications of the agreements submitted to it for approval"). Certainly HHS's forty-percent market share and its stated intent to use that power suggest competitive injuries. Herbert Hovenkamp, *Federal Antitrust Policy: the Law of Competition and its Practice,* §3.7d, at 127 (3d ed. 2005) ("Tying Arrangement and exclusive dealing analysis seems to be gravitating toward a requirement of a 30% share or greater of a properly defined relevant market").

**2. Zone of Interests**. The "zone of interest" prong of standing is a prudential doctrine that asks whether the interests to be protected *arguably* fall within those protected by the relevant statute. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust, Co.,* 522 U.S. 479, 492 (1998). This generous and undemanding test focuses not on Congress' intended beneficiary, but on those who in practice can be expected to police the interests that the statute protects. *ALDF,* 154 F.3d at 444; *Am. Friends Serv. Comm.,* 720 F.2d at 52 ("the relatively rigorous requirements for establishing congressional intent to create a private right of action should not be equated with

the 'slight' indicia standard under the 'zone' test") (footnote omitted). To show that they are *arguably* "protected" by a statute, plaintiffs may demonstrate that they are either the statute's intended beneficiaries or "suitable challengers" to enforce the statute.

For intended beneficiaries, "'slight beneficiary indicia' are sufficient to sustain standing." *Am. Friends Serv. Comm.,* 720 F.2d at 50 & n.37. Because AAPS's interests (unbiased reports, elimination of unnecessary or overlapping committees, timely access to information, facilitated monitoring) are FACA's interests, AAPS readily meets the test. Further, AAPS's financial burden from monitoring HHS's raft of overlapping consensus panels and in countering biased HHS-created information are *arguably* within FACA's zone of interests. *See Kennecott Utah Copper Corp. v. U.S. Dept. of Interior,* 88 F.3d 1191, 1203-05 (D.C. Cir. 1996) (private company's lost economic benefit from withdrawn regulation within zone of interests protected by Federal Register Act's requirement for prompt publication of final rules); *Am. Friends Serv. Comm.,* 720 F.2d at 55 (professional researchers and those seeking information for use in possible litigation are within the zone of interests of federal records-preservation statutes); *Cummock,* 180 F.3d at 291 (FACA concerns "the 'real world' of Washington policy making").

Suitable challengers are those with "interests… sufficiently congruent with those of the intended beneficiaries that [they] are not more likely to frustrate than to further the statutory objectives." *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.,* 988 F.2d 1272, 1275 (D.C. Cir. 1993); *Reytblatt v. U.S. Nuclear Regulatory Comm'n,* 105 F.3d 715, 721 (D.C. Cir. 1997) (same); *MD Pharm., Inc. v. D.E.A.,* 133 F.3d 8, 13 (D.C. Cir. 1998) (same). Thus, even if HHS could demonstrate that any particular FACA provision was intended to benefit only Congress, AAPS remains a "suitable challenger" because AAPS's interests mirror those of Congress.

Finally, for *ultra vires* agency action, the zone-of-interest test essentially does not apply.

*Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 811-12 & nn.13-14 (D.C. Cir. 1987).

> It may be that a particular constitutional or statutory provision was intended to protect persons like the litigant by limiting the authority conferred. If so, the litigant's interest may be said to fall within the zone protected by the limitation. Alternatively, it may be that the zone of interests requirement is satisfied because the litigant's challenge is best understood as a claim that *ultra vires* governmental action that injures him violates the due process clause.

*Haitian Refugee Ctr.,* 809 F.2d at 812 n.14; *accord Chiles v. Thornburgh,* 865 F.2d 1197, 1210-11 (11th Cir. 1989).

3.    **Other Factors**. Aside from HHS's proffered bases for dismissal, no legal or equitable principal precludes this action. HHS misperceives this case as a political question. Defs.' Mot. 22-23. A "political question" is nonjusticiable "where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. U.S.,* 506 U.S. 224, 228 (1993) (citations and quotations omitted). The Constitution does not commit *anything* to HHS, *see* U.S. CONST. art. I-III, which is purely a creature of statute. 42 U.S.C.A. §3501; 20 U.S.C. §3508(a). Further, Section II.A, *infra,* demonstrates that the Court here does not lack "judicially discoverable and manageable standards" on the only count on which HHS presses the issue.

B.    <u>Judicial Review</u>. Citing FACA's legislative history, HHS argues that, because FACA has no statutory review (*i.e.,* no FACA-specific provisions for judicial review), any review must lie under the Administrative Procedure Act ("APA"). Defs.' Mot. at 13. In its complaint, however, AAPS identifies several forms of non-APA, nonstatutory review. Compl. ¶18. Other than its fey denial, Answer ¶82, HHS does not address – much less credibly dispute – that the black-letter, judge-made, officer-suit exception to the judge-made sovereign-immunity doctrine was a founding principle of this democracy and its judiciary. Compl. ¶82; Section of Administrative

Law & Regulatory Practice of the American Bar Association, *"A Blackletter Statement of Federal Administrative Law,"* 54 ADMIN. L. REV. 1, 46 (2002) ("Under the longstanding officer suit fiction recognized in *Ex Parte Young,* 209 U.S. 123 (1908), suits against government officers seeking prospective equitable relief are not barred by the doctrine of sovereign immunity").[6] Further, contrary to HHS's second defense, Answer at 1, Congress expressly has recognized a distinction between color-of-legal-authority and official-capacity actions for judicial-review against officers. 5 U.S.C. §702 (listing official-capacity and color-of-legal-authority actions as distinct); 28 U.S.C. §1391(e) (same); *cf.* 18 U.S.C. §2337(1)-(2) (same); *Stafford v. Briggs,* 444 U.S. 527, 539 (1980) ("By including the officer or employee, both in his official capacity and acting under color of legal authority, the committee intends… to include also those cases where the action is nominally brought against the officer in his individual capacity even though he was acting within

---

[6] *See* U.S. CONST. art. III, §2 ("judicial power shall extend to all cases, in law and *equity*") (emphasis added); THE FEDERALIST NO. 78, at 464-66 (Alexander Hamilton) (Clinton Rossiter ed., Signet 2003) (1961) (discussing judicial review); Robert Yates, Brutus Essay XI (1788), *reprinted in* THE ESSENTIAL ANTIFEDERALIST, at 187-90 (W.B. Allen & Gordon Lloyd, ed., 2002) (same); Judiciary Act of 1789, ch. 20, §16, 1 Stat. 72, 82 (establishing equity jurisdiction); *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 459 n.14 (1977) (Judiciary Act's §16 was "declaratory of *existing law*" of equity) (emphasis added); Louis L. Jaffe, *Suits against Governments and Officers: Sovereign Immunity,* 77 HARV. L. REV. 1, 5-18 (1963) (describing centuries of development of various petitions and writs against the Crown's actions *with its consent* and against the Crown's officers' unlawful actions *without consent*); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 165 (1803) ("the law… entertains no respect or delicacy [for the Crown's officers]; but furnishes various methods of detecting the errors and misconduct of those agents, by whom the king has been deceived and induced to do a temporary injustice") (*quoting* 3 WILLIAM BLACKSTONE, COMMENTARIES *255); *Osborn v. Bank of U.S.,* 22 U.S. (9 Wheat.) 738, 843 (1824) ("it would be subversive of the best established principles, to say that the laws could not afford the same remedies against the agent employed in doing the wrong, which they would afford against him, could his principal be joined in the suit"); Louis L. Jaffee, *The Right to Judicial Review I,* 71 HARV. L. REV. 401, 433 (1958) ("that the King's courts… could order his officers to account for their conduct [] was the essence of… "the rule of law." Whatever the logical contradictions between this doctrine and sovereign immunity, [it] had become firmly established [and] as much a part of the law as… sovereign immunity").

24

the apparent scope of his authority and not as a private citizen. *Such actions are also in essence against the United States but are brought against the officer or employee as an individual only to circumvent what remains of the doctrine of sovereign immunity.*") (*quoting* H.R. Rep. No. 1936, 86th Cong., 2d Sess., 3-4 (1960)) (Court's emphasis).[7]

**1. Non-APA Nonstatutory Review**. As indicated, AAPS asserts several non-APA bases for this Court's subject-matter jurisdiction to provide judicial review here. Significantly, the APA does not limit these non-APA actions. *Nat'l Treasury Employees Union v. Campbell,* 589 F.2d 669, 673 n.7 (D.C. Cir. 1978) (Mandamus Act, APA, and other nonstatutory review are distinct, alternate causes of action) ("*NTEU*"); *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1328 (D.C. Cir. 1996) (APA did not alter the pre-APA nonstatutory judicial review doctrines); *Dart v. U.S.,* 848 F.2d 217, 224 (D.C. Cir. 1988) ("[n]othing in the subsequent enactment of the APA altered [or] repeal[ed] the review of *ultra vires* actions recognized long before, in *McAnnulty*"). Consequently, because they rely on APA limitations on judicial review, the APA cases cited by HHS, Defs.' Mot. 13-20, neither are apposite to nor limit this Court's non-APA jurisdiction. Indeed, as signaled by the *NTEU, Reich,* and *Dart* decisions cited above, there are numer-

---

[7] *See also Ex parte Young,* 209 U.S. at 160 (officer acting without valid authority is "stripped of his official or representative capacity and is *subjected in his person* to the consequences of his *individual conduct,*" and suit is "against [him] *personally as a wrongdoer* and not against the State") (emphasis added); *Georgia R.R. & Banking Co. v. Redwine,* 342 U.S. 299, 305 (1952) ("this action against appellee *as an individual* is not barred as an unconsented suit against the State") (emphasis added); *U.S. v. Lee,* 106 U.S. 196, 210 (1882) (Robert E. Lee's family's suit to eject federal officers from Arlington National Cemetery was "against [officers], *as individuals,* to recover possession" notwithstanding that "the officers who are sued assert no personal possession, but are holding as the mere agents of the United States") (emphasis added); *U.S. v. Boutwell,* 84 U.S. (17 Wall.) 604, 607 (1873) ("[i]f he be an officer, and the duty be an official one, still the writ is aimed exclusively against him as a person, and he only can be punished for disobedience…. It is, therefore, in substance, a personal action, and it rests upon the averred and assumed fact that the defendant has neglected or refused to perform a personal duty").

ous (and controlling) instances where a plaintiff who lacked an APA cause of action nonetheless could sue under the alternate, pre-APA modes of judicial review. *See also, e.g., Indep. Broker-Dealers' Trade Ass'n v. SEC,* 442 F.2d 132, 143 & n.18 (D.C. Cir. 1971) ("[if APA] should be given narrow reading, the action is sustainable by reference to the general equity jurisdiction of the District Court"); *Franklin v. Massachusetts,* 505 U.S. 788, 801 (1992) (equitable review of agency action that did not qualify for APA review); *Pickus v. U.S.,* 543 F.2d 240, 243-44 & n.10 (D.C. Cir. 1976) (*citing* cases); *Webster v. Doe,* 486 U.S. 592, 601-03 (1988); *cf. Texas Rural Legal Aid, Inc. v. Legal Serv. Corp.,* 940 F.2d 685, 696-97 (D.C. Cir. 1991) (non-APA agency's decisions remain "subject to the pre-APA requirement that administrative decisions be rationally based – a standard that courts have held is equivalent to the APA's requirement that agency action not be arbitrary or capricious"). Significantly, "inquiry into whether suit lies under *Ex parte Young* does not include [merits] analysis," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 636-37 (2002), and thus does not allow dismissal without a merits analysis.

    **a.** **This Court's Equity Jurisdiction**. This Court long has had equity jurisdiction that exceeds that of other district courts and extends to federal officers headquartered here. *Kendall v. U.S. ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 580-81 (1838); *Stark v. Wickard,* 321 U.S. 288, 290 & n.1 (1944); *Peoples v. U.S. Dept. of Agriculture,* 427 F.2d 561, 564 (D.C. Cir. 1970). Neither the APA nor the Mandamus Act displaced or otherwise limited this historic jurisdiction, which derives both from the court's enabling legislation and Maryland's ceding the District's territory to form the District as a federal enclave. *Peoples,* 427 F.2d at 565; *Gamen v. Heckler,*

746 F.2d 844, 851 (D.C. Cir. 1984).[8]

      **b. Mandamus and Venue Act**. Under 28 U.S.C. §1361, district courts have original jurisdiction over any employee, officer, or agency of the United States to compel the performance of ministerial duties. 28 U.S.C. §1361. Specifically, a plaintiff can bring an action for mandamus where: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate legal remedy available to the plaintiff. *Council of and for the Blind of Delaware County Valley, Inc., v. Regan,* 709 F.2d 1521, 1533 (D.C. Cir. 1983) (*en banc*). Section 1361's first requirement is coextensive with the zone-of-interest test for the underlying statute. For example, in *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,* 793 F.2d 1322 (D.C. Cir. 1986), the underlying statute extended a mandamus cause of action to anyone aggrieved under the statute, which displaced altogether any prudential restrictions and extended the remedy to anyone with Article III standing (*i.e.,* to the fullest scope allowed under Article III). 793 F.2d at 1336; *see also Silveyra v. Moschorak,* 989 F.2d 1012, 1014 & n. 1, 1015

---

[8] The current statute confers the same jurisdiction as that on which the *Peoples* court relied. *Compare* D.C. Code §11-501 *with* D.C. Code §11-521 (1967). Both versions grant this Court "any other jurisdiction conferred *by law*" in addition to "jurisdiction as a United States district court." The "law" establishing this Court confers it with "general jurisdiction in law and equity." *See* Act of March 3, 1863, 12 Stat. 762; Act of June 25, 1936, 49 Stat. 1921. The District of Columbia Court Reorganization Act of 1970 did not repeal this jurisdiction, but instead retained the jurisdiction granted to this Court "by law," D.C. Code §11-501, which cannot impliedly repeal the prior jurisdiction. *Schlesinger v. Councilman,* 420 U.S. 738, 752 (1975) ("'repeals by implication are disfavored,' and this canon of construction applies with particular force when the asserted repealer would remove a remedy otherwise available"). Indeed, the legislative history of the 1976 statute waiving sovereign immunity for equitable relief notes that, under the then-current law, plaintiffs could escape the then-applicable $10,000 amount-in-controversy requirement by seeking to enjoin federal officers in the District of Columbia. H.R. Rep. No. 94-1656, at 15-16, *reprinted in* 1976 U.S.C.C.A.N. 6121, 6136. In other words, Congress itself recognized in 1976 that its 1970 Reorganization Act had left intact this Court's equitable jurisdiction over federal actors.

(9th Cir. 1993) (*per curium*) (whether government owes duty to a putative mandamus plaintiff is contingent on plaintiff's satisfying the zone-of-interest test); *Jarecki v. U.S.,* 590 F.2d 670, 675 (7th Cir. 1979) (same); *cf. Bd. of Liquidation v. McComb,* 92 U.S. (2 Otto) 531, 541 (1876) ("when a plain official duty… is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance"). Because AAPS falls within FACA's zone of interests, AAPS satisfies this prong of the mandamus inquiry.

To the extent that HHS imagines any interpretive ambiguity, such ambiguity does not lessen the clear duty to act. *Swan v. Clinton,* 100 F.3d 973, 978 (D.C. Cir. 1996) ("ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act'"); *13th Reg'l Corp. v. U.S. Dept. of Interior,* 654 F.2d 758, 760 (D.C. Cir. 1980); *Am. Cetacean Soc. v. Baldrige,* 768 F.2d 426, 433 (D.C. Cir. 1985) ("If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose") (quotations omitted), *rev'd on other grounds sub nom. Japan Whaling Ass'n v. Am. Cetacean Soc.,* 478 U.S. 221 (1986).

AAPS has no adequate, alternate legal remedy. Significantly, the opportunity to challenge HHS's biased reports in future agency proceedings such as rulemakings is not *now* an alternate remedy. *Am. Life Ins. Co. v. Stewart,* 300 U.S. 203, 215 (1937) ("the settled rule is that equitable jurisdiction existing at the filing of a bill is not destroyed because an adequate legal remedy may have become available thereafter"); *Shaughnessy v. Pedreiro,* 349 U.S. 48, 51-52 (1955) (APA provides judicial review of agency's final order, even if plaintiff has *subsequent*

judicial remedies). In any event, although Congress may have enacted restrictions in the mandamus jurisdiction that §1361 provides to *other district courts,* Congress did not restrict the more-generous mandamus jurisdiction under this Court's equity jurisdiction. *Peoples,* 427 F.2d at 564-65.

      **c.** ***Ultra Vires* Action**. AAPS alleges that HHS acted (and continues to act) *ultra vires* its authority. Under the "*Larson-Dugan* exception," an equitable action lies against a federal officer's actions beyond the officer's constitutional or statutory authority, on the grounds that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689 (1949); *Dugan v. Rank,* 372 U.S. 609, 621-23 (1963); *accord Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C. Cir. 1984) (citing cases). Even without enforceable standards, courts can enjoin an agency's injury-causing actions absent express authority to undertake those actions: "[agencies are] creature[s] of statute," that have "no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." *Michigan v. EPA,* 268 F.3d 1075, 1081 (D.C. Cir. 2001). Without statutory authority, the agency has none. *Id; Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986) (recognizing that "an agency literally has no power to act… unless and until Congress confers power upon it").

      **d. Declaratory Judgment Act**. The Declaratory Judgment Act, 28 U.S.C. §§2201-2202 ("DJA"), authorizes declaratory relief "whether or not further relief… could be sought." *Id.* §2201(a); *Duke Power Co.,* 438 U.S. at 70-71 n.15 ("While the [DJA] does not expand our jurisdiction, it expands the scope of available remedies" where plaintiffs sought declaratory relief that a statute was invalid, as an alternate remedy to seeking compensation for a taking). Since 1976, §1331 has authorized DJA actions against federal officers, regardless of the

29

amount in controversy. *Califano v. Sanders,* 430 U.S. 99, 105 (1977) (§1331's 1976 amendment authorizes DJA action against federal officers) (*citing* Pub. L. 94-574, 90 Stat. 2721 (1976)); *see also* H.R. Rep. No. 96-1461, at 3-4, *reprinted in* 1980 U.S.C.C.A.N. 5063, 5065 (§1331's 1980 amendment did not repeal its 1976 amendment); *Hurley v. Reed,* 288 F.2d 844, 848 (D.C. Cir. 1961) ("fact that another remedy would be equally effective affords no ground for declining declaratory relief" against federal officers); *Tierney v. Schweiker,* 718 F.2d 449, 457 (D.C. Cir. 1983) (same); Administrative Procedure Act, Legislative History, 79th Cong., S.Doc. No. 248, 79th Cong., 2d Sess., at 37, 212, 276 (1946) (APA no barrier to DJA actions against federal officers). Thus, either in conjunction with, or as an alternative to, relief under other legal theories, this Court may issue the requested declaratory relief. *See, e.g., Nat'l Treasury Employees Union v. Nixon,* 492 F.2d 587, 616 (D.C. Cir. 1974) (declaratory relief may be granted in conjunction with mandamus jurisdiction.).

   2.   **APA**. Under the APA, any person aggrieved within the meaning of a relevant statute is entitled to judicial review of *inter alia* final agency action for which the plaintiff lacks an adequate remedy, 5 U.S.C. §§702-704, and courts "shall… compel agency action unlawfully withheld," "set aside agency action… found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory… authority," or "without observance of procedure required by law." 5 U.S.C. §706. Absent clear and convincing evidence of legislative intent *to preclude* review, agency action is reviewable. *Block v. Community Nutrition Inst.,* 467 U.S. 340, 345 (1984); *Abbott Labs., Inc., v. Gardner,* 387 U.S. 136, 141 (1967). This Circuit extends this "generous and hospitable" reception to the APA's definitions. *Soucie v. David,* 448 F.2d 1067, 1073 (D.C. Cir. 1971). HHS raises two APA issues: when agency action qualifies as "final," and what agency actions are unreviewably committed to agency discretion.

**a.    Final Agency Action**. HHS is an executive agency, 5 U.S.C. §101, and thus an APA "agency." 5 U.S.C. §§551(1), 701(b). Although HHS does not seriously contest it, the challenged actions are "agency action," which the APA defines to include "an agency rule, order,… or the equivalent or denial thereof, or failure to act." 5 U.S.C. §551(13). And "order" means:

> *the whole or a part of a final disposition,* whether affirmative, negative, injunctive, or declaratory in form, *of an agency in a matter other than rule making* but including licensing[.]

*Id.* §551(6) (emphasis added). Congress intended this language to apply broadly, and it has been interpreted to include (for example) that the issuance of a complaint (*i.e.,* the "final disposition" of whether the agency has reasonable cause to issue the complaint). *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 238 n.7 (1980) (citing broad language of APA legislative history defining "agency action"); *Shaughnessy v. Pedreiro,* 349 U.S. 48, 51-52 (1955) (APA provides judicial review of agency's final order, even if not the last available remedy).

> The term "agency action" brings together previously defined terms in order to simplify the language for judicial review provisions of Section 10 and *to assure the complete coverage of every form of agency power, proceeding, action, or inaction.*

S. Doc. 248, at 197-98 (emphasis added); *id.* 255 (same). "In that respect, the term [agency action] includes the *supporting procedures,* findings, conclusions, or statements of reasons or basis for the action *or inaction.*" *Id.* (emphasis added). Thus, "agency action" has "complete coverage" of every form of proceeding or action, including inaction. *Bennett v. Spear* sets a two-part test to determine whether agency action is *final:* (1) it "must mark the 'consummation' of the agency's decision making process" and not "merely tentative or interlocutory" in nature; and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. 154, 177-78 (1997) (internal citations and quotations omitted). All of the relevant actions and inaction here are final because HHS has concluded its delib-

erations (*e.g.,* charted advisory panels, entered contracts, decided advisory committees do not require charters), with legal consequences (*e.g.,* creation of biased or *ultra vires* advisory panels, denial of information, duplication of advisory committees).

      **b.   Committed to Discretion by Law**. Under 5 U.S.C. §701(a)(2), courts will find agency actions "committed to agency discretion by law" in "those *rare instances* where statutes are drawn in such broad terms that *in a given case* there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410 (1971) (interior citations omitted, emphasis added); *accord Heckler v. Chaney,* 470 U.S. 821, 830 (1985) ("if no judicially manageable standards are available for judging how and when an agency should exercise its discretion," then §701(a)(2) precludes review). Of course, that an agency *has discretion* does not preclude judicial review. *See* 5 U.S.C. §706(2)(A) (judicial review of *abuse of discretion*). Instead, to preclude review, discretion must be "committed to [the] agency… by law." 5 U.S.C. §701(a)(2).

     Section 701(a)(2) "is a very narrow exception." *Overton Park,* 401 U.S. at 410; *Chaney,* 470 U.S. at 838. Moreover, courts determine such non-justiciability on a *case-specific basis* through a "discriminating analysis of the *particular question posed,* in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and *posture in the specific case.*" *Baker v. Carr,* 369 U.S. 186, 211 (1962) (emphasis added); *cf. Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1224-25 & n.2 (D.C. Cir. 1993) (using hypothetical abuse of discretion to negative agency's argument for blanket non-reviewability). Finally, even where a statute fails to provide manageable standards on its face, other regulatory or statutory provisions may supply standards to enable judicial review. *Block v. SEC,* 50 F.3d 1078, 1082 (D.C. Cir. 1995) (noting that "an enforcement decision that would otherwise be unreviewable is subject to judicial review if the Congress *or the agency itself*

has provided a meaningful standard for the agency to follow in exercising its enforcement power"); *CC Distributors, Inc. v. U.S.,* 883 F.2d 146, 153-56 (D.C. Cir. 1989) (even where statute did not provide meaningful standards to review agency's exercise of discretion, regulations could provide the necessary standards).

In the FACA context, a divided panel of this Circuit has held that FACA §5(b)(2)'s "fairly balanced" requirement is justiciable. *Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods,* 886 F.2d 419, 423-24 (D.C. Cir. 1988) (Friedman, J., concurring); *id.* at 432-34 (Edwards, J., concurring in part and dissenting in part); *but see id.* at 426-30 (Silberman, J., concurring in judgment) (§5(b)(2) not justiciable under APA); *see also Nat'l Anti-Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control,* 711 F.2d 1071, 1073-74 & nn.1-2 (D.C. Cir. 1983) (*citing* S. Rep. No. 1098, 92d Cong., 2d Sess. 9 (1972) *and* H.R. Rep. No. 1017, 92d Cong., 2d Sess. 6 (1972)); *Nat'l Nutritional Foods Ass'n v. Califano,* 603 F.2d 327, 334, 336 (2nd Cir. 1979) ("[i]f an agency wishes to rely publicly on the backing of an advisory committee, it must do what the statute commands [, which] directly implicates the concern Congress addressed in [FACA §5(b)(2)-(3)] that agency action might be dominated by one particular viewpoint"); *Cargill, Inc. v. U.S.* 173 F.3d 323, 335-36 & n.21 (5th Cir. 1999) (noting that in *Microbiological Criteria* "the other two judges *disagreed* with Judge Silberman and found the statutory provisions to be justiciable") (emphasis in original); *Colorado Envtl. Coalition v. Wenker,* 353 F.3d 1221, 1232 (10th Cir. 2004) (analogizing regulatory fair-balance requirement for FACA committees to holdings of *Cargill* and the Friedman-Edwards majority on §5(b)(2) in *Microbiological Criteria*); *Alabama-Tombigbee Rivers Coalition v. Dep't of Interior,* 26 F.3d 1103, 1106-07 (11th Cir. 1994) (upholding injunction that remedied §5(b)(2) violations).

HHS cites two FACA decisions to support its position, but neither controls over of the Friedman-Edwards *Microbiological Criteria* decisions and *Nat'l Anti-Hunger Coalition.* In *Claybrook v. Slater,* 111 F.3d 904 (D.C. Cir. 1997), this Circuit held FACA §10(e) nonjusticia-ble where it "*authorize[s* a specified federal officer], whenever *he determines* it to be in the pub-lic interest, to adjourn [a FACA] meeting." Further, in *AAPS v. Clinton,* 997 F.2d 898 (D.C. Cir. 1993), Judge Silberman's colleagues in the majority authorized him to state that "FACA's 'bal-anced viewpoint' requirement may not be justiciable" and to cite his *Microbiological Criteria* concurrence. 997 F.2d at 903 n.2. Because *AAPS v. Clinton* reviewed a *presidential* advisory committee, however, it would not control here, even if Judge Silberman had persuaded his two colleagues to adopt his *Microbiological Criteria* position. Consistent with separation-of-power concerns, FACA sets different criteria for the President and agencies to charter FACA advisory panels. *Compare* FACA §9(a)(1) *with* FACA §9(a)(2). Thus, Judge Silberman's *AAPS v. Clinton* footnote does not elevate his *Microbiological Criteria* concurrence to the law of this Circuit.

Because they involve statutory provisions that confer inherently more deference to the agency (*e.g.,* the use of the permissive "may" instead of "shall"), *Marshall County Health Care Auth.,* 988 F.2d at 1225 n.2, or because they fall in doctrinal areas (*e.g.,* national security) in which Congress traditionally defers to the executive branch, *CIA v. Sims,* 471 U.S. 159, 168-69 (1985), the other appellate cases that HHS cites are readily distinguishable. Defs.' Mot. at 14-20, 27-30; *FAA v. Drake,* 291 F.3d 59, 62 (D.C. Cir. 2002) (addressing a statute under which "agency 'may dismiss a complaint without a hearing when the Secretary [of Transportation] or Administrator is *of the opinion* that the complaint does not state facts that warrant an investiga-tion or action'") (*quoting* 49 U.S.C. §46101(a)(3) (1994), emphasis in original); *Webster v. Doe,* 486 U.S. at 601-03 (no *APA* review in national-security arena under statute providing "Director

of Central Intelligence *may, in his discretion,* terminate the employment of any... employee"
[when] "*advisable* in the interests of the United States," although the Court *allowed constitu-
tional review*) (emphasis added)); *Falkowski v. EEOC,* 764 F.2d 907, 910-11 (D.C. Cir. 1985)
(no review under statute providing that government attorneys "*may* be sent by the Attorney Gen-
eral… to attend to the interests of the United States" because Attorney General "acts in the con-
text of a lengthy history of discretionary authority"). HHS also cites several district-court deci-
sions, Defs.' Mot. at 16-20, which lack precedential value, *In re Exec. Office of President,* 215
F.3d 20, 24 (D.C. Cir. 2000), particularly in the face of the Friedman-Edwards *Microbiological
Criteria* decisions and *Nat'l Anti-Hunger Coalition.*

## II.   APPLICATION OF SUBJECT-MATTER JURISDICTION TO SPECIFIC COUNTS

AAPS plainly has standing to challenge the denial of FACA-required information
(Counts II and III), Section I.A.1.a, *supra;* the imbalance and undue-influence (Counts I, II, and
III), Sections I.A.1.b-I.A.1.c, *supra; Nat'l Anti-Hunger Coalition,* 711 F.2d at 1074 n.2; the fail-
ure to follow FACA's other substantive and procedural protections (Counts I, II, III, IV, and VI),
Sections I.A.1.b-I.A.1.c, *supra;* the failure to follow AHIC's own charter (Count V), Section
I.A.1.c, *supra;* and the current and threatened economic burdens (Counts I, II, III, IV, and VI),
Section I.A.1.d, *supra.* To the extent that it finds the pleadings inadequate, moreover, the Court
should allow AAPS an opportunity to supplement the pleadings before dismissal becomes final.
*Alley,* 984 F.2d at 1208; *Biovail Corp.,* 256 F.3d at 807.

**A.   Count I: Imbalance and Undue Influence**. Count I alleges that that AHIC violates
FACA §5's fair-balance and undue-influence provisions, notwithstanding HHS's conclusory
chartering determination to the contrary. Compl. ¶84. HHS asks this Court to dismiss Count I as
a matter of law because 5 U.S.C. §701(a)(2) commits FACA fair-balance and undue-influence

35

claims to agency discretion. Defs.' Mot. at 13-20.

Even if the Friedman-Edwards *Microbiological Criteria* decisions and *Nat'l Anti-Hunger Coalition* did not directly refute HHS's argument, *see* Section I.B.2.b, *supra* (collecting cases), dismissal nonetheless would remain inappropriate here for three reasons. First, unlike the cases on which HHS and Judge Silberman's *Microbiological Criteria* concurrence rely, Congress here has provided limiting criteria to guide courts' review under FACA §5(b)(2) and (b)(3). *See* FACA §§2(b)(2) (essentiality as a test for new advisory committees), 9(a)(2) (prohibiting new advisory committees unless agency head makes public-interest determination); S. Rep. No. 1098, 92d Cong., 2d Sess. 9 (1972) (fair-balance requirement intended to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee); H.R. Rep. No. 1017, 92d Cong., 2d Sess. 6 (1972) (same). Second, even if *FACA* and its legislative history do not provide sufficient limiting criteria, the *GSA regulations* and *HHS's own actions* can provide such criteria. *Block,* 50 F.3d at 1082; *CC Distributors,* 883 F.2d at 153-56. The GSA regulations impose additional limiting criteria. *See* 41 C.F.R. §102–3.60(b)(3) ("consider a cross-section of those directly affected, interested, and qualified"); 41 C.F.R. pt 102–3, subpt B, App. A., at III (consider committee's economic impact, the perspectives required, and the need for divergent points of view); *cf.* 41 C.F.R. §102–3.105(g) (requiring agency heads to develop procedures to ensure independent judgment). Similarly, HHS's own FACA guidelines may provide limiting criteria, as may the "satisfactory plan for appropriate balance of committee membership" to which Defendant Leavitt referred in his AHIC determination. *See* Compl. ¶¶46, 47. Thus, even if the Court concludes that neither FACA nor the GSA regulations provide the requisite criteria, dismissal remains inappropriate until HHS certifies the record

on which it acted and produces its FACA guidelines.[9] Third, even assuming that *some* unfair-balance claims are nonjusticiable does not mean that AAPS's claim is nonjusticiable. Here, a 17-member advisory committee produced 17 members who have "given speeches about the promise of health IT," Compl. ¶49, a remarkable lack of viewpoint diversity.[10] By all appearances, HHS considered the fair-balance requirements unenforceable and proceeded accordingly.

In its fair-balance argument, moreover, HHS cites only decisions premised on the APA and thus subject to §701(a)(2). Because APA restrictions simply do not apply to non-APA officer suits, *see* Section I.B.1-I.B.1.d, *supra,* those decisions offer HHS no help. In several instances, courts have found FACA imbalance as *ultra vires. See, e.g., Nat'l Anti-Hunger Coalition v. Exec. Comm. of the President's Private Sector Survey on Cost Control,* 566 F.Supp. 1515, 1517 (D.D.C. 1983) (declaring FACA recommendations to violate FACA because "Executive Committee did not proceed in accordance with the requirements of the Act and hence its ap-

---

[9] In a section entitled "Promising Practices Could Better Ensure Independence and Balance," a recent Government Accountability Office ("GAO") report suggests measures that this Court could incorporate into a remedial order to supply further judicially manageable criteria, if the Court concludes that the current statutory and regulatory measures fail adequately to cabin discretion under FACA §5(b)(2). *See* GAO, *FEDERAL ADVISORY COMMITTEES: Additional Guidance Could Help Agencies Better Ensure Independence and Balance,* at 41-50 (April 2004).

[10] Over 90% of respondents consider it is "very important" that "government agencies" not have access to their medical information without their permission. Compl. ¶78. Assuming, contrary to that evidence, that people favor Health IT and privacy equally, the odds of selecting 17 of 17 proponents through a balanced process are less than one in 100,000 (*i.e.,* $1/(2^{17})$). Accepting that Defendant Leavitt would select himself improves that to less than one in 50,000 (*i.e.,* $1/(2^{16})$), and accepting that he would name eight colleagues serving at the pleasure of a President committed to Health IT yields odds of less than one in 500 (*i.e.,* $1/(2^9)$). As HHS acknowledges, its committed-to-discretion argument is jurisdictional, Defs.' Mot. at 14 n.6, and AAPS is entitled to jurisdictional discovery to determine whether AHIC's imbalance represents a statistically improbable event or an intentional FACA violation. *NRDC v. Pena,* 147 F.3d 1012, 1024 (D.C. Cir. 1998).

proval was *ultra vires* and illegal because of the lack of fair balance"); *Patriot, Inc., v. H.U.D.,* 963 F.Supp. 1, 6 n.4 (D.D.C. 1997) ("HUD did have some input from outside sources, but, inasmuch as HUD flouted [FACA], it lacked the balanced participation that provides confidence in accurate decision-making"). Thus, this Court can review HHS's actions under non-APA review, even if §701(a)(2) restricts APA review.

   **B.   <u>Count II: Unlawful Contractual Panels</u>**. Count II alleges that that HHS's spawning of various consensus panels through contractors violates FACA's chartering requirements. Compl. ¶87. HHS asks this Court to dismiss Count II as a matter of law because FACA does not apply to consensus panels created by its contractors. Defs.' Mot. at 26-27.

   As elaborated in Section II.A of AAPS's motion for partial summary judgment, however, this Circuit's "contractor exception" is not so broad as to authorize HHS's intentional end run around FACA. *Food Chem. News v. Young,* 900 F.2d 328, 331 (D.C. Cir. 1990) ("contractor proposed the use of an expert panel"); *Byrd v. EPA,* 174 F.3d 239, 247 (D.C. Cir. 1999). Indeed, even under *Byrd,* a contractor-established consensus panel may violate FACA if the agency exercises certain controls that the contract grants the agency. *Byrd,* 174 F.3d at 247 ("result in this case might have been different if EPA had exercised its authority"). Because the *Byrd* panel had disbanded, whereas the HHS contract panels have not, AAPS can obtain declaratory and injunctive relief against HHS's operation of the contract panels that Dr. Byrd no longer could obtain. *Byrd,* 174 F.3d at 244-45 (discussing mootness). Moreover, without reviewing the contracts in question, dismissal is unwarranted. *See* Answer ¶¶63-64 (referring Court to the contracts); *SEC v Chenery Corp.,* 318 U.S. at 94 (1943) (requiring review on administrative record prior to APA's enactment); 5 U.S.C. §706 (same for APA review).

   More significantly, however, the "contractor exception" cases on which HHS relies fall

under the APA and did not consider whether FACA occupied the field of federal agency-created consensus panels. *See* Section I.B.1-I.B.1.d, *supra* (APA restrictions do not limit officer suits under *ultra vires* analysis); *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1333-34 (D.C. Cir. 1996) (field-occupation analysis can render agency action *ultra vires* a federal agency's authority); *Michigan v. EPA,* 268 F.3d 1075, 1084 (D.C. Cir. 2001) (Congressional mandates to agencies to carry out "specific statutory directive[s] define[] the relevant functions of [the agency] in a particular area" such that agencies "cannot rely on [their] general authority… when a specific statutory directive defines [their] relevant functions"); *Am. Petroleum Inst. v. EPA,* 52 F.3d 1113, 1119 (D.C. Cir. 1995) ("[agency] cannot rely on its general authority… when a specific statutory directive defines [its] relevant functions… in a particular area"). Thus, before this Court authorizes HHS to circumvent FACA by contract, it should consider whether HHS acted *ultra vires* by not establishing the contractor panels via FACA. Put another way, even if *Byrd v. EPA* compelled the conclusion that FACA does not apply to HHS's contractor panels, it would not mean that HHS acted within its authority by convening those panels outside FACA. Certainly, HHS cannot rely on a contract to achieve an end *ultra vires* its authority. *Priebe & Sons v. U.S.,* 332 U.S. 407, 411 (1949) ("where Congress has not adopted a different standard," courts "customar[il]y… apply to the construction of government contracts the principles of general contract law") (*citing U.S. v. Standard Rice Co.,* 323 U.S. 106, 111 (1944)).

C.  **Count III: Unlawful Subcommittees**. Count III alleges that that the spawning of four AHIC subcommittees comprised of both AHIC members and private-sector AHIC nonmembers violates FACA's chartering requirements. Compl. ¶90; FACA §3(2) ("'advisory committee' means any committee… or any subcommittee or other subgroup… which is… established or utilized by one or more agencies… in the interest of obtaining advice or recommendations for…

39

one or more… officers of the Federal Government"). HHS asks this Court to dismiss Count III as a matter of law because FACA does not apply to subcommittees that AHIC (as distinct from HHS) creates to provide advice to AHIC (as distinct from the government). Defs.' Mot. at 21-25.

Taking HHS's arguments in reverse order, HHS simply misstates FACA's scope, which reaches committees that provide "advice or recommendations [to] one or more agencies *or officers* of the Federal Government." FACA §3(2) (emphasis added). HHS qualifiedly admits that all of the federal AHIC members are federal officers, Answer ¶56, and AAPS alleges that all of the non-federal AHIC members are "special-purpose (*i.e.,* non-permanent) federal officers," Compl. ¶56. On information and belief, formed after reasonable inquiry, which likely could be proved by discovery or certification of the record, HHS swore in all of the non-federal AHIC members as special-purpose officers of the federal government at the first AHIC meeting. Thus, all AHIC members are "officers" for FACA purposes. Answer ¶56; Compl. ¶56. The AHIC subcommittees cannot escape FACA by virtue of HHS's unsworn implication in a brief that the AHIC subcommittees will not provide advice to federal officers. To the contrary, AHIC subcommittees exist for the sole purpose of advising federal officers.[11]

---

[11] Significantly, AHIC's private-sector members are not "full-time[] or permanent part-time" federal officers, which would trigger FACA §3(2)(i)'s exception. Further, the AHIC members' status as federal officers factually distinguishes the cases that HHS cites, in which FACA did not apply to the subcommittees or workgroups of FACA advisory committees. *See Nat'l Anti-Hunger,* 557 F.Supp. 524 (D.D.C.), *aff'd* 711 F.2d 1071 (D.C. Cir. 1983) (no allegation that committee members were federal officers); *In re Cheney,* 406 F.3d 723 (D.C. Cir. 2005) (same); *AAPS v. Clinton,* 997 F.2d 898 (D.C. Cir. 1993) (same). Because all of the foregoing decisions involved *presidential,* as distinct from agency, advisory committees, it is entirely possible that the presidential committees operated under different rules and did not swear in their non-federal members. In any event, because they did not address the federal-officer status of the parent committee's members, those decisions cannot negative the conclusion that AHIC's subcommittees advise AHIC's "federal officers" within the meaning of FACA §3(2). HHS also cites language from *Lombardo v. Handler,* 397 F.Supp. 792, 800 (D.D.C. 1975), that no longer is valid. *See*

*(Footnote cont'd on next page)*

40

HHS's other argument – that AHIC formed the subcommittees – offers HHS no help for two reasons, one general to all advisory committees and one unique to AHIC. First, for quasi-public entities like AHIC, FACA's "established or utilized" test covers not only advisory panels created directly by an agency, but also "the offspring of some organization created or permeated by the Federal Government." *Pub. Citizen v. DOJ,* 491 U.S. at 462-63; *accord ALDF,* 104 F.3d at 429-30. Clearly, AHIC qualifies as an organization both created by and permeated by the federal government. Indeed, the second reason that HHS cannot rely on its "AHIC did it" defense is that AHIC lacks judgment independent of HHS: AHIC essentially does what Secretary Leavitt says, at least until it holds a vote. *See* Compl. ¶55. There is no evidence that AHIC held a vote on whether and how to convene subcommittees. Compl. ¶57 (alleging that HHS, not AHIC, convened the subcommittees); Answer ¶57 ("*DHHS has convened four… subcommittees,* comprised of both AHIC members and AHIC non-members) (emphasis added). Because the AHIC subcommittees constitute independent FACA advisory committees in their own right, FACA required HHS to comply with all the substantive and procedural requirements for establishing an advisory committee, starting with the chartering requirements. Given HHS's failure to do so, dismissal clearly is unwarranted.

**D.**   **Count IV: Charter and Determination Violate FACA**. Count IV seeks to vacate and remand HHS's determination under FACA §9(a)(2) that AHIC was in the public interest. FACA §9(a)(2) prohibits agencies' establishing an advisory committee until "determine[ing that its establishment] as a matter of formal record… with timely notice published in the Federal Register,

---

*(Footnote cont'd from previous page.)*

*Animal Legal Def. Fund v. Shalala,* 104 F.3d 424, 429-30 (D.C. Cir. 1997) (*citing Pub. Citizen v. DOJ,* 491 U.S. at 463) ("*ALDF*").

[is] in the public interest in connection with the performance of duties imposed on that agency by law." HHS asks this Court to dismiss Count IV as a matter of law because 5 U.S.C. §701(a)(2) commits FACA chartering determinations to agency discretion. Defs.' Mot. at 27-30.

Count IV overlaps with Counts I, III, and V. For example, if the Court finds imbalance or undue HHS influence on AHIC (Count I), unlawful AHIC subcommittees (Count III), or AHIC's failure to satisfy its charter's requirement(s) on privacy and security expertise, then the Court could vacate and remand HHS's chartering of AHIC. In the alternative, if the Court *upholds* the AHIC subcommittees (Count III), the Court could find that the AHIC charter failed adequately to describe AHIC, as expanded by the subcommittees, Compl. ¶93, which also would justify vacatur and remand. In addition, however, Count IV also stands on its own to challenge HHS's chartering determination as simply too conclusory to withstand judicial review, particularly given all the other advisory panels on Health IT issues. Compl. ¶¶44, 62-64, 74, 93. Courts are "powerless to affirm" such conclusory determinations. *SEC v Chenery Corp.,* 332 U.S. at 196; *Burlington Truck Lines,* 371 U.S. at 170 ("an agency's discretionary order [will] be upheld, if at all, on the same basis articulated in the order by the agency itself").

Although HHS contends FACA §9(a)(2) to commit FACA determinations to agency discretion, it cites cases that involve significantly greater levels of statutory discretion (*e.g.,* that use permissive rather than mandatory language) or doctrinal areas that involve significantly greater congressional deference (*e.g.,* national security). *See* Section I.B.2.b, *supra* (collecting cases). Further, it ignores the fact that FACA, the implementing regulations, and HHS's own actions provide limiting criteria to guide judicial review. *Block,* 50 F.3d at 1082; *CC Distributors,* 883 F.2d at 153-56. First, Congress and GSA's implementing regulations clearly preclude new advisory committees unless essential, which necessarily entails considering the existence and work

of other or prior panels. *See* FACA §2(b)(2); 41 C.F.R. §§102–3.30(a), 102–3.60(b)(2). Further, HHS's minimalist interpretation of FACA §9(a)(2)'s requirements would render meaningless the varying standards that Congress imposed on presidential versus agency advisory panels. *Compare* FACA §9(a)(1) *with* FACA §9(a)(2). As with Count I, moreover, dismissal is unwarranted until HHS produces the record on which it acted, including any guidance issued under FACA §8(a). *See* Compl. ¶47.

**E.    Count V: AHIC Privacy/Security Expert**. Count V alleges that HHS failed to comply with its charter's requirement that AHIC's members include an "expert on matters pertaining to privacy and security protections of individually identifiable health information." Compl. ¶96. Based on a document that its brief alleges to identify the required expert(s), HHS argues that the Court should dismiss Count V. Defs.' Mot. at 31.

Even if this Court accepts the truth of the extra-pleading allegations in HHS's brief, however, those allegations do not support dismissal. According to HHS's brief, Ms. Davenport-Ennis is AHIC's privacy expert, and Dr. Cresanti is AHIC's security-protections expert. *Id.* n.16. The pleadings establish that Ms. Davenport-Ennis served on the originally chartered AHIC, but question her qualifications to represent the public's privacy interests. Compl. ¶51. The pleadings do not establish that Dr. Cresanti either served or now serves on AHIC. On information and belief, formed after reasonable inquiry, which likely could be proved by discovery or certification of the record, Dr. Cresanti was not a member of AHIC as initially chartered, when AAPS filed its complaint, or even when HHS filed its answer.

Far from justifying *dismissal,* HHS's brief suggests that, as originally chartered, AHIC lacked the required expert on security protections. Of course, neither HHS's conclusory, unsworn brief nor the alleged "frequently asked questions" document that it quotes actually *es-*

*tablish* that either Ms. Davenport-Ennis or Dr. Cresanti actually qualify as "experts" in anything. *See* 41 C.F.R. §102–3.60(b)(3) (when a committee "requir[es] technical expertise [, it] should include persons with *demonstrated professional or personal qualifications and experience* relevant to the functions and tasks to be performed") (emphasis added). Accordingly, dismissal is unwarranted.

**F.    Count VI: Renewal of NCVHS Charter**. Count VI alleges that HHS violated FACA by failing to renew the NCVHS charter. Compl. ¶99. Based on a hyperlink to a document that its brief alleges to constitute a renewed NCVHS charter, HHS argues that the Court should dismiss Count VI. Defs.' Mot. at 32.

Even if this Court accepts the truth of the extra-pleading allegations in HHS's unsworn brief, HHS nonetheless still could not establish that it will prevail on Count VI. *See* FACA §14(b)(1), §14(b)(3) (renewed advisory committee must file its renewed charter with Congress before taking any other action); *accord* 41 C.F.R. §102–3.70. HHS's brief does not establish that it *filed* the allegedly renewed NCVHS charter. And even if HHS could establish that it *both renewed and filed* the charter, HHS still cannot justify dismissal because AAPS sufficiently pleads that the AHIC charter(s) and renewed NCVHS charter must address the overlap between AHIC and NCVHS. Compl. ¶¶62, 101(B)(iv), 101(D); *see also* FACA §2(b)(2); 41 C.F.R. §§102–3.30(a), 102–3.60(b)(2). Thus, regardless of whether HHS renewed the charter before or after AAPS filed its complaint, AAPS still can obtain *some* relief against the renewed NCVHS charter. FED. R. CIV. P. 54(c); *PETA,* 396 F.3d at 421. Accordingly, dismissal is unwarranted.

## CONCLUSION

WHEREFORE, AAPS respectfully asks this Court to deny HHS's motion to dismiss.

Dated: July 14, 2006                    Respectfully submitted,


 /signed/ Lawrence J. Joseph
Lawrence J. Joseph, D.C. Bar No. 464777

2121 K Street, NW, Suite 800
Washington, DC 20037
Telephone: (202) 669-5135
Telecopier: (202) 318-2254

*Counsel for Association of American
Physicians and Surgeons, Inc.*