UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN | ) | |
| PHYSICIANS & SURGEONS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|         v. | ) | Civil Action No. 06-0319-ESH |
| | ) | |
| U.S. DEPARTMENT OF HEALTH & | ) | |
| HUMAN SERVICES, *et al.,* | ) | |
|     Defendants. | ) | |

## DECLARATION OF LAWRENCE J. JOSEPH

I, Lawrence J. Joseph, hereby declare and state as follows:

1.   I am over 18 years of age, and I am not a party to this action. I reside in McLean, Virginia. I am the attorney representing plaintiff Association of American Physicians & Surgeons ("AAPS") in the above-captioned action. In that capacity, as set forth below, I have obtained from internet sites of the U.S. government the exhibits attached hereto.

2.   Using the archive search feature on the Federal Business Opportunities website (fbo.gov), I obtained Request for Proposal No. AHRQ-05-0015 and its two amendments, attached hereto as Exhibit 1.

3.   From the Press Release section (http://www.hhs.gov/news/press/2006.html) of the website for the Department of Health & Human Services, I downloaded the press release dated May 17, 2006, attached hereto as Exhibit 2.

4.   The attached exhibits have been in my possession and control since I downloaded them from the foregoing locations.

1

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of July 2006.


  /signed/ Lawrence J. Joseph
Lawrence J. Joseph

Exhibit 1

OMB 0990-0115

**PART I - THE SCHEDULE**                Request for Proposal
**SECTION A - SOLICITATION FORM**        No. AHRQ-05-0015
                                         Date Issued:   June 7, 2005
                                         Date Questions Due: June 17, 2005
                                         Date Proposals Due:  July 15, 2005
                                         Time Due:      12 noon local time

You are invited to submit a proposal to the Agency for Healthcare Research and Quality (AHRQ) and the National Coordinator for Health Information Technology (National Coordinator), for Request for Proposal (RFP) No. AHRQ-05-0015, entitled "Privacy and Security Solutions for Interoperable Health Information Exchange." Your proposal must be developed and submitted in accordance with the requirements and instructions of this RFP.  To assist in the preparation of proposals, HHS will host a pre-proposal conference call on June 20, 2005, from 1:00 to 4:00 PM EST.  For more details on how to participate in the pre-proposal conference call, please see http://www.hhs.gov/healthit.  The Government anticipates competitively awarding one contract and encourages subcontracting directly with up to 40 state or territorial governments (or designated entities) in order to complete the tasks within the prescribed timeframe.

For this acquisition,  the AHRQ recommended goal (as a percentage of total planned subcontract dollars) is 30% for Small Businesses, which shall include at least 11% (as a percentage of total contract value) for Small Disadvantaged Businesses, at least 5% (as a percentage of total planned subcontract dollars) for Women-Owned Small Businesses, and at least 3% (as a percentage of total planned subcontract dollars) for HUBZone Small Businesses and at least 3% (as a percentage of total planned subcontract dollars) for Veteran-Owned Small Businesses.  These goals represent AHRQ's expectation of the minimum level for subcontracting.  The North American Industry Classification System (NAICS) code that best describes this requirement is 54161.  The small business size standard is $6 million.

A cost-plus-fixed-fee contract is contemplated for an eighteen-month period of performance.  You are expected to respond with technical and pricing proposals for the entire period of performance.

If you intend to submit a proposal in response to this solicitation, please inform the Contracting Office of your intent by completing the Proposal Intent Response Form (attachment 4 to this solicitation) and send it to the Contracting Office no later than June 30, 2005.  You may send it to the address below or fax it to 301-427-1740.

It is your responsibility to monitor the web site where the RFP will be posted to learn about any amendments to the solicitation.  The RFP and any amendments will be posted on the following three web sites:  1) Federal Business Opportunities web site: www.fedbizopps.gov; 2) AHRQ's web site: www.ahrq.gov; and 3) the National Coordinator's web site:  www.hhs.gov/healthit.

Offerors shall submit the following:

A.    Technical Proposal (See Section L.8) **Original and 12 copies**
B.    Past Performance Information (See Section L.9) **Original and 3 copies**
C.    Small Disadvantaged Business Participation Plan (See Section L.10) **Original and 4 copies**
D.    Business Proposal (See Section L.11) **Original and 4 copies.**  The Small Business Subcontracting Plan should be submitted as a separate section of the Business Proposal.

(This does not apply to small business concerns)

Your proposal must provide the full name of your company, the address, including county, Tax Identification Number (TIN), DUN and Bradstreet No., and if different, the address to which payment should be mailed.  Please note that prospective contractors must be registered in the Central Contractor Registration database prior to award of contract.  (See FAR 4-11 for further details).

**YOUR ATTENTION IS CALLED TO THE LATE PROPOSAL PROVISIONS PROVIDED IN SECTION L.3 OF THIS RFP.  YOUR ATTENTION IS ALSO DIRECTED TO THE TECHNICAL PROPOSAL INSTRUCTIONS PROVIDED IN SECTION L.8 OF THE SOLICITATION.**

Questions regarding this solicitation shall be received in this office no later than June 17, 2005 (See Section L.6).   Your questions should be submitted to the attention of Robert Zuhlke, Procurement Analyst, Agency for Healthcare Research and Quality, 540 Gaither Road, Rockville, Maryland  20850 and the envelope should be marked "Proposal Questions RFP No. AHRQ-05-0015**." Discussions with any other individual outside the Contracts Management Office may result in rejection of the potential offeror's proposal.**

The proposal shall be signed by an authorized official to bind your organization and must be received in our Contracts Office no later than **12 noon**, EDT, on **July 15, 2005**.  Your proposal must be mailed to the following address:

> Agency for Healthcare Research and Quality
> Contracts Management, Room 4319
> 540 Gaither Road
> Rockville, Maryland 20850

Hand carried proposals may be dropped off at the above location.  However, please allow ample time as proposals cannot be accepted until they have gone through security.  We will not be held responsible for any delays that may be incurred getting your proposal through security.

NOTE:        The U.S. Postal Service's "Express Mail" <u>does not</u> deliver to our Rockville, Maryland address.  Packages delivered via this service will be held at a local post office for pick-up.  <u>The Government will not be responsible for picking up any mail at a local post office</u>. If a proposal is not received at the place, date, and time specified herein, it will be considered a "late proposal."

The RFP does not commit the Government to pay any cost for the preparation and submission of a proposal.  It is also brought to your attention that the Contracting Officer is the only individual who can legally commit the Government to the expenditure of public funds in connection with the proposed acquisition.

Requests for any information concerning this RFP should be referred to Robert Zuhlke, (301) 427-1714.

Sincerely,


Jacquelyn Carey
Director, Contracts Management
Agency for Healthcare Research & Quality

## TABLE OF CONTENTS

**PART I**                                                              **Pages**

Section A              Solicitation                                    1-3
                       Table of Contents                               4
Section B              Supplies or Services & Prices/Costs              5-6
Section C              Description/Specification/Work Statement         7-12
Section D              Packaging and Marking                           13
Section E              Inspection and Acceptance                       13
Section F              Period of Performance and Delivery Schedule     14-16
Section G              Contract Administration Data                    17-19
Section H              Special Contract Requirements                   20-23

**PART II**

Section I              Contract Clauses                                24-28

**PART III**

Section J              List of Attachments                              29

**PART IV**

Section K              Representations and Instructions                30-36
Section L              Instructions, Conditions & Notices to Offerors  37-56
Section M              Evaluation Factors for Award                    57-60

**Attachments**

1.     Past Performance Questionnaire and Contractor Performance Form   61-65
2.     SF LLL-A, Disclosure of Lobbying Activities                      66-69
3.     Small and Small Disadvantaged Business Subcontracting Plan       70-76
4.     Proposal Intent Response Sheet                                   77

## SECTION B-SUPPLIES OR SERVICES AND PRICES/COSTS

**B.1    BRIEF DESCRIPTION OF SUPPLIES OR SERVICES**

"Privacy and Security Solutions for Interoperable Health Information Exchange."   See Section C for a complete description.

**B.2.    ESTIMATED COST**

**Note:** The Government estimates the total cost of this procurement, for all awards, at approximately $11,500,000, inclusive of fees and any proposed subcontracts.  The Government believes that approximately 40 subcontracts, of no more than $350,000 per subcontract, may be awarded by the Contractor to a state or territorial government or its duly recognized entity that is a multiple stakeholder entity.

a.    The estimated cost (exclusive of fees) for performance of the work under this contract, including direct and indirect costs, is $ (TO BE NEGOTIATED)

b.    The fixed fee for this contract is $ (TO BE NEGOTIATED).  The fixed fee shall be paid in installments based on the percentage of completion of work, as determined by the Contracting Officer.  Payment shall be subject to the withholding provisions of the Clause ALLOWABLE COST AND PAYMENT and FIXED FEE incorporated herein.

c.  The Government's maximum obligation, represented by the sum of the estimated cost plus the fixed fee for the contract period is as follows:

(TO BE NEGOTIATED)

**B.3    PROVISIONS APPLICABLE TO DIRECT COSTS**

a.    Items Unallowable Unless Otherwise Provided Notwithstanding the clauses, ALLOWABLE COST AND PAYMENT, and FIXED FEE, incorporated into this contract, unless authorized in writing by the Contracting Officer, the costs of the following items or activities shall be unallowable as direct costs:

(1)    Acquisition, by purchase or lease, of any interest in real property;

(2)    Rearrangement or alteration of facilities;

(3)    Purchase or lease of any item of general purpose-office furniture or office equipment regardless of dollar value. (General purpose equipment is defined as any items of personal property which are usable for purposes other than research, such as office equipment and furnishings, pocket calculators, etc.);

(4)    Accountable Government property (defined as both real and personal property with an acquisition cost of $1,000 or more, with a life expectancy of more than two years) and "sensitive items" (defined and listed in the Contractor's Guide for Control of

Government Property, 1990, regardless of acquisition value;

(5)     Travel to attend general scientific meetings;

(6)     Foreign Travel;

(7)     Any costs incurred prior to the contract's effective date;

(8)     Rental of meeting rooms not otherwise expressly paid for by the contract;

(9)     Any formal subcontract arrangements not otherwise expressly provided for in the contract

(10)    Consultant fees in excess of $500/day; and

(11)    Information Technology hardware or software.

b.     This contract is subject to the provisions of Public Law (P.L.) 99-234 which amends the Office of Federal Procurement Policy Act to provide that contractor costs for travel, including lodging, other subsistence, and incidental expenses, shall be allowable only to the extent that they do not exceed the amount allowed for Federal employees.

The Contractor, therefore, shall invoice and be reimbursed for all travel costs in accordance with Federal Acquisition Regulations (FAR) 31.205-46.

<u>**SECTION C/ STATEMENT OF WORK**</u>

**SECTION C**

**DESCRIPTION/SPECIFICATION/WORK STATEMENT**

Independently and not as an agent of the Government, the Contractor shall furnish all the necessary services, qualified personnel, material, equipment, and facilities, not otherwise provided by the Government as needed to perform the Statement of Work below:

**A.    Background Information**

On April 27, 2004, the President issued an executive order (EO) announcing his commitment to the use of health information technology (health IT) in order to reduce medical errors, lower costs and provide better information for consumers and physicians.  In particular, the President called for the widespread adoption of electronic health records (EHRs) and for health information to follow patients throughout their care in a seamless and secure manner.  Widespread use of EHRs offers a unique means of improving quality, lowering healthcare costs and preventing medical errors, which may contribute to the death of between 50,000 and 100,000 Americans per year.

The EO directed the Secretary of Health and Human Services (HHS) to establish within the Office of the Secretary the position of National Coordinator for Health Information Technology (National Coordinator).  On July 21, 2004, the National Coordinator released the Framework for Strategic Action outlining the goals and strategies to realize the President's goal.  Over the past 9 months, HHS has widely discussed these ideas in public meetings, through a Request for Information (RFI) published in the Federal Register, and in reviews of current state and local efforts in the health care industry.

In order to take the next critical step toward realizing the President's goal of widespread interoperable EHR adoption, the Secretary of HHS has initiated the next phase of the HHS health IT strategy.  This phase will unfold over the next 500 days and includes convening leaders to coordinate public and private health IT efforts, developing strategies, contracting for studies, and funding prototypes and demonstrations to enable health IT.

The HHS health IT strategy calls for the following critical actions:

- Support an American Health Information Community (AHIC), a federal advisory committee that will develop advice and seek consensus-based recommendations for coordinating efforts in the public and private sectors for interoperable health IT adoption.
- Develop, create prototypes for, and evaluate a process to harmonize industry-wide health IT standards development, maintenance and refinements over time.

7

- Develop, create prototypes for, and evaluate a compliance certification process for EHRs and the infrastructure or network components through which EHRs interoperate.
- Assess and develop plans to address variations in organization-level business policies and state laws that affect privacy and security practices, including those related to HIPAA, which may pose challenges to interoperable health information exchange.
- Develop, create prototypes for, and evaluate a nationwide health information network (NHIN) architecture for widespread health information exchange that can be used to test specialized network functions, security protections and monitoring, and demonstrate feasibility of scalable models.
- Assess EHR adoption through surveys, assessments and studies that can identify key enablers of EHR adoption and monitor the diffusion of EHRs by the health care community at large.
- Coordinate the sharing of health information through Federal health programs among the Federal Health Architecture (FHA) program.

This contract is a key part of the HHS health IT plan.  It directs a Contractor to assess and develop solutions to address the variation in organization-level business policies and state laws that affect privacy and security practices, including those related to HIPAA, which may pose challenges to interoperable health information exchange. Workable privacy and security approaches and business practices are imperative for comprehensive information exchange solutions to facilitate quality improvement, medical error reduction, timely surveillance, rigorous research, improved efficiency and affordability of healthcare.

B.    **Purpose**

There is a burgeoning movement for regional health information exchange in states throughout the country.  At least 23 states have introduced or passed legislation for health information exchange efforts or have Governor support through executive order, proposed budget appropriations, or commissioned planning efforts.  Forty-three states have one or more community-based health IT projects and/or prototype regional health information organizations (RHIOs) that have received Federal funding through AHRQ and/or HRSA grants and contracts.  Twenty-eight states have formal efforts underway developing one or multiple RHIOs to achieve interoperable HIT adoption.

However, even the most successful regional health information exchange efforts continue to face common challenges, including governance, variations in privacy and security policies, sustainable business models, choice of technologies, clinician adoption and variations in laws and business practices within states.  To gather information on these challenges, the National Coordinator issued a Request for Information (RFI) regarding a nationwide health information network (NHIN) that could provide a uniform framework for the secure, accurate, and timely exchange of health information.  Many RFI respondents indicated that health information exchange continues to be impeded by the lack of an interoperability framework, but even a NHIN with the technical capacity and the tools required to move patient data across a region or state would still face a myriad of business challenges due to the variation in how participating organizations implement policies for privacy and security of personal

health information.  For example, HIPAA allows covered entities to implement required security and privacy policies in a manner that can be tailored to individual business needs and contexts, and also respects more stringent state privacy requirements.

Variation in privacy and security practices presents challenges as entities seek to participate in interoperable health information exchange.  For example, most hospitals or clinicians are required to maintain business policies for privacy and security of protected health information, but there is not a vehicle or entity responsible for doing this in a multiple stakeholder environment as would occur with widespread health information exchange.  Therefore, workable mechanisms and policies must be developed to address variations in organization-level business policies and state laws, while maintaining the levels of security and privacy that consumers expect.

Various RHIOs have begun to explore solutions to address variations in privacy and security practices, including implementation of rules for information exchange through collaborative governance mechanisms, formal business arrangements, and the use of electronic brokering services.  However, without a comprehensive assessment of each State's laws and organization level business practices and the development of best practices, states risk ongoing challenges and delays to achieve widespread interoperable exchange of health information.

The purpose of this contract is to:  (1) assess variations in organization-level business policies and state laws that affect health information exchange; (2) identify and propose practical solutions, while preserving the privacy and security requirements in applicable Federal and state laws and (3) develop detailed plans to implement solutions.  HHS encourages the Contractor to coordinate through subcontracts with approximately 40 states or territorial governments or its duly recognized entity, as directly teaming in this manner is a critical element to the successful completion of this contract within the prescribed timeframe.

The Contractor shall also work collaboratively with other HHS health IT contractors working on the development and evaluation of NHIN architecture prototypes and appropriate stakeholders from the Department of Health and Human Services (HHS), Department of Veterans Affairs (VA), Department of Defense (DoD), Department of Commerce (DoC), Department of Homeland Security (DHS), Environmental Protection Agency (EPA), National Science Foundation (NSF) and General Services Administration (GSA).  The contractors shall meet and collaborate because there are tasks within each contract that are interdependent and require a coordinated and systematic approach.  For example, the NHIN prototypes shall be informed by the proposed solutions to address variations in privacy and security practices in states.  Analogously, the proposed solutions to address variations in privacy and security practices should reflect the goal of aligning or interfacing with a NHIN. Information on the contract solicitation for developing prototypes for a NHIN architecture is available via the Federal Register and the HHS website.


C.    **Specific Requirements**

The Contractor shall assess organization-level business policies and state laws that pose challenges to interoperability, and shall develop solutions to address these

challenges.  Given the wide variation in state laws and health care market environments, the Contractor shall do this work in direct collaboration with the states and other state-level stakeholders.  To do this, the Contractor shall convene efforts with and among states, including state or territorial governments or a multi-stakeholder entity duly recognized by the state or territorial government.  **The state or duly recognized entity shall engage public and private sector health care entities that are involved in interoperable health information technology adoption.  The entities shall include, but not be limited to: clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories, pharmacies, long term care facilities and nursing homes, homecare and hospice, correctional facilities, professional associations and societies, medical and public health schools that undertake research, quality improvement organizations, consumers or consumer organizations, and state government (Medicaid, public health departments, etc.).**

The Contractor shall perform the following tasks:

1.  Develop a comprehensive work plan building upon the plan included in the original proposal submission.  The work plan shall include a written description of proposed process/strategy to execute all tasks and apply Earned Value Management (EVM - as referenced in section 300.4 of OMB Circular A-11) to the extent practicable.  The work plan shall also provide the Project Officer with project activities; task prioritization; resource requirements, including person hours by task; interim milestones to achieve deliverables; interdependencies and intersections with other activities and risk mitigation strategies.

2.  Conduct a project start-up meeting with the National Coordinator, Contract Officer and Project Officer to review the contract, introduce contractor and government staff, review and approve work plan and identify and prioritize initial activities.  Within one (1) week after start up meeting, submit a final work plan.

3.  At the direction of the Project Officer, in coordination with the Contracting Officer, provide for travel and per diem for two (2) individuals to attend and participate in the following meetings: (1) a one and one half (1 ½) day meeting of the AH I C, a Federal advisory committee, that will provide advice and seek consensus based recommendations for coordinating efforts in the public and private sectors for interoperable health IT adoption and (2) a two day meeting to participate with other HHS health IT contractors and other  stakeholders such as HHS, VA, DoD, DoC, DHS, EPA, NSF and GSA in the development and evaluation of interoperable health IT.  It is expected that these meetings will be held in the Washington, DC area at a time yet to be determined.

4.  Develop and execute a plan to ensure that up to 40 state or territorial governments or a multi-stakeholder entity duly recognized by the state or territorial government are directly involved to assess and address the impact of organization-level business policies and state laws on security and privacy practices and the degree to which they pose challenges to interoperable health

information exchange.  The plan shall include provisions for awarding any subcontracts, not more than one per state or territory in order to maximize funding.  The Contractor shall provide the Project Officer a list of any recommended subcontract awards for final approval.  The plan, and its execution, shall:

   a.  Assess and analyze the impact of organization-level business policies and state laws on security and privacy practices and the degree to which they pose challenges to interoperable health information exchange.  Also, the Contractor, including any subcontractors, shall identify and document best practices and lessons learned in implementing privacy and security practices.  The privacy and security practices in implementing health IT that shall be considered, include but are not limited to, the following:

      i.  User and entity authentication to verify that a person or entity seeking access to electronic personal health information is who they claim to be.

      ii.  Information authorization and access controls to allow access only to people or software programs that have been granted access rights to electronic personal health information.

      iii.  Patient and provider identification to match identities across multiple information systems and locate electronic personal health information across enterprises.

      iv.  Information transmission security or exchange protocols (i.e., encryption, etc.) for information that is being exchanged over an electronic communications network.

      v.  Information protections so that electronic personal health information cannot be improperly modified.

      vi.  Information audits that record and monitor the activity of health information systems.

      vii.  Administrative or physical security safeguards required to implement a comprehensive security platform for health IT

      viii.  State law restrictions about information types and classes, and the solutions by which electronic personal health information can be viewed and exchanged.

      ix.  Information use and disclosure policies that arise as health care entities share clinical health information electronically.

   b.  Identify solutions to address organization-level business policies and state laws that affect privacy and security practices in order to permit interoperable health information exchange, while preserving the privacy and security requirements in applicable Federal and state laws.  Solutions are needed so that patient information can be shared among many authorized entities in an automated and cost-effective manner while complying with Federal and state privacy and security laws.  The solutions that shall be considered, but not limited to, are collaborative governance mechanisms, business arrangements that serve as a trusted broker of health information exchange, and technical brokering solutions to harmonize business policies to allow for interoperable health IT.  These solutions should reflect the goal of interfacing with a NHIN to permit widespread interoperability.

    c.  Develop an implementation plan to address organization-level business policies and state laws that affect privacy and security practices in order to permit interoperable health information exchange.  The plan must also include an assessment of the feasibility of the plan, its timeline, business model, business and technical requirements and any education and training considerations that the plan would necessitate.  The plan must also describe and justify the governance process, which shall be used to reach consensus on and achieve implementation of the plan in a multiple stakeholder environment as would occur with widespread health information exchange.

    d.  Convene as necessary a statewide or regional workshop to finalize and reach consensus on the assessment and potential solutions.  Statewide meetings shall include, but not be limited to, the following stakeholders: clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories, pharmacies, long term care facilities and nursing homes, homecare and hospice, correctional facilities, professional associations and societies, medical and public health schools that undertake research, quality improvement organizations, consumers or consumer organizations and state government (Medicaid, public health departments, etc.).  The Contractor, including any subcontractors, shall be responsible for securing the meeting facility, identifying and inviting participants, establishing the agenda, identifying speakers and presenters, travel and honoraria for speakers and presenters, and for the preparation and dissemination of meeting materials.  Meeting participants will be responsible for their own travel and per diem costs.

5.  Develop project management tools (e.g., assessment and plan templates), toolkits and guidelines for assessments, analyses and plans for the variation assessment and proposed solutions and for convening the statewide workshops.

6.  Develop and execute a convening strategy and plan to hold one national meeting. The purpose of the nationwide meeting shall be to discuss and finalize a nationwide summary and synthesis of variation assessments and proposed solutions among all states to inform policy making at the Federal, State and local levels, and NHIN prototype solutions for supporting health information exchange across the nation.  The Contractor shall be responsible for securing the meeting facility, identifying and inviting participants, establishing the agenda, identifying speakers and presenters, travel and honoraria for speakers and presenters, and for the preparation and dissemination of meeting materials.  Meeting participants will be responsible for their own travel and per diem costs.  It is expected that this meeting will be one and half (1 ½) days in length.

7.  For each of up to 40 states or territories, provide final assessments and analysis for how variations in organization level business policies and state laws that affect privacy and security practices, including those related to HIPAA, pose challenges

to interoperable health information exchange.   Best practices and lessons learned in implementing privacy and security practices shall also be documented.

8.  For each of up to 40 states or territories, provide a final plan to implement solutions to address variations in organization level business policies and state laws that affect privacy and security practices in order to permit interoperability. The plan must also provide an assessment of the feasibility of the plan, its timeline, business model, business and technical requirements, and any education and training considerations that implementing the plan would necessitate.  The plan shall also describe and justify the governance process, which will be used to reach consensus on and implementation the plan in a multiple stakeholder environment as would occur with widespread health information exchange.

9.  Produce a nationwide summary and synthesis of variation assessments and proposed solutions among all states to inform policy making at the Federal, State and local levels, and NHIN prototype solutions for supporting health information exchange across the nation.

10. Submit written monthly technical and financial status reports describing progress against milestones, potential risks and mitigation strategies, EVM to the extent practicable and planned activities for the coming month.  The financial reports will include:  1) actual cost for the reporting period and cumulative cost for the contract to date; 2) budgeted costs for the reporting period and contract to date based on the work performed; and 3) estimated costs by month for the remainder of the performance period of the contract.

## SECTION D - PACKAGING AND MARKING

Not Applicable

## SECTION E - INSPECTION AND ACCEPTANCE

**E.1     INSPECTION AND ACCEPTANCE**

    a.    The contracting officer or the duly authorized representative will perform inspection and acceptance of materials and services to be provided.

    b.    For the purpose of this SECTION the Government Project Officer is the authorized technical representative of the contracting officer.

    c.    Inspection and acceptance will be performed at:

            Agency for Healthcare Research and Quality
            540 Gaither Road
            Rockville, Maryland  20850

**E.2     CLAUSES INCORPORATED BY REFERENCE (FEB 1998)**

This contract incorporates the following clause by reference, with the same force and effect as if it were given in full text.  Upon request, the Contracting Officer will make its full text available.

| FAR Clause No. | Title and Date |
| --- | --- |
| 52.246-5 | Inspection of Services-Cost Reimbursement (April 1984) |

**SECTION F - PERIOD OF PERFORMANCE AND DELIVERY SCHEDULE**

**F.1     CLAUSES INCORPORATED BY REFERENCE (FEB 1998)**

This contract incorporates the following clause by reference, with the same force and effect as if they were given in full text.  Upon request, the Contracting Officer will make their full text available.  Also, the full text of a clause may be accessed electronically at this address: www.arnet.gov/far

**FEDERAL ACQUISITION REGULATION (FAR) (48 CFR CHAPTER 1) CLAUSES**

| FAR Clause No. | Title and Date |
|---|---|
| 52.242-15 | Stop Work Order (AUG 1989) Alternate I (APRIL 1984) |

**F.2     PERIOD OF PERFORMANCE**

The Government anticipates the period of performance shall be from September 30, 2005 through March 31, 2007.

**F.3     DELIVERY SCHEDULE**

The items specified for delivery below are subject to the review and approval of the Project Officer before final acceptance.  The Contractor shall be required to make revisions deemed necessary by the Project Officer.

The Contractor shall produce the following scheduled reports/deliverables in the amount, and within the time frame indicated.  Deliverables shall be submitted to the Project Officer.  Draft deliverables are those submitted to the Project Officer for review.  Final deliverables are those incorporating changes requested by the Project Officer.

The Contractor shall submit deliverables to the Project Officer in electronic format on CD-ROMs unless directed by the Project Officer to provide hard copies.  The Contractor shall submit deliverables in Microsoft Word 2000.  All other deliverables (e.g., Power Point presentations, Adobe PDF files) shall be compatible with the current software version used by HHS.  All deliverables shall meet section 508 of Rehabilitation Act, 28 U.S.C. § 794d accessibility requirements.  All deliverables are subject to the review and approval of the Project Officer.

The Contractor shall submit the following items in accordance with the stated delivery schedule as noted below:

| Ref | Description | Quantity | Delivery |
|---|---|---|---|
| 1 | Draft comprehensive work plan as described in Task 1. | 5* | Within 3 weeks of EDOC |
| 2 | Project start up meeting via teleconference, as described in Task 2. | n/a | Within 4 weeks EDOC |
| 3 | Final work plan as described in Task 2. | 5* | Within 5 weeks EDOC |

15

| Ref | Description | Quantity | Delivery |
|---|---|---|---|
| 4 | Submit written monthly status and financial reports as described in Task 10. | 5* | Beginning the 10th day of the 2nd month of EDOC and every month thereafter |
| 5 | Plan to solicit and process any subcontracts to state or territorial governments (or their duly recognized entities) as described in Task 4. | 5* | Within in 2 months of EDOC |
| 7 | Proposed list of any subcontract awards to state or territorial governments (or their duly recognized entities) as described in Task 4. | 5* | Within in 6 months of EDOC |
| 8 | Project management tools as described in Task 5. | 5* | Within in 7 months of EDOC |
| 9 | Each state's/territory's interim assessment of the impact of organization-level business policies and state laws on security and privacy practices and the degree to which they pose challenges to interoperable health information exchange, as described in Task 4a. | 5* | Within in 12 months of EDOC |
| 10 | Each state's/territory's interim analysis of options to address variations in organization level business policies and state laws that affect security and privacy practices in order to permit interoperable health information exchange, as described in Task 4b. | 5* | Within in 13 months of EDOC |
| 11 | Each state's/territory's interim implementation plan to address variations in organization level business policies and state laws that affect security and privacy practices in order to permit interoperable health information exchange, as described in Task 4c. | 5* | Within in 14 months of EDOC |
| 12 | Plan to develop and execute national meeting, as described in Task 6. | 5* | Within in 14 months of EDOC |
| 13 | National meeting(s) to discuss and finalize a nationwide summary and synthesis of variation assessments and proposed solutions among all states, as described in Task 6. | n/a | Within in 17 months of EDOC |
| 14 | Final assessment and analysis reports of the variations in organization level business policies and state laws that affect privacy and security practices in order to permit interoperability in a state, as described in Task 7. | 5* | At contract end date |
| 15 | Final plans to implement solutions to address variations in organization level business policies and state laws that affect privacy and security practices in order to permit interoperability in a state, as described in Task 8. | 5* | At contract end date |
| 16 | Nationwide summary and synthesis to inform policy making at Federal, State and local levels and NHIN architecture prototype solutions as described in Task 9. | 5* | At contract end date |

A copy of each deliverable marked with an asterisk (*) shall also be provided to the Contracting Officer:
Agency for Healthcare and Research Quality
540 Gaither Road
Rockville, MD  20850

## SECTION G - CONTRACT ADMINISTRATION DATA

**G.1    KEY PERSONNEL**

Pursuant to the Key Personnel clause incorporated in Section I of this contract, the following individual(s) is/are considered to be essential to the work being performed hereunder:

NAME                                                        TITLE

### (TO BE COMPLETED AT TIME OF CONTRACT AWARD)

The clause cited above contains a requirement for review and approval by the Contracting Officer of written requests for a change of Key Personnel reasonably in advance of diverting any of these individuals from this contract.  Receipt of written requests at least 30 days prior to a proposed change is considered reasonable.

**G.2    PROJECT OFFICER**

The following Project Officer(s) will represent the Government for the purpose of this contract:

### (TO BE COMPLETED AT TIME OF CONTRACT AWARD)

The project officer is/are responsible for: (1) monitoring the contractor's technical progress, including the surveillance and assessment of performance and recommending to the contracting officer changes in requirements; (2) interpreting the statement of work and any other technical performance requirements; (3) performing technical evaluation as required; (4) performing technical inspections and acceptances required by this contract; and (5) assisting in the resolution of technical problems encountered during performance.

The contracting officer is the only person with authority to act as an agent of the Government under this contract.  Only the contracting officer has authority to: (1) direct or negotiate any changes in the statement of work; (2) modify or extend the period of performance; (3) change the delivery schedule; (4) authorize reimbursement to the contractor of any costs incurred during the performance of this contract; or (5) otherwise change any terms and conditions of this contract.

The Government may unilaterally change its Project Officer designation.

**G.3    INVOICE SUBMISSION**

a.    INVOICE SUBMISSION

Billing Instructions are attached and made part of this contract. Instructions and the following directions for the submission of invoices must be followed to meet the requirements of a "proper" payment request pursuant to FAR 32.9, and must be in accordance with the General Provisions clause 52.232-25 Prompt Payment (OCT 2003).

Invoices/financing requests shall be submitted in an original and three copies to:

> Contracting Officer
> Agency for Healthcare Research and Quality
> Division of Contracts Management
> 540 Gaither Road
> Rockville, Maryland  20850

**G.4    INFORMATION ON VOUCHERS**

(1)    The Contractor agrees to include the following minimum information on vouchers:

(a)    Contractor's name and invoice date;

(b)    Contract Number;

(c)    Description and price of services actually rendered;

(d)    Other substantiating documentation or information as required by the contract;

(e)    Name (where practicable), title, phone number, and complete mailing address or responsible official to whom payment is to be sent; and

(f)    The Internal Revenue Service Taxpayer Identification Number.

(2)    The Contractor shall furnish the following <u>minimum</u> information in support of costs submitted:

(a)    <u>Direct Labor</u> - include all persons, listing the person's name, title, number of hours or days worked, labor rate, the total cost per person and a total amount of this category;

(b)    <u>Fringe Costs</u> - show rate, base and total amount as well as verification/allowability or rate changes (when applicable);

(c)    <u>Overhead or Indirect Costs</u> - show rate, base and total amount as well as verification/allowability or rate changes (when applicable);

(d)    <u>Consultants</u> - include the name, number of days or hours worked, a total amount per consultant and a total amount for this category;

(e)    <u>Travel</u> - include for each airplane or train trip taken the name of the traveler, date of travel, destination, the transportation costs including ground transportation, shown separately, and per diem costs.  Other travel costs shall also be listed.  A total amount for this category shall be provided;

(f)    <u>Subcontractors</u> - include for each subcontractor, the same data that is being provided for the prime contractor.  A total number for this category shall be provided.

(g)    <u>Data Processing</u> - include all non-labor costs, i.e., computer time, equipment purchase, lease or rental, data tapes, etc.  A total amount for this category shall be provided.

(h)    <u>Other</u> - include a listing of all other direct charges to the contract, i.e., office supplies, telephone, equipment rental, duplication, etc.

(i)    <u>Equipment Cost</u> - itemize and identify separately from material costs including reference to approval in all cases;

(j)    <u>G&A</u> - show rate, base and total as well as verification/allowability of rate changes (when applicable); and

(k)    <u>Fee</u> - show rate, base and total.

(3)    Payment shall be made by:

        PSC Finance
        Parklawn Building, Room 16-23
        5600 Fishers Lane
        Rockville, Maryland 20857
        Telephone Number (301) 443-6766

## G.5    INDIRECT COST RATES

In accordance with Federal Acquisition Regulation (FAR) (48 CFR Chapter 1) Clause 52.216-7(d)(2), <u>Allowable Cost and Payment</u>, incorporated by reference in this contract, in Part II, Section I, the primary contact point responsible for negotiating provisional and/or final indirect cost rates is the cognizant contracting official as set forth in FAR Subpart 42.7 - Indirect Cost Rates.

Reimbursement will be limited to the rates and time periods covered by the negotiated agreements.  The rates, if negotiated, are hereby incorporated without further action of the contracting officer.

## G.6    ELECTRONIC FUNDS TRANSFER

Pursuant to FAR 52.232-33, Payment by Electronic Funds Transfer - Central Contractor Registration (OCT 2003), the Contractor shall designate a financial institution for receipt of electronic funds transfer payments.  This designation shall be submitted, in writing, to the finance office designated in the contract.

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

**H.1    RESTRICTIONS ON PUBLICATION AND DISSEMINATION OF MATERIAL DERIVED FROM WORK PERFORMED UNDER THIS CONTRACT**

Section 903(c) of the Public Health Service Act (PHS Act), 42 U.S.C. 299a-1, states in part that "No information, if the establishment or person supplying the information or described in it is identifiable, obtained in the course of activities undertaken or supported under this title, may be used for any purpose other than the purpose for which it was supplied unless such establishment or person has consented...to its use for such other purpose.  Such information may not be published or released in other form if the person who supplied the information or who is described in it is identifiable unless such person has consented...to its publication or release in other form."

To ensure compliance with these requirements and to fulfill the mandate of 923(b)(1) of the PHS Act, 42 U.S.C. 299c-2(b)(1), to assure that statistics developed with AHRQ support are of high quality, comprehensive, timely, and adequately analyzed, except as otherwise provided in this contract, the Agency for Healthcare Research and Quality (AHRQ) must, prior to dissemination by the contractor, review all reports, presentations, or other disclosures that contain statistics and analytical material based on or derived from work performed under this contract.  Accordingly:

(a)    AHRQ will, within three months of the receipt of any proposed publication, presentation, or any other disclosure of materials derived from information collected or produced for a particular task order, use best efforts to review the proposed report, presentation, or other text to assure that (1) identifiable information is being used for the purpose for which it was supplied; (2) the privacy of individuals and confidentiality of establishments supplying identifiable information or described in it is not violated; and (3) the quality of statistical work meets the statutory standards cited above.

(b)    Except as provided in H.2(c), (e), and H.2(d), the contractor will not publish, have published, or otherwise disseminate any material resulting or derived from the work performed for AHRQ-funded research, except in accordance with the terms or conditions required by the Project Officer or until AHRQ has published the results of the research.

(c)    Except as provided in H.2(e)**,** in the event no written conditions or approval are received from the Project  Officer by the end of the three month period following submission of a request (that is accompanied by the proposed text) to publish a report or to make a presentation or other disclosure of material derived from work performed for AHRQ-funded research, the contractor may publish, present, or otherwise disclose this material subject to the restrictions of Section 903(c).  However, the contractor must print prominently on the report or any portion of it which is released, or state prior to any oral or other disclosure of material derived from work performed under this contract, the following disclaimer:

"THIS REPORT *(or other appropriate description of publication)* HAS NOT BEEN APPROVED BY THE AGENCY FOR HEALTHCARE RESEARCH AND QUALITY"

21

(d)     Whether or not written approval of the Project Officer is received, the contractor must:

.     print the following statement prominently on written reports or other forms of recorded data derived from work performed under this contract which is to be released; or

.     preceding any presentation or other oral disclosure of such material make the following statement:

"IDENTIFIABLE INFORMATION IN THIS REPORT OR PRESENTATION IS PROTECTED BY FEDERAL LAW, SECTION 924(C) OF THE PUBLIC HEALTH SERVICE ACT, 42 U.S.C. 299C-3(C).  ANY CONFIDENTIAL IDENTIFIABLE INFORMATION IN THIS REPORT OR PRESENTATION THAT IS KNOWINGLY DISCLOSED IS DISCLOSED SOLELY FOR THE PURPOSE FOR WHICH IT WAS PROVIDED.

(e)     In cases where the Contracting Officer has given written notice that the Government intends to require assignment of rights in any particular data produced under this contract, the contractor shall be granted a license to publish such data or analyses based on those data, that meet the statutory confidentiality and quality requirements referenced in the second paragraph of this section.

(f)     Whenever data or analyses are to be developed by a subcontractor under this contract, the contractor must include the terms of H.2.(a), (b), (c), (d) and (e) in the subcontract, without substantive alteration, and with a prohibition on the subcontractor engaging in further assignment of its obligations to the contractor. No clause may be included to diminish the Government's restriction on publication and dissemination of work or material derived from work performed under this contract.

## H.2    DEBARMENT

Violation of the special provisions of this contract entitled **RESTRICTIONS ON PUBLICATION AND DISSEMINATION OF MATERIAL DERIVED FROM WORK PERFORMED UNDER THIS CONTRACT, and RIGHTS IN DATA - SPECIAL WORKS** will be viewed as a serious violation of the terms of this contract as the requirements in this provision reflect AHRQ statutory obligations and responsibilities.  Such violations, as well as other violations, of the contract terms which are deemed serious, could result in the initiation of debarment proceedings in accordance with the Federal Acquisition Regulations and the Department of Health and Human Services implementing regulations.

**H.3    SUBCONTRACTS**

The contractor must include in any subcontracts executed or used to provide the support specified in this contract the terms of requirements H.1, H.2 and H.3.  These requirements are to be included without substantive alteration, and no clause may be included to diminish these requirements.

Award of any subcontract is subject to the written approval of the Contracting Officer upon review of the supporting documentation as required by FAR Clause 52.215-12, Subcontractor Cost or Pricing Data, of the General Clauses incorporated into this contract.  A copy of the signed subcontract shall be provided to the Contracting Officer.

**H.4    LATE PAYMENTS TO THE GOVERNMENT**

Late payment of debts owed the Government by the Contractor, arising from whatever cause, under this contract/order shall bear interest at a rate or rates to be established in accordance with the Treasury Fiscal Requirements Manual.  For purposes of this provision, late payments are defined as payments received by the Government more than 30 days after the Contractor has been notified in writing by the Contracting Officer of:

a.      The basis of indebtedness.

b.      The amount due.

c.      The fact that interest will be applied if payment is not received within 30 days from the date of mailing of the notice.

d.      The approximate interest rate that will be charged.

**H.5    PRIVACY ACT**

The Privacy Act clauses cited in Section I (FAR 52.224-1 and 52.224-2) are applicable to the consultant records kept by the Contractor for the Agency for Healthcare Research and Quality.

You are hereby notified that the Contractor and its employees are subject to criminal penalties for violations of the Act (5 U.S.C. 552a(i)) to the same extent as employees of the Department. The Contractor shall assure that each Contractor employee is aware that he/she can be subjected to criminal penalties for violations of the Act.  Disposition instructions:  Records are to be destroyed after contract closeout is completed and final payment is made and in accordance with IRS regulations.

**H.6    SALARY CAP GUIDE NOTICE**

Pursuant to P.L. 108-447, no Fiscal Year 2005 (October 1, 2004 - September 30, 2005) funds may be used to pay the direct salary of an individual through this contract at a rate in excess of the direct salary rate for Executive Level I of the Federal Executive Pay Scale.  That rate is $180,100 per year for the period of January 1, 2005 through December 31, 2005.  Direct salary is exclusive of overhead, fringe benefits, and general and administrative expenses.  The salary limit also applies to individuals proposed under subcontracts.  If this is a multi-year contract, it may be subject to unilateral modifications by the Government if any salary rate ceilings are established in future DHHS appropriation acts.  P.L. 108-447 states in pertinent part:

> None of the funds appropriated in this Act for the National Institutes of Health, the Agency for Healthcare Research and Quality, and the Substance Abuse and Mental Health Services Administration shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of Executive Level I.

Contractors shall absorb that portion of an employee's salary (plus the dollar amount for fringe benefits and indirect costs associated with the excess) that exceeds a rate of $180,100 a year.

**PART II - CONTRACT CLAUSES**

(04/05-DCM)
(FAC 2005-03)

**SECTION I**
**CONTRACT CLAUSES**
**GENERAL CLAUSES FOR A COST-PLUS-A-FIXED-FEE CONTRACT**

CLAUSES INCORPORATED BY REFERENCE (FEBRUARY 1998)

This contract incorporates the following clauses by reference, with the same force and effect as if they were given in full text.  Upon request, the Contracting Officer will make their full text available.  Also, the full text of a clause may be accessed electronically at this address: http://www.arnet.gov/far/

I.  FEDERAL ACQUISITION REGULATION (FAR) (48 CFR CHAPTER 1)
    CLAUSES

| FAR Clause No. | Title and Date |
| --- | --- |
| 52.203-3 | Gratuities (APR 1984) |
| 52.203-5 | Covenant Against Contingent Fee (APR 1984) |
| 52.203-6 | Restrictions on Subcontractor Sales to the Government (Jul 1995) |
| 52.203-7 | Anti-Kickback Procedures  (JUL 1995) |
| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity (JAN 1997) |
| 52.203-10 | Price or Fee Adjustment for Illegal or Improper Activity (JAN 1997) |
| 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions (JUN 2003) |
| 52.204-4 | Printing or Copying Double-Sided on Recycled Paper (AUG 2000) |
| 52.204-7 | Central Contractor Registration. (OCT 2003) |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment (JAN 2005) |
| 52.215-2 | Audit and Records - Negotiation (JUN 1999) |
| 52.215-8 | Order of Precedence-Uniform Contract Format (Oct 1997) |

| 52.215-10 | Price Reduction for Defective Cost or Pricing Data (OCT 1997) (applicable to contract actions over $550,000) |
|---|---|
| 52.215-12 | Subcontractor Cost or Pricing Data (OCT 1997) (applicable to contract actions over $550,000) |
| 52.215-15 | Pension Adjustments and Asset Reversions (OCT 2004) |
| 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other Than Pensions  (OCT 1997) |
| 52.215-19 | Notification of Ownership Changes (OCT 1997) |
| 52.216-7 | Allowable Cost and Payment (DEC 2002) |
| 52.216-8 | Fixed Fee (MAR 1997) |
| 52.219-8 | Utilization of Small Business Concerns  (MAY 2004) |
| 52.222-2 | Payment for Overtime Premiums (JUL 1990).  The amount in paragraph (a) is "zero" unless different amount is separately stated elsewhere in contract. |
| 52.222-3 | Convict Labor (JUNE 2003) |
| 52.222-26 | Equal Opportunity (APR 2002) |
| 52.222-35 | Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans. (DEC 2001) |
| 52.222-36 | Affirmative Action for Workers With Disabilities (JUNE 1998) |
| 52.222-37 | Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans. (DEC 2001) |
| 52.222-39 | Notification of Employee Rights Concerning Payment of Union Dues or Fees (DEC 2004) |
| 52.223-6 | Drug Free Workplace (MAY 2001) |
| 52.223-14 | Toxic Chemical Release Reporting (AUG 2003) |
| 52.224-1 | Privacy Act Notification (APRIL 1984) |
| 52.224-2 | Privacy Act (APRIL 1984) |
| 52.225-1 | Buy American Act - Supplies  (JUNE 2003) |
| 52.225-13 | Restrictions on Certain Foreign Purchases (DEC 2003) |

| | |
|---|---|
| 52.227-1 | Authorization and Consent  (JULY 1995) |
| 52.227-2 | Notice and Assistance Regarding Patent and Copy-Right Infringement (AUG 1996) |
| 52.227-3 | Patent Indemnity (APRIL 1984) |
| 52.227-16 | Additional Data Requirements (JUNE 1987) |
| 52.228-7 | Insurance-Liability to Third Persons (MAR 1996) |
| 52.232-9 | Limitation on Withholding of Payments (APRIL 1984) |
| 52.232-17 | Interest (JUNE 1996) |
| 52.232-20 | Limitation of Cost (APR 1984) |
| 52.232-23 | Assignment of Claims (JAN 1986) |
| 52.232-25 | Prompt Payment (OCT 2003) |
| 52.232-33 | Payment by Electronic Funds Transfer Central        Contractor Registration (Oct 2003) |
| 52.233-1 | Disputes (JULY 2002) |
| 52.233-3 | Protest After Award (AUG 1996)  Alternate I (JUNE 1985) |
| 52.233-4 | Applicable Law for Breach of Contract Claim (OCT 2004) |
| 52.237-10 | Identification of Uncompensated Overtime (Oct 1997) |
| 52.242-1 | Notice of Intent to Disallow Costs (APRIL 1984) |
| 52.242-3 | Penalties for Unallowable Costs (MAY 2001) |
| 52.242-4 | Certification of Final Indirect Costs (Jan 1997) |
| 52.242-13 | Bankruptcy (JULY 1995) |
| 52.243-2 | Changes - Cost Reimbursement (AUG 1987) - Alternate II (APRIL 1984) |
| 52.244-2 | Subcontracts (AUGUST 1998) |
| 52.244-5 | Competition in Subcontracting (DEC 1996) |
| 52.245-5 | Government Property (Cost Reimbursement, Time-and-Material, or Labor-Hour Contract (MAY 2004) |
| 52.246-5 | Inspection of Services-Cost Reimbursement (APRIL 1984) |

27

| | |
|---|---|
| 52.246-23 | Limitation of Liability-(FEB 1997) |
| 52.248-1 | Value Engineering (FEB 2000) |
| 52.249-6 | Termination (Cost-Reimbursement) (MAY 2004) |
| 52.249-14 | Excusable Delays (APRIL 1984) |
| 52.251-1 | Government Supply Sources (APRIL 1984) |
| 52.253-1 | Computer Generated Forms (JAN 1991) |

II.   DEPARTMENT OF HEALTH AND HUMAN SERVICES ACQUISITION
        REGULATION (HHSAR)  (48 CFR CHAPTER 3) CLAUSES

HHSAR

| Clause No. | Title and Date |
|---|---|
| 352.202-1 | Definitions (JAN 2001) |
| 352.224-70 | Confidentiality of Information (JAN 2005) |
| 352.228-7 | Insurance - Liability to Third Persons (DEC 1991) |
| 352.232-9 | Withholding of Contract Payments (APRIL 1984) |
| 352.233-70 | Litigation and Claims (APR 1984) |
| 352.242-71 | Final Decisions on Audit Findings (APRIL 1984) |
| 352.270-1 | Accessibility of Meetings, Conferences, and Seminars to Persons With Disabilities (JAN 2001) |
| 352.270-5 | Key Personnel (APRIL 1984) |
| 352.270-6 | Publication and Publicity (JUL 1991) |
| 352.270-7 | Paperwork Reduction Act (JAN 2001) |

**KEY PERSONNEL (APRIL 1984) (HHSAR 352.270-5)**

The personnel specified in this contract are considered to be essential to the work being performed hereunder.  Prior to diverting any of the specified individuals to other programs, the Contractor shall notify the Contracting Officer reasonably in advance and shall submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the program.  No diversion shall be made by the Contractor without the written consent of the Contracting Officer; provided, that the Contracting Officer may ratify in writing such diversion and such ratification shall constitute the consent of the Contracting Officer required by this clause.  The contract may be amended from time to time during the course of the contract to either add or delete personnel, as appropriate.
(End of clause)

**PART III- LIST OF DOCUMENTS, EXHIBITS AND ATTACHMENTS**

**SECTION J - LIST OF ATTACHMENTS**

| Attachment | | Pages |
|---|---|---|
| 1. | Past Performance Questionnaire and Contractor Performance Form | 5 |
| 2. | SF LLL-A, Disclosure of Lobbying Activities | 4 |
| 3. | Small and Small Disadvantaged Business Subcontracting Plan | 7 |
| 4. | Proposal Intent Form | 1 |

**NOTE:  ALL ATTACHMENTS ARE LOCATED AT THE END OF THIS REQUEST FOR PROPOSAL**

(FAC 2001-27)

PART IV.  REPRESENTATIONS AND INSTRUCTIONS

SECTION K

REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS

| K.1 | HHSAR 315.204-5 | Representations and Instructions |
| K.2. | FAR 52.204-8 | Annual Representations and Certifications (JAN 2005) |
| K.3. | FAR 52.222-21 | Prohibition of Segregated Facilities (FEB 1999) |
| K.4. | FAR 52.230-1 | Cost Accounting Standards Notices and Certification (JUNE 2000) |
| K.5. | P.L. 103-227 | Certification Regarding Environmental Tobacco Smoke |

K.I  REPRESENTATIONS AND INSTRUCTIONS

(a) Section K, Representations, certifications, and other statements of offerors.
(1) This section shall begin with the following and continue with the applicable representations and certifications:

TO BE COMPLETED BY THE OFFEROR:  (The Representations and Certifications must be executed by an individual authorized to bind the Offeror.) The Offeror makes the following Representations and Certifications as part of its proposal.  (Check or complete all appropriate boxes or blanks on the following pages.)

_____
   (Name of Offeror)                    (RFP No.)


_____
(Signature of Authorized Individual)        (Date)


(Typed Name of Authorized Individual)


NOTE:  The penalty for making false statements in offers is  prescribed in 18 U.S.C. 1001.
      K.2.  ANNUAL REPRESENTATIONS AND CERTIFICATIONS (JAN 2005) (FAR 52.204-8)

31

(a)(1) If the clause at 52.204-7, Central Contractor Registration, is included in this solicitation, paragraph (b) of this provision applies.

(2) If the clause at 52.204-7 is not included in this solicitation, and the offeror is currently registered in CCR, and has completed the ORCA electronically, the offeror may choose to use paragraph (b) instead of completing the corresponding individual representations and certifications in the solicitation.  The offeror shall indicate which option applies by checking one of the following boxes:

[  ] (i) Paragraph (b) applies

[  ] (ii) Paragraph (b) does not apply and the offeror has completed the individual representations and certification in the solicitation.

(b) The offeror has completed the annual representations and certifications electronically via the Online Representations and Certifications Application (ORCA) website at http://orca/bpn.gov.  After reviewing the ORCA database information, the offeror verifies by submission of the offer that the representations and certifications currently posted electronically have been entered or updated within the last 12 months, are current, accurate, complete, and applicable to this solicitation (including the business size standard applicable to the NAICS code referenced for this solicitation), as of the date of this offer and are incorporated in this offer by reference (see FAR 4.1201); except for the changes identified below (offeror to insert changes, identifying change by clause number, title, date).  These amended representation(s) and/or certification(s) are also incorporated in this offer and are current, accurate, and complete as of the date of this offer.

FAR Clause#              Title                          Date           Change

Any changes provided by the offeror are applicable to this solicitation only, and do not result in an update to the representations and certifications posted on ORCA.

(End of provision)

K.3. PROHIBITION OF SEGREGATED FACILITIES

(FEB 1999) (FAR 52.222-21)

(a)     "Segregated facilities," as used in this clause, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of written or oral policies or employee custom. The term does not include separate or single-user rest rooms or necessary dressing or sleeping areas provided to assure privacy between the sexes.

(b)     The Contractor agrees that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained.  The Contractor agrees that a breach of this clause is a violation of the Equal Opportunity clause in this contract.

(c)     The Contractor shall include this clause in every subcontract and purchase order that is subject to the Equal Opportunity clause of this contract.
                    (End of Clause)


K.4.  COST ACCOUNTING STANDARDS NOTICES AND
CERTIFICATION
(FAR 52.230-1) (JUNE 2000)
NOTE: This notice does not apply to small businesses or foreign governments.  This notice is in three parts, identified by Roman numerals I through III.

Offerors shall examine each part and provide the requested information in order to determine Cost Accounting Standards (CAS) requirements applicable to any resultant contract.

If the offeror is an educational institution, Part II does not apply unless the contemplated contract will be subject to full or modified CAS-coverage pursuant to 48CFR 9903.201-2(c)(5) or 9903.201-2(c)(6),respectively.

I.    Disclosure Statement - Cost Accounting Practices and Certification

(a) Any contract in excess of $500,000 resulting from this solicitation, will be subject to the requirements of the Cost Accounting Standards Board (48 CFR, Chapter 99), except for those contracts which are exempt as specified in 48 CFR 9903.201-1.

(b)  Any offeror submitting a proposal which, if accepted, will result in a contract subject to the requirements of 48 CFR Chapter 99 must, as a condition of contracting, submit a Disclosure Statement as required by 48 CFR 9903.202.  When required, the Disclosure Statement must be submitted as a part of the offeror's proposal under this solicitation unless the offeror has already submitted a Disclosure Statement disclosing the practices used in connection with the pricing of this proposal.  If an applicable Disclosure Statement has already been submitted, the offeror may satisfy the requirement for submission by providing the information requested in paragraph (c) of Part I of this provision.  Caution:  In the absence of specific regulations or agreement, a practice disclosed in a Disclosure Statement shall not, by virtue of such disclosure, be deemed to be a proper, approved, or agreed-to practice for pricing proposals or accumulating and reporting contract performance cost data.

(c)  Check the appropriate box below:

[ ]       (1) Certificate of Concurrent Submission of Disclosure Statement.
          The offeror hereby certifies that, as a part of the offer, copies of the Disclosure Statement have been submitted as follows: (i) original and one copy to the cognizant Administrative Contracting Officer (ACO) or cognizant Federal agency official authorized to act in that capacity, as applicable, and (ii) one copy to the cognizant Federal auditor.

          (Disclosure must be on Form No. CASB DS-1 or CASB DS-2, as applicable.  Forms may be obtained from the cognizant ACO or Federal official and/or from the loose-leaf version of the Federal Acquisition Regulation.)

          Date of Disclosure Statement:_____
          Name and Address of Cognizant
           ACO or Federal official where filed:
          The offeror further certifies that practices used in estimating costs in pricing this proposal are consistent with the cost accounting practices disclosed in the Disclosure Statement.

[ ]       (2) Certificate of Previously Submitted Disclosure Statement.

          The offeror hereby certifies that the required Disclosure Statement was filed as follows:

          Date of Disclosure Statement:_____
          Name and Address of Cognizant
           ACO or Federal official where filed:_____

          The offeror further certifies that the practices used in estimating costs in pricing this proposal are consistent with the cost accounting practices disclosed in the applicable Disclosure Statement.


[ ]       (3) Certificate of Monetary Exemption.

          The offeror hereby certifies that the offeror together with all divisions, subsidiaries, and affiliates under common control, did not receive net awards of negotiated prime contracts and subcontracts subject to CAS totaling more than $25 million in the cost accounting period immediately preceding the period in which this proposal was submitted.  The offeror further certifies that if such status changes before an award resulting from this proposal, the offeror will advise the Contracting Officer immediately.

34

[ ]        (4) Certificate of Interim Exemption.

The offeror hereby certifies that (i) the offeror first exceeded the monetary exemption for disclosure, as defined in (3) of this subsection, in the cost accounting period immediately preceding the period in which this offer was submitted and (ii) in accordance with 48 CFR, Subpart 9903.202-1, the offeror is not yet required to submit a Disclosure Statement.  The offeror further certifies that if an award resulting from this proposal has not been made within 90 days after the end of that period, the offeror will immediately submit a review certificate to the Contracting Officer, in the form specified under subparagraph (c)(1) or (c)(2) of Part I of this provision, as appropriate, to verify submission of a completed Disclosure Statement.

Caution:  Offerors currently required to disclose because they were awarded a CAS-covered prime contract or subcontract of $25 million or more in the current cost accounting period may not claim this exemption (4).  Further, the exemption applies only in connection with proposals submitted before expiration of the 90-day period following the cost accounting period in which the monetary exemption was exceeded.

II.     Cost Accounting Standards - Eligibility for Modified Contract Coverage

If the offeror is eligible to use the modified provisions of 48 CFR, Subpart 9903.201-2(b) and elects to do so, the offeror shall indicate by checking the box below.  Checking the box below shall mean that the resultant contract is subject to the Disclosure and Consistency of Cost Accounting Practices clause in lieu of the Cost Accounting Standards clause.

[ ]        The offeror hereby claims an exemption from the Cost Accounting Standards clause under the provisions of 48 CFR, Subpart 9903.201-2(b) and certifies that the offeror is eligible for use of the Disclosure and Consistency of Cost Accounting Practices clause because during the cost accounting period immediately preceding the period in which this proposal was submitted, the offeror received less than $25 million in awards of CAS-covered prime contracts and subcontracts or the offeror did not receive a single CAS-covered award exceeding $1 million.  The offeror further certifies that if such status changes before an award resulting from this proposal, the offeror will advise the Contracting Officer immediately.

Caution:  An offeror may not claim the above eligibility for modified contract coverage if this proposal is expected to result in the award of a CAS-covered contract of $25 million or more or if, during its current cost accounting period, the offeror has been awarded a single CAS-covered prime contract or subcontract of $25 million or more.

III.    Additional Cost Accounting Standards Applicable to Existing Contracts

The offeror shall indicate below whether award of the contemplated contract would, in accordance with subparagraph (a)(3) of the Cost Accounting Standards clause, require a change in established cost accounting practices affecting existing contracts and subcontracts.
[ ] Yes     [ ] No

                              (End of Provision)

ALTERNATE I (APR 1996)

[ ]      (5) Certificate of Disclosure Statement Due Date by Educational Institution.

If the offeror is an educational institution that, under the transition provisions of 48 CFR 9903.202-1(f), is or will be required to submit a Disclosure Statement after receipt of this award, the offeror hereby certifies that (check one and complete):

[] (a) A Disclosure Statement filing Due Date of _____ has been established with the cognizant Federal agency.

[] (b) The Disclosure Statement will be submitted within the six month period ending months after receipt of this award.

Name and Address of cognizant ACO or Federal Official where Disclosure Statement is to be filed:

**(END OF ALTERNATE I)**


** Insert the day, month, and year when price negotiations were concluded and price agreement was reached or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price.

*** Insert the day, month, and year of signing, which should be as close as practicable to the date when the price negotiations were concluded and the contract price agreed to.

End of Certificate

36

### K.5.   ENVIRONMENTAL TOBACCO SMOKE

The Public Health Service strongly encourages all grant and contract recipients to provide a smoke-free workplace and to promote the nonuse of all tobacco products.  In addition, Public Law 103-227, the Pro-Children Act of 1994, prohibits smoking in certain facilities (or in some cases, any portion of a facility) in which regular or routine education, library, day care, health care or early childhood development services are provided to children.

#### CERTIFICATION REGARDING ENVIRONMENTAL TOBACCO SMOKE

Public Law 103-227, also known as the Pro-Children Act of 1994 (Act), requires that smoking not be permitted in any portion of any indoor facility owned or leased or contracted for by an entity and used routinely or regularly for the provision of health, day care, early childhood development services, education or library services to children under the age of 18, if the services are funded by Federal programs either directly or through State or local governments, by Federal grant, contract, loan, or loan guarantee.  The law also applies to children's services that are provided in indoor facilities that are constructed, operated, or maintained with such federal funds.  The law does not apply to children's services provided in private residences; portions of facilities used for inpatient drug or alcohol treatment; service providers whose sole source of applicable Federal funds is Medicare or Medicaid; or facilities where WIC coupons are redeemed.  Failure to comply with the provisions of the law may result in the imposition of a civil monetary penalty of up to $1000 for each violation and/or the imposition of an administrative compliance order on the responsible entity.

By signing this certification, the offeror/contractor certifies that the submitted organization will comply with the requirements of the Act and will not allow smoking within any portion of any indoor facility used for the provision of services for children as defined by the Act.

The submitting organization agrees that it will require that the language of this certification be included in any subawards which contain provisions for children's services and that all subrecipients shall certify accordingly.

Organization:_____

Signature_____ Title_____

Date_____

## SECTION L - INSTRUCTIONS, CONDITIONS AND NOTICES TO OFFERORS

**L.1    SOLICITATION PROVISIONS INCORPORATED BY REFERENCE (FEB 1998) (FAR 52.252-1)**

This solicitation incorporates the following solicitation provisions by reference, with the same force and effect as if they were given in full text.  Upon request, the contracting officer will make the full text available.  Also, the full text of a clause may be assessed electronically at this address: http://www.arnet.gov/far/

a.    Federal Acquisition Regulation (FAR) (48 CFR Chapter 1) Solicitation Provisions

   (1)    52.215-16    Facilities Capital Cost of Money (OCT 1997)

   (2)    52.215-20    Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data (OCT 1997)

**L.2    DATA UNIVERSAL NUMBERING (DUNS) NUMBER (OCT 2003) (FAR 52.204-6)**

(a)    The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "DUNS" or "DUNS+4" followed by the DUNS number or "DUNS+4" that identifies the offeror's name and address exactly as stated in the offer.  The DUNS number is a nine-digit number assigned by Dun and Bradstreet Information Services. The DUNS+4 is the DUNS number plus a 4-character suffix that may be assigned at the discretion of the offeror to establish additional CCR records for identifying alternative Electronic Funds Transfer (EFT) accounts (see Subpart 32.11) for the same parent concern.

(b)    If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one.

   (1)  An offeror may obtain a DUNSnumber—
         (i) If located within the United States, by calling Dun and Bradstreet at 1-866-705-5711 or via the Internet at *http://www.dnb.com*; or
         (ii) If located outside the United States, by contacting the local Dun and Bradstreet office.

(2)  The offeror should be prepared to provide the following information:
     (i) Company legal business name.
     (ii) Tradestyle, doing business, or other name by which your entity is commonly recognized.
     (iii) Company physical street address, city, state and Zip Code.
     (iv) Company mailing address, sity, state and Zip Code (if separate from physical).
     (v) Company telephone number.
     (vi) Date the company was started.
     (vii) Number of employees at your location.
     (viii) Chief executive officer/ key manager.
     (ix) Line of business (industry)
     (X) Company Headquarters name and address (reporting relationship within your entity).
                    (End of provision)

## L.3  INSTRUCTIONS TO OFFERORS - COMPETITIVE ACQUISITION (MAY 2001) ALTERNATE I (JAN 2004)(FAR 52.215-1)

(a)       Definitions.  As used in this provision –

"Discussions" are negotiations that occur after establishment of the competitive range that may, at the Contracting Officer's discretion, result in the offeror being allowed to revise its proposal.

"In writing," "writing," or "written" means any worded or numbered expression that can be read, reproduced, and later communicated, and includes electronically transmitted and stored information.

"Proposal modification" is a change made to a proposal before the solicitation's closing date and time, or made in response to an amendment, or made to correct a mistake at any time before award.

"Proposal revision" is a change to a proposal made after the solicitation closing date, at the request of or as allowed by a Contracting Officer as the result of negotiations.

"Time," if stated as a number of days, is calculated using calendar days, unless otherwise specified, and will include Saturdays, Sundays, and legal holidays. However, if the last day falls on a Saturday, Sunday or legal holiday, then the period shall include the next working day.

(b)       Amendments to solicitations.  If this solicitation is amended, all terms and conditions that are not amended remain unchanged.  Offerors shall acknowledge receipt of any amendment to this solicitation by the date and time specified in the amendment(s).

(c)       Submission, modification, revision, and withdrawal of proposals.

(1)    Unless other methods (e.g., electronic commerce or facsimile) are permitted in the solicitation, proposals and modifications to proposals shall be submitted in paper media in sealed envelopes or packages (i) addressed to the office specified in the solicitation, and (ii) showing the time and date specified for receipt, the solicitation number, and the name and address of the offeror.  Offerors using commercial carriers should ensure that the proposal is marked on the outermost wrapper with the information in paragraphs (c)(1)(i) and (c)(1)(ii) of this provision.

(2)    The first page of the proposal must show—

(i)    The solicitation number;

(ii)    The name, address, and telephone and facsimile numbers of the offeror (and electronic address if available);

(iii)    A statement specifying the extent of agreement with all terms, conditions, and provisions  included in the solicitation and agreement to furnish any or all items upon which prices are offered at the price set opposite each item;

(iv)    Names, titles, and telephone and facsimile numbers (and electronic addresses if available) of persons authorized to negotiate on the offeror's behalf with the Government in connection with this solicitation; and

(v)    Name, title, and signature of person authorized to sign the proposal.  Proposals signed by an agent shall be accompanied by evidence of that agent's authority, unless that evidence has been previously furnished to the issuing office.

(3)    Submissions, modification, revision, and withdrawal of proposals.

(i)    Offerors are responsible for submitting proposals, and any modification or revisions, so as to reach the Government office designated in the solicitation by the time specified in the solicitation.  If no time is specified in the solicitation, the time for receipt is 4:30 p.m., local time, for the designated Government office on the date that proposal or revision is due.

(ii)    (A) Any proposal, modification, or revision received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and -

(1)      If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

(2)      There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

(3)      It is the only proposal received.

(B) However, a late modification of an otherwise successful proposal that makes its terms more favorable to the Government, will be considered at any time it is received and may be accepted.

(iii)      Acceptable evidence to establish the time of receipt at the Government installation includes the time/date stamp of that installation on the proposal wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel.

(iv)      If an emergency or unanticipated event interrupts normal Government processes so that proposals cannot be received at the office designated for receipt of proposals by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation, the time specified for receipt of proposals will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume.

(v)      Proposals may be withdrawn by written notice received at any time before award. Oral proposals in response to oral solicitations may be withdrawn orally. If the solicitation authorizes facsimile proposals, proposals may be withdrawn via facsimile received at any time before award, subject to the conditions specified in the provision at 52.215-5, "Facsimile Proposals." Proposals may be withdrawn in person by an offeror or an authorized representative, if the representative's identity is made known and the representative signs a receipt for the proposal before award.

(4)      Unless otherwise specified in the solicitation, the offeror may propose to provide any item or combination of items.

(5)      Offerors shall submit proposals submitted in response to this solicitation in English, unless otherwise permitted by the solicitation, and in U.S. dollars, unless the provision at FAR 52.225-17, Evaluation of Foreign Currency Offers, is included in the solicitation.

(6)     Offerors may submit modifications to their proposals at any time before the solicitation closing date and time, and may submit modifications in response to an amendment, or to correct a mistake at any time before award.

(7)     Offers may submit revised proposals only if requested or allowed by the Contracting Officer.

(8)     Proposals may be withdrawn at any time before award. Withdrawals are effective upon receipt of notice by the Contracting Officer.

(d)     Offer expiration date.  Proposals in response to this solicitation will be valid for the number of days specified on the solicitation cover sheet (unless a different period is proposed by the offeror).

(e)     Restriction on disclosure and use of data.  Offerors that include in their proposals data that they do not want disclosed to the public for any purpose, or used by the Government except for evaluation purposes, shall —

(1)     Mark the title page with the following legend:

This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed–in whole or in part–for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of–or in connection with–the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract.  This restriction does not limit the Government's right to use information contained in this data if it is obtained from another source without restriction.  The data subject to this restriction are contained in sheets [insert numbers or other identification of sheets]; and

(2)     Mark each sheet of data it wishes to restrict with the following legend:

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal.

(f)     Contract award.

(1)     The Government intends to award a contract or contracts resulting from this solicitation to the responsible offeror(s) whose proposal(s) represents the best value after evaluation in accordance with the factors and subfactors in the solicitation.

(2)     The Government may reject any or all proposals if such action is in the Government's interest.

42

(3)    The Government may waive informalities and minor irregularities in proposals received.

(4)    The Government intends to evaluate proposals and award a contract after conducting discussions with offerors whose proposals have been determined to be within the competitive range.  If the Contracting Officer determines that the number of proposals that would otherwise be in the competitive range exceeds the number at which an efficient competition can be conducted, the Contracting Officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals.  Therefore, the offeror's initial proposal should contain the offeror's best terms from a price and technical standpoint.

(5)    The Government reserves the right to make an award on any item for a quantity less than the quantity offered, at the unit cost or prices offered, unless the offeror specifies otherwise in the proposal.

(6)    The Government reserves the right to make multiple awards if, after considering the additional administrative costs, it is in the Government's best interest to do so.

(7)    Exchanges with offerors after receipt of a proposal do not constitute a rejection or counteroffer by the Government.

(8)    The Government may determine that a proposal is unacceptable if the prices proposed are materially unbalanced between line items or subline items.  Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly overstated or understated as indicated by the application of cost or price analysis techniques.  A proposal may be rejected if the Contracting Officer determines that the lack of balance poses an unacceptable risk to the Government.

(9)    If a cost realism analysis is performed, cost realism may be considered by the source selection authority in evaluating performance or schedule risk.

(10)    A written award or acceptance of proposal mailed or otherwise furnished to the successful offeror within the time specified in the proposal shall result in a binding contract without further action by either party.

(11)    If a post-award debriefing is given to requesting offerors, the Government shall disclose the following information, if applicable:

    (i)    The agency's evaluation of the significant weak or deficient factors in the debriefed offeror's offer.

    (ii)    The overall evaluated cost or price and technical rating of the successful and the debriefed offeror and past performance information on the debriefed offeror.

(iii)   The overall raking of all offerors, when any ranking was developed by the agency during source selection

(iv)   A summary of the rationale for award

(v)    For acquisitions of commercial items, the make and model of the item to be delivered by the successful offeror.

(vi)   Reasonable responses to relevant questions posed by the debriefed offerors as to whether source-slection procedures set forth in the solicitation, applicable regulations, and other applicable authorities were followed by the agency.

(End of provision)

**L.4    TYPE OF CONTRACT (APRIL 1984)(FAR 52.216-1)**

The Government contemplates award of a cost-plus fixed fee contract resulting from this solicitation.

It is anticipated that one award will be made from this solicitation and that the award will be made on/about September 30, 2005.

**L.5    SERVICE OF PROTEST (AUG 1996)(FAR 52.233-2)**

(a)   Protests, as defined in Section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the General Accounting Office (GAO) shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

Director, Contracts Management
Agency for Healthcare Research and Quality
540 Gaither Road
Rockville, Maryland  20850

(b)   The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

**L.6    POINT OF CONTACT FOR TECHNICAL INQUIRIES**

The technical contact for additional information and answering inquiries is the Contracting Office.   All questions regarding this solicitation shall be in writing and received by the Contracting Office no later than **June 17, 2005**. It is requested that all questions be submitted by both e-mail and hardcopy.  E-mail to rzuhlke@ahrq.gov (fax to 301-427-1740).

**L.7    GENERAL INSTRUCTIONS**

Introduction

The following instructions will establish the acceptable minimum requirements for the format and contents of proposals.  Special attention is directed to the requirements for technical and business proposals to be submitted in accordance with these instructions:

a.    Contract Type and General Provisions:  It is contemplated that a cost-type contract will be awarded.  In addition to the special provisions of this request for proposal (RFP), any resultant contract shall include the general clauses applicable to the selected offeror's organization and type of contract awarded.  Any additional clauses required by Public Law, Executive Order, or procurement regulations, in effect at the time of execution of the proposed contract, will be included.

b.    Authorized Official and Submission of Proposal:  The proposal shall be signed by an official authorized to bind your (the offeror's) organization.  Your proposal shall be submitted in the number of copies, to the address, and marked as indicated in the cover letter of this solicitation.  Proposals will be typewritten, reproduced on letter sized paper and will be legible in all required copies.  To expedite the proposal evaluation, all documents required for responding to the RFP should be placed in the following order:

I.    TECHNICAL PROPOSAL:  See Technical Proposal Instructions for recommended format (L.8). Please mark as original or copy.

II.    PAST PERFORMANCE INFORMATION: See Past Performance Information Instructions for format (L.9)

III.    SMALL DISADVANTAGED BUSINESS PARTICIPATION PLAN:  See Small Disadvantaged Business Plan Instructions for format (L.10) Please mark as original or copy.

IV.    BUSINESS PROPOSAL:  See Business Proposal Instructions for recommended format (L.11).

c.    Separation of Technical, Past Performance Information, Small Disadvantaged Business Plan, and Business Proposal:  The proposal shall be in 4 parts:

(1) Technical Proposal; (2) Past Performance Information; (3) Small Disadvantaged Business Participation Plan; and (4) Business Proposal.  Each of the parts shall be separate and complete in itself so that evaluation of one may be accomplished independently of, and concurrently with, evaluation of the other.  The technical proposal shall not contain reference to cost; however resources information, such as data concerning labor hours and categories, materials, subcontracts, etc., shall be contained in the technical proposal so that your understanding of the Statement of Work (SOW) may be evaluated.  It must disclose your technical approach in as much detail as possible, including, but not limited to, the requirements of the technical proposal instructions.

d.    Evaluation of Proposals:  The Government will evaluate technical proposals in accordance with the criteria set forth in Section M, Evaluation/Award Criteria.

e.    Rejection of Proposals:  The Government reserves the right to reject any or all proposals received.  It is understood that your proposal will become part of the official contract file.

f.    Unnecessarily Elaborate Proposals:  Unnecessarily elaborate brochures or other presentations beyond those sufficient to present a complete and effective proposal are not desired and may be construed as an indication of the offeror's lack of cost consciousness.  Elaborate art work, expensive visual and other presentation aids are neither necessary nor wanted.

g.    Privacy Act:  The Privacy Act of 1974 (Public Law (P.L.) 93-579) requires that a Federal agency advise each individual whom it asks to supply information:  1) the authority which authorized the solicitation; 2) whether disclosure is voluntary or mandatory; (3) the principal purpose or purposes for which the information is intended to be used; (4) the uses outside the agency which may be made of the information; and 4) the effects on the individual, if any, of not providing all or any part of the requested information.

Therefore:

(1)    The Government is requesting the information called for in this RFP pursuant to the authority provided by Section 301(g) of the Public Health Service Act, as amended, and P.L. 92-218, as amended.

(2)    Provisions of the information requested are entirely voluntary.

(3)    The collection of this information is for the purpose of conducting an accurate, fair, and adequate review prior to a discussion as to whether to award a contract.

(4)    Failure to provide any or all of the requested information may result in a less than adequate review.

(5)     The information provided by you may be routinely disclosed for the following purposes:

-to the cognizant audit agency and the General Accounting Officer for auditing;
-to the Department of Justice as required for litigation;
-to respond to Congressional inquiries; and
-to qualified experts, not within the definition of Department employees for opinions as a part of the review process.

In addition, the Privacy Act of 1974 (P.L. 93-579, Section 7) requires that the following information be provided when individuals are requested to disclose their social security number.

Provision of the social security number is voluntary.  Social security numbers are requested for the purpose of accurate and efficient identification, referral, review and management of AHRQ contracting programs.  Authority for requesting this information is provided by Section 305 and Title IV of the Public Health Service Act, as amended.

h.     The RFP does not commit the Government to pay any cost for the preparation and submission of a proposal.  It is also brought to your attention that the Contracting Officer is the only individual who can legally commit the Government to the expenditure of public funds in connection with this or any acquisition action.

The Government reserves the right to award a contract without discussions if the Contracting Officer determines that the initial prices are fair and reasonable and that discussions are not necessary.

## L.8    TECHNICAL PROPOSAL INSTRUCTIONS

The technical proposal shall contain an original and twelve (12) copies.   The technical proposal described below shall be limited to **25 pages** not including resumes or bibliographies, with no less than a 12 point pitch, with the majority of the text double-spaced (lists of deliverables, person loading charts, and similar materials need not be double-spaced, so long as they are legible). Resumes or CVs are only required for key personnel.  Brief biographic sketches of other personnel may be provided.  Lengthy proposals and voluminous appendices are neither needed nor desired as they are difficult to read and evaluate and may indicate the offeror's inability to concisely state their proposal.

a.    Recommended Technical Proposal Format

The offeror's proposal should present sufficient information to reflect a thorough understanding of the work requirements and a detailed plan for achieving the objectives of the scope of work.  Technical proposals shall not merely paraphrase the requirements of the Agency's scope of work or parts thereof, or use of phrases such as "will comply" or "standard techniques will be employed." The technical proposal must include a detailed description of the techniques and procedures to be used in achieving the proposed end results in compliance with the requirements of the Agency's scope of work.

(1)    Cover Page:  The name of the proposing organization, author(s) of the technical proposal, the RFP number and the title of the RFP should appear on the cover.  One (1) manually signed original copy of the proposal and the number of copies specified in the RFP cover letter are required.

(2)    Table of Contents:  Provide sufficient detail so that all important elements of the proposal can be located readily.

(3)    Introduction:  This should be a one or two page summary outlining the proposed work, your interest in submitting a proposal, and the importance of this effort in relation to your overall operation.

(4)    Technical Discussion:  The offeror shall prepare a technical discussion which addresses evaluation criteria A, B, C, D, E and F below.  The evaluation criteria are as follows:

A)    Understanding the Problem
B)    Technical Approach
C)    Management/Work Plan
D)    Key Personnel
E)    Organizational Description
F)    Past Performance (See Section L.9)

**Technical proposals submitted in response to this RFP shall address each of the items described below, and shall be organized in the same manner and within the page limitations specified.  Proposals shall be prepared in double-spaced format, with numbered pages.**

At a minimum, potential offerors must meet the following criteria:

Have the capability to engage public and private sector health care entities that have a stake in advancing interoperable health information technology adoption, and include, but not be limited to: clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories, pharmacies, long term care facilities and nursing homes, homecare and hospice, correctional facilities, professional associations and societies, medical and public health schools that undertake research, quality improvement organizations, consumers or consumer organizations, and state government (Medicaid, public health departments, etc.).

**A)  Understanding the Problem**

The offeror shall provide a brief statement and environmental scan of the issue(s)/challenge(s) which underscores the concept of and need for this contract.

**B)  Technical Approach**

1.  The Offeror shall clearly describe the approach, process, scope, and possible outcomes for the different types of requirements called for under this contract. The offeror shall address the financial, clinical, technical, legal, and interdependencies to assess and develop plans to address the variation in state laws and organization level business policies in a multiple stakeholder environment.  The offeror shall provide a specific timeline and draft work plan in the proposal submission.

2.  The Offeror shall clearly demonstrate ability to develop a statewide planning process in health information exchange, which includes multiple stakeholders; identify solutions to address the privacy and security challenges to health data exchange; design a strategy to ensure the challenges are addressed; demonstrate the ability to identify the intersection with and build upon existing state/regional interoperability efforts (if any); demonstrate the ability to engage complete geographical involvement and/or coverage of the state or identified region.

3.  The Offeror shall clearly demonstrate the ability to convene public and private sector health care entities that have a stake in advancing interoperable health information technology adoption to assess and develop plans to address the variation in state laws and business policies.  The entities shall include, but not be limited to: clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories, pharmacies, long term care facilities and nursing homes, homecare and hospice, professional associations and societies, quality improvement organizations, consumers or consumer organizations and state government (Medicaid, public health departments, etc.).

49

**C)  Management /Work Plan**

 a. A draft work plan of the approach and plan for accomplishing the proposed work. The offeror shall also describe the strategies, tools, and techniques proposed to ensure objective, credible, timely, and high quality work.  Include milestones, risk mitigation strategies, level and nature of co-investment by the offeror and any partners/subcontractors, and an estimated timeline showing interim and final milestones.

 **b.** The offeror shall also: address plans for identifying, utilizing and monitoring consultants and subcontractors; generating clear, concise reports on project findings; conducting quality assurance.  The offeror shall also describe the number of person hours for each task and for service delivery and provide a signed agreement, e.g., a letter of commitment, across the offeror and any personnel other than current direct employees that include dates of employment and specific tasks to be performed.

**D)  Key Personnel**

The proposal shall specify the project team, including subcontractors and consultants and include the education, experience, and demonstrated skills to conduct a statewide health information exchange program.  Offeror shall provide evidence of availability, qualifications, and demonstrated experience of health IT, medical and business personnel.  Offeror shall include a description of their experience in facilitating multi-stakeholder groups, analysis of large quantities of information, leading health information technology projects or implementations and coordinating and managing the work of others in the production of extensive, complex reports.

In this project, at a minimum, the project director is classified as key personnel.  Offeror shall provide evidence of the availability, qualifications, and demonstrated experience of key management personnel, including the project director.  The project director shall have, at a minimum, a masters degree in a health, health services or health IT related specialty and not less than six (6) years total work experience which includes: 1) at least four (4) years in the health IT specialty services field; 2) knowledge of coordination activities with states and territories; and 3) demonstrated skills in organizing and monitoring complex projects in states and territories and in health care and health IT.

**E)  Organizational Description**

Offerors shall submit a description of the offeror's organization, including, but not limited to: the form of the entity (teaming, subcontracting, etc.) that will be contracting with the government; the qualifications the entity has to perform this work; the size, mission, and primary business activity of each team member/subcontractor, their role in the project, and the rationale for including them; and relevant work and accomplishments. Demonstrate complete geographical involvement and/or coverage of the state.

**L.9    Past Performance Information**

Offerors shall submit the following information, in an original and three (3) copies, as part of their proposal for both the offeror and proposed major subcontractors:

(1)    A list of the last five (5) contracts and subcontracts completed during the past three years and all contracts and subcontracts currently in process.  Contracts listed may include those entered into by the Federal Government, agencies of State and local governments and commercial customers.  Offerors that are newly formed entities without prior contracts should list contracts and subcontracts as required for all key personnel.  Include the following information for each contract and subcontract:

> a: Name of contracting activity
> b: Contract number
> c: Contract type
> d: Total contract value
> e: Contract work
> f:  Contracting Officer and telephone number
> g: Program Manager and telephone number
> h: Administrative Contracting Officer, if different from item f, and telephone number
> i: List of major subcontracts

(2)    The offeror may provide information on problems encountered on the contracts and subcontracts identified in (1) above and corrective actions taken to resolve those problems.  Offerors should not provide general information on their performance on the identified contracts.  General performance information will be obtained from the references.

(3)    The offeror may describe any quality awards or certifications that may indicate the offeror possesses a high-quality process for developing and producing the product or service required.  Identify what segment of the company (one division or the entire company) that received the award or certification.  Describe when the award or certification was bestowed.  If the award or certification is over three years old, present evidence that the qualifications still apply.

(4)    Each offeror will be evaluated on his/her performance under existing and prior contracts for similar products or services. Performance information will be used for both responsibility determinations and as an evaluation factor against which offeror's relative rankings will be compared to assure best value to the Government.  The Government will focus on information that demonstrates quality of performance relative to the size and complexity of the procurement under consideration.  References other than those identified by the offeror may be contacted by the Government with the information received used in the evaluation of the offeror's past performance.

The attached Past Performance Questionnaire and Contractor Performance Form shall be completed by those contracting organizations listed in (1) above.  The evaluation forms shall be completed and forwarded directly to the following:

> Robert Zuhlke
> Agency for Healthcare Research and Quality
> Contracts Management
> 540 Gaither Road
> Rockville, Maryland 20850
> FAX: 301-427-1740

Evaluation forms must be received by **July 15, 2005** in order to be included in the review process.  It is the responsibility of the offeror to ensure that these documents are forwarded to the Contracting Officer.

## L.10    SMALL DISADVANTAGED BUSINESS PARTICIPATION PLAN

In accordance with FAR Part 15.304 (c)4, the extent of participation of Small Disadvantaged Business (SDB) concerns in performance of the contract shall be evaluated in unrestricted acquisitions expected to exceed a total estimated cost of $500,000 ($1,000,000 for construction) subject to certain limitations (see FAR 19.201 and 19.202.

A.    All offerors, regardless of size, shall submit the following information in an original and four copies:

A plan on the extent of participation of Small Disadvantaged Business concerns in performance of the contract.  Participation in performance of the contract includes the work expected to be performed by SDB concern(s).  This can include SDB (as prime contractor), joint ventures, teaming arrangements, and subcontracts.  Include the following information in SDB participation plans:

1. The extent of an offeror's commitment to use SDB concerns.  Commitment should be as specific as possible, i.e., are subcontract arrangements already in place, letters of commitment, etc.  Enforceable commitments will be weighted more heavily than non-enforceable ones.

2. Specifically identify the SDB concerns with points of contact and phone number.

3. The complexity and variety of the work SDB concerns are to perform.

4. Realist for the use of SDB in the proposal.

5. Past performance of the offeror in complying with subcontracting plans for SDB concerns.

6. Targets expressed as dollars and percentage of total contract value for each participating SDB; which will be incorporated into and become part of any resulting contract.

7.   The extent of participation of SDB concerns in terms of the total acquisition.

B.  SDB participation information will be used for both responsibility determinations and as an evaluation factor against which offeror's relative rankings will be compared to assure the best value to the Government.  The Government will focus on information that demonstrates realistic commitments to use SDB concerns relative to the size and complexity of the acquisition under consideration.  The Government is not required to contact all references provided by the offeror.  Also, references other than those identified by the offeror may be contacted by the Government to obtain additional information that will be used in the evaluation of the offeror's commitment to SDB participation.


**L.11    BUSINESS PROPOSAL**

The offeror shall submit as part of the proposal a <u>separate</u> enclosure titled "Business Proposal."  The Business Proposal shall include the Cost/Price Proposal, the Small Business Subcontracting Plan, and Other Administrative Data in accordance with the following:

A.    <u>Cost/Price Proposal</u>

A cost proposal, original and 4 copies, shall be provided only to the extent that it shall include:

1.    Certified, unloaded, labor rates for individuals expected to work on a project of this size and nature.

2.    Certified documentation indicating that the offeror has a cost accounting system in place which allows for the collection, tracking and reporting of all costs under a cost reimbursement-type contract.

3.    Certified documentation that the offeror has a current indirect cost rate agreement in place with a federal agency or that is in the process of obtaining or revising such an agreement.  A copy of the indirect cost rate agreement or the proposed rate agreement shall be provided.

The business proposal must contain sufficient information to allow the Government to perform a basic analysis of the proposed cost or price of the work.  This information shall include the amounts of the basic elements of the proposed cost or price.

As appropriate, cost breakdowns shall be provided for the following cost elements.

(a)    <u>Direct Labor</u>

The estimated cost for all personnel who will be assigned for direct work on this project shall be included.  Give the name, title, percent of effort or time, salary and fringe benefits for each employee.

53

Salary increases that are anticipated during performance of a resultant contract should be proposed as a cost.  If escalation is included, state the degree (percent) and methodology, e.g., annual flat rate applied to a base rate as of a specific date or a mid-pointed rate for the period of performance.  State whether any additional direct labor (new hires) will be required during the performance period of this procurement.  If so, state the number required and anticipated date of hire.  Also, specify the month and day on which your fiscal year commences.

(b)    <u>Supplies and Equipment</u>

Include description, unit price, quantity, total price, justification for purchasing or leasing items and the basis for pricing (vendor quotes, invoices prices, etc.).

(c)    <u>Travel</u>

The amount proposed for travel shall be supported with a breakdown which includes purposes, destination, duration, and estimated cost (transportation and per diem) for each proposed trip.  If travel costs are proposed on the basis of your organization's established travel policy, a copy of the policy must be provided.

(d)    <u>Consultants</u>

This element should include name(s) of consultant, number of days, and daily rate.  The method of obtaining each consultant, either sole source or competitive, and the degree of competition or the rationale for sole source shall be explained.

(e)    <u>Subcontractors</u>

Subcontractor costs shall be broken down and supported by cost and pricing data adequate to establish the reasonableness of the proposed amount.  Support documentation should include degree of subcontract competition and basis for selecting source.

(f)    <u>Other Direct Costs</u>

Any proposed other direct costs shall be supported with breakdown outlining the separate costs proposed and details supporting the formulation of the costs proposed.  A signed agreement between the offeror and any personnel other than direct employees that includes dates of employment, salary, and specific tasks to be performed should be included.

(g)    <u>Indirect Costs</u>

Indicate how you have computed and applied indirect costs, and provide a basis for evaluating the reasonableness of the proposed rates.

B.    Other Administrative Data

(1)    <u>Terms and Conditions</u>:  The proposal shall stipulate that it is predicated upon the terms and conditions of the RFP.  In addition, it shall contain a statement to the effect that it is firm for a period of at least 120 days from the date of receipt thereof by the Government.

Minimum Bid Acceptance Period (April 1984)

(a)    "Acceptance period," as used in this provision, means the number of calendar days available to the Government for awarding a contract from the date specified in this solicitation for receipt of bids.

(b)    This provision supersedes any language pertaining to the acceptance period that may appear elsewhere in this solicitation.

(c)    The Government requires a minimum acceptance period of 120 days.

(d)    A bid allowing less than the Government's minimum acceptance period may be rejected.

(e)    The bidder agrees to execute all that it has undertaken to do, in compliance with its bid, if that bid is accepted in writing within (i) the acceptance period stated in paragraph (3) above, or (ii) any longer acceptance period stated in paragraph (4) above.

(2)    <u>Authority to Conduct Negotiations</u>:  The proposal shall list the names and telephone numbers of persons authorized to conduct negotiations and to execute contracts.

(3)    <u>Property</u>:

(a)    It is HHS policy that contractors will provide all equipment and facilities necessary for performance of contracts.  Exception may be granted to furnish Government-owned property, or to authorize purchase with contract funds, only when approved by the contracting officer.  If additional equipment must be acquired, you shall include the description, estimated cost of each item and whether you will furnish such items with your own funds.

(b)    You shall identify Government-owned property in your possession and/or property acquired from Federal funds to which you have title, that is proposed to be used in the performance of the prospective contract.

(c)    The management and control of any Government property shall be in accordance with HHS Publication (OS) 74-115 entitled, <u>Contractor's Guide for Control of Government Property</u>" 1990, a copy of which will be provided upon request.

(4)    <u>Royalties</u>:  You shall furnish information concerning royalties which are anticipated to be paid in connection with the performance of work under the proposed contract.

55

(5)     <u>Commitments</u>:  You shall list other commitments with the Government relating to the specified work or services and indicate whether these commitments will or will not interfere with the completion of work and/or services contemplated under this proposal.

(6)     <u>Financial Capacity</u>:  You shall provide sufficient data to indicate that you have the necessary financial capacity, working capital, and other resources to perform the contract without assistance from any outside source.  If not, indicate the amount required and the anticipated source.  (Financial data such as balance sheets, profit and loss statements, cash forecasts, and financial histories of your organization's affiliated concerns should be utilized.)

(7)     <u>Performance Capability</u>:  You shall provide acceptable evidence of your "ability to obtain" equipment, facilities, and personnel necessary to perform the requirements of this  project.  If these are not represented in your current operations, they should normally be supported by commitment or explicit arrangement, which is in existence at the time the contract is to be awarded, for the rental, purchase, or other acquisition of such resources, equipment, facilities, or personnel.  In addition, you shall indicate your ability to comply with the required or proposed delivery or performance schedule taking into consideration all existing business commitments, commercial as well as Government.

(8)     Representations and Certifications:  Section K, "Representations and Certifications and Other Statements of Offerors" shall be completed and signed by an official authorized to bind your organization.  **This section shall be made a part of the original business proposal**.

## L.11     SELECTION OF OFFERORS

a.     The acceptability of the technical portion of each contract proposal will be evaluated by the technical review committee.  The committee will evaluate each proposal in strict conformity with the evaluation criteria of the RFP, utilizing point scores and written critiques.  The committee may suggest that the Contracting Officer request clarifying information from an offeror.

b.     The business portion of each contract proposal will be subjected to a limited cost review, management analysis, etc.

c.     The Contracting Officer will, in concert with Agency staff, evaluate past performance of the technically acceptable offerors and decide which proposals are in the competitive range.  Oral or written discussions will be conducted with all offerors in the competitive range, if necessary.  All aspects of the proposals are subject to discussions, including cost, technical approach, past performance, and contractual terms and conditions.  Final Proposal Revisions will be requested with the reservation of the right to conduct limited negotiations after submission of the Final Proposal Revisions.

d.      A final best-buy analysis will be performed taking into consideration the results of the technical evaluation, cost analysis, past performance, and ability to complete the work within the Government's required schedule.  The Government reserves the right to make an award to the best advantage of the Government, technical merit, cost, past performance, and other factors considered.

e.  The Government reserves the right to make a single award, multiple awards, or no award at all to the RFP.

## SECTION M - EVALUATION FACTORS FOR AWARD

### TECHNICAL EVALUATION CRITERIA

**M.1**   Selection of an offeror for contract award will be based on an evaluation of proposals against four factors and award will be made to that responsible offeror whose proposal is most advantageous to the Government.  The four factors are: technical, cost, past performance and the Small Disadvantaged Business (SDB) plan.  The technical proposal will receive paramount consideration in the selection of the Contractor(s) for this acquisition.  Offerors that submit technically acceptable proposals will then be evaluated for past performance and for their SDB Participation Plan.   Following the evaluation of the offeror's past performance and SDB Participation Plan, a competitive range will be determined.

**M.2**   All evaluation factors, other than cost or price, when combined are significantly more important than cost or price.  However, cost/price may become a critical factor in source selection in the event that two or more offerors are determined to be essentially equal following the evaluation of all factors other than cost or price.  In any event, the Government reserves the right to make an award to that offeror whose proposal provides the best overall value to the Government.  The Government reserves the right to make a single award, multiple awards, or no award at all.

### THE GOVERNMENT RESERVES THE RIGHT TO MAKE AN AWARD WITHOUT DISCUSSION

**M.3**   All proposals will be reviewed in accordance with the governing regulations and AHRQ policies and procedures.  The technical proposal, past performance information, and SDB Participation Plan will be evaluated in terms of the offeror's responses to each of the evaluation factors.  Each proposal will be evaluated on the likelihood of meeting the Government's requirements.  The evaluation factors and assigned weights which will be used in the overall review of the offeror's proposal are outlined below. The technical proposal shall consist of the responses to evaluation criteria A through E.  The offeror should show that the objectives stated in the proposal are understood and offer a logical program for their achievement.  The following criteria will be used to evaluate proposals and will be weighed as indicated in establishing a numerical rating for all proposals submitted.  Factors facilitating the evaluation of each criteria below are referenced in the corresponding criteria found in Section L of this solicitation:

***OFFERORS PLEASE NOTE***:  Evaluation Criteria A through E, for a total of 100 points, will be evaluated by a technical peer review committee, who will also recommend technical acceptability or unacceptability of the proposal.  Program staff and contracting staff will review and evaluate Criteria F and G, for a total of 25 points. The total possible points for Evaluation Criteria A through G is 125 points.

| EVALUATION CRITERIA | WEIGHT |
|---|---|
| **A. Understanding the Problem**<br>The proposal shall be evaluated on the completeness of the proposal and the Offeror's demonstrated understanding of the problems of the project in its response to the objectives, tasks, and solutions. | 20 points |
| **B. Technical Approach**<br>The proposal shall be evaluated on the completeness, reasonableness, clarity, and feasibility of the approach to satisfy the requirements of each individual task of the statement of work. | 20 points |
| **C. Management/Work Plan**<br>The offeror's demonstrated ability to achieve the delivery of performance requirements through the proposed use of corporate/organizational management and other personnel resources will be evaluated. The offeror's demonstrated ability to manage subcontractors and consultants, and the ability to complete the project milestones using a cost-effective approach will be evaluated. The offeror's draft work plan shall be evaluated on how clearly it demonstrates the offeror's understanding of the statement of work. | 25 points |
| **D. Key Personnel**<br>The background, skills, experience, and education of key personnel in the area of health IT and coordination of efforts within states and territories shall be evaluated. The offeror's proposed key personnel shall be evaluated against the education and experience requirements as set forth in the Instructions to Offerors. | 25 points |
| **E. Organizational Description**<br>The offeror's proposed organizational description shall be evaluated against the requirements as set forth in the Instructions to Offerors. | 10 points |

**TOTAL POINTS BEFORE PAST PERFORMANCE and SMALL DISADVANTAGED BUSINESS PARTICIPATION PLAN**                **100 points**

F.     <u>Past Performance</u>                                      20 points

Offerors will be evaluated on their past performance (since June 1, 2000).

The offerors' past performance will be evaluated on the basis of the following factors:

    (a)     Quality: How well the contractor conformed to the performance standard in providing the research services or achieved the stated objective of the contract or grant. Quality will be evaluated by the personnel provided, the level of effort agreed to in the contract statement of work or grant, and quality of final products (e.g., written reports).

    (b)     Timeliness: How well the contractor adheres to time-tables and delivery schedules in providing the research services or products. Consideration is given to contractor's effort to recommend and/or take corrective actions to keep the contract or grant on schedule.

    (c)     Customer -satisfaction: Rates the professional and cooperative behavior of the contractor or grantee with the client.

(d)    Cost control: Rates the cost-effectiveness of the contractor or grantee in conducting the contract.

Assessment of the offeror's past performance will be one means of evaluating the credibility of the offeror's proposal, and relative capability to meet performance requirements.

The completed questionnaires will provide a basis for determining past performance evaluation as well as information obtained from the references listed in the proposal, other customers known to the Government, consumer protection organizations, and others who may have useful and relevant information.  Information will also be considered regarding any significant subcontractors and key personnel records.  Past performance will be scored on a range from 0 to 20, with 20 being the most favorable.

Evaluation of past performance will often be quite subjective based on consideration of all relevant facts and circumstances.  It will not be based on absolute standards of acceptable performance.  The Government is seeking to determine whether the offeror has consistently demonstrated a commitment to customer satisfaction and timely delivery of services at fair and reasonable prices.

The assessment of the offeror's past performance will be used as a means of evaluating the relative capability of the offeror and the other competitors.  Thus, an offeror with an exceptional record of past performance may receive a more favorable evaluation than another whose record is acceptable, even though both may have acceptable technical proposals.

By past performance, the Government means the offeror's record of conforming to specifications and to standards of good workmanship; the contractor's record of forecasting and controlling costs; the offeror's adherence to contract schedules, including the administrative aspects of performance; the offeror's reputation for reasonable and cooperative behavior and commitment to customer satisfaction; and generally, the offeror's business-like concern for the interest of the customer.

The Government will consider the number or severity of an offeror's problems, the effectiveness of corrective actions taken, the offeror's overall work record, and the age and relevance of past performance information.

The lack of a performance record may result in an unknown performance risk assessment, which will neither be used to the advantage nor disadvantage of the offeror.

The Government reserves the right to evaluate relevant past performance information not specifically provided by the offeror.


G.  SMALL DISADVANTAGED BUSINESS PARTICIPATION PLAN          5 points

The evaluation will be based on information obtained from the plan provided by the offeror, the realism of the proposal, other relevant information obtained from named SDB concerns, and any information supplied by the offeror concerning problems encountered in SDB participation


Evaluation of the SDB Participation Plan will be a subjective assessment based on a

consideration of all relevant facts and circumstances.  It will not be based on absolute standards of acceptable performance.  The Government is seeking to determine whether the offeror has demonstrated a commitment to use SDB concerns for the work that it intends to perform as the prime contractor.

The assessment of the offeror's SDB's Participation Plan will be used as a means of evaluating the relative capability and commitment of the offeror and the other competitors.  Thus, an offeror with an exceptional record of participation with SDB concerns may receive more points and a more favorable evaluation than another whose record is acceptable, even though both may have acceptable technical proposals.

SDB participation will be scored with offerors receiving points from 0 to 5, with 5 being the most favorable.

**Attachment 1**

## PAST PERFORMANCE QUESTIONNAIRE

**PART ONE: INSTRUCTIONS**

The offeror listed below has submitted a proposal in response to the Agency for Healthcare Research and Quality (AHRQ) Solicitation No. AHRQ-05-0015, entitled "Privacy and Security Solutions for Interoperable Health Information Exchange."  Past performance is an important part of the evaluation criteria for this acquisition, so input from previous customers of the offeror is important.  This office would greatly appreciate you taking the time to complete this form. **This information is to be provided to Robert Zuhlke, Procurement Analyst, and is NOT to be disclosed to the offeror either verbally or in writing.**  Please provide an honest assessment and return to AHRQ to the address shown below, no later than **July 15, 2005**.  If you have any questions, please contact Mr. Robert Zuhlke at (301) 427-1714.

> Robert Zuhlke
> Agency for Healthcare Research and Quality
> Contracts Management
> 540 Gaither Road
> Rockville, Maryland 20850
>
> FAX: (301) 427-1740

NAME OF OFFEROR:_____

ADDRESS:_____

       _____

**<u>Contractor Performance Form</u>**

1.    Name of Contractor:_____

2.    Address:_____

      _____

3.    Contract/Grant Number: _____

4.    Contract/Grant Value (Base Plus Options): _____

5.    Contract/Grant Award Date: _____

6.    Contract/Grant Completion Date: _____

7.    Type of Contract/Grant: (Check all that apply) (  )FP (  )FPI (  )FP-EPA
      (  ) Award Fee (  ) CPFF-Completion (  ) CPFF-Term (  ) CPIF (  ) CPAF
      (  ) IO/IQ (  ) BOA (  ) Requirements (  ) Labor-Hour (  )T&M (  ) SBSA
      (  )8(a) (  )SBIR (  ) Sealed Bid(  )Negotiated(  )Competitive (  )Non-Competitive

8.    Description of Requirement:

## CONTRACTOR'S PERFORMANCE RATING

Ratings: Summarize contractor performance and circle in the column on the right the number which corresponds to the performance rating for each rating category.  Please see reverse page for explanation of rating scale.

| Quality of Product or Service | Comments | 0<br>1<br>2<br>3<br>4<br>5 |
|---|---|---|
| Cost Control | Comments | 0<br>1<br>2<br>3<br>4<br>5 |
| Timeliness of Performance | Comments | 0<br>1<br>2<br>3<br>4<br>5 |
| Business Relations | Comments | 0<br>1<br>2<br>3<br>4<br>5 |
|  |  |  |

Customer Satisfaction - Is/was the Contractor committed to customer satisfaction?__Yes__ No ; Would you use this Contractor again? __Yes__No

Reason:

**NAME OF EVALUATOR:** _____

**TITLE OF EVALUATOR:** _____

**SIGNATURE OF EVALUATOR:**_____

**DATE:**_____

**MAILING ADDRESS:**

_____

_____

_____



**PHONE #:**_____

**Rating Guidelines:**  Summarize contractor performance in each of the rating areas. Assign each area a rating 0(Unsatisfactory), 1(Poor), 2(Fair),  3(Good), 4(Excellent)  5(Outstanding).  Use the following instructions as guidance in making these evaluations.

| | Quality | Cost Control | Timeliness of Performance | Business Relation |
|---|---|---|---|---|
| | -Compliance with contract requirements<br>-Accuracy of reports<br>-Technical excellence | -Within budget(over/ under target costs)<br>-Current, accurate, and complete billings<br>-Relationship of negotiated costs to actual<br>-Cost efficiencies<br>-Change orders issue | -Met interim milestones<br>-Reliable<br>-Responsive to technical direction<br>-Completed on time, including wrap-up and contract adm<br>-No liquidated damages assessed | -Effective management<br>-Businesslike correspondence<br>-Responsive to contract requirements<br>-Prompt notification of problems<br>-Reasonable/cooperative<br>-Flexible<br>-Pro-active<br>-Effective small/small disadvantaged  business sub-contracting program |
| 0-unsatisfactory | Nonconformances are jeopardizing the achievement of contract requirements, despite use of Agency resources | Ability to manage cost issues is jeopardizing performance of contract requirements, despite use of Agency resources | Delays are jeopardizing the achievement of contract requirements, despite use of Agency's resources | Response to inquiries, technical/service/administrative  issues is not effective |
| 1-Poor | Overall compliance requires major Agency resources to ensure achievement of contract  requirements | Ability to manage cost issues requires major Agency resources to ensure achievement of contract requirements | Delays require major Agency resources to ensure achievement of contract requirements | Response to inquiries, technical/service/administrative  issues is marginally effective |
| 2-Fair | Overall compliance requires minor Agency resources to ensure achievement of contract requirements | Ability to manage cost issues requires minor Agency resources to ensure achievement of contract requirements | Delays require minor Agency resources to ensure achievement of contract requirements | Response to inquiries, technical/service/administrative  issues is somewhat effective |
| 3-Good | Overall compliance does not impact achievement of contract requirements | Management of cost issues does not impact achievement of contract requirements | Delays do not impact achievement of contract requirements | Response to inquiries, technical/service/administrative issues is usually effective |
| 4-Excellent | There are no quality problems | There are no cost management issues | There are no delays | Response to inquiries, technical/service/administrative issues is effective |

5-Outstanding.  The Contractor has demonstrated an outstanding performance level that justifies adding a point to the score.  It is expected that this rating will be used in those rare circumstances where Contractor performance clearly exceeds the performance levels described as "Excellent."

**ATTACHMENT 2**                                                    0348-0046

Complete this form to disclose lobbying activities pursuant to 31 U.S.C. 1352
(See reverse for public burden disclosure.)

| 1. Type of Federal Action: | 2. Status of Federal Action: | 3.   Report Type: |
|---|---|---|

**4. Name and Address of Reporting Entity:**

G   Prime                       G   Subawardee
                    Tier_____, if known:

Congressional District, if known:

**5. If Reporting Entity in No. 4 is Subawardee, Enter Name     and Address of Prime**

Congressional District, if known:

**6. Federal Department/Agency:**

**7. Federal Program Name/Description**

CFDA Number, if applicable: _____

**8. Federal Action Number, if known:**

**9. Award Amount, if known:**
$

**10. a. Name and Address of Lobbying Entity**
    (if individual, last name, first name, MI):

                    (attach Continuation
Sheet(s)

**b. Individual Performing Services (including address if     different from No. 10a)**
    (last name, first name, MI)

SF-LLL-A, if necessary)

**11. Amount of Payment (check all that apply):**

    $_____  G  actual    G  planned

**12. Form of Payment (check all that apply):**

G  a. cash
G  b. in-kind; specify:  nature_____
                        value_____

**13. Type of Payment (check all that apply):**

G   a. retainer
G   b. one-time fee
G   c. commission
G   d. contingent fee
G   e. deferred
G   f. other; specify:
_____

**14.  Brief Description of Services Performed or to be Performed and Date(s) of Service, including officer(s), employee(s), or Member(s) contacted, for payment indicated in Item 11:**

                    (attach Continuation Sheet(s) SF-LLL-A, if necessary)

**16. Information requested through this form is authorized by** title 31 U.S.C. section 1352.  This disclosure of lobbying activities is a material representation of fact upon which reliance was placed by the tier above when this transaction was made or entered into.  This disclosure is required pursuant to 31 U.S.C. 1352. This information will be reported to the Congress semi-annually and will be available for public inspection.  Any person who fails to file the required disclosure shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each failure.

Signature:_____

Print
Name:_____

Title:_____

Telephone
No.:_____Date:_____

**Federal Use Only**

Authorized for Local Reproduction
Standard Form--LLL

## DISCLOSURE OF LOBBYING ACTIVITIES
## CONTINUATION SHEET

Approved by OMB
0348-0046

Reporting Entity:_____  Page _____ of _____

Authorized for Local Reproduction
Standard Form--LLL-A

## INSTRUCTIONS FOR COMPLETION OF SF-LLL, DISCLOSURE OF LOBBYING ACTIVITIES

This disclosure form shall be completed by the reporting entity, whether subawardee of prime Federal recipient, at the initiation or receipt of a covered Federal action, or a material change to a previous filing, pursuant to title 31 U.S.C. section 1352. The filing of a form is required for each payment or agreement to make payment to any lobbying entity for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with a covered Federal action. Use the SF-LLL-A Continuation Sheet for additional information if the space on the form is inadequate. Complete all items that apply for both the initial filing and material change report. Refer to the implementing guidance published by the Office of Management and Budget for additional information.

1. Identify the type of covered Federal action for which lobbying activity is and/or has been secured to influence the outcome of a covered Federal action.

2. Identify the status of the covered Federal action.

3. Identify the appropriate classification of this report. If this is a follow-up report caused by a material change to the information previously reported, enter the year and quarter in which the change occurred. Enter the date of the last previously submitted report by this reporting entity for this covered Federal action.

4. Enter the full name, address, city, state and zip code of the reporting entity. Include Congressional District, if known. Check the appropriate classification of the reporting entity that designates if it is, or expects to be, a prime or subaward recipient. Identify the tier of the subawardee, e.g., the first subawardee of the prime is the 1st tier. Subawards include but are not limited to subcontracts, subgrants and contract awards under grants.

5. If the organization filing the report in item 4 checks "Subawardee," then enter the full name, address, city, state and zip code of the prime Federal recipient. Include Congressional District, if known.

6. Enter the name of the Federal agency making the award or loan commitment. Include at least one organizational level below agency name, if known. For example, Department of Transportation, United States Coast Guard.

7. Enter the Federal program name or description for the covered Federal action (item 1). If known, enter the full Catalog of Federal Domestic Assistance (CFDA) number for grants, cooperative agreements, loans, and loan commitments.

8. Enter the most appropriate Federal identifying number available for the Federal action identified in item 1 (e.g., Request for Proposal (RFP) number, Invitation for Bid (IFB) number, grant announcement number, the contract, grant, or loan award number, the application/proposal control number assigned by the Federal agency). Include prefixes, e.g., "RFP-DE-90-001."

9. For a covered Federal action where there has been an award or loan commitment by the Federal agency, enter the Federal amount of the award/loan commitment for the prime entity identified in item 4 or 5.

10. (a)  Enter the full name, address, city, state and zip code of the lobbying entity engaged by the reporting entity  identified in item 4 to influence the covered Federal action.

    (b)  Enter the full names of the individual(s) performing services, and include full address if different from 10(a); Enter Last Name, First Name, and Middle Initial (MI).

11. Enter the amount of compensation paid or reasonably expected to be paid by the reporting entity (item 4) to the lobbying entity (item 10). Indicate whether the payment has been made (actual) or will be made (planned). Check all boxes that apply. If this is a material charge report, enter the cumulative amount of payment made or planned to be made.

12. Check the appropriate box(es). Check all boxes that apply. If payment is made through an in-kind contribution, specify the nature and value of the in-kind payment.

13. Check the appropriate box(es). Check all boxes that apply. If other, specify nature.

14. Provide a specific and detailed description of the services that the lobbyist has performed, or will be expected to perform, and the date(s) of any services rendered. Include all preparatory and related activity, not just time spent in actual contact with Federal officials. Identify the Federal official(s) or employee(s) contacted or the officer(s), employee(s), or Member(s) of Congress that were contacted.

15. Check whether or not a SF-LLL-A Continuation Sheet(s) is attached.

16. The certifying official shall sign and date the form, print his/her name, title and telephone number.

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0046), Washington, D.C.  20503.

**ATTACHMENT 3**
SMALL BUSINESS SUBCONTRACTING PLAN

**DATE OF PLAN**:_____

CONTRACTOR_____

ADDRESS: _____

_____

_____

DUNN & BRADSTREET NUMBER: _____

SOLICITATION OR CONTRACT NUMBER: _____

ITEM/SERVICE (Description): _____

_____

TOTAL CONTRACT AMOUNT:  $_____     $_____
                        Total contract or       Option #1
                           Base-Year, if options     (if applicable)
$ _____     $_____     $_____
Option #2                Option #3                Option #4        (if applicable)

TOTAL MODIFICATION AMOUNT, IF APPLICABLE     $ _____
TOTAL TASK ORDER AMOUNT, IF APPLICABLE     $ _____

PERIOD OF CONTRACT PERFORMANCE (Month, Day & Year): _____

The following is a suggested model for use when developing subcontracting plans as required by Section 8(d) of the Small Business Act, as amended, and implemented by Federal Acquisition Regulations (FAR) Subpart 19.7.  While this model plan has been designed to be consistent with statutory and regulatory requirements, other formats of a subcontracting plan may be acceptable; however, failure to include the essential information as exemplified in this model may be cause for either a delay in acceptance or the rejection of a bid or offer when a subcontracting plan is required. Further, the use of this model is not intended to waive other requirements that may be applicable under statute or regulation. "SUBCONTRACT," as used in this clause, means any agreement (other than one involving an employer-employee relationship) entered into by a Federal Government prime contractor or subcontractor calling for supplies or services required for performance of the contract or subcontract.

Subcontracting Plan
(Rev. October 2001)

**1.  Type of Plan** (check one)

      _____ Individual plan (all elements developed specifically for this contract and applicable for the full term of this contract).

      _____ Master plan (goals developed for this contract) all other elements standardized and approved by a lead agency Federal Official; must be renewed every three years and contractor must provide copy of lead agency approval.

      _____ Commercial products/service plan, including goals, covers the offerer's fiscal year and applies to the entire production of commercial items or delivery of services sold by either the entire company or a portion thereof  (e.g., division, plant, or product line); this includes planned subcontracting for both commercial and Government business.

**2.  Goals**

State separate dollar and percentage goals for Small Business (SB), Small Disadvantaged Business (SDB), Woman-owned Small Business (WOSB), Historically Underutilized Business Zone (HUBZone) Small Business, Veteran-owned (VOSB), and "Other than small business" (Other) as subcontractors, for the base year and each option year, as specified in FAR 19.704 (break out and append option year goals, if the contract contains option years) or project annual subcontracting base and goals under commercial plans.

a.   Total estimated dollar value of ALL planned subcontracting, i.e., with ALL types of concerns under this contract is $ _____   (b + g = a)

b.   Total estimated dollar value and percent of planned subcontracting with SMALL BUSINESSES (including SDB, WOSB, HUBZone, and VOSB):
         (% of "a")  $ _____  and _____%

c.   Total estimated dollar value and percent of planned subcontracting with SMALL DISADVANTAGED BUSINESSES: (% of "a")  $ _____  and _____% Federal Subcontract Goal 5%

d.   Total estimated dollar value and percent of planned subcontracting with WOMAN-OWNED SMALL BUSINESSES: (% of "a")  $ _____  and _____% Federal Subcontract Goal 5%

e.   Total estimated dollar and percent of planned subcontracting with HUBZone SMALL BUSINESSES:    (% of "a")  $ _____  and _____%

f.   Total estimated dollar and percent of planned subcontracting with VETERAN SMALL BUSINESSES*  (% of "a")  $ _____  and _____% Federal Subcontract Goal 3%

g.   Total estimated dollar and percent of planned subcontracting with "OTHER THAN SMALL BUSINESSES": (% of "a")  $ _____  and _____%

**Notes:**    *Service-disabled veteran goal should be included as part of veteran small business goal.
      1.  Federal prime contract goals are:
          SB equals 23%; SDB equals 5%; HUBZone equals 2.5%, WOSB equals 5% and
          VOSB equals 3% and can serve as objectives for subcontracting goal development.
      2.  SDB, WOSB, HUBZone and VOSB goals are subsets of SB and should be counted and reported in multiple categories, as appropriate.

Subcontracting Plan
(Rev. October 2001)          2

h.  Provide a description of ALL the products and/or services to be subcontracted under this contract, and indicate the size and type of business supplying them (check all that apply).

| Product/Service | Other | SB | SDB | WOSB | HUBZoneSB | VOSB |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

i.  Provide a description of the method used to develop the subcontracting goals for SB, SDB, WOSB, HUBZone, and VOSB concerns.  Address efforts made to ensure that maximum practicable subcontracting opportunities have been made available for those concerns and explain the method used to identify potential sources for solicitation purposes.  Explain the method and state the quantitative basis (in dollars) used to establish the percentage goals.  Also, explain how the areas to be subcontracted to SB, SDB, WOSB, HUBZone, and VOSB concerns were determined, how the capabilities of these concerns were considered for subcontract opportunities and how such data comports with the cost proposal.  Identify any source lists or other resources used in the determination process.  (Attach additional sheets, if necessary.)

_____
_____
_____
_____
_____
_____

j.  Indirect costs have _____ have not_____ been included in the dollar and percentage subcontracting goals     above (check one).

k.  If indirect costs have been included, explain the method used to determine the proportionate share of such costs to be allocated as subcontracts to SB, SDB, WOSB, HUBZone, and VOSB concerns.

_____
_____
_____

Subcontracting Plan
(Rev. October 2001)                    3

3. **Program Administrator:**

NAME/TITLE:
ADDRESS:
TELEPHONE/E-MAIL:

**Duties**:  Has general overall responsibility for the company's subcontracting program, i.e., developing, preparing, and executing subcontracting plans and monitoring performance relative to the requirements of those subcontracting plans.  Other duties include, but are not limited to, the following activities:

a.       Developing and promoting company-wide policy initiatives that demonstrate the company's support for awarding contracts and subcontracts to SB, SDB, WOSB, HUBZone, and VOSB concerns; and for assuring that these concerns are included on the source lists for solicitations for products and services they are capable of providing.

b.       Developing and maintaining bidder source lists of SB, SDB, WOSB, HUBZone, and VOSB concerns from all possible sources;

c.       Ensuring periodic rotation of potential subcontractors on bidder's lists;

d.       Ensuring that requests for contracts (RFC) are designed to permit the maximum practicable participation of SB, SDB, WOSB, HUBZone, and VOSB concerns;

e.       Accessing various sources for the identification of SB, SDB, WOSB, HUBZone, and VOSB concerns to include the SBA's PRO-Net and SUB-Net Systems, (http://www.sba.gov), the Federal Acquisition Computer Network (FACNET) Contractor Registration Database, the NIH e-Portals in Commerce (e-PIC), (http://epic.od.nih.gov/), the National Minority Purchasing Council Vendor Information Service, the Office of Minority Business Data Center in the Department of Commerce, local small business and minority associations, contact with local chambers of commerce and Federal agencies' Small Business Offices;

f.       Establishing and maintaining contract and subcontract award records;

g.       Participating in Business Opportunity Workshops, Minority Business Enterprise Seminars, Trade Fairs, Procurement Conferences, etc;

h.       Ensuring that SB, SDB, WOSB, HUBZone, and VOSB concerns are made aware of subcontracting opportunities and assisting concerns in preparing responsive bids to the company;

i.       Conducting or arranging for the conduct of training for purchasing personnel regarding the intent and impact of Section 8(d) of the Small Business Act, as amended;

j.       Monitoring the company's subcontracting program performance and making any adjustments necessary to achieve the subcontract plan goals;

k.       Preparing, and submitting timely, required subcontract reports;

l.       Coordinating the company's activities during the conduct of compliance reviews by Federal agencies; and

m.       Other duties:_____

Subcontracting Plan
(Rev. October 2001)                    4

## 4. **Equitable Opportunity**

Describe efforts the offeror will make to ensure that SB, SDB, WOSB, HUBZone, and VOSB concerns will have an equitable opportunity to compete for subcontracts.  These efforts include, but are not limited to, the following activities:

a.            Outreach efforts to obtain sources:
1.                    Contacting minority and small business trade associations; 2) contacting business development organizations and local chambers of commerce; 3) attending SB, SDB, WOSB, HUBZone, and VOSB procurement conferences and trade fairs; 4) requesting sources from the Small Business Administrations (SBA) PRO-Net and SUB-Net Systems,  (http://www.sba.gov/) and other SBA and Federal agency resources; and 5) Conducting market surveys to identify new sources, to include, accessing the NIH e-Portals in Commerce, (e-PIC), (http://epic.od.nih.gov/).

b.            Internal efforts to guide and encourage purchasing personnel:
1)                    Conducting workshops, seminars, and training programs;
2)                    Establishing, maintaining, and utilizing SB, SDB, WOSB, HUBZone, and VOSB source lists, guides, and other data for soliciting subcontractors; and
3)                    Monitoring activities to evaluate compliance with the subcontracting plan.

c.            Additional efforts: _____

## 5. **Flow Down Clause**

The contractor agrees to include the provisions under FAR 52.219-8, "Utilization of Small Business Concerns," in all acquisitions exceeding the simplified acquisition threshold that offers further subcontracting opportunities. All subcontractors, except small business concerns, that receive subcontracts in excess of $500,000 ($1,000,000 for construction) must adopt and comply with a plan similar to the plan required by FAR 52.219-9, "Small Business Subcontracting Plan."  (Flow down is not applicable for commercial items/services as described in 52.212-5(e) and 52.244-6(c).)

## 6. **Reporting and Cooperation**

The contractor gives assurance of  (1) cooperation in any studies or surveys that may be required; (2) submission of periodic reports which show compliance with the subcontracting plan; (3) submission of Standard Form (SF) 294, "Subcontracting Report for Individual Contracts," and attendant Optional Form 312, SDB Participation Report, if applicable, (required only for contracts containing the clause 52.219-25) and SF-295, "Summary Subcontract Report," in accordance with the instructions on the forms; and  (4) ensuring that subcontractors agree to submit Standard Forms 294 and 295.

| Reporting Period | Report Due | Due Date |
|---|---|---|
| Oct 1 - Mar 31 | SF-294 | 4/30 |
| Apr 1 - Sept 30 | SF-294 | 10/30 |
| Oct 1 - Sept 30 | SF-295 | 10/30 |
| Contract Completion | OF-312 | 30 days after completion |

Special instructions for commercial plan:  SF-295 Report is due on 10/30 each year for the previous fiscal year ending 9/30.
Report forms are posted at http://sbo.od.nih.gov under "Forms."

Subcontracting Plan
(Rev. October 2001)                5

a.      Submit SF-294 to cognizant Awarding Contracting Officer.

b.      Submit Optional Form 312, (OF-312), if applicable, to cognizant Awarding Contracting Officer.

c.      Submit SF-295 to cognizant Awarding Contracting Officer and to the:

> Office of Small and Disadvantaged Business Utilization
> Department of Health and Human Services
> 200 Independence Avenue, SW
> Humphrey H. Building, Room 517-D
> Washington, D.C. 20201

d.      Submit "information" copy of the SF-295 and the SF-294 upon request to the SBA Commercial Market Representative (CMR); visit the SBA at http://www.sba.gov/gc and click on assistance directory to locate your nearest CMR.

## 7. **Record keeping**

The following is a recitation of the types of records the contractor will maintain to demonstrate the procedures adopted to comply with the requirements and goals in the subcontracting plan.  These records will include, but not be limited to, the following:

a.      SB, SDB, WOSB, HUBZone, and VOSB source lists, guides and other data identifying such vendors;

b.      Organizations contacted in an attempt to locate SB, SDB, WOSB, HUBZone, and VOSB sources;

c.      On a contract-by-contract basis, records on all subcontract solicitations over $100,000, which indicate for each solicitation (1) whether SB, SDB, WOSB, HUBZone, and/or VOSB concerns were solicited, if not, why not and the reasons solicited concerns did not receive subcontract awards.

d.      Records to support other outreach efforts, e.g., contacts with minority and small business trade associations, attendance at small and minority business procurement conferences and trade fairs;

e.      Records to support internal guidance and encouragement provided to buyers through (1) workshops, seminars, training programs, incentive awards; and (2) monitoring performance to evaluate compliance with the program and requirements; and

f.      On a contract-by-contract basis, records to support subcontract award data including the name, address, and business type and size of each subcontractor.  (This item is not required on a *contract – by – contract basis* for company or division-wide commercial plans.)

g.      Additional records: _____

Subcontracting Plan
(Rev. October 2001)                    6

# SIGNATURE PAGE
(applies to Master or Commercial type plans)

**This master or commercial type subcontracting plan is submitted by:**

**Contractor:** _____

**Contractor Signature:** _____

**Typed Name:** _____

**Title:** _____

**Date Prepared:** _____

**And Is Accepted By:**

**Agency:** _____

**Contracting Officer Signature:** _____

**Typed Name:** _____

**Date:** _____

**ATTACHMENT 4**

*PROPOSAL INTENT RESPONSE SHEET*

<u>RFP No. AHRQ-05-0015 – Privacy and Security Solutions for Interoperable Health Information Exchange</u>

**Please review the attached request for proposal.  Furnish the information requested below and return this page by June 17, 2005.  Your expression of intent is not binding but will greatly assist us in planning for the proposal evaluation.**

---

**[   ]  INTEND TO SUBMIT A PROPOSAL**

**[   ] DO NOT INTEND TO SUBMIT A PROPOSAL FOR THE FOLLOWING REASONS:**

**COMPANY/INSTITUTION NAME:**

**AUTHORIZED SIGNATURE:**

**TYPED NAME AND TITLE:**

**DATE:**

---

**Please return to:**

> **Robert Zuhlke**
> **Agency for Healthcare Research and Quality**
> **Contracts Management**
> **540 Gaither Road**
> **Rockville, Maryland 20850**

REQUEST FOR PROPOSAL AHRQ-05-0015
TITLE: PRIVACY AND SECURITY SOLUTIONS FOR INTEROPERABLE
HEALTH INFORMATION EXCHANGE
PROPOSAL DUE: JULY 15, 2005, 12 NOON LOCAL TIME (UNCHANGED)
AMENDMENT NO. 1 TO RFP

INSTRUCTION: (Clarifications/answers to certain questions during the
telephone conference held on June 20, 2005)

*Answers to questions asked by various prospective contractors:*

**1. Should contractors work with AHRQ funded safety net recipients?**

A: Offerors should include all stakeholders necessary to complete the tasks
specified in the RFP.

**2. Should the contractors work with AHRQ RHIO recipients?**

A: Offerors should include all stakeholders necessary to complete the tasks
specified in the RFP.

**3.     Can more than 2 individuals from the contractor's team attend and
participate in the AHIC and government agency meetings if they are local
and not travel and per diem expenses are incurred?**

A: Depending on the proposed costs of attendance of more than two individuals,
the Government may consider approving additional attendees.

**4.     Have the "multi-stakeholder entities" been identified or will this be
part of the proposal?**

A: To the greatest extent practical, multi-stakeholder entities should be identified
by the offeror in the proposal. For the purposes of the proposal, letters of interest
from multi-stakeholder entities are sufficient demonstration of their commitment.

**5.     In task 4.a., the privacy and security practices implementing health IT
there seems to be a heavy emphasis on security practices. Does the AHRQ
want the contractor to fully review the use and disclosure controls and
impediments found under the HIPAA privacy rule and some state laws or
just as manifested in organizational policies (see 4.a.ix)**

A: The Contractor is expected to assess the organization-level business policies
and state laws that pose challenges to interoperability, including those policies
that are developed to comply with the HIPAA Privacy Rule and various state
laws.

**6. Does Past Performance mean the past 5 contracts over the past 3 years or the past 5 relevant/related contracts over the past 3 years?**

A: For the purposes of this solicitation, the past 5 most or as closely related as possible contracts would be preferable to just the past 5.

**7. On page 47, the instruction to use "12 pt. pitch" is vague. Do you mean 12 pt. FONT?**

A: Yes, 12 point FONT will be fine.

**8. Do the letters of commitment from subcontractors count against the 25-page limit?**

A: No, they do not.

**9. "Include project reference items a – i (page 51) for the five references and all current contracts/subcontracts. Do you want all of that information for all current contracts?**

A: Yes.

**10. Do you want 5 references from each subcontractor and five from the prime, or just 5 TOTAL?**

A: Five for the prime alone will be sufficient.

***Clarifications/Additions to RFP as a result of discussions and concerns:***

**11. SMALL BUSINESS SUBCONTRACTING PLAN:
(PART IV Section L – add a new paragraph, L.11 Business Proposal, paragraph B. Small Business Subcontracting Plan; previous paragraph B. Other Administrative Data is renumbered to paragraph C.)**

B.      Small Business Subcontracting Plan:

    All offerors except small businesses are required to submit a subcontracting plan in accordance with the Small Business Subcontracting Plan, FAR 52.219-9, incorporated in this solicitation. A copy of the AHRQ model subcontracting plan is provided as an attachment (Attachment #3) to this solicitation. If the model plan is not used, all elements outlined must be addressed in the offeror's format. If the offeror is not a small business and fails to submit a subcontracting plan with the initial proposal, the offeror will be considered nonresponsive and their proposal will be returned without further consideration.

    This provision does not apply to small business concerns. This provision does apply to all other offerors, including large business concerns, colleges, universities and non-profit organizations.

The term "subcontract" means any agreement (other than one involving an employer-employee relationship) entered into by a Federal Government prime contractor or subcontractor calling for supplies or services required for the performance of the original contract or subcontract.  This includes, but is not limited to, agreements/ purchase orders for supplies and services such as equipment purchase, copying services, and travel services.

The offeror understands that:

a.      No contract will be awarded unless and until an acceptable plan is negotiated with the Contracting Officer. The plan will be incorporated in to the contract.

b.      An acceptable plan must, in the determination of the Contracting officer, provide the maximum practicable opportunity for small business concerns and small business concerns owned and controlled by socially and economically disadvantaged persons to participate in the performance of the contract.

c.      If a subcontracting plan acceptable to the Contracting Officer is not negotiated within the time limits prescribed by the contracting activity and such failure arises out of causes within the control and with the  fault or negligence of the offeror, the offeror shall be ineligible for award.  The Contracting Officer shall notify the Contractor in writing of the reasons for determining a subcontracting plan unacceptable early enough in the negotiation process to allow the Contractor to modify the plan within the time limits prescribed.

d.      Prior compliance of the offeror with other such subcontracting plans under previous contracts will be considered by the Contracting Officer in determining the responsibility of the offeror for award of the contract.

e.      It is the offeror's responsibility to develop a satisfactory subcontracting plan with respect to small business concerns and small business concerns owned and controlled by socially and economically disadvantaged individuals, and women-owned small business concerns, and that each such aspect of the offeror's plan will be judged independent of the other.

f.      The offeror will submit, as required by the Contracting Officer, subcontracting reports in accordance with the instructions therein, and as further directed by the Contracting Officer.  Subcontractors will also submit these reports to the Government Contracting

Officer or as otherwise directed, with a copy to the prime Contractor's designated small and disadvantaged business liaison.

g.    For this particular acquisition, the AHRQ recommended goal (as a percentage of total contract value for the base period) is **23% for Small Businesses**, which shall included at least **5%** (as a percentage of total planned subcontract dollars for the base period) for **Small Disadvantaged Businesses**, at least **5%** (as a percentage of total planned subcontract dollars total planned subcontract dollars for the base period) for **Women-Owned Small Businesses**, and at least **2%** (as a percentage of total planned subcontract dollars for the base period) for **HUBZone Small Businesses** and at least **3%** (as a percentage of total planned subcontract dollars for the base period) for **Veteran-Owned Small Businesses**. These goals represent AHRQ's expectations of the minimum level for subcontracting with small business at the prime contract level. Any goal stated less than the AHRQ recommended goal shall be justified and is subject to negotiation.

Note: All offerors are required to submit Subcontracting Plans, as set forth in the Request for Proposal, detailing how it plans to utilize various small businesses and Disadvantaged Small Businesses. The agreements between the prime and subcontractors do not necessarily need to be executed before the proposal submission date. Most of the work (i.e., at least 50%) for the subcontractors must be identified in the proposal. (Note this requirement is in addition to the requirement for the Small Disadvantaged Business Participation Plan as set forth in L.10)

## 12. COST AND PRICING CERTIFICATION:
**(PART IV Section K – add a new paragraph, Item IV - CAS – Waiver, page 35a)**

a. According to FAR 15.403-1(c)(1), cost and pricing data is not required when there is adequate competition; but the offeror must have an approved purchasing system so that the costs and/or prices are determined to be fair and reasonable.

In exceptional cases, a waiver from the requirement for an approved purchasing system may be issued by the Head of the Contracting Authority (HCA) of AHRQ. An offeror needs to provide sufficient supporting rationale to request the waiver from AHRQ. The HCA may consider waiving this requirement if an offeror can demonstrate that its purchasing system is able to generate current, accurate and complete cost and pricing data for this acquisition. Please note that the waiver is for exceptional situations only, and therefore, the chance of granting a waiver is small. If the waiver is granted, all subcontracts above $25,000 will

require the Contracting Officer's approval before the subcontracts are awarded by the Prime contractor.

b. If an offeror is a small business, State or Local government, or Federally Recognized Indian Tribal Government, an approved purchasing system is not required. However, other accounting system requirements may be triggered, such as Generally Accepted Accounting Principles, other FAR Part 31 rules, and appropriate OMB Circulars such as A-87 and/or A-122.

c. In the alternative, if an offeror does not feel that it is able to comply with the intended cost plus fixed fee requirements, it may propose a fixed price under FAR Part 15. The scope of work and the period of performance will remain the same. Any fixed price proposal will be evaluated according to the evaluation criteria of the RFP.

**13. FAR 52.227-17 RIGHTS IN DATA – SPECIAL WORKS (JUNE 1987): (PART II Section I is revised to include the FAR Clause, Rights in Data—Special Works (FAR 52.227-17) (JUNE 1987)**

Below is a list of all registrants that had signed up to be part of the June 20th Conference call for voicing questions and concerns with the RFP as originally issued on FEDBIZOPS.

**LIST OF REGISTRANTS**

**Privacy and Security Solutions for Interoperable Health Information Exchange**

June 20, 2005
1:00 p.m. EDT

| COMPANY | REGISTRANTS |
|---|---|
| Accenture | Consultant |
| ACS Government Healthcare Solution | Vice President |
| Adler InfoSec & Privacy Group | President |
| AFEHCT | Executive Director |
| AHIMA | |
| AirDefense | Director - Business |
| Altarum Institute | Practice Area Lead |
| Altarum Institute | Sr. Contract Administration |

| COMPANY | REGISTRANTS |
|---|---|
| American Medical Association | Director |
| Apptis | VP |
| ATI | Director, Info Prote |
| Availity, L.L.C. | Director - IT |
| Beacon Partners, Inc. | Manager of Consulting |
| Blank Rome | Partner |
| Blue Cross Blue Shield of Alabama | HIPAA Project Manager |
| BlueWare, Inc. | |
| Booz Allen Hamilton | Senior Associate |
| Capgemini | Account Executive |
| Cassidy & Associates | Independent |
| Center for Biosecurity of University of Pittsburgh Medical Center | Associate |
| Center For Healthcare Automation | President |
| Cerner | |
| CIBER | Federal |
| Claredi Corporation | V.P. Strategic Relations |
| Clayton Group | |
| Computer Associates | Director of Business |
| Compuware Corporation | |
| Corbus | Sr. Business Develop |
| Covisint | Healthcare Solutions |
| CureMD Corporation | Manager Business Dev |
| Cybertrust | |
| Decisive Analytics Corporation | |
| Deloitte Consulting | Manager |
| DiamondCluster International | Consultant |
| Director, EHR Technology | |
| East Bridge Consultants | President |
| Eastman Kodak Company | |
| ECC Int | |
| Eclipsys | VP Mktg Research & T |
| EDS | Business Development |
| eHealth Initiative | |

| COMPANY | REGISTRANTS |
|---------|-------------|
| Forum Systems, Inc. | Director Business De |
| FourThought Group | Sr. Consultant |
| Fox Systems, Inc. | Proposal Writer |
| Fox Systems, Inc. | Proposal Manager |
| Fox Systems, Inc. | Project Manager |
| Gartner | Sr. Account Executive |
| Genesis Plastics | CEO |
| Georgetown University Medical | Director of Information |
| Good Health Network | Chief Security Office |
| Government Works | VP of Sales |
| Government Works | VP of Business Development |
| Greater New York Hospital Association | Associate Vice President |
| GTRI | Research Associate |
| GTSI | Account Manager – HH |
| H. Lee Moffitt Cancer Center | VP/CIO IT |
| Health Choice Network, Inc. | Acting President & C |
| HealthTransactions.com | COO, CPO |
| Hewitt Associates | Managing Consultant |
| High Performance Technologies | Senior Associate |
| HIMSS | EHR Manager |
| HIMSS | Program Manager, Cer |
| HIMSS | Director of Federal |
| HIMSS | Director of Public P |
| HPTi | Senior Associate |
| Hyperspace Communications Inc. | VP Marketing & Opera |
| IBM | Director, Public Sec |
| IBM | IT Architect |
| IBM | |
| IBM Research | Government Relations |
| Ingenium Corporation | Business Development |
| Interoperability Clearinghouse | Executive Director |
| Kleron Technology Corporation | Vice President |
| Koss on Care | President |
| KPMG LLP | Partner |

| COMPANY | REGISTRANTS |
|---|---|
| Kryptiq | Dir. Government Init |
| Lockheed Martin | Director, BD Healthcare |
| Louisiana Public Health Institute | Director, Urban Health |
| MA SHARE | Project Manager |
| Manatt, Phelps & Phillips, LLP | Co-Chair, Government |
| Marwood Group | |
| MAXIMUS | VP Enterprise Security |
| McKesson | Sr. Product Manager |
| McKesson | VP Clinical Technology |
| Medica Fabrica | President |
| Medical Review of North Carolina | EHR Consultant |
| MEDITECH, Inc | EHR Project Manager |
| Michigan Public Health Institute | Executive Director |
| Misty Meadow Holdings, Inc. | President |
| Mitier | Business Development |
| MITRE | Principal Engineer |
| MITRE | Principal Engineer |
| MMS | Director of Sales |
| MPHI | Program Director |
| NASCIO | Program Manger |
| National Conference of Commissioners on Uniform State Laws | Deputy Executive Dir |
| National Governors Association | Senior Policy Analyst |
| National Network of Public Health | Associate Director |
| NCHICA | Consultant |
| New World Healthcare Solutions | Chief Medical Office |
| NNPHI | CEO |
| Nortel PEC | Business Development |
| Nova Information | SVP |
| N-Tegrity Solutions | Principal |
| Nutter McClennen & Fish | Partner |
| Object Health | Principal |
| Oracle | Senior Director |
| ORC Macro | Director |

| COMPANY | REGISTRANTS |
|---|---|
| Peter T Barry Company | Principal |
| Pfizer | Director, Business T |
| Phoenix Health Systems | Principal |
| PostX Corporation | Director, Products a |
| President | TerraStar Consulting |
| PricewaterhouseCoopers | Senior Associate |
| PrimeCare Systems, Inc. | VP Latin America |
| PrimeCare Systems, Inc. | Executive Vice President |
| Principal Innovation, Inc. | President |
| ProviderLink | Director |
| Quality Insights of Pennsylvania | Chief Operating Officer |
| RAND Corporation | |
| RAND Corporation | Behavioral Scientist |
| Reed Smith LLP | Partner |
| Research Triangle Institute | Research Statistician |
| RTI | Sr Survey Director |
| RxHub | VP, Standards & Prod |
| RxHub | SVP & Communication |
| SAIC | Asst. Vice President |
| SEC Associates, Inc. | President & CEO |
| Security Alliance, LLC | Managing Director |
| Skylight Software, Inc. | President |
| Smart Document Solutions | General Counsel |
| SMART Technology, Inc. | Vice President |
| Sonnenschein, Nath & Rosenthal | Partner |
| Stanford WRG | |
| State of Michigan | Public Relations Liaison |
| State of Minnesota | Dept. Manager |
| Sybase, Inc. | |
| Tall Tree Labs | Ontology Projects |
| TeraMedica | VP Marketing |
| The Advisory Board Company | Coordinator |
| The Center for Regulatory Effectiveness | Director, Cybersecurity |
| The Center for Regulatory Effectiveness | Member, Board of Adv |

| COMPANY | REGISTRANTS |
|---|---|
| The MEDSTAT Group, Inc. | Sr. Manager, Contracts |
| Thompson Cobb Bazilio & Associates | Senior Manager |
| Toombs and Associates | Managing Consultant |
| Troutman Sanders LLP | Associate |
| Unisys | CRE |
| Unisys | CRE |
| University of Maryland School of Medicine | PhD/Research Fellow |
| University of Pittsburgh Medical Center | Director, ISD; Priva |
| University of Pittsburgh Medical Center | VP, Emerging Tech. |
| University of Wisconsin – Madison | Professor |
| Vecna Technologies, Inc. | Principal Consultant |
| WebMD Corporation | Director, Strategic |
| WebMD Corporation | Sr. Vice President |
| West Virginia medical Institute | Director of State Se |
| Windermere | Director |
| XPress Technologies & HL7 | President & CEO XPre |

REQUEST FOR PROPOSAL AHRQ-05-0015
TITLE:  PRIVACY AND SECURITY SOLUTIONS FOR INTEROPERABLE
HEALTH INFORMATION EXCHANGE
PROPOSAL DUE:  JULY 15, 2005, 12 NOON LOCAL TIME (UNCHANGED)
AMENDMENT NO. 2 TO RFP
(29 Pages)

INSTRUCTION:  Clarifications/answers to certain questions during the telephone
conference held on June 20, 2005, that were not addressed in the previous
amendment, Pages 1-6.

Transcript of June 20, 2005 Conference Call is now available, immediately
following the clarifications, Pages 7-29.

*Answers to questions asked by various prospective contractors:*

1. **Security and Privacy Laws are in a state of flux and there are new laws
   being proposed and passed daily.  Does AHRQ want the contractor to look
   at pending and emerging laws and regulations as well as those that are
   established?**

*A:  In its assessment of organization-level business policies and state laws that pose
challenges to interoperability, the contractor may consider existing, pending and
emerging law.*

2. **With regard to preemption issues, can we rely on analyses done by others
   a few years ago for HIPAA privacy compliance or does AHRQ envision a
   new preemption analysis in all 40 territories?**

*A:  The offeror may consider existing privacy analyses in its assessment organization-
level business policies and state laws that pose challenges to interoperability.*

*HHS does not intend for the contractor to conduct a preemption analysis.  As described
in DESCRIPTION/SPECIFICATION/WORK STATEMENT, Section C, Specific
Requirements, Task 4, b., the contractor is to identify solutions to address organization-
level business policies and state laws that affect privacy and security practices in order
to permit interoperable health information exchange, while preserving the privacy and
security requirements in applicable state and Federal laws.*

3. **In TASK 4.a., the privacy and security practices implementing health IT
   there seems to be a heavy emphasis on security practices.  Does AHRQ
   want the contractor to fully review the use and disclosure controls and
   impediments found under the HIPAA privacy rule and some state laws or
   just manifested in organizational policies?**

*A:  The contractor is expected to assess the organization-level business policies and
state laws that pose challenges to interoperability, including those policies that are
developed to comply with the HIPAA Privacy Rule and various state laws.*

**4. Do solutions that need to be identified include potential federal and state legislative changes?**

*A: As described in DESCRIPTION/SPECIFICATION/WORK STATEMENT, Section C, Specific Requirements, Task 4, b., the contractor is to identify solutions to address organization-level business policies and state laws that affect privacy and security practices in order to permit interoperable health information exchange, while preserving the privacy and security requirements in applicable state and Federal laws.  As the clause states, the contractor is expected to focus on preservation of privacy and security requirements in applicable federal and state laws.*

**5. Can the implementation plan to address organization-level business policies and the regional workshops include education for those entities that have implemented policies and procedures that are more stringent than required by current federal or state law?**

*A:  As described in DESCRIPTION/SPECIFICATION/WORK STATEMENT, Section C, Specific Requirements, Task 4, b., the contractor is to identify solutions to address organization-level business policies and state laws that affect privacy and security practices in order to permit interoperable health information exchange, while preserving the privacy and security requirements in applicable state and Federal laws.
The government cannot comment on an offeror's specific strategies to complete the work.*

***Clarification of the role of tribal governments***

**SECTION C STATEMENT OF WORK is amended include specific references to tribal governments as follows:**

Cover Page, Part I – THE SCHEDULE, first paragraph, last sentence currently states:

> The Government anticipates competitively awarding one contract and encourages subcontracting directly with up to 40 state or territorial governments (or designated entities) in order to complete the tasks within the prescribed timeframe.

**Cover Page, Part I – THE SCHEDULE, first paragraph, last sentence is amended to state:**

> **The Government anticipates competitively awarding one contract and encourages subcontracting directly with up to 40 state, tribal or territorial governments (or designated entities) in order to complete the tasks within the prescribed timeframe.  Hereinafter "state, tribal or territorial governments" are referred to collectively as "state or territorial governments".**

SECTION C/ STATEMENT OF WORK, Specific Requirements, third and fourth sentences currently state:

2

The state or duly recognized entity shall engage public and private sector health care entities that are involved in interoperable health information technology adoption.  The entities shall include, but not be limited to: clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories, pharmacies, long term care facilities and nursing homes, homecare and hospice, correctional facilities, professional associations and societies, medical and public health schools that undertake research, quality improvement organizations, consumers or consumer organizations, and state government (Medicaid, public health departments, etc.).

**SECTION C/ STATEMENT OF WORK, Specific Requirements, third and fourth sentences, are amended to state:**

**The state or duly recognized entity shall engage public and private sector health care entities that are involved in interoperable health information technology adoption.  The entities shall include, but not be limited to: clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories, pharmacies, long term care facilities and nursing homes, homecare and hospice, correctional facilities, professional associations and societies, medical and public health schools that undertake research, quality improvement organizations, consumers or consumer organizations, and state and tribal governments (Medicaid, public health departments, etc.).**

SECTION C/ STATEMENT OF WORK, Specific Requirements, 4d., second sentence currently states:

Statewide meetings shall include, but not be limited to, the following stakeholders:  clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories, pharmacies, long term care facilities and nursing homes, homecare and hospice, correctional facilities, professional associations and societies, medical and public health schools that undertake research, quality improvement organizations, consumers or consumer organizations and state government (Medicaid, public health departments, etc.).

**SECTION C/ STATEMENT OF WORK, Specific Requirements, 4d., second sentence, is amended to state:**

**Statewide meetings shall include, but not be limited to, the following stakeholders:  clinicians, physician groups (primary and specialty care) and other providers, Federal health facilities (i.e., Department of Defense, Indian Health Service, Department of Veterans Affairs), hospitals, payers, public health agencies, community clinics and health centers, laboratories,**

3

pharmacies, long term care facilities and nursing homes, homecare and hospice, correctional facilities, professional associations and societies, medical and public health schools that undertake research, quality improvement organizations, consumers or consumer organizations and state and tribal governments (Medicaid, public health departments, etc.).

*SECTION H – SPECIAL CONTRACT REQUIREMENT is amended as follows for Paragraphs H.1, H.2 and H.3*

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

## H.1    RIGHTS IN DATA – SPECIAL WORKS  AND RESTRICTIONS ON PUBLICATION AND DISSEMINATION OF MATERIAL DERIVED FROM WORK PERFORMED UNDER THE CONTRACT

FAR 52.227-17 Rights in Data – Special Works is hereby incorporated by reference.

The provisions of H.1 shall apply to any publication, release or use of data first produced in the performance of the contract pursuant to the terms of FAR 52.227-17(d).

Section 924(c) of the Public Health Service Act (PHS Act), 42 U.S.C. 299c-3(c), states in part that:

No information, if the establishment or person supplying the information or described in it is identifiable, obtained in the course of activities undertaken or supported under this title, may be used for any purpose other than the purpose for which it was supplied unless such establishment or person has consented...to its use for such other purpose. Such information may not be published or released in other form if the person who supplied the information or who is described in it is identifiable unless such person has consented...to its publication or release in other form.

To ensure compliance with these requirements and to fulfill the mandate of 923(b)(1) of the PHS Act, 42 U.S.C. 299c-2(b)(1), to assure that statistics and analyses developed with AHRQ support are of high quality, comprehensive, timely, and adequately analyzed, the Agency for Healthcare Research and Quality (AHRQ) must, prior to any publication or dissemination by the contractor permitted under the contract, review all data, reports, presentations, or other disclosures that contain statistics and analytical material based on or derived from work performed under the contract.  Accordingly:

(a)    AHRQ will use best efforts to (1) review the proposed report, presentation, or other text derived from data or information collected or produced for the contract to assure that (a) any identifiable information is being used for the purpose for which it

4

was supplied; (b) the privacy of individuals and confidentiality of establishments supplying identifiable information or described in it is not violated; and (c) the quality of statistical and analytical work meets the statutory standards cited above, and (2) within six weeks of receipt, either approve or provide written conditions for the publication or dissemination of the proposed publication, presentation, or other disclosure of the materials.  In the event the contractor does not agree to any written conditions provided under (a)(2), AHRQ will use best efforts to continue negotiations with the contractor to come to agreement on conditions for publication that fulfill AHRQ's statutory data dissemination obligations under Sections 923 and 924 of the PHS Act.

(b)     In the event neither agreement to publication nor any written conditions are received from the Contract Officer by the end of the six-week period following receipt of proposed text for publication of a report or a presentation or other disclosure of data or material derived from work performed under the contract, the contractor may publish, present, or otherwise disclose the material using best efforts to meet the standards set out in Section 923(b)(1) and subject to the restrictions of Section 924(c).  However, the contractor must print prominently on the report or any portion of it which is released, or state prior to any oral or other disclosure of material derived from work performed under the contract, the following disclaimer:

THIS REPORT *(or other appropriate description of publication)* HAS NOT BEEN APPROVED BY THE AGENCY FOR HEALTHCARE RESEARCH AND QUALITY.

(c)     Whether or not written approval of the Contract Officer is received, the contractor must:

.       print the following statement prominently on written reports or other forms of recorded data derived from work performed under the contract which is to be published or released; or

.       preceeding any presentation or other oral disclosure of such material make the following statement:

IDENTIFIABLE INFORMATION IN THIS REPORT OR PRESENTATION IS PROTECTED BY FEDERAL LAW, SECTION 924(c) OF THE PUBLIC HEALTH SERVICE ACT, 42 U.S.C. 299c-3(c).  ANY CONFIDENTIAL IDENTIFIABLE INFORMATION IN THIS REPORT OR PRESENTATION THAT IS KNOWINGLY DISCLOSED IS DISCLOSED SOLELY FOR THE PURPOSE FOR WHICH IT WAS PROVIDED.

(d)    Whenever data or analyses are to be developed by a subcontractor under the contract, the contractor must include in the subcontract the terms of H.1.without substantive alteration, and with a prohibition on the subcontractor engaging in further assignment of its obligations to the contractor.  No clause may be included to diminish the Government's requirements for or restrictions on publication and dissemination of work or material derived from work performed under the contract.

## H.2    DEBARMENT

Violation of the special provisions of the contract entitled **RESTRICTIONS ON PUBLICATION AND DISSEMINATION OF MATERIAL DERIVED FROM WORK PERFORMED UNDER THE CONTRACT, and RIGHTS IN DATA - SPECIAL WORKS** will be viewed as a serious violation of the terms of the contract as the requirements in this provision reflect AHRQ statutory obligations and responsibilities.  Such violations, as well as other violations, of the contract terms which are deemed serious, could result in the initiation of debarment proceedings in accordance with the Federal Acquisition Regulations and the Department of Health and Human Services implementing regulations.

## H.3    SUBCONTRACTS

The contractor must include in any subcontracts executed or used to provide the support specified in the contract the terms of requirements H.1 and H.2.  These requirements are to be included without substantive alteration, and no clause may be included to diminish these requirements.

Award of any subcontract is subject to the written approval of the Contract Officer upon review of the supporting documentation as required by FAR Clause 52.215-12, Subcontractor Cost or Pricing Data, of the General Clauses incorporated into the contract.  A copy of the signed subcontract shall be provided to the Contracting Officer.

***TRANSCRIPT of June 20th Conference Call (not in original amendment)***

**AHRQ Request for Proposal: Privacy and Security Solutions for Interoperable Health Information Exchange**

June 20, 2005
1:00 p.m. EDT

***NOTE: This Transcript Is Posted For Informational Purposes Only.
If There Are Any Discrepancies between the Solicitation and Any Amendments,
the Solicitation and Amendments take precedence***

CoordinatorGood afternoon and thank you for standing by. All participants will be able to listen-only until the question and answer portion of the conference. This conference is being recorded. If anyone has any objections, you may disconnect at this time. I'd like to introduce the host for today's call, Dr. David Brailer, National Coordinator for Health Information Technology. Sir, you may begin.

D. BrailerOkay. Thank you, Operator. Let me thank everyone for participating in today's call. The purpose of today's call is to discuss the RFP issue entitled Privacy and Security Solutions for Interoperable Health Information Exchange. With me today are staff from the office of the National Coordinator, the Agency for Healthcare Research and Quality, and the Program Support Center. Let me ask them all to introduce themselves.

L. Evans        This is Lori Evans from the Office of National Coordinator.

S. Young    This is Scott Young from the Agency for Healthcare Research and Quality.

S. ChristensenSusan Christensen at the Agency for Healthcare Research and Quality.

B. Zuhlkey  Bob Zuhlkey at the Agency for Healthcare Research and Quality.

S. Williams   Sharon Williams from the Agency for Healthcare Research and Quality.

M. Weisman        I'm Marc Weisman, HHS Procurement Executive.

7

L. du Pont          Lammot du Pont, Office of National Coordinator.

D. Brailer  Okay, thank you.  Before we begin to take questions, let me start by setting a foundation for today's discussion.  In the past month, we've released two reports that summarize a large amount of the thinking that has been feeding into our planning over the past year.

The first report was the health IT Leadership Panel Report that was reported to us by the CEO's of Fortune 100 companies not involved in healthcare, including FedEx, General Motors, International Paper, Johnson Controls, Target Corporation, Pepsi Co., Proctor & Gamble, Wells Fargo, Wal-Mart, etc.  These CEO's were asked to convene and to discuss if health information technology should be a priority for their investments in healthcare because of the role that they play as procurers of health benefits for their employees.  They definitively answered yes to that question to discuss that issue at length about how employers would view an improvement in quality and productivity of the healthcare industry.

Secondly, we asked them to give us their expert opinion as leaders of information transformations in their own industries about how health information technology investments could lead to improvements in healthcare.  They believed that healthcare could follow very much the same contours as their industries in terms of having substantial productivity improvements, lowering defect rates, improvement in customer service.  This report is available at our Web site at www.hhs.gov/healthit.

The second report was the summary of the RFI responses that we released two weeks ago.  This was based on the review of the responses to the request for information that my office released in November 2004.  The RFI generated more than 500 responses with 5,000 pages of information and had several key findings.

First the respondents called for the need to have a vehicle to organize and reflect the broad public and private interests in leading health information technology.  This is one of the key reasons that we announced the formation of the American Health Information Community that'll be formed over the course of 2005.

Secondly, there should be governance mechanisms for determination of standards as well as development of financing and operation of network architecture that incorporates both public and private stakeholders.  This is one of the inputs into the standard terminazation and compliance certification RFPs that were discussed last week.

Thirdly, there should be decentralized regionally brokered networks linked by a uniform communication and framework as well as open standards and policies, which was one of the key inputs into the National Health Information Network Architecture.  Also they called for patient centric information that had sufficient privacy safeguards and security controls that both allowed information to be shared, but also to be protected.  This was one of the key inputs into the RFP that was issued that's the purpose of today's call.

Finally, they called for incentives to accelerate deployment and adoption of a national network and for the information technology at the point of care.  The recommendations we're making in that area are still under consideration.

Turning to the Privacy and Security Solutions RFP.  This RFP will address and support the development of plan to address variations and organizational level business policies as well as state laws that affect the privacy and security practices, including those related to HIPPA or other sources that may pose challenges to interoperable health information exchange.  Lammot du Pont will tell us the ground rules for today's call.

L. du PontThe purpose of the call today is to address your questions regarding the solicitation.  The answers today are for informational purposes so you'll need to check the FedBizOpps Web site for the official response.  If there are any differences or contradictions between today's transcript and any amendments, the amendments and what is in the information on FedBizOpps does control.

We're going to try to answer all your questions today, however, we may need to research the question and generate an official response, which will be provided by a formal amendment to the RFP, again, posted on the FedBizOpps Web site.  We're not going to be able to talk about particulars of any of the proposals today as we are prohibited from insisting in the development and the preparation of your proposals.

Finally, a copy of today's unedited transcript will be provided on the FedBizOpps Web site, we hope in the next few days.  As soon as we can get the transcript from MCI.  It will part of an amendment along with those who registered for the call.

As we've indicated, or we'll send you an e-mail regarding this, but if you don't want your name to appear on the published list of registrants, please contact Karen Butler at karen.butler@hhs.gov or via telephone at 202-205-0227.  We'll also send you an e-mail regarding this later today.

D. Brailer All right. Thanks, Lammot. Now turning to this RFP, let me just call out two aspects of this that I think bear note before we turn to questions. The first is that this RFP is a critical component of how we will engage and collaborate with states and develop teaming relationships between the contractor in states that are substanded and that allow us to be in developing questions about how we can develop future-looking policies or practices that can enhance security and privacy, yet allow broad scale interoperability to occur at the same time. These relationships are a critical component of what we see being formed through this effort.

Secondly, this RFP has a key dependency that's called out on page nine with the National Health Information Network Architecture RFPs that will be aimed at being able to develop an interaction between the privacy and security thinking here at the business and public policy level with the kinds of architecture design that are in the National Health Information Network. And vice versa being able to take questions about architecture and feed them into a public policy process. So these dependencies are critical.

There are other dependencies with other contractors and other efforts that we have underway, but the one that we think that's worth noting up front is the one with the National Health Information Network Architecture. Let me now turn to questions. With that, I'm going to turn it to Scott Young, who will moderate the question and answer period.

S. Young Thank you, David. I'm looking forward to answering your questions. Operator, is the first question queued up?

Coordinator Thank you. We will now begin the question and answer session. One moment for the first question. Greg Rowe, your line is open.

G. Rowe Hello, Greg Rowe, American Cancer Biorepository. We're trying to understand the relationship as you described a little bit between this and the other three proposals. The question specifically is if we make application to two of them because our technology is similar, or our approach, would we be automatically eliminated from one or the other or could we determine which of the two we've selected if they don't want to award both contracts to one company?

S. Young Greg, thank you for that question. Let me turn that over to our procurement officials in the room to answer that.

M. Weisman Yes, you are permitted to propose on all of the RFPs. If you make the competitive range and are offered contracts on more than one, you may accept contracts on more than one. Or in the alternative, if you feel that there's a particular area you want to specialize in and if you're offered two contracts reject one. That would be satisfactory as well.

G. Rowe                          Great. Thank you very much.

Coordinator                 David Swiegert, you may ask your question.

D. SwiegertA brief question.  The Earn Value Management approach that's been articulated in OMB Circular A11, usually that you see EVM used where's there's an opportunity to create tangible deliverables, tangible artifacts.  Do you see this model as relevant to the most extent that these deliverables can be created as a tangible deliverable?  In other words, how far along the line do you see some very specific artifacts and deliverables being created?

S. Young  David, thank you for that.  Let me take a stab at it and then I'll turn it over to some of the program staff here in the room.  As the phrase, "to the extent practicable," implies the use of EVM is required only to that extent.  If you or other bidders believe EVM is not practicable, you should indicate so in your proposal and actually kind of roll up that reasoning in the proposal as well.  Let me ask if others have got an addendum to that.  I'm seeing them in the room.  I know that's not an exact or precise answer, but we're going to throw it back in your lap to make that determination based around your proposal.

D. Swiegert Yes, and that sounds good.  What's good about that response, I know it's informal in response, but you're giving some amount of flexibility to the potential contractor to create some kind of management control tool.  I think that's the purpose here, what you're really looking for.  You want accurate milestones to find an accurate task to get to those milestones.  Perhaps, there might be a commercial methodology or model, then you would be open to seeing anything as long as it's getting people down the road of accountability and meeting tasks and delivering what needs to be delivered.  That's the assumption, right?

S. YoungYes.  Again, that would come back to you or other bidders to make that argument within your proposal.

D. Swiegert                              Okay.  Thank you.

Coordinator              Joyce Potter, you may ask your question.

J. Potter  Can you tell me if second years of contractors on this effort will count toward the prime contractors subcontracting goals?

S. Young Can you clarify that for me?  There's a requirement around 40, but …

M. WeismanThere is a requirement that you submit a subcontracting plan that addresses the small business in various goals of the federal government.  That's expressed in Section L, it gives you those percentages.  You're also required to submit a small disadvantaged of subcontracting plan and that's a scored part of the evaluation.

If you use subcontractors, in other words, as part of this effort uses subcontractors who are, if you will, enunciated on those plans, then, yes, they will count towards meeting the requirements in this plan.  So in other words, if you have a subcontractor that's a qualified minority business, then you should display them on the plan as well as being, if you will, a business partner with you.  That would help satisfy that requirement.

S. Young                   Joyce, does that answer your question?

J. Potter  Close.  But we expect that some of our subcontractors will come to us second tier, so through another subcontractor.  Generally, that means we would take only the first tier's information into how we meet our goals.  So, for example, we've got a non-profit that would be our subcontractor who would reach out and bring to us a second tier subcontractor.  The non-profit would be considered a large business, however, they'd be bringing some small businesses to us.

M. Weisman  That's correct.  What you need to do then as you shape those business relationships, you craft your subcontracting plan around that.  I would believe that if you have that first tier that you could reach down into the second tier if you can show the flow of, if you will, the work in dollars to that second tier.

J. Potter                           Excellent.  Thank you.

S. Young                    All right.  Thank you.  Next question.

Coordinator              Bob Sesfuit you may ask your question.

B. SesfuitThank you.  Bob Sesfuit, Smart Technology.  We're all ready an SDB, small disadvantaged contractor.  Do we have to also fill out a subcontracting plan?

S. Young           I'm going to turn that over to procurement folks as well.

M. WeismanSo if you're a small disadvantaged subcontractor and you're going to bid as the prime, you are not required to file either of the two subcontracting plans.  You will receive a full point score for the small disadvantaged plan.

B. Sesfuit                              Thank you.

Coordinator              John Wyler, you may ask your question.

J. Wyler     John Wyler, Interoperability Clearinghouse.  I wanted to get some greater clarity on one of those items that you clarified just a little while ago abut subcontractors and prime contractors.  We're a small business non-profit.  Does the department differentiate or profit from non-profit in its identification of small businesses?

S. Young                 I'm going to turn that over to procurement folks.
M. WeismanI don't believe so, but I'll get further clarification.  In other words, whether you're profit or non-profit should not make a difference to you.  In other words, if you come in as a prime I'm pretty certain that you would not have to file the small business plan, but you would have to file the small disadvantaged business plan even if you were a non-profit.  But I'll get specific clarity on that.

J. WylerThat's great.  A small follow on if you don't mind.  An organization that is a non-profit often or sometimes can be a consortia and its numbers make up that organizational structure.  I presume that we will still have to fill out the subcontract that we operate a little bit differently for profit concerns and how we treat partners, we call them members.

S. Young    Are you talking about something that would be referred to as an association or a --

J. Wyler    Association in one and some standard bodies are also non-profit membership structures, they're 501C6's. Often associations don't do work, but consordia's such as ours, in fact, do work and they do work through the collective of many members. Some are small, some are large.

M. Weisman Again, I'll have to get greater clarity on this particular issue. Just so I understand, what you're saying is you believe your status is small, but you have a number of members who have a various status. So you'd like to know how we view just the entire organization if you're --?

J. Wyler Right, or how you're going to view. It would probably be, for simplicities sake, just not care about who's a full profit or who's a non-profit, but it might be of interest looking at SDOs that have membership structures and perform as a collective through its members.

S. Young Thank you for that. Just as a reminder to all those on the call, we talk about responses to these and getting more information, that will come out in the form of an amendment. Look for those at FedBizOpps. We won't be getting back to people individually, obviously. I wanted to reiterate that. But those responses will be posted in a, hope to be, timely manner, but just as soon as the information's available to us.

J. Wyler                              Thank you, Dr. Brailer.

S. Young                                    I was Young, but --

Coordinator               Doug Robinson, you may ask your question.

D. RobinsonDoug Robinson, NASCIO, National Association of State CIOs.  A related question to one just asked related to references to multi-stakeholder entities dually recognized by the state.  Again, the question is would that include national government associations?

S. YoungDid it have a corporate structure to that association?  Would there be a non-profit corporate structure or?

D. Robinson                          Yes, 501 C3

S. YoungThe question is that do we recognize if all 50 states are members of the association.  This would come in either as a prime or – as coming in as a prime?

D. RobinsonPrime coming in as a prime and also what are the deliverables in terms of executing a plan that includes multi-stakeholder involvement representing the states; as well as a state level stakeholder, multiple references to multi-stakeholder entities, but that multi-stakeholder isn't defined as such.  Just asking for a clarification I guess for definitional purposes.

S. Young           Let me turn that over to our procurement folks as well.

M. WeismanAgain, if I understand what you're asking can an association, if you will hold a contract with us.  If that's the question, the answer's yes.  If you're asking something a little bit different, then I'd need to do a little research and provide more clarification.

D. RobinsonNo, that's the question.  Either as a prime or a subcontractor, that would be acceptable then.

M. Weisman                              Yes.

D. Robinson                          Okay.  Thank you.

S. Young                              Thank you.

Coordinator              Joyce Potter, you may ask your question.

J. Potter Yes.  Past performance on page 51 asks for the last five contracts and subcontracts.  Are you really looking for just the last five completed or would you prefer to see past performance information on relevant contracts?

B. Zulkey  I would say the past five because that's the way it was worded and I think that's the way Jackie interpreted it as well.  The last five.

S. Young  Okay.  So if they've had more than five, chronologically last five.  I'm just looking for our procurement folks to …

B. Zulkey                              I would say just the last five.

S. Young  All right.  So chronologically the last five is what we'd be looking for.

J. Potter  So it doesn't matter if the technical areas don't coincide with what this RFP is looking for?  Is that correct?

S. YoungJust hold on for two seconds here.  Our procurement folks are going to confer on this and be back with you in two seconds.

J. Potter                              Okay, thank you.

S. YoungJoyce, we've had a brief discussion here. Relevance is important.  We will clarify the position in the amendment that will be on Fed Bus Ops.  So we need to go and do a little more thinking on that internally and you should see that when that's published.

J. Potter                              Thank you.

S. Young                              Thank you.

Coordinator           David Sable, you may ask your question.

D. SableYes, thank you.  I have a question related to page 10, item number four, the 40 state or territorial governments of multi-stakeholder entities.  I guess I have two questions.  One is when you say an entity that is dually recognized by state or territorial government, does that mean anything more than simply that it's legally organized?  Or does it have to have some official status with state government as being involved in health information exchange?

The second question is will there be any process for entities that believe they're qualified to do an analysis for a particular state to signal their interest under this grant to the federal government?  Or is it really going to be up to the prime to seek those entities out and find them using whatever process they decide to adopt?

S. Young    Right.  So let me take the first part.  What we're looking for, those entities are recognized by that state government for the purposes of this RFC, for the purposes of this work.  So they can't necessarily be self declared and come in.  They have to be recognized by the state.

As for the second part, how do the prime avail themselves with those 40 subcontractors, I think we're looking for that to be part of the proposal.  How do you envision collecting those 40?  You would want it to be rolled up in the proposal that you sent to us, how do you intend to find those 40?

D. Sable  But if for my own perspective, I'm associated with an entity that I think would be more suited to being a subcontractor for a particular area, what's the way to let the world know about that given that you're only going to be really dealing with primes?

S. Young  Well, a couple of things.  One, I think you certainly let a body of folks know on it.  I think that this participant's list will be made available if people so choose to have their organization and names published, that's another avenue.  But other than that, I think that that's the extent of the assistance that we look to give to make those interactions occur.

D. Sable                                  Okay, thank you.

S. Young                              Thank you.

Coordinator            Laura Shiplett, you may ask your question.

L. Shiplett    That's Laura, as in Laura Shiplett with the National Governor's Association.  I was just following up on the past performance issue.  Do grants received by an organization such as ours qualify in the same light as a past contract would?  Because the predominant vehicle we have received funds from in the past from the federal government has been in the form of grants rather than contracts.

S. Young        Laura, we're going to turn that to our procurement folks.

M. Weisman  We're answering almost an identical question from one of the previous calls.  So we'll clarify that in our amendment to this one so it's consistent.

S. Young              All right.  So stand by for that answer, Laura.

L. Shiplett                              Thank you.

S. Young        Thank you.  Operator, are there any other calls in queue?

CoordinatorWe have one question from Charlotte Hazlette.  Ma'am, you may ask your question.

M. Hazlette.Good afternoon.  My name is Marlette Hazlette from Georgia Tech.  I have a question of clarification.  It's unclear to me whether or not we need to have all of our subcontractors; just for example, we were going to be prime, identified ahead of time or if we need a plan for identifying those?  A couple of the answers have made that unclear to me.  If we need to have some of them identified, is there a certain percentage of those or?  Is that question clear?

S. YoungIt is.  Just wait one for the answer.  Charlotte, we have some answers for you.  Marc Weisman is going to kind of lay this out because I think we would probably butcher the answer if we did it.  So I'm going to turn it over to Marc.

M. WeismanWe'll provide more clarity in our written response, but you need to provide a subcontracting plan and a small disadvantage-subcontracting plan with your proposal.  On that plan may be subcontractors that you will contract with that do substantial work under this contract.  However, if they're not identified at this time, you still need to bring forward those other subcontracting plans.

17

So you would look to, perhaps, other cost areas like overhead and other expenditures you may have to develop those plans. Those plans must come in and they have to be more than just, if you will, sort of placeholder saying that I will go out and do x, y, and z. We just have to see something more developing there especially in that small disadvantage plan. So, as I said, we'll provide you some more clarity on that area.

M. Hazlette                              Thank you.

S. Young                                 Thank you.

Coordinator              Solomon Apazul, you may ask your question.

S. Apazul  Hello. I need clarification with regard to the two terminologies privacy and security. It seems to be thinking solution, recommendation, for quality makers primarily. The security is more technical, privacy is … to quality …, but when it comes to security practice, that's based on available technology and the state of the art and things like that. So in terms of available producing analysis report, the recommendations for policy makers, I'm trying to see how can you make technology recommendation for policy makers? Can you clarify that?

S. Young  Yes. I'm going to turn this over to some of our other program folks here, but from the federal perspective as well as very state perspectives as well as organizational perspectives, you're right; those terms all have got very different meaning. They might go from laws to regulation to just business norms, back and forth.

I don't know that we've got – we've outlined this, I think, on page 11 where you see kind of what our views are on this. But if you notice that we say include, but are not limited to the following practices, I think you hit on a very good point there that this is a fairly broad area with many definitional constructs within it. I don't know that we would have any type of, limit it within the compliance of this conversation. Let me turn it over to Susan Christensen.

S. Christensen  This is Susan Christensen. A lot of the purpose of this is to solicit other thoughts who are working in this area about how to approach this and break it down, to break it down into manageable pieces. You've identified a key way of approaching it. As Scott said, this is a laundry list, it's not complete. So we wouldn't want to tell you exactly how to approach that, but we are looking for both policy and technical suggestions and you tell us how you would propose to do it.

S. Young                                 Thank you.

S. Apazul  For example, just to follow-up, that page 11-4, the following item identification to match item to data across multiple information. One of the recommendations could be if you implement a unique patient identifier, which is a HIPAA legislation, which is being put on hold, can we make recommendation for a legislative action?

D. Brailer                          Scott, could I jump into this?

S. Young                                  Yes.

D. Brailer   Hello, this is David Brailer.  Let me illuminate this because this has been an issue that I know has been discussed at great length. What we're playing with here is the interface between if you had technological capacity, whether for security or privacy, and how that influences policy.

What I mean by policy is not just public policy, but business policy.  For example, public policy determined that the way to have flexibility under HIPPA was to allow business policy to make a wide range of choices.  That interplay between public policy and business policy created a space where technology could act.  We don't want to go backwards and define this from the technology outward basis.  What I mean by that is we still want to stay with the policy discussions, but it's not just public policy.

So ask yourself what opportunities does technology create that could lead to business or public policies that enhance both privacy and security and interoperable access; or what policy conditions, business or public, could lead to an environment where technology could act.  But what we're looking for is the ability to strengthen security and privacy and at the same time make information widely available so that it's both protected and accessible.  So its that interplay between the two that we really think is the most important to bring out here.

S. Apazul                                 Thank you, Dr. Brailer.

Coordinator               Diane Stone, you may ask your question.

D. Stone Yes, good afternoon.  Questions confirming dates and timetable.  I see July 15th for submission and I see September 30th as the anticipated period of performance.  My question is between those two dates, when would the prime contract be awarded?

S. Young I'll turn this over to our procurement folks, but July 15th is the date that the proposals are due.  The end of September would be the award day, it certainly would be, I wouldn't anticipate it being any later, it would be by that date.  It can't be biased at the fiscal year.  So I think if I understand your question, you're talking about when the proposals are due and then the award date.

D. Stone Well behind the question is when would the world know who the prime contractor is?

S. Young                                 That would be the award date.

D. Stone                                 September 30th.

S. Young                                 Right.

D. Stone                                 All right.  Thank you.

S. Young                                    Thank you.

Coordinator                     Matt Gallagher, your line is open.

M. GallagherHello, thank you.  A follow-up on the procurement options.  One page 44 of the paper it says that it is anticipated that one award would be made for this solicitation and that award would be on or about September 30th and on page 57 the government reserves the right to make a single award, multiple awards, or no award at all.

Throughout the paper, you mentioned a number of different sizes and capabilities of contractors.  I'm wondering is your vision that this is a single award to a prime who is then orchestrating a multiplicity of sub's who bring to the table various understandings of geographical rules of engagement, technological rules of engagement, or some mix of people who together bring the whole thing to the table and the government orchestrates that.

D. Brailer                      Could I speak to that, Scott?

S. Young                        You certainly can.

D. BrailerThis is Dr. Brailer.  I think it's a really good question and it really probes the purposeful breadth that we left in how responses could come forward. If you would, there's no inside favorites, there's no process here by which we've limited the kinds of responses.

But what we've called for, and I started in my introductory comment with this, is a substantial and substantive involvement of the states, either through the state or through designated organizations involved in health information in the states. We did that because we don't want to see the dialog begin by saying what should Washington do about this problem. We want to be able to see what could be done and what's able to be done in the states.

Obviously, a substantive and substantial way for states to be involved with the contractor is through subcontract, but it's not only limited to that. If there are pre-existing mechanisms where states are all ready involved and have the form and the mechanism and the convening power to bring them forward to talk about this topic and it's not involving subcontracts, that would be a legitimate response as well.

But ideally we want to make sure that those who can address this issue, which are enterprises and state leaders and regional entities, have some skin in the game and have a sense that this is a process for them to not only engage what's going on in their territories, but in a cross territorial way. So that ambiguity is somewhat purposeful, not meant to create a problem, but meant to enlist with a broad range of responses to ways we could go about convening this.

M. Gallagher                    May I ask a follow-up?

S. Young                        Certainly.

M. GallagherTherefore, would it be a reasonable consideration for a contractor who, let's say, had an understanding of four or five states rules of engagements and proposed methodology by which those policies and those technologies, which were existing in those states and, let's say they were in a closed contacted regional geography, then that would be an acceptable solution to part of the problem and therefore a good kind of day for contract work.

S. Young                        Dr. Brailer, did you want to?

D. BrailerYes, I guess I would comment. Obviously, we can have Marc Weisman make the final call of this. We can't pre-evaluate any potential contract or idea. It's up to you to make a determination if you want to actually go forward with that. We laid out a large number of states because we don't want to see narrow cast solutions.

So taking literally what you said, if it was four or five, I think that would be very narrow compared to what we're looking for. Our goal in the RFP is to have the overwhelming majority of states be involved in this effort. But I maybe didn't understand something you were asking.

S. Young                        Thank you.

Coordinator           Rob Montgomery, you may ask your question.

R. MontgomeryYes, thank you. Actually I have three questions, but I'll ask them in succession after the answers are given. This topic of subcontractors has

come up a couple of times, but I think the questions didn't quite get to the point. Will the 40 states or territory subcontracts be flowing through the prime contractors contract?  If they happen to be small businesses or SDBs, would this be used to calculate their subcontractor obligations?

S. Young   Yes they would be flowing through the prime.  Let me turn it over to Marc Weisman regarding the SDB question.

M. WeismanAgain, many companies and universities and the like have, if you will, corporate subcontracting plans.  So what one might see would be that you would bring forward your corporate plan, which might address both our small business goals and our small disadvantaged business goals.

Then in this particular arrangement where it is envisioned that you would have subcontractors in addition to those corporate subcontractors, they could be added to your plan if you so choose.  You do need to have a plan filed for both small business and small disadvantaged business.  So if, for example, you did not have something like a corporate plan, then that cadre of small businesses that are going to be part of your subcontracting makeup can be proposed as that plan, as the sub's and the disadvantaged plan.

But to get points for that, it would have to be more than just a plan to go out and find those companies.  So for that requirement, that would have to be a little bit more, if you will, I'll use the word nailed down, than if you had a plan all ready developed.  Again, we're going to clarify this whole area a bit more specifically when the amendment comes out.

S. Young      All right.  Thank you.  Mr. Montgomery, your second question.

R. MontgomerySecond question is should the 40 state territory subcontractors be identified in the proposal or just state a plan as to how you will subcontract or engage in subcontracting these 40 state and territories subcontractors?

S. YoungHold on just two seconds.  Mr. Montgomery, there is not a requirement that they be named in the response.  If people are able to, there certainly is no limitation to doing that, but it is not a requirement.

R. MontgomeryOkay, great.  Thank you.  The third question is such an "A" under task four on page, I believe it's 11, talks a little about the assessment and analysis work that will be done with the data.  If it's possible can you speak in a little bit more detail about how you see this data being utilized?  Is it going to be used to support the prototype contractor, for example, or is it going to be used for a gap analysis or conflict identification across states in order to create a repository to the access by other health care information entities?

S. YoungI think it's envisioned it could potentially be used for all of those things. But let me just pause there and see if Dr. Brailer has got some comments on how he sees this information being used.  But certainly all of those things you named would be a possibility.

D. Brailer          Could I just have you repeat the question for me?

R. Montgomery If you could comment on how you envision what kind of analysis and how will the data be utilized once it's been collected across these 40 state and territorial entities?  What do you envision the use of this data?  Would it be gap analysis, would it be used to guide?

D. Brailer    Right.  It's a good question.  We envision this as the first step in, perhaps, a long step of actions to begin understanding privacy and security in a world that is interoperable.  Let me just say two seconds about that.  In a world that's interoperable where data could flow relatively seamlessly at a patient's request, it involves many new kinds of policy thinkings and many new kinds of business practices that we don't have today.

For example, information flowing has new ways of creating both controls for the information to flow in restrictions and new ways of monitoring and new ways of understanding the patient's involvement in that.  We certainly won't address all of those issues in this contract.

This first contract is aimed at understanding what the issues are that are barriers to interoperability because of flexibility and ways that we can also strengthen security and privacy as we address those.  So that would feed into a variety of things.

First, into new tasks or activities that we might request on behalf of states or contractors to do.  Secondly, we call that this dependency on requirements or the National Health Information Architecture.  What issues does it need to think about that is a technical platform that it needs to begin incorporating into it that are fed from this policy analysis?

Thirdly, there could be tasks that are convened within HHS or other federal agencies to begin understanding policy questions at the federal level.  Fourthly, there could be issues that come up that the states themselves begin to explore or examine.

So there are at least four things that flow from this and they're in the spirit of opportunity identification I think more than a gap analysis because I think a gap analysis would imply that we know what the end stage is and we're trying to compare that to where the world it today and then evaluate that gap.  I think its fare to say that from a policy perspective, we don't know where the end stage is.  We're trying to define that to a large degree, but we're defining it in a way that respects the states rights issues, that respects the high decentralization that all ready existed in privacy and security, and that respects the issues of protection, foremost, among all.

So this is an opportunity assessment, it is a directional assessment, and it's a chance to set an agenda and to begin identifying key roadmap issues as we go on this policy journey through privacy and security.  Does that help?

M. Montgomery            Yes, very much so.  Thank you.

D. Brailer                    Thank you.

S. Young                    Thank you.

Coordinator                 John McKinney, your line is open.

J. McKinneyYes, I'd like, if you could, to speak just a minute to clarify on page 13 item number nine.  I understand the nationwide discussion that it talks about, but could you clarify the relationship to the second part of that statement about the prototype solutions and how that ties in with regard to the other RFP on the architecture prototype?

D. Brailer                    Do you want me to speak to that, Scott?

S. Young                Yes, I was just going to throw that one to you.

D. Brailer  Okay, sure.  First, let me talk about the NHIN architecture contracts.  These are to develop architecture, if you would, blueprints for what the infrastructure looks like that would allow otherwise interoperable electronic health records to connect and to share information, to locate the information, to gaining access to it, to have their activities monitored, to be able to restrict access, to be able to do other tasks that are commonly seen now in other sectors of our lives, banking, etc., but not in healthcare.

Those architecture prototypes would be in the public domain and evaluated by a certification contractor and, if you would, turned into requirements, inspectible requirements for architecture.  Also the contractors would implement prototypes that would actually test their architectures for the purposes of developing specific feedback on implementation questions.

This contract feeds into the architecture and vice versa because clearly one of the key tasks in the architecture are the technical mechanisms by which data is protected.  I'm not here speaking about privacy or security only, I'm really speaking about both.  Ways that it's protected, ways that data is accessed, ways that access is monitored.  Those technical implementations we're asking the NHIN architectures to do in free form.  What I mean by that, without guidance other than today's public policy.

This contractor's going to, again, evaluate where we need to be in the future.  It will raise policy questions, which will in itself lead to potential policy requirements either at the business level, the state level, perhaps at the federal level although that's not our thinking today.  That would feed back to the NHIN architecture contractors to say how would you deal with these questions?  What are the architectural and implementation issues that are arised by this activity?  Therein this contract is not inherently technical, if you would, this RFP for the states.  This is really policy.

That would feed into the architecture contractors who would then feed back to the various groups and say here are the issues that we've learned about that.  That would then pass to a subsequent or follow-up contract after this one because this is relatively narrowly scoped.

But the key dependency is feeding in, if you would, the requirements for what potential policy processes would say, here's how we can make data available in a way that still preserves flexibility and protects data privacy.  Does that help?

J. McKinney Partially. I guess in what this nationwide summary for this RFP should discuss, the NHIN prototype solutions would be part of that summary is what you're saying?

D. Brailer  It would be a mechanism by which the output or recommendations that's come from this project are tested, at least the narrow piece that have to do with technology development.

J. McKinney                          Great. Thank you.

D. Brailer                          Thank you.

Coordinator       Paula Denise Edwards, you may ask your question.

P. Edwards Actually someone's all ready asked my question so I'll defer and pass on to the next person.

S Young                          Thank you.

Coordinator One moment, there is another question. You may ask your question. Denise Tingle, your line is open.

D. Tingle    Thank you. Hello, this is Denise Tingle, Booz, Allen, Hamilton. I actually had two questions. The first one relates to the fact that the RFP states that you intend to award a CPFS type contract. The question is around the fact, we've had a lot of discussion some of these non-profit membership type groups potentially taking a prime role. If they were to take a prime role, how does the normal requirement under a CPFS contract to have a federally approved accounting system? How would that play out?

S. Young                  Let me turn that over to Marc Weisman.

M. Weisman Actually, that was asked in one of the previous RFPs and we'll give you a more detailed answer. But I would say that we are, if you will, proposing this contract to be cost plus C, however, this isn't a status and your proposals may determine that a different contract type is more appropriate when it comes to the award. So we would like the mission to be as cost plus, but we will have a more definitive answer on that for you.

D. Tingle    Okay, great. Thank you very much. I have one other just quick question. This regards section l.8.a.c. There's a statement in there that says the offer should include milestones, risk mitigation strategies, level in nature of co-investment by the offerer and any partners and subcontractors. I would like to get some clarity around what's anticipated there under that comment around co-investments.

S. Young Give me two seconds on that. Denise, could you site that page number and that section again?

D. Tingle Sure. I'm not sure that I, I'm sorry to say I don't think I have the page number. It's l.8.a.c is what I have in my notation here.

26

W                              Okay, the management work plan.

D. Tingle                      I believe that's correct.

S. Young                       Just two seconds.

D. Tingle                      Page 50.

S. Young   Denise, we found that section.  Thank you.  We are going to further clarify that in the amendment that will be coming out.

D. Tingle                      Okay, great.  Thank you very much.

S. Young                       Thank you.

Coordinator                    Rob Montgomery, your line is open.

R. Montgomery Thank you.  One other quick question about small businesses.  In the other RFPs there's an exclusive reference to a $6 million annual revenue cap for small business.  I don't recall seeing anything in this particular RFP.  Has it been specified?

S. Young     On page one, second paragraph, last sentence states the small business size standard is $6 million.

R. Montgomery                  Okay, thank you.  I missed that.

S. Young                       Thank you.

Coordinator                    Shirley Hall, you may ask your question.

S. Hall      Yes, hello.  Good day.  I was wondering what clause applies to the contract regarding rights and data.  Is that our general rights and data clause, the FAR clause 522.27-14, it that applicable to this contract?

S. Young Hold on just two seconds, Shirley.  Shirley, two parts to this.  One is we want to make sure that we call your attention and others attention to h.1 on page 21 and 22, and to look at that carefully.  Having said that, that will be further amended and clarified in the amendment that will come out.

S. Hall Okay.  And it will explain if there are any restrictions on the use of the data at the end of the project, things like that?

S. Young The amendment will actually, again, further define the restrictions that are outlined in Section H.1.

S. Hall                        Okay.  All right.  Great, thank you.

Coordinator At this time there are no questions.  One moment for a question. Thalum Mapaiu, you may ask your question.

27

T. Mapaiu  Hello.  How many large contract awards will be made?  How many awards?

S. Young                    There is going to be a single award made.

T. Mapaiu                              Okay.

S. Young                              Thank you.

T. Mapaiu                              Thank you.

Coordinator              Paula Denise Edwards, your line is open.

P. Edwards  Hello.  I'm wondering if there's anything that individual states or interested subcontractors from the 40 entities can be doing in preparation for a potential RFP or request for proposals to enter into subcontracts with the prime.

S. Young                              Right.

Coordinator                    We'll say it again.

P. Edwards                    Ask the question again?

S. YoungI actually heard the question.  Well, certainly we're going to have people on to their own devices, if you will, to make arrangements with potential primes.  However, one thing, as people have made their intentions known on this call, as you just did and there is a list of participants that will be published with the transcripts if people have so chosen to make their name and organization available.  That would potentially let people have intercessions with either future primes or future subcontractors.  That is kind of the extent to the answer we can give on that at this point.

P. Edwards                              Great, thank you.

D. Brailer                    Okay, last call for any questions.

CoordinatorOkay, we do have one question.  Just a moment please.  Marc …

Mark   Hello, yes.  I'm a professor of the University of Wisconsin.  I've been doing some research in this area for a while and I'm wondering if there's any particular encouragement incentive or frankly disability for people working with academic researchers in incorporating a more pure research component into a proposal?

S. Young Mark, hold on for just two seconds and we'll have a response for you here.  Mark, there is nothing that would preclude your organization from coming in as the prime.  You would still need to meet each of the requirements in that.

Mark                              I'm sorry, go ahead.

S. Young    No, you would need to meet all the requirements.  Nothing would preclude your organization from coming in.

Mark      And I assume there would also be no particular problem in being a sub under some other prime either.

S. Young                              No, none.

Mark                          Okay, great.  Thank you.

Coordinator    If there are no more questions, we will conclude the meeting.  Charles Valentino, your line is open.

C. Valentino Hello, this is Charles Valentino.  I was wondering based on some of the information that we've heard today, is there any flexibility in the dates for this response to this RFP?  Do you see this being extended at some point beyond July 15th?

S. Young              No.  We don't envision any flexibility in the dates.

C. Valentino                    Okay.  Thanks a lot.

S. Young                          Thank you.

Coordinator At this time, there are no questions.  One moment, please.  There are no questions at this time.

D. Brailer Okay, operator, thank you.  Let me thank everyone for participating on the call.  It was a very good set of discussion and intelligent issues that we raised.  I appreciate very much everyone participating.

I also want to thank the staff from my office, the staff from the Agency for Healthcare Research and Quality, and the staff from the Program Support Center, who have been leading our procurement effort.  Stay tuned for the amendment and the transcript of the call out within a few days.  We appreciate your efforts to move forward with this.  Thank you all very much.

Exhibit 2



# News Release

FOR IMMEDIATE RELEASE
Wednesday, May 17, 2006

Contact: HHS Press Office
(202) 690-6343

## American Health Information Community Approves First Set of Recommendations

The American Health Information Community (the Community) unanimously approved and delivered 28 recommendations yesterday to HHS Secretary Mike Leavitt for his consideration. The Community made recommendations on how to make health records digital and interoperable while protecting patient privacy and the security of those records.

"I have identified nine priorities at HHS to focus my effort around, and health IT is at the heart of every one of them. The work we do in this group is vital, its need is urgent, and I am pleased by the steps taken by the Community to further these goals," Secretary Leavitt said.

Secretary Leavitt led discussion of the recommendations, stressing the importance of the work being done by the Community, and emphasizing urgency in making progress on health IT. Among the recommendations, the Community advised that:

- The Health Information Technology Standards Panel (HITSP) identify and define standards that will enable:
  - secure messaging between patients and clinicians, such as secure e-mail to allow a patient to receive a doctor's advice outside a traditional office visit;
  - reporting results from laboratory testing, so lab results will travel with patients; and
  - availability of electronic registration information to replace the medical clipboard.
- The Certification Commission for Health Information Technology (CCHIT) incorporates HITSP standards as criteria for product certification on an ongoing basis, to ensure interoperability.
- A subgroup be formed to frame privacy and security issues relevant to the work of the breakthroughs.

The Community also unanimously adopted all CCHIT criteria for certification of ambulatory electronic health records (EHRs). The Office of the National Coordinator for Health Information Technology (ONC) entered into a $2.7 million contract with the CCHIT last year to develop and test criteria for certification of health IT, which began in April of 2006. The CCHIT will expand certification to inpatient EHRs in 2007.

Secretary Leavitt also welcomed Robert Cresanti, Under Secretary of Technology at the Department of Commerce, to the Community. Mr. Cresanti replaces Michelle O'Neill, who was the Acting Under Secretary.

For more information about the Community and its Workgroups, and to read their recommendation letters containing the complete recommendations, visit http://www.hhs.gov/healthit/ahic.html.

###

Note: All HHS press releases, fact sheets and other press materials are available at *http://www.hhs.gov/news*.

Last revised: May 18, 2006

HHS Home | Questions? | Contact HHS | Site Map | Accessibility | Privacy Policy | Freedom of Information Act | Disclaimers

The White House | FirstGov

U.S. Department of Health & Human Services · 200 Independence Avenue, S.W. · Washington, D.C. 20201