UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN | ) | |
| PHYSICIANS & SURGEONS, INC. | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0319-ESH |
| | ) | |
| U.S. DEPARTMENT OF HEALTH & | ) | |
| HUMAN SERVICES, *et al.,* | ) | |
| Defendants. | ) | |

### SUPPLEMENTAL DECLARATION OF LAWRENCE J. JOSEPH

I, Lawrence J. Joseph, hereby declare and state as follows:

1.      I am over 18 years of age, and I am not a party to this action. I reside in McLean, Virginia.

2.      I am the attorney representing plaintiff Association of American Physicians & Surgeons, Inc. ("AAPS") in the above-captioned action to be filed in the United States District Court for the District of Columbia. In that capacity, as set forth below, I have obtained or attempted to obtain documents from various public and/or published sources.

3.      I have personal knowledge of the facts asserted in this declarations and am competent to testify thereto at trial.

**Private- and State-Sector AHIC Members Retain Private and State Employment**

4.      On August 18, 2006, I visited the website of the Blue Cross Blue Shield Association, which listed Scott P. Serota as its President and Chief Executive Officer at the following address: http://www.bcbs.com/news/officers.html.

5.      On August 18, 2006, I visited the website of the American Academy of Family Physicians, which listed Douglas E. Henley, M.D., F.A.A.F.P. as its Executive Vice President at the following address:

http://www.aafp.org/online/en/home/aboutus/theaafp/officersetc/officers/douglashenley.html.

1

6.      On August 18, 2006, I visited the website of VHA Inc., which listed Lillee

Gelinas, R.N., M.S.N. as its Vice President and Chief Nursing Officer at the following address:

https://www.vha.com/portal/server.pt/gateway/PTARGS_0_2_983_354_0_43/http%3B/remote.v

ha.com/public/news/experts.asp.

7.      On August 18, 2006, I visited the website of the Federation of American

Hospitals , which listed Charles N. Kahn III  as its President at the following address:

http://www.fahs.com/who_we_are/staff/.

8.      On August 18, 2006, I visited the website of the National Patient Advocate

Foundation, which listed Nancy Davenport-Ennis as its Chief Executive Officer & President at

the following address: http://www.npaf.org/index.php?p=29.

9.      On August 18, 2006, I visited the website of PepsiCo, which listed Steven S

Reinemund as its Chairman of the Board and Chief Executive Officer at the following address:

http://www.pepsico.com/PEP_Company/OfficersDirectors/index.cfm.

10.      On August 18, 2006, I visited the website of SureScripts, which listed Kevin

Hutchinson as its President & CEO at the following address:

http://www.surescripts.com/bios.htm#hutchinson.

11.      On August 18, 2006, I visited the website of Intel Corporation, which listed Craig

R. Barrett as its Chairman of the Board at the following address:

http://www.intel.com/pressroom/ExecBios.htm.

12.      On August 18, 2006, I visited the website of the Indiana Family and Social

Services Administration, which listed Mitch Roob as its Secretary at the following address:

http://www.state.in.us/fssa/admin/about/directory/index.html.

**Federal Initiative to Accelerate Adoption of Health Information Technology**

13.      On February 22, 2006, I downloaded the American Health Information

Community ("AHIC") charter and accompanying determinations from the U.S. Department of

Health & Human Services' website at the following location:

http://www.hhs.gov/healthit/ahiccharter.pdf. The copy of the charter has remained in my

possession and control at all times since I downloaded it.

14.      On August 18, 2006, I downloaded the American Health Information Community

("AHIC") charter from the U.S. Department of Health & Human Services' website at the

following location: http://www.hhs.gov/healthit/ahiccharter.pdf.

15.      The two copies of the charter has remained in my possession and control at all

times since I downloaded it.

16.      The charter that I downloaded on February 22, 2006, provides that one of AHIC's

functions is to "advance and develop recommendations for… [a]cceleration of interoperable

EHR adoption across the broad spectrum of health care providers." A copy is attached hereto as

Exhibit A.

17.      The charter that I downloaded on August 18, 2006, provides that one of AHIC's

functions is to "advance and develop recommendations for… [a]cceleration of interoperable

EHR and personal health record (PHR) adoption across the broad spectrum of health care

providers." A copy is attached hereto as Exhibit B.

**AHIC Subcommittees Deliberated and Made Recommendations**

18.      On August 18, 2006, I downloaded the Meeting Minutes package for AHIC's

meeting on May 16, 2006, from the U.S. Department of Health & Human Services' website at

the following location:  http://www.hhs.gov/healthit/documents/MeetingMaterials.pdf. Included

within those meeting materials are letters dated May 9, 2006, to the Hon. Michael O. Leavitt from each of the four AHIC subcommittees then extant (namely, Electronic Health Records, Chronic Care, Consumer Empowerment, and Biosurveillance). The meeting materials have remained in my possession and control at all times since I downloaded them, and the four letters are attached hereto as Exhibits C through F, respectively.

19.    The letter from AHIC's Electronic Health Records subcommittee provides "recommendations," Ex. C, at 3-7, and describes the group's "deliberations," *id.* at 1.

20.    The letter from AHIC's Chronic Care subcommittee provides "recommendations," Ex. D, at 3-6.

21.    The letter from AHIC's Consumer Empowerment subcommittee provides "recommendations," Ex. E, at 3-6, and describes the group's "deliberations," *id.* at 1.

22.    The letter from AHIC's Biosurveillance subcommittee provides "recommendations," Ex. F, at 3-6, and describes the group's "deliberations," *id.* at 1.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of August 2006.

Lawrence J. Joseph

Exhibit A

# Charter
# American Health Information Community

## 1. Purpose

On April 27, 2004, the President signed Executive Order 13335 (EO) announcing his commitment to the promotion of health information technology (health IT) to lower costs, reduce medical errors, improve quality of care, and provide better information for patients and physicians.  In particular, the President called for widespread adoption of electronic health records (EHRs) and for health information to follow patients throughout their care in a seamless and secure manner.

In the EO, the President enunciated a vision to provide leadership for the development and national implementation of an interoperable health IT infrastructure that: (a) ensures appropriate information to guide medical decisions is available at the time and place of care;  (b) improves health care quality, reduces medical errors, and advances the delivery of appropriate, evidence-based medical care; (c) reduces health care costs resulting from inefficiency, medical errors, inappropriate care, and incomplete information; (d) promotes a more effective marketplace, greater competition, and increased choice through the wider availability of accurate information on health care costs, quality, and outcomes; (e) improves the coordination of care and information among hospitals, laboratories, physician offices, and other ambulatory care providers through an effective infrastructure for the secure and authorized exchange of health care information; and (f) ensures  patients' individually identifiable health information is secure and protected.

The EO directed the Secretary of the Department Health and Human Services (HHS) to establish within the Office of the Secretary the position of National Health Information Technology Coordinator (National Coordinator).

Recognizing the need for public and private sector collaboration to achieve these goals, the EO charged the National Coordinator, to the extent permitted by law, to coordinate outreach and consultation by the relevant branch agencies (including Federal commissions) with public and private parties of interest, including consumers, providers, payers, and administrators.

As a part of this collaboration, the Secretary of HHS (Secretary) hereby creates the American Health Information Community (AHIC) to:  1) advise the Secretary and recommend specific actions to achieve a common interoperability framework for health IT; and 2) serve as a forum for participation from a broad range of stakeholders to provide input on achieving interoperability of health IT.

## 2. Authority

42 U.S.C. Sec. 217a, Sec. 222 of the Public Health Service Act, as amended.  The AHIC is governed by the provisions of Public Law 92-463, as amended, (5 U.S.C. Appendix 2), which sets forth standards for the formation and use of federal advisory committees.

## 3. Function

The AHIC shall advise the Secretary concerning efforts to develop information technology standards and achieve interoperability of health IT so the President's health IT goals can be achieved.  At the Secretary's request, the AHIC may provide advice on related matters pertaining to health IT.

The AHIC shall operate in a manner that is consistent with the EO, including not assuming or relying upon additional federal resources or spending to accomplish adoption of interoperable health information technology.

The AHIC shall, among other things, advance and develop recommendations for the following issues:

- Protection of health information through appropriate privacy and security practices.
- Ongoing harmonization of industry-wide health IT standards.
- Achievement of an Internet-based nationwide health information network that includes information tools, specialized network functions, and security protections for interoperable health information exchange.
- Acceleration of interoperable EHR adoption across the broad spectrum of health care providers.
- Compliance certification and inspection processes for EHRs, including infrastructure components through which EHRs interoperate.
- Identification of health IT standards for use by the National Institute for Standards and Technology (NIST) in a Federal Information Processing Standards (FIPS) process relevant to Federal agencies.
- Identification and prioritization of specific use cases for which health IT is valuable, beneficial and feasible, such as adverse drug event reporting, electronic prescribing, lab and claims information sharing, public health, bioterrorism surveillance, and advanced research.
- Succession of AHIC by a private-sector health information community initiative.

## 4.  Structure

The AHIC shall not exceed 17 voting members, including the Chair, and members shall be appointed by the Secretary.  Membership shall include officials from HHS and its component agencies, and other appropriate federal agencies, including, but not limited to, the Department of Veterans Affairs, Office of Personnel Management, Department of Commerce, Department of Treasury, and the Department of Defense.  The federal members may be represented by alternates.   At least one member shall be an expert on matters pertaining to privacy and security protections of individually identifiable health information.  The Secretary shall select other members from persons knowledgeable in the field of health IT, or in fields applicable or related thereto, including physicians, health care providers, patients, payers, purchasers, public health experts, research scientists, and a State official.  Non-federal members of the AHIC will be Special Government Employees, unless classified as representatives.   The Secretary shall be the Chair and may designate an Acting Chair for any meeting or portion of a meeting, as the Secretary deems appropriate.

Members shall serve 2-year terms, except that any member appointed to fill a vacancy for an unexpired term shall be appointed for the remainder of such term.  A member may serve for up to 180 days after the expiration of the member's term or until a successor has taken office.

The National Coordinator shall provide management and support services for the AHIC.

Less than the full AHIC may convene to gather information; conduct research; analyze relevant issues and facts in preparation for a meeting; or draft position papers for deliberation by the AHIC.

Less than the full AHIC may convene to discuss administrative matters of the AHIC or to receive administrative information from a Federal official or agency.

## 5.  Meetings

AHIC meetings may be held up to 12 times per year, at the call of the Chair or Acting Chair, who shall also provide the meeting agenda.  A quorum shall be required for any meeting; the majority of those members appointed to the AHIC as of the date of the meeting shall constitute a quorum.  Meetings shall be open to the public except when closure is specifically allowed by law, and meetings may be closed to the public only after all statutory and regulatory requirements for doing so have been met.  The Secretary, or other official to whom the authority has been delegated, shall make such determinations.  Notice of all meetings shall be given to the public in accordance with applicable laws.

All meetings shall be conducted, and records of the proceedings kept, as required by applicable laws and HHS regulations.

### 6. Compensation

Members who are not full-time Federal employees shall be paid at the rate of $250 per day, plus per diem and travel expenses in accordance with Standard Government Travel Regulations.

### 7. Annual Cost Estimate

Estimated annual cost for operating the AHIC, including compensation and travel expenses for members but excluding staff support, is $3 million. Estimated annual person-years of staff support required is four, at an estimated annual cost of $700,000.

### 8. Reports

In the event a portion of a meeting is closed to the public, a report shall be prepared which shall contain, at a minimum, a list of members and their business addresses, the committee activities, and recommendations made during the fiscal year. A copy of the report shall be provided to the Department Committee Management Office.

### 9. Termination Date

Unless renewed by appropriate action prior to its expiration, the AHIC shall terminate two years from the date this charter is approved. However, the maximum term of operation for the AHIC shall be five years.


Approved:

_____          _____

          Date                                    Secretary

## <u>THE SECRETARY OF HHS STATIONERY</u>

### FORMAL DETERMINATION

I determine, after appropriate consultation between this Department and General Services Administration, that formation of the American Health Information Community is in the public interest in connection with the performance of duties imposed on the Department by law, and that such duties can best be performed through the advice and counsel of such a group.

I deem that it is not feasible for the Department or any of its existing committees to perform these duties, and that a satisfactory plan for appropriate balance of committee membership has been submitted.

_____
Date

_____
Secretary

- 5 –

Exhibit B



**THE SECRETARY OF HEALTH AND HUMAN SERVICES**
WASHINGTON, D.C.  20201

# Amended Charter
# American Health Information Community

## 1. Purpose

On April 27, 2004, the President signed Executive Order 13335 (EO) announcing his commitment to the promotion of health information technology (health IT) to lower costs, reduce medical errors, improve quality of care, and provide better information for patients and physicians. In particular, the President called for widespread adoption of electronic health records (EHRs) and for health information to follow patients throughout their care in a seamless and secure manner.

In the EO, the President enunciated a vision to provide leadership for the development and national implementation of an interoperable health IT infrastructure that: (a) ensures appropriate information to guide medical decisions is available at the time and place of care; (b) improves health care quality, reduces medical errors, and advances the delivery of appropriate, evidence-based medical care; (c) reduces health care costs resulting from inefficiency, medical errors, inappropriate care, and incomplete information; (d) promotes a more effective marketplace, greater competition, and increased choice through the wider availability of accurate information on health care costs, quality, and outcomes; (e) improves the coordination of care and information among hospitals, laboratories, physician offices, and other ambulatory care providers through an effective infrastructure for the secure and authorized exchange of health care information; and (f) ensures patients' individually identifiable health information is secure and protected.

The EO directed the Secretary of the Department Health and Human Services (HHS) to establish within the Office of the Secretary the position of National Health Information Technology Coordinator (National Coordinator).

Recognizing the need for public and private sector collaboration to achieve these goals, the EO charged the National Coordinator, to the extent permitted by law, to coordinate outreach and consultation by the relevant branch agencies (including Federal commissions) with public and private parties of interest, including consumers, providers, payers, and administrators.

As a part of this collaboration, the Secretary of HHS (Secretary) hereby creates the American Health Information Community (AHIC) to: 1) advise the Secretary and recommend specific actions to achieve a common interoperability framework for health IT; and 2) serve as a forum for participation from a broad range of stakeholders to provide input on achieving widespread adoption of interoperable health IT.

- 1 -

## 2. Authority

42 U.S.C. Sec. 217a, Sec. 222 of the Public Health Service Act, as amended. The AHIC is governed by the provisions of Public Law 92-463, as amended, (5 U.S.C. Appendix 2), which sets forth standards for the formation and use of federal advisory committees.

## 3. Function

The AHIC shall advise the Secretary concerning efforts to develop information technology standards and achieve interoperability of health IT so the President's health IT goals can be achieved. At the Secretary's request, the AHIC may provide advice on related matters pertaining to health IT.

The AHIC shall operate in a manner that is consistent with the EO, including not assuming or relying upon additional federal resources or spending to accomplish adoption of interoperable health information technology.

The AHIC shall, among other things, advance and develop recommendations for the following issues:

- Protection of health information through appropriate privacy and security practices.
- Ongoing harmonization of industry-wide health IT standards.
- Achievement of an Internet-based nationwide health information network that includes information tools, specialized network functions, and security protections for interoperable health information exchange.
- Acceleration of interoperable EHR and personal health record (PHR) adoption across the broad spectrum of health care providers.
- Compliance certification and inspection processes for EHRs, including infrastructure components through which EHRs interoperate.
- Identification of health IT standards for use by the National Institute for Standards and Technology (NIST) in a Federal Information Processing Standards (FIPS) process relevant to Federal agencies.
- Identification and prioritization of specific breakthrough initiatives for which health IT is valuable, beneficial and feasible, such as adverse drug event reporting, electronic prescribing, lab and claims information sharing, chronic care management, public health, bioterrorism surveillance, and advanced research.
- Policy and technical barriers to breakthrough initiatives
- Succession of AHIC by a private-sector health information community initiative.

## 4. Structure

The AHIC shall not exceed 18 voting members, including the Chair and Vice Chair, and members shall be appointed by the Secretary. Membership shall include officials from HHS and its component agencies, and other appropriate federal agencies, including, but not limited to, the Department of Veterans Affairs, Office of Personnel Management, Department of Commerce, Department of Treasury, and the Department of Defense. The federal members may be represented by alternates. At least one member shall be an expert on matters pertaining to privacy protections of individually identifiable information, and one member shall be an expert on matters pertaining to security protections of individually identifiable information. The Secretary shall select other members from persons knowledgeable in the field of health IT, or in fields applicable or related thereto, including physicians, health care providers, patients, payers, purchasers, public health experts, research scientists, and a State official. Non-federal members of the AHIC will be Special Government Employees, unless classified as representatives. The Secretary shall be the Chair and may designate an Acting Chair for any meeting or portion of a meeting, as the Secretary deems appropriate.

Members shall serve 2-year terms, except that any member appointed to fill a vacancy for an unexpired term shall be appointed for the remainder of such term. A member may serve for up to 180 days after the expiration of the member's term or until a successor has taken office.

The National Coordinator shall provide management and support services for the AHIC.

Less than the full AHIC may convene to gather information; conduct research; analyze relevant issues and facts in preparation for a meeting; or draft position papers for deliberation by the AHIC. Work groups may be formed to make recommendations to the full AHIC on breakthrough initiatives or other priority areas.

Less than the full AHIC may convene to discuss administrative matters of the AHIC or to receive administrative information from a Federal official or agency.

## 5. Meetings

AHIC meetings may be held up to 12 times per year, at the call of the Chair or Acting Chair, who shall also provide the meeting agenda. A quorum shall be required for any meeting; the majority of those members appointed to the AHIC as of the date of the meeting shall constitute a quorum. Meetings shall be open to the public except when closure is specifically allowed by law, and meetings may be closed to the public only after all statutory and regulatory requirements for doing so have been met. The Secretary, or other official to whom the authority has been delegated, shall make such determinations. Notice of all meetings shall be given to the public in accordance with applicable laws. Meetings will be conducted, and records of the proceedings kept, as required by applicable laws and Departmental policies.

## 6. Compensation

Members who are not full-time Federal employees and serve as representatives shall serve without compensation, but will receive per diem and travel expenses in accordance with Standard Government Travel Regulations. Members who are not full-time Federal employees and serve as Special Government Employees shall be paid at the rate of $250 per day, plus per diem and travel expenses in accordance with Standard Government Travel Regulations.

## 7. Annual Cost Estimate

Estimated annual cost for operating the AHIC, including compensation and travel expenses for members but excluding staff support, is $3 million. Estimated annual person-years of staff support required is four, at an estimated annual cost of $700,000.

## 8. Reports

In the event a portion of a meeting is closed to the public as determined otherwise by the Secretary of HHS, in accordance with the Government in the Sunshine Act (5 U.S.C. 552b(c)) and the Federal Advisory Committee Act, a report shall be prepared which shall contain, at a minimum, a list of members and their business addresses, the committee activities, and recommendations made during the fiscal year. A copy of the report shall be provided to the Department Committee Management Office.

## 9. Termination Date

Unless renewed by appropriate action prior to its expiration, the AHIC shall terminate two years from the date this charter is approved. However, the maximum term of operation for the AHIC shall be five years.

Approved:

MAY 3 1 2006

_____          _____

Date                                            Secretary

Exhibit C

May 9, 2006

The Honorable Michael O. Leavitt
Chairman
American Health Information Community
200 Independence Avenue, S.W.
Washington, D.C.  20201

Dear Mr. Chairman:

The American Health Information Community has identified and prioritized several health information technology applications, or "breakthroughs," that could produce specific tangible value for healthcare consumers. To address one of these breakthrough areas, the Electronic Health Records (EHR) Workgroup was formed and given the following broad and specific charges:

> **Broad Charge for the Workgroup:** Make recommendations to the Community on ways to achieve widespread adoption of certified EHRs, minimizing gaps in adoption among providers.

> **Specific Charge for the Workgroup:** Make recommendations to the Community so that within one year, standardized, widely available, and secure solutions for accessing current and historical laboratory results and interpretations are deployed for clinical care by authorized parties.

The Workgroup's deliberations highlighted a number of key issues with respect to the specific charge:

1. The need to support all of the necessary steps in the evolutionary path toward a patient-centric flow of laboratory results data
2. The urgent need for endorsed, adopted, and interoperable vocabulary, messaging, and implementation standards that can be applied to enable the exchange of laboratory results data
3. The potential barriers posed by the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and Health Insurance Portability and Accountability Act of 1996 (HIPAA) regulations that may hinder electronic laboratory results data exchange in a patient-centric manner, particularly in States that have more stringent privacy laws
4. Technical considerations relating to privacy and security with respect to patient and provider authorization and authentication, including accurate patient identification and linkage to patient specific information
5. The need for an aligned business case and incentives for the multiple stakeholders involved
6. The need for assessment, monitoring, and research of the experiences of early adopters and identification of best practices.

This letter provides both context and recommendations for how these issues can be addressed to enable widespread access to both current and historical lab data in a patient-centric fashion.

## BACKGROUND AND DISCUSSION

### Widespread EHR Adoption and Availability of Historical Laboratory Results

In his January 2004 State of the Union Address, President George W. Bush highlighted the importance of information technology in health care when he stated, "By computerizing health records, we can avoid dangerous medical mistakes, reduce costs, and improve care." In April 2004, the President issued Executive Order 13335, calling for widespread adoption of interoperable EHRs within 10 years, and established the position of National Coordinator for Health Information Technology.

The effective use of EHRs has the potential to positively influence both the quality and cost of health care for the Nation. It presents clinical information and comprehensive patient data to clinicians at the point of care, facilitating more informed decisions in a shorter time frame. In addition, the cost of care can be decreased by streamlining data collection, decreasing the likelihood and associated cost of medical errors, and reducing resources used for duplicative or unnecessary information capture and testing.

Despite these benefits, the Nation has been slow to adopt EHRs, as highlighted in the recent work of the Health IT Adoption Initiative. This group evaluated both the quality and the results of all EHR adoptions surveys and found that overall physician adoption was approximately 17 percent[1]. A recent Agency for Healthcare Research and Quality (AHRQ)-sponsored report that reviewed 286 studies focused on HIT adoption identified a large number of barriers to the implementation of HIT. These barriers were classified as:

- **Situational barriers,** including the high cost of purchasing and implementing EHRs as well as developing the necessary interfaces between EHRs and other Health Information Technology (HIT) systems on a custom basis
- **Cognitive or physical barriers,** including users' physical disabilities and insufficient computer skills
- **Liability barriers,** including confidentiality concerns
- **Knowledge and attitudinal barriers.**[2]

---

[1] *The HIT Adoption Initiative. Report to the Office of the National Coordinator: an environmental scan of the current state of EHR adoption measurement in the United States.* Boston, MA: The George Washington University School of Public Health and Health Services; Institute for Health Policy at MGH/Partners HealthCare System; Division of Internal Medicine at the Brigham & Women's Hospital; Clinical and Quality Analysis Group of Partners HealthCare System. In press.

[2] Shekelle PG, Morton SC, Keeler EB, et al. *Costs and benefits of health information technology, evidence report/technology assessment,* no. 132. Rockville, MD: Agency for Healthcare Research and Quality; April 2006. AHRQ Publication No. 06-E006. Available at: http://www.ahrq.gov/downloads/pub/evidence/pdf/hitsyscosts/hitsys.pdf. Accessed May 8, 2006.

Another short-term barrier is the lack of comprehensive electronic data on any one individual. Laboratory results have the unique feature of currently existing in electronic format, though they are generally transmitted to physician offices by fax. Since these results are a component in 70 percent of clinical decisions, timely and easy access to comprehensive laboratory information is of high value to clinicians.

The ability to easily access this information through an EHR at the point of care would enhance the value of the EHR to the clinician greatly. Unfortunately, the current environment precludes this type of easy access to comprehensive information. Indeed, many States prohibit labs from providing results to anyone other than the ordering clinician. Moreover, while results exist in electronic format, they cannot be transmitted directly to an EHR without customized and expensive interfacing, and there are no clear technological solutions for how patients determine the degree to which their laboratory information can be made available to multiple providers. Addressing these barriers would realize significant value to the purchasers and users of EHRs and, therefore, increase adoption.

## RECOMMENDATIONS

### I.    Provider- and Patient-Centric Models

The ultimate goal is to make laboratory data available in a patient-centric model, where a patient's laboratory results data are available to all authorized providers of care regardless of where or when the information is generated. This would enable patients to benefit from more coordinated and complete health care delivery, and it would reduce the cost associated with duplicate and unnecessary tests. Thus, the patient-centric model extends availability of information beyond the existing business environment, where laboratory data results are available in a provider-centric model (i.e., only the laboratory data ordered by a specific provider for a specific patient are available for review). The Workgroup recognizes that an evolutionary path from the provider-centric model to the patient-centric model requires the adoption and use of data standards that allow more efficient flow of information. This will enable the suppliers and users of electronic laboratory results data to use standards that promote interoperability and lower costs of specialized interfaces to meet the needs of the current environment, while adopting the tools and technologies to support the patient-centric model as they are developed and implemented. A patient-centric model also will require addressing both technical and legal privacy and security issues.

> **Recommendation 1.0: The U.S. Department of Health and Human Services (HHS) should take immediate steps to facilitate the adoption and use of endorsed standards and incentives needed for interoperability of lab results within the current provider-centric environment. The Office of the National Coordinator for Health Information Technology (ONC) shall work with multiple stakeholders to develop a detailed workplan to achieve patient-centric information flow of laboratory data by March 31, 2007.**

3

## II.    Standards

Systems must be able to receive electronic lab test results when requested by a patient or authorized health care provider. The lack of easily implemented, usable standards is a primary barrier to this flow of critical information. By incorporating Health Information Technology Standards Panel (HITSP)-endorsed standards and implementation guides into its certification process for EHRs, CCHIT certification can reduce the cost of laboratory interface development, which is a significant barrier to EHR adoption. Laboratory-to-practice connectivity has been an elusive goal that has prevented leveraging the benefits of HIT interoperability in the small practice setting and has frustrated clinicians and vendors seeking to implement EHR systems. Much has been blamed on the high cost of custom interfaces, which are estimated at $30,000 to $50,000 per laboratory and $20,000 per interface in a group practice office.[3]

Once HITSP has endorsed standards for laboratory results vocabulary, messaging, and implementation, Federal health care delivery systems should begin adopting these standards in a reasonable time frame. Although this is not mandating their use, doing so should help to promote further adoption within the private sector. In addition, Federal agencies should positively incentivize adoption of HITSP-endorsed standards and implementation guides in their contracts.

> **Recommendation 2.0: HITSP should identify and endorse vocabulary, messaging, and implementation standards for reporting the most commonly used laboratory test results by September of 2006, so as to be included in the CCHIT interoperability criteria for March 2007 certification. HITSP should consider CLIA and HIPAA regulatory requirements as appropriate.**
>
> **Recommendation 2.1: Federal health care delivery systems (those which provide direct patient care) should develop a plan to adopt the HITSP-endorsed standards for laboratory data interoperability by December 31, 2006.**
>
> **Recommendation 2.2: Federal Agencies and Departments with health lines of business should include/incentivize the use of HITSP-approved standards in their contracting vehicles where applicable.**

## III.    CLIA/HIPAA Options

The HIPAA Privacy Rule generally permits the disclosure of protected health information (PHI) by covered entities to health oversight agencies, other health care providers, and other covered entities and their business associates for purposes of disease management and chronic care improvement. However, the HIPAA Privacy Rule does not pre-empt more stringent Federal or State laws governing the release of such information. Regulations promulgated under CLIA require that clinical laboratories disclose test results only to "authorized persons" – defined as individuals authorized under State law to order tests or receive test results, or both, and, if applicable, the individual responsible for using the test results and the laboratory that initially

---

[3] Walker J, Pan E, Johnston D, Adler-Milstein J, Bates DW, Middleton B. *The value of health care information exchange and interoperability*. Health Affairs Web Exclusive. Available at: http://content.healthaffairs.org/cgi/content/full/hlthaff.w5.10/DC1. Accessed January 19, 2005.

requested the test, e.g., reference laboratories. Many States require that clinical laboratories disclose test results only to the ordering physician or his/her designee and are silent on disclosure of test results to others caring for the patient.

In order for electronic historical laboratory results to be available in a patient-centric fashion to authorized providers of care, various architectural models (Web portals, RHIOs, etc.) must be evaluated with respect to CLIA and HIPAA. In addition, specific guidance from CLIA should be pursued on permitting the use of a patient's authorization as a means of enabling the release of lab data.

> **Recommendation 3.0: By September 30, 2006, ONC should review the possible models for the exchange of both current and historical lab information and determine which would require CLIA/HIPAA guidance, regulatory change, and/or statute change.**

> **Recommendation 3.1: Based of the findings from Recommendation 3.0, by December 31, 2006, ONC should engage the National Governors Association and other State-based organizations to resolve variations in "authorized persons" under the various State statutes, regulations, policies, and practices as a resource for clinical laboratories seeking to define access rights to electronic laboratory data.**

## IV.    Privacy and Security

Health information can be accessed only with adequate security and privacy mechanisms if there are clear standards and means for the following:

- **Identification.** Accurate identification of patients is particularly important in a digital environment, where it is essential for treatment, safety, and payment accuracy and to ensure that PHI is not misdirected to misidentified individuals.  While the most accurate identification can be achieved through the use of unique patient identification numbers, cultural and political considerations make such an approach infeasible, at least in the near future. That being the case, other technologies, policies, and procedures must be developed or identified and implemented to ensure the lowest possible patient identification error. An alternative to creating unique personal identification for everyone is to define a national standard set of authenticating information required to receive health care. Unambiguously identifying patients and linking their information from multiple sources is a major challenge both within and across clinical enterprises. Unless caregivers are able to access linked information on a given patient across the continuum of care, proper and cost-effective care cannot be rendered. Similarly, the ability to link patient data in a secure fashion is critical to the anonymized use of information for national research, public health surveillance, and bio-preparedness.

- **Authentication.** For the health care delivery system to realize the greatest benefit from digitization, clinicians and patients must be able to authenticate that each person using an EHR is who he/she says he/she is.  An environment of trust based on secure authentication allows for buy-in from clinicians, patients, and other healthcare entities.

- **Authorization.** The existence of contradictions within the patchwork of State privacy laws also inhibits authorized individuals from connecting health care information. HIPAA set a minimum national privacy standard, but many States have augmented those standards. This results in a jumble of State laws that are fundamentally inconsistent; what is mandated in one State is prohibited in another.

  **Recommendation 4.0: The Community should create a consumer empowerment subgroup comprised of privacy, security, clinical, and technology experts from each Community Workgroup. The subgroup should frame the privacy and security policy issues relevant to all the Community charges and solicit broad public input and testimony to identify viable options or processes to address these issues that are agreeable to all key stakeholders. The recommendations developed should establish an initial policy framework and address issues including but not limited to:**

  - **Methods of patient identification**
  - **Methods of authentication**
  - **Mechanisms to ensure data integrity**
  - **Methods for controlling access to personal health information**
  - **Policies for breaches of personal health information confidentiality**
  - **Guidelines and processes to determine appropriate secondary uses of data**
  - **A scope of work for a long-term independent advisory body on privacy and security policies.**

## V.    Advancing Adoption

As the health care industry travels this evolutionary path of adoption from provider-centric to patient-centric historical laboratory data exchange, it is imperative that the unique needs of and impact on all stakeholders are carefully considered. Although much discussion has taken place regarding the potential benefits, cost savings, cost shifting, and increased costs of interoperable lab results data, a full examination and development of the business case, including identification of incentives for all stakeholders, is required.

> **Recommendation 5.0: HHS, in collaboration with all key stakeholders, should both assess the value proposition and develop the business case for current and historical laboratory results data sharing across all adoption models, considering the unique needs and alignment of incentives for all stakeholders**.

## VI.    Assessment, Monitoring, and Research

The provision of patient-centric laboratory data resources has the potential to improve the quality and efficiency of patient care. However, it is necessary to prove that these benefits are actually being achieved in practice. It is also important to consider that implementations may vary in their effectiveness and that best practices need to be identified and disseminated as early as possible.

**Recommendation 6.0: By March 31, 2007, AHRQ, in collaboration with the Centers for Disease Control and Prevention (CDC) and the Centers for Medicare & Medicaid Services (CMS), should develop a proposed study methodology to measure the extent and effectiveness of the adoption of the first stage of HITSP standards, as well as the adoption and utilization of aggregated patient-centric data as they become available.**

**Recommendation 6.1: By December 31, 2007, AHRQ, in collaboration with the CDC and CMS, should research best practices in the implementation and utilization of patient-centric laboratory data stores and how to implement this knowledge.**

These recommendations are supported by information obtained through research and testimony to the Electronic Health Records Workgroup, which is contained in the supporting documents available at http://www.hhs.gov/healthinformationtechnology/.

Thank you for giving us the opportunity to submit these recommendations. We look forward to discussing these recommendations with you and the members of the American Health Information Community.

Sincerely yours,

Jonathan B. Perlin, M.D., Ph.D.
Co-chair, Electronic Health
Records Workgroup

Sincerely yours,

Lillee Smith Gelinas, R.N., M.S.N.
Co-chair, Electronic Health
Records Workgroup

7

Exhibit D

May 9, 2006

The Honorable Michael O. Leavitt
Chairman
American Health Information Community
200 Independence Avenue, S.W.
Washington, D.C.  20201

Dear Mr. Chairman:

The American Health Information Community members identified and prioritized several health information technology applications, or "breakthroughs", that could produce specific tangible value to healthcare consumers. To address one of these breakthrough areas, a Chronic Care Workgroup was formed and given the following broad and specific charges:

> **Broad Charge for the Workgroup:** Make recommendations to the Community to deploy widely available, secure technology solutions for remote monitoring and assessment of patients and for communication between clinicians about patients.

> **Specific Charge for the Workgroup:** Make recommendations to the Community so that within one year, widespread use of secure messaging, as appropriate, is fostered as a means of communication between clinicians and patients about care delivery.

While concentrating on deployment of the specific charge, the Workgroup identified five significant issues which could either preclude or enable successful implementation of both charges. The Workgroup's recommendations presented in this letter address these five issues:

1. Reimbursement
2. Medical Liability and Licensure
3. Systems Supporting Patient-Clinician Secure Messaging
4. Consumer and Clinician Access
5. Patient Identification, Authentication and Security

**BACKGROUND AND DISCUSSION**

**Chronic Illness and Patient-Clinician Secure Messaging**

Approximately 50-60 million Americans live stably with at least one chronic condition and most have more than one. This 20 percent of the US population interprets care which is safe, safe, effective, efficient, timely, patient-centered, and equitable (the aims of the Institute of Medicine) broadly -- given that most of the care management occurs outside of the professional setting. Patients with stable chronic conditions manage a good part of their care themselves while monitoring diets, controlling weight, checking blood sugars, adjusting blood thinners, and titrating asthma medications.

This population, above and beyond almost any other, requires frequent and easy communication with their clinicians for guidance and timely decisions so that their chronic condition can be better and more tightly managed in their home, work, and school environments with minimal disruption. Further, as technology continues to find new and better ways to gather and transmit information through monitoring and communication devices, there will be even greater opportunity to meet patients' needs for care wherever and whenever they require the time and expertise of their physician or clinician.

Early efforts in this area of enhanced patient-clinician communication suggest that patients benefit from better health outcomes and that overall cost savings are realized.  As the use of more robust communication technologies expands, the value of those communications to consumers (e.g., time savings, access, more engagement with their clinicians) and clinicians (e.g., time savings, convenience, better understanding of patient needs) can be better quantified and used to guide new developments and policies.

Technology alone, however, will not lead to better care and outcomes. Critical components of success include how the technology is adopted, how it is used, as well as the financial and social policies which either incent or disincent the adoption and use by both clinicians and consumers. The following recommendations which address technical, financial, and social barriers are specific to secure messaging between patients and their physicians and clinicians.  These recommendations are, however, applicable to all types of telehealth communications.

**Secure Messaging -- Definition and Common Functionalities**

Secure patient-clinician messaging refers to communications between patients and clinicians who have an explicit measure of responsibility for the patient's care. In addition to online consultation, secure messaging between patients and their clinicians may be used for:

- Requesting Prescription Refills
- Scheduling Appointments
- Requesting Referrals
- Receiving Routine Test Results
- Receiving Reminders and Instructions

Secure messaging may occur through a secure unique portal, may be part of a shared electronic health record system, may be accessed through a delivery system's architecture or may be part of encrypted attachments to traditional email. Independent of the vehicle, secure messaging is characterized by clear guidelines for use, published by the American Medical Association (AMA) and American Medical Informatics Association (AMIA), and a clear methodology for assessing value developed by the Institute of Medicine and the American Telemedicine Association.

Adoption by the practicing clinical community has, however, been limited. The following recommendations address the major barriers:

2

**RECOMMENDATIONS**

**I.    Reimbursement**

While up to 80 percent of chronic care management takes place outside of the clinician's office, the practitioner is only reimbursed for time and expertise if the patient makes the effort to make and keep an appointment for an office visit.  Explanations on how to best manage the changing patterns of atrial fibrillation, to modulate insulin in a brittle diabetic, to monitor of blood pressure and to titrate medications all require office visits in order for clinicians to be compensated, though much of this information and guidance could be provided through remote communication. Lack of reimbursement for clinician time and expertise rendered outside of the office setting is the major barrier to widespread adoption of the use of secure messaging between clinicians and their patients. In situations where lack of compensation is not a barrier (salaried clinicians or fee for service reimbursement for secure messaging) both a positive return on investment and improved quality of care have been noted by the entity holding responsibility for the costs of care.

There are, however, multiple methods of reimbursement.  Fee for service payments, capitation, salary, bundling of services, and pay-for-performance have each been observed to produce different behaviors in practicing clinicians.  In a system where any one clinician is subjected to multiple methodologies, he or she will determine which workflows and practice approaches are likely to produce the best return on their time and effort.  As an example, it has been demonstrated that clinicians must be able to offer the ability to communicate via secure messaging with at least 20 to 30 percent of their patients before they find it worthwhile to change office workflows and practices to maximize its effectiveness.

Lastly, reimbursement for virtually any service has attendant guidelines that should be clearly defined.

> **Recommendation 1.0:  The U.S. Department of Health and Human Services (HHS) should develop and regularly update the evidence base for informed reimbursement policies with respect to secure messaging between clinicians and their patients. This should include monitoring and reporting the effect of secure messaging on cost, quality of care, patient and caregiver satisfaction, and medico-legal issues.**

> **Recommendation 1.1:  HHS should compile and assess the effect of various reimbursement methodologies for secure messaging on clinician workflow in various care models, and report on best practices.**

> **Recommendation 1.2:  Public and private payers, including the Centers for Medicare & Medicaid Services (CMS), should contribute to the evidence for and information base on reimbursement strategies through direct reimbursement, pilot or demonstration studies, or coverage analysis for Internet-based patient/clinician encounters in accordance with guidelines developed by the American Medical Informatics Association, the American Medical Association, and the Massachusetts**

3

**Health Data Consortium for structured secure messaging, including, but not limited to, encounters that qualify under CPT code 074T.**

## II.     Medical Liability and Licensure

Existing State licensing laws prohibit a practitioner licensed in one State from providing advice/care/education using a remote communication modality to any of his or her patients residing in another State. Licensing alternatives, such as licensure by reciprocity, for the purpose of permitting reimbursable secure messaging between patients and clinicians across State lines should be considered.

In addition to providing better care to patients with chronic illness, patient/clinician communication may be critical in the event of a man-made (e.g., anthrax) or natural (e.g., H5N1 influenza) bio-event. Immediate, secure communication will provide information that can affect diagnostic, therapeutic and isolation decisions to avoid further spread. State licensing laws should not prohibit our ability to diagnose and treat individuals who have been exposed to fast-spreading, possibly deadly, biological agents.

> **Recommendation 2.0: HHS should convene the appropriate State agencies and professional societies to develop and adopt new licensing alternatives which will address the ability to provide electronic care delivery across State boundaries while still ensuring compatibility with individual State requirements.**

## III.     Standards for Secure Patient-Clinician Messaging and Supporting Systems

Secure technology solutions for communication about chronic care delivery among clinicians, and between clinicians and patients, and for remote monitoring and assessment of patients, must be based on standard transactions before they can be widely deployed as a means of chronic care improvement. A solution will be effective only if the clinical data can be appropriately shared between parties with legitimate needs for the data. Web portals currently offer feasible solutions for secure messaging among clinicians and patients; however, their effectiveness is limited by a lack of standardization and interoperability.  Certification of secure message transactions and portals by a recognized certification body has the potential to encourage more widespread utilization.

> **Recommendation 3.0: The Office of the National Coordinator for Health Information Technology (ONC) should direct the Health Information Technology Standards Panel (HITSP) to define standards for secure patient-clinician messaging transactions so that they may be interoperable with electronic health records.**

> **Recommendation 3.1: ONC should direct the Certification Commission on HIT to establish certification criteria for system interoperability with patient-clinician secure messaging.**

## IV.    Consumer and Clinician Access

The benefits of HIT, particularly transactional functions, are of recognized value to consumers. However, several studies have suggested that certain populations are less likely than others to access health information services electronically than others. A number of factors have been identified that may contribute to this disparate use. In order to minimize disparities in health care related to use of health information technology, it is necessary to identify and confirm barriers to use and strategies to ensure that secure messaging can be a viable technology for all population groups.

Providers also have variable access to HIT, particularly in areas where broadband is not available.

> **Recommendation 4.0: The Agency for Healthcare Research and Quality (AHRQ) should conduct a synthesis of current knowledge from existing studies of health information technology use by elderly, ill, and underserved populations including an analysis of barriers and drivers.  The barrier and driver analysis should elucidate for which subpopulations barriers can be overcome and how.**

> **Recommendation 4.1: HHS will work with appropriate organizations to report on secure messaging availability to providers across the country and report on a plan and timetable to make securing messaging available uniformly.**

## V.    Privacy and Security

Accurate, verifiable, unique patient identification and authentication is a foundational requirement both for supporting secure messages between patients and clinicians as well as incorporating the documents created into electronic health records. The records include both those maintained by health care organizations as well as personal health records, which may be maintained by patients. The methodology for identifying and authenticating patients must be constructed in such a way as to promote patient trust in the process, transparency in the use of information provided, and adequate patient control over who may or may not access this information. Ideally, patient-identifying components and the method for cross-matching these components between systems should be standardized to facilitate matching patient identification across multiple systems, multiple provider environments, and multiple health-care sectors -- as long as patients have a full understanding of the potential risks and benefits of this capability and voluntarily chose to allow this level of interoperability.

Authentication is the first step to enabling a patient, or the patient's proxy, access to his or her health information electronically and having a high level of assurance that the sender of health information is in fact the authoritative source for the information. The technologies that are developed should facilitate the identification/authentication process, provide a more acceptable level of security, and create opportunities for structured data entry not routinely available in common e-mail systems. The e-authentication industry is advanced and authentication is an existing technology that healthcare can leverage.

5

**Recommendation 5.0:  The Community should create a consumer empowerment subgroup comprised of privacy, security, clinical and technology experts from each Community Workgroup. The subgroup should frame the privacy and security policy issues relevant to all the Community charges and solicit broad public input and testimony to identify viable options or processes to address these issues that are agreeable to all key stakeholders. The recommendations developed should establish an initial policy framework and address issues including but not limited to:**

- **Methods of patient identification**
- **Methods of authentication**
- **Mechanisms to ensure data integrity**
- **Methods for controlling access to personal health information**
- **Policies for breaches of personal health information confidentiality**
- **Guidelines and processes to determine appropriate secondary uses of data**
- **A scope of work for a long-term independent advisory body on privacy and security policies.**

These recommendations are supported by information obtained through research and testimony to the Chronic Care Workgroup which is contained in the supporting documents available at http://www.hhs.gov/healthinformationtechnology/.

Thank you for giving us the opportunity to submit these recommendations.  We look forward to discussing these recommendations with you and the members of the American Health Information Community.

Exhibit E

May 9, 2006

The Honorable Michael O. Leavitt
Chairman
American Health Information Community
200 Independence Avenue, S.W.
Washington, D.C.  20201

Dear Mr. Chairman:

The American Health Information Community has identified and prioritized several health information technology applications, or "breakthroughs," that could produce specific tangible value for healthcare consumers. To address one of these breakthrough areas, the Consumer Empowerment Workgroup was formed and given the following broad and specific charges:

> **Broad Charge for the Workgroup:** To make recommendations to the Community to gain widespread adoption of a personal health record (PHR) that is easy to use, portable, longitudinal, affordable, and consumer centered.

> **Specific Charge for the Workgroup:** To make recommendations to the Community so that within one year, a pre-populated, consumer-directed, and secure electronic registration summary is available to targeted populations. Make additional recommendations to the Community so that within one year, a widely available pre-populated medication history linked to the registration summary is deployed.

The Workgroup's deliberations highlighted a number of key issues regarding the specific charge, including the following:

1. Privacy and security safeguards and consumer control of personal health information related to medication history and registration summary need to be established and enforced.
2. There is no widely accepted standard definition or functional specification for the features of a PHR.
3. There are no standards or functional specification for populating medication history and registration summary tools.
4. Appropriate incentives to encourage consumer and provider use of PHRs must be identified and supported.
5. Currently, consumers have little to no access to their electronic medical records.
6. Generally, consumers are unaware of the availability and value of medication histories and electronic registration summaries and, therefore, of the potential value to them of a PHR.

This letter provides both context and recommendations for how most of these issues can be addressed by enabling access to electronic registration summaries and medication histories in target populations.

## BACKGROUND AND DISCUSSION

Many people believe that successfully deploying some form of easily accessible, personal health information could be one of several important ways to encourage individual involvement in self-care and care management. Consumer commitment to PHRs could increase efficiency in the healthcare system, lower overall costs, and improve health care information access.

PHRs and related tools, such as medication histories and registration summaries, have few standards for data content, format, functionality, interoperability, use guidelines, privacy or security policies, development, deployment, education, and outreach. Traditionally, consumers have had limited exposure to PHRs and the process for enrollment. As a result, there is low demand for, and little common understanding of, the usefulness and purpose of these tools. Instead, current interest in PHRs is found largely among employers, health plans, and vendors. Nonetheless, many health care experts believe widespread use of user-friendly, consumer-centric health information may have short- and long-term benefits for consumer health and health care utilization. Potential users of these tools have legitimate concerns about managing data access and ensuring privacy and security as well as with the lack of interoperability, lack of user support, and general unavailability of tools needed to manage a registration summary and medication history.

While some PHRs are sold to providers who make them available to their patients, few of these are automatically populated with patient-specific information from the provider's system. More often, PHRs and related tools are "shells" to be populated by the individual or a caregiver who must spend many hours entering relevant data. There is little consistency in how the populated tools can be accessed by providers. Likewise, the availability of the information to a sponsoring provider in his or her office is limited, because providers may not have computers on their desks or in their patient exam rooms, and many providers do not have access to the internet in their offices.

In addition, some PHRs are populated with data from health insurance claims. For example, employers are increasingly offering PHRs to their employees; in one case brought to the attention of the Workgroup, a vendor imports claims data from various health plans under contract to an employer to populate the PHR tool. There is concern that providers cannot access the claims data and that the data cannot be electronically transmitted to patients. Similarly, there is concern that claims data do not include current health status or health history, because such data represent singular events and lag behind the actual encounters within the health care system.

In many discussion groups and forums, interest in PHRs (including medication history) is based on the ability to:

1. Secure information consistently from all providers
2. Make available medical information to all providers consistently (common source for the same data)
3. Track medications (prescriptions, over-the-counter medicines, and supplements)
4. Track diagnoses, conditions, test results, hospitalizations, comprehensive treatments, and enrollment in clinical trials

5. Give providers, family members, or other caregivers emergency access to health information.

The Workgroup notes that in order to give target populations access to electronic registration summaries and medication histories, it is necessary for consumers to choose one of many different types of PHR sponsors including vendors that offer Web-based tools for the storage and management of their personal health information. The Workgroup also recognizes that most enablers for registration summaries and medication histories are the same as those for PHR adoption. Thus, many of the Workgroups' evolving recommendations inevitably address the broad charge in order to achieve the short-term goal. We expect to continue to refine many recommendations related to PHRs after the Workgroup hears additional testimony and deliberates on more complex issues pertaining to the broader charge. For the purposes of the specific charge, the following objectives were agreed upon to guide the development of recommendations.

Primary Objectives:

1. Create measurable value for consumers, patients, and families for improved health outcomes, cost, and convenience.
2. Ensure privacy and security protections and consumer control of their medication history and registration summary.

Secondary Objectives:

3. Create measurable value for health system participants.
4. Establish an initial "building block" for supporting expanded PHR availability and portability.
5. Enhance interoperability among PHRs and other digital health information systems such as electronic health records (EHRs) and other PHRs.

The Workgroup recognizes that there are many key policy issues/barriers that must be addressed to assure the general public that a personal health record can be developed that will provide for privacy and security of the consumer's information as it moves forward to realize these Primary and Secondary Objectives. The following recommendations will be subject to periodic review and possible revision as the Workgroup continues to work on both its broad charge and its specific charge from the Community.


**RECOMMENDATIONS**

The Workgroup identified the following actionable recommendations to meet the specific charge.

## I.    Interoperability

The Community acknowledges that the minimum dataset required for the breakthrough project's registration summary and medication history is a small subset of a more comprehensive PHR. Furthermore, the Workgroup recognizes the importance of establishing a technical, policy, and business infrastructure to enable widespread adoption of registration summary and medication history exchange, while supporting innovation in the PHR space. We encourage the use of an underlying PHR infrastructure for maintaining and exchanging PHR-related information that goes beyond the minimum dataset. We envision that vendors and PHR sponsors will want to provide these extended services by using both standardized data and images and, in some cases, unstructured data or "free text." These efforts to extend PHR functionality will lead to further expansion of the fully adopted PHR minimum dataset and exchange standards that will undergo the same specification and certification process as is being developed in the first version of our efforts. We support trading partner exchange of data that fall outside the minimum dataset if they follow the principles and precepts established for the initial scope of the consumer empowerment breakthrough.

> **Recommendation 1.0: The Health Information Technology Standards Panel (HITSP) should identify the technical and data standards to enable the availability of a core registration dataset and medication history (with comprehensive review of recommendations for registration and medication history provided to HITSP by the Workgroup), including vocabularies, messaging, authentication, security standards, and appropriate documentation, by September 30, 2006.**

## II.    Demonstrating Value

The Workgroup considered various target populations for the specific charge to meet the primary objective of creating measurable value for consumers, patients, and families for improved health outcomes, cost, and convenience. Patients with chronic conditions requiring frequent use of the health care system are most likely to derive value from the availability of an electronic registration summary and medication history. Examples can be found in the pediatric community where health status can be documented starting at birth and within the Medicare populations where chronic conditions require the use of multiple concomitant medications. We gave particular consideration to pediatric populations, because there are opportunities to use longitudinal PHRs to follow patients over their lives, while demonstrating to families and providers of well and chronically ill children the short term value of registration summaries and medication histories.

> **Recommendation 2.0: The U.S. Department of Health and Human Services (HHS), through the Centers for Medicare & Medicaid Services (CMS), the Agency for Healthcare Research and Quality (AHRQ), other interested Federal agencies, and private-sector partners, should pilot programs that measure and demonstrate the value of an electronic registration summary and medication history to patients with chronic disease. The sponsoring organizations should strive to implement pilot programs that meet all the objectives identified by the Workgroup no later than**

**December 30, 2006, and an evaluation of the initial results should be reported to the Community by June 30, 2007.**

Also, the Workgroup believes education and outreach for providers about the availability and benefits of electronic registration summary and medication history information will be necessary to encourage participation in the breakthrough initiative. Additionally, outreach will be necessary to confirm consumer and patient use of PHRs.

A broad variety of private-sector organizations regularly provides health education to their constituents. Examples include organizations such as patient advocates, chronic disease advocates, provider associations, and umbrella entities that are trade associations composed of many consumer groups. These private-sector organizations are positioned to identify effectively ways to segment and reach consumer groups for education purposes. They have established grassroots networks with proven track records for communicating information and providing education to their members.

Targeted outreach needs to be culturally sensitive and available in a variety of forms to meet consumer needs. For the breakthrough initiative, consideration should be given to foreign languages, health literacy, and basic Internet skills. In addition, while it is important to make electronic registration summaries and medication histories readily available, consumer and provider use of these data is essential to achieving their benefits.

> **Recommendation 2.1: In the next 6 months, HHS agencies sponsoring pilots for an electronic registration summary and medication history should work with appropriate private-sector health organizations, such as patient advocacy organizations and medical professional societies, to promote provider and consumer participation in a breakthrough project through a targeted outreach initiative.**

## III.   Privacy and Security

Each breakthrough workgroup identified policy issues to establish public trust and ensure successful adoption and implementation of recommendations. The consumer empowerment group recognizes its work is expected to bring 300 million new users into a nationwide health information network, raising numerous questions about privacy, data security, consumer control, and trust. Survey data and early user experience confirm that Americans believe that their personal health information is highly sensitive, and they demand strong protections regarding its proper management, sharing, and use.

Privacy and security policy issues are essential to achieving the four workgroups' specific charges. As a result, it makes sense to create a consumer empowerment subgroup comprised of existing Workgroup members who are most knowledgeable about privacy and security policy issues and their practical application. The subgroup's charge would be to make recommendations to the Community on the most pressing privacy and security issues that need to be addressed for implementation of the breakthroughs. The subgroup's mission would be to build public trust by ensuring structured public input, including written and oral testimony from consumer groups, privacy advocates, technology experts, clinicians, and population health experts to enable

5

balanced discussions of all issues. Consensus recommendations will be made based on broad public input. The Workgroup recognizes the need for a long-term multi-stakeholder policy advisory body to develop and recommend long-term privacy and security policies in addition to a thorough and deliberative shorter-term work group process to address the needs for implementation of the breakthroughs.

**Recommendation 3.0: The Community should create a consumer empowerment subgroup comprised of privacy, security, clinical, and technology experts from each Community Workgroup. The subgroup should frame the privacy and security policy issues relevant to all the Community charges and solicit broad public input and testimony to identify viable options or processes to address these issues that are agreeable to all key stakeholders. The recommendations developed should establish an initial policy framework and address issues including, but not limited to:**

- **Methods of patient identification**
- **Methods of authentication**
- **Mechanisms to ensure data integrity**
- **Methods for controlling access to personal health information**
- **Policies for breaches of personal health information confidentiality**
- **Guidelines and processes to determine appropriate secondary uses of data**
- **A scope of work for a long-term independent advisory body on privacy and security policies.**

These recommendations are supported by information obtained through research and testimony to the Consumer Empowerment Workgroup which is contained in the supporting documents available at http://www.hhs.gov/healthinformationtechnology/.

Thank you for giving us the opportunity to submit these recommendations. We look forward to discussing these recommendations with you and the members of the American Health Information Community.

Sincerely yours,                                  Sincerely yours,

Linda Springer                                    Nancy Davenport-Ennis
Co-chair, Consumer Empowerment                    Co-chair, Consumer Empowerment
Workgroup                                         Workgroup

Exhibit F

May 9, 2006

The Honorable Michael O. Leavitt
Chairman
American Health Information Community
200 Independence Avenue, S.W.
Washington, D.C.  20201

Dear Mr. Chairman:

The American Health Information Community has identified and prioritized several health information technology applications, or "breakthroughs," that could produce a specific tangible value to healthcare consumers. To address one of these breakthrough areas, the Biosurveillance Workgroup was formed and given the following broad and specific charges:

> **Broad Charge for the Workgroup:** Make recommendations to the Community to implement the informational tools and business operation to support real-time nationwide public health event monitoring and rapid-response management across public health and care delivery communities and other authorized government agencies.

> **Specific Charge for the Workgroup:** Make recommendations to the Community so that within 1 year, essential ambulatory care and emergency department visit, utilization, and lab result data from electronically enabled health care delivery and public health systems can be transmitted in standardized and anonymized format to authorized public health agencies within 24 hours.

The Workgroup's deliberations highlighted a number of key needs that must be addressed to meet the group's specific charge, including the following:

1. Define the necessary steps to determine the data and technical specifications needed to support key public health functions.
2. Share data in a way that supports all levels of public health while ensuring that traditional public health roles are maintained.
3. Protect patient confidentiality.
4. Define clear goals, metrics, and rigorous program evaluations to inform recommendations for new programs, ongoing programs, and the broader charge.

This letter provides both context and recommendations for how these issues can be addressed to enable the transmission of ambulatory, emergency department, and lab data from electronically enabled health care systems to public health systems.


**BACKGROUND AND DISCUSSION**

The threat of significant naturally occurring or manmade health events is a critical issue for the Nation. The ability to detect events rapidly, manage the events, and mobilize resources

appropriately in response can save lives. Information from hospital emergency departments can be electronically reported and monitored without identifying patients and serve to provide a real-time view of the health of our communities. These data can be shared with and among local, State, and Federal public health agencies to support shared and unique needs at all levels of the public health system. Likewise, information from public health agencies can be shared in real-time with clinical providers in emergency departments to improve their ability to respond to rapidly evolving events.

At the onset, the Biosurveillance Workgroup agreed that the biosurveillance functions to be supported with advanced, enhanced, or real-time transmission of electronic health data are initial event detection, situational awareness, outbreak management, and response management. Accomplishing these functions requires a coordinated effort across Federal, State, and local public health agencies, along with partnerships with the clinical care delivery system.

In order to get a better understanding of the potential for local and State public health agencies to participate in a biosurveillance breakthrough, the Workgroup solicited input from the Association of State and Territorial Health Officials (ASTHO) and the National Association of County and City Health Officials (NACCHO). In April 2006, ASTHO and NACCHO surveyed the State, Territorial, and large (>200,000 population) local health departments across the Nation regarding their capacity to receive, in electronic format, clinical care data to support biosurveillance efforts.

Responses to the ASTHO survey were received from 29 States, three Territories, and the District of Columbia. Several important findings emerged from this survey:

- The majority of State public health agencies have the capacity and the need to participate in biosurveillance efforts. These results emphasize the need for public health to be actively engaged in the electronic exchange of health information.
- Eighty-two percent of all responding agencies indicated that they are receiving, or plan to receive within the next 6 months, electronic data from clinical care settings for one or more biosurveillance capabilities.
- Eighty-nine percent of all respondents reported that they have an active relationship with some clinical partners to develop capacity for electronically receiving, processing, and using data for either notifiable disease reporting or biosurveillance efforts.
- Eighty-two percent of all respondents indicated a lack of funding, and 70 percent of all respondents indicated a lack of trained personnel as the primary obstacles for participating in a nationwide biosurveillance project.

Responses to the NACCHO survey were received from 93 large (>200,000 population) local public health agencies. The key findings from this survey include the following:

- The majority of the large local public health agencies have the capacity and the need to participate in biosurveillance efforts.
- Sixty-eight percent of all responding agencies indicated that they are receiving, or plan to receive within the next 6 months, electronic data from clinical care settings for one or more biosurveillance capabilities.

- Ninety-eight percent of all respondents reported that they have an active relationship with clinical partners for local preparedness planning.
- Sixty-eight percent of all respondents indicated a lack of funding, and 51 percent of all respondents indicated a lack of a technology infrastructure as the primary obstacles for participating in a nationwide biosurveillance project.

These findings informed the preliminary recommendations with respect to the specific charge as described below.


**RECOMMENDATIONS**

**I.    Data Strategy**

A minimum dataset is necessary to meet the specific charge to obtain data in a biosurveillance program to enable key public health functions including initial event detection, situational awareness, outbreak management, and response management. The types of data necessary for the specific charge were recognized by the Workgroup, but not at the level of detail needed for the implementation of a program. The Workgroup acknowledged that it might not be feasible to get all of the data elements in the minimum dataset from every emergency department, laboratory, or ambulatory care setting. This led to consideration of two strategies for data collection. One data strategy would target receiving the minimum dataset from a limited number of clinical data providers and would support initial event detection, situational awareness, outbreak management, and response management. The second data strategy would be based on data that are easily obtained and potentially provide broader geographic coverage while still supporting at least one of the public health functions. For both strategies, data may need to be filtered with consideration given to usefulness in public health functions balanced with sensitivity of information.

> **Recommendation 1.0: By June 30, 2006, the U.S. Department of Health and Human Services (HHS), in collaboration with State and local governmental public health agencies and clinical care partners, should establish, convene, and oversee a Data Steering Committee to carry out the activities described in the recommendations below.**
>
> **Recommendation 1.1: The Data Steering Committee will identify the data elements and the appropriate filtering of data from ambulatory care settings, emergency departments, and laboratories as well as hospital utilization data needed to enable the key public health functions, as outlined above. The Health Information Technology Standards Panel (HITSP) should identify the technical specifications for these initial data requirements by September 30, 2006. The Centers for Disease Control and Prevention (CDC) and others should provide the HITSP with the public health expertise and funds needed to perform this task.**

**Recommendation 1.2: By August 15, 2006, the Data Steering Committee should identify the data sources and requirements necessary to allow for collection of a more limited set of data across a broader geographic area.**

## II.      Roles of Local, State, and Federal Public Health Agencies

The Workgroup recognizes that public health investigations are typically led by local health departments, with assistance from state health agencies if the investigation exceeds local capacity.  State health agencies lead investigations when local health department capacity does not exist and assist in multi-jurisdictional outbreaks.  Variations in the relationship between local health departments and state health agencies do occur across the country.  Local and state jurisdictions may ask CDC to participate in an investigation when necessary. CDC becomes involved in investigations that cross state or national jurisdictional boundaries.

**Recommendation 2.0: For the purposes of the Biosurveillance Breakthrough Initiative, the CDC should establish memoranda of understanding to enable simultaneous data flow from data providers to local, State, and Federal public health entities while preserving traditional investigation roles at local and State public health levels, whereby local and State jurisdictions continue to have lead roles in public health investigations. State and local public health agencies should ensure such memoranda of understanding are put into place and supported.**

## III.     Protecting Patient Confidentiality

Data from clinical encounters are very important to public health authorities for the purposes of biosurveillance. Critical in the use of these data are the need to protect patient privacy and support initial detection and authorized public health investigation of critical health events. Although the Health Insurance Portability and Accountability Act of 1996 (HIPAA) allows for named reporting of appropriate public health data, important concerns remain about protecting patient privacy. HIPAA "de-identification" relates to data used for public release and other purposes such as scientific research. Some of these data, such as general localizing information, are critical for public health to establish that an event is occurring and how it may threaten the general population. So, while full HIPAA de-identification may provide maximum protection from a privacy and security perspective, it makes it virtually impossible for public health authorities to have information needed to identify, monitor, and respond to public health emergencies.

At the other end of the spectrum, public health authorities, at times, get named data as required by State or local law to allow follow-up on notifiable diseases. For biosurveillance, a significant amount of public health value can be derived from data that do not include obvious identifying information; therefore, it is not necessary to use named data for these broader biosurveillance purposes. The Workgroup agrees that identifiers, such as medical record numbers or patient names, should not be included in this biosurveillance breakthrough. However, data providers should ensure the ability to re-identify individuals for public health agencies in the event of an authorized public health investigation.

ASTHO has reported that some States and local jurisdictions believe that explicit State-level authorization might be necessary to permit the exchange of data for biosurveillance.[1] Data collected under a biosurveillance breakthrough would not be available for public release. The only data that should be shared with public health entities are those that are necessary to meet the core public health functions.

**Recommendation 3.0: By August 30, 2006, HHS should develop sample data use agreements to facilitate the sharing of data from health care providers to local, State, and Federal public health agencies. HHS also should offer practical implementation guidance to data providers and State and local public health agencies to address HIPAA concerns about transmitting data (with obvious identifiers removed) for public health purposes.**

**Recommendation 3.1: HHS, in collaboration with privacy experts, State and local governmental public health agencies, and clinical care partners, should develop public communication materials to educate the general public about the information that is used for biosurveillance including the benefits to the public's health, improved national security, and the protection of patient confidentiality by September 30, 2006.**

## IV.    Program Evaluation

The Biosurveillance Workgroup recommendations include strategies that build on existing programs and capacity in local, State, and Federal health departments to implement a biosurveillance program to transmit data from electronically enabled clinical care settings across the country simultaneously to local, State, and Federal public health agencies as feasible. Clear, measurable metrics are needed to guide the implementation, monitoring, and evaluation of this effort in the short and long-term. Program evaluation should be designed and implemented by public health officials experienced in biosurveillance programs.

**Recommendation 4.0: The CDC, State and local governmental public health agencies, and clinical care partners with firsthand experience in managing ongoing biosurveillance programs should design and conduct evaluations of the biosurveillance breakthrough. These parties should establish goals, develop outcome measures, and establish metrics for evaluation of the breakthrough by September 30, 2006.**

**Recommendation 4.1: The Data Steering Committee will monitor the progress continuously, interpret the results of program evaluations, and assess the value of the data. The Data Steering Committee will use the results of program evaluations; taking into account the minimum data necessary for public health purposes to inform recommendations for modifications to the program. The Data Steering Committee should consider large-scale implementations and suggest modifications**

---

[1] Association of State and Territorial Health Officials. *The impact of the HIPAA privacy rule on syndromic surveillance.* 2004. Available at: http://www.astho.org/pubs/29724_ASTHO.pdf

**to data collection when sufficient evidence exists that demonstrates the value of the information derived or lack thereof. The Data Steering Committee should monitor adherence to the protection of patient confidentiality.**

These recommendations are supported by information obtained through research and testimony to the Biosurveillance Workgroup, which is contained in the supporting documents available at http://www.hhs.gov/healthinformationtechnology/.

Thank you for giving us the opportunity to submit these recommendations. We look forward to discussing these recommendations with you and the members of the American Health Information Community.

Sincerely yours,                    Sincerely yours,                    Sincerely yours,

Julie Gerberding, M.D.              E. Mitchell Roob                    Charles N. Kahn, III
Co-chair, Biosurveillance           Co-chair, Biosurveillance           Co-chair, Biosurveillance
Workgroup                           Workgroup                           Workgroup

6