**Office of Government Ethics**

**82 x 22**

**Memorandum dated July 9, 1982
from J. Jackson Walter
Director of the Office of Government Ethics
to Heads of Departments and Agencies
of the Executive Branch
regarding Members of Federal Advisory Committees
and the Conflict-of-Interest Statutes**

**Introduction**

The purpose of this memorandum is to discuss the applicability of the conflict-of-interest statutes, 18 U.S.C. §§ 202-209, to persons not regularly employed in the Federal Government who accept appointments as members of an advisory committee, board, commission or the like established in a Department or agency of the executive branch (hereafter "advisory committee" or "committee"). We have been moved to this task both by uncertainties voiced to us concerning this subject and by an occasional flat assertion that advisory committee members, without exception, are outside the coverage of §§ 202-209.

We believe it will be helpful to the Departments, agencies and committee members (1) to identify the factors relevant to a determination under existing authority whether or not the persons who are members of a given committee are bound by provisions of the conflict-of-interest laws, and (2) by way of illustration, to apply the factors to the memberships of a number of committees now or formerly in existence.

**Background**

Sections 202-209 of Title 18, United States Code, were enacted in 1962 by Public Law No. 87-849, 76 Stat. 1119, to replace similar laws that had in many ways become outmoded. Those laws in general had been read both in Congress and the executive branch to cover persons not otherwise employed by the Government who performed services for it on a temporary or intermittent basis, either singly or as members of advisory committees.[1] Moreover, they were read to apply to such individuals with the same force and scope as they applied to full-time employees.[2] As a result, a highly qualified person who was a partner in, or employed by, an enterprise that had dealings with the Government often could not be recruited by an agency for occasional service because it could not assure him that he or the enterprise would be free of restrictions that were unreasonable in the light of his projected duties.[3]

Although Congress had provided relief for a number of agencies by granting to members of their statutorily created advisory committees limited exemptions from the conflict-of-interest laws,[4] those laws before 1963 by and large remained an appreciable deterrent to the Government's obtaining needed part-time services. One of the main purposes of the new legislation was to facilitate the recruit-ment of experts for part-time assistance "without relaxing basic ethical standards or permitting actual conflicts of interest."[5] Congress achieved this purpose by creating in 18 U.S.C. § 202(a) the category of "special Government employees" (SGE's), which includes most individuals who serve less than full-time. Section 202(a) in general defines an SGE as an officer or employee of the Government who is appointed or employed to serve it, with or without compen-sation, for not more than 130 days during any period of

365 consecutive days either full-time or intermittently.[6] SGE's are treated less restrictively in 18 U.S.C. §§ 203, 205 and 209 than are regular employees, but not in §§ 207 and 208.

As a corollary to the enactment of section 202(a) and the provisions relating to SGE's in the sections that followed it, Congress at the same time enacted a separate provision, section 2 of Public Law No. 87-849, that foreclosed, as to §§ 203-209, the carryover of any of the *ad hoc* statutory exemptions that were then on the books for the benefit of consultants or advisory committee members in the executive branch. Congress thus announced, in effect, that it had established conflict-of-interest measures with regard to those nonregular employees that gave due regard to their proper interests and to those of the Government as well -- measures that eliminated the need for *ad hoc* corrective adjustments in the future.

## Characteristics of Advisory Committees and Their Memberships

1. *Governing Standards of Appendix C*

The legislative and judicial branches of Government aside, the conflict-of-interest statutes by their terms apply only to an "officer or employee" of the executive branch.[7] Almost without exception advisory committee members in that branch are expected by their host agencies to perform services so infrequently as to require the agencies to place those who are employees in the ranks of the SGE's. For this reason, the authoritative guidelines for an agency's determination whether members of one of its advisory committees are employees for purposes of §§ 202-209 appear in Appendix C, which pertains mostly to SGE's.[8]

Appendix C stems from President Kennedy's Memorandum to the Heads of Executive Departments and Agencies, dated February 9, 1962, and entitled "Preventing Conflicts of Interest on the Part of Advisers and Consultants to the Government."[9] The chief purpose of the Memorandum, which was issued about a year before 18 U.S.C. §§ 202-209 came into force, was to lay down rules and standards derived from the existing statutes for the guidance of agencies in their employment of part-time advisory personnel, including committee members. A paragraph headed "Industry, Labor or Agricultural Representatives" informed the agencies that "[i]t is occasionally necessary to distinguish consultants and advisers from persons speaking for a firm or an industry, or for labor or agriculture, or in some other representative capacity" and went on to state that a consultant or adviser is a person who serves as an employee, while an outside representative is not an employee and therefore not within the scope of the conflict-of-interest laws.[10]

On May 2, 1963, President Kennedy replaced the Memorandum of February 9, 1962, with one entitled "Preventing Conflicts of Interest on the Part of Special Government Employees" that reflected the intervening enactment of §§ 202-209.[11] The new document essentially restated the paragraph described above and then added to it a list of five principles for use in making the determination it required. The revised paragraph and appended principles read as follows:[12]

### Industry, Labor, Agricultural or other Representatives

> It is occasionally necessary to distinguish between consultants and advisers who are special Government employees and persons who are invited to appear at a department or agency in a representative capacity to speak for firms or an industry, or for labor or agriculture, or for any other recognizable group of persons, including on occasion the public at large. *A consultant or adviser whose advice is obtained* by a department or agency from time to time *because of his individual qualifications and who serves in an independent capacity is an officer or employee of the Government*. On the other hand, *one who is requested to appear* before a Government department or agency *to present the views of a non-governmental organization or group which he represents, or for which he is in a position to speak, does not act as a servant of the Government and is not its officer or employee. He is*

*therefore not subject to the conflict of interest laws* and is not within the scope of this memorandum. However, the section of this memorandum headed "Ethical Standards of Conduct" sets forth rules of ethics by which he should be guided even though not in the status of a Government official, and the agency before which he appears should call that section to his attention.

The following principles are useful in arriving at a determination whether an individual is acting before an agency in a representative capacity:

(1) *A person who receives compensation from the Government for his services as an adviser or consultant is its employee and not a representative of an outside group.* However, the Government's payment of travel expenses and a per diem allowance does not by itself make the recipient an employee.

(2) It is rare that a consultant or adviser who serves alone is acting in a representative capacity. *Those who have representative roles are for the most part persons serving as members of an advisory committee or similar body utilized by a Government agency. It does not follow, however, that the members of every such body are acting as representatives and are therefore outside the range of the conflict of interest laws.* This result is limited to the members of committees utilized to obtain the views of non-governmental groups or organizations.

(3) The fact that an individual is appointed by an agency to an advisory committee upon the recommendation of an outside group or organization tends to support the conclusion that he has a representative function.

(4) Although members of a governmental advisory body who are expected to bind outside organizations are no doubt serving in a representative capacity, the absence of authority to bind outside groups does not require the conclusion that the members are Government employees. What is important is whether they function as spokesmen for non-governmental groups or organizations and not whether they can formally commit them.

(5) *Where an adviser or consultant is in a position to act as a spokesman for the United States or a government agency -- as, for example, in an international conference -- he is obviously acting as an officer or employee of the Government.* (Emphasis added.)

The second Presidential memorandum remained on the books as such until 1965 when it was rescinded by operation of a provision in President Johnson's Executive Order 11222 of May 8, "Prescribing Standards of Ethical Conduct for Government Officers and Employees."[13] Section 601 of the Executive Order delegated to the Civil Service Commission (the ancestor of the Office of Personnel Management) the statutory authority of the President to establish regulations for the conduct of persons in the civil service. Section 701(a) directed the Commission to issue "appropriate regulations and instructions" to implement the standards of conduct, etc., set forth in the Order for observance by the agencies and employees of the Government. Section 703(e) rescinded the Memorandum of May 2, 1963, effective the date of the Commission's issuance of regulations under section 701(a). Those regulations were published October 1, 1965.[14]

In pursuance of an understanding with interested agencies at the time Executive Order 11222 was drafted, the Civil Service Commission on November 9, 1965, reinstated the most significant portions of the May 2, 1963, Memorandum, including the provisions quoted above. It did so by publishing them as instructions of governmentwide applicability in the form of Appendix C. Thus, those instructions, although no longer clothed in the raiment of a presidential command, have their original force since they were issued by the Commission (and are maintained by the Office of Personnel Management) in the exercise of expressly delegated presidential authority.

## 2. *Comparison Between Distinction Made in Appendix C and Definitions That Apply in Title 5, United States Code*

The proscriptions of 18 U.S.C. §§ 202-209 apply to a person who serves the executive branch only if he or she acts in the capacity of an "officer or employee" of the Government.[15] However, none of these sections of the criminal code nor any other of the penal laws contains a definition of that term as it stands by itself or as modified in various ways in §§ 202-209. On the other hand, 5 U.S.C. §§ 2104 and 2105 define "officer" and "employee" respectively and are instructive here. They provide that for the purposes of Title 5, a person is regarded as an officer or employee of the United States if he (1) is appointed by a Federal officer or employee, (2) is engaged in the performance of a Federal function under law and (3) is subject to the supervision of a Federal officer or employee.

The first criterion of §§ 2104/5, a formal appointment, is met in Appendix C by paragraphs (a)-(d), which contain detailed rules for "obtaining and utilizing the services of . . . temporary or intermittent employee[s]." Paragraph (e) makes those rules applicable in the case of an advisory committee member who is serving in an independent capacity:

> (e) When a person is serving as a member of an advisory committee, board or other group, and is by virtue of his membership thereon an officer or employee of the United States, the requirements of paragraphs (a), (b), (c) and (d) should be carried out to the same extent as if he were serving the sponsoring agency separately and individually.

The second requirement of the Title 5 definitions, that for an individual to be an employee he must be engaged in the performance of a Federal function, is paralleled in Appendix C by the instruction that of the persons, including committee members, who serve the Government temporarily or intermittently, only those who do so in an independent capacity are its employees. To characterize an industry representative or the like as a Federal functionary is a contradiction in terms. Although he may well furnish valuable information or advice to his host agency, that benefit to it does not produce the legal status of a Federal employee for him any more than it would if he were to use the same material for the benefit of his private employer in a public speech or article that came to the agency's attention.

The third requirement of §§ 2104/5, that to be an employee, an individual must carry on his duties under the supervision of another employee, is important in distinguishing the former's status from the status of an independent contractor who provides a service to an agency. The contractor is not hired under the civil service laws and is not subject to the supervision that inheres in an employee-supervisor relationship in the civil service. More to the point, he is not an employee for the purposes of 18 U.S.C. §§ 202-209.[16]

The third factor is not important with respect to advisory committees because in contrast to business organizations, universities, research foundations and other permanent entities able to carry out advisory activities, committees are rarely brought into the service of an agency by means of a contract. However, it is worthwhile to mention an issue that could arise in connection with the conflict-of-interest statutes if an agency were to create an advisory committee and then enter into a contract with it or each of its members individually. The issue is whether the agency would in practice exercise supervision over the operations of the committee and the formulation of judgments by its members that was great enough to taint the contract as a device for concealing their true status as SGE's under §§ 202-209.[17] If an agency, for example, were to convene a committee and award the members a contract pursuant to which they (1) produced, after independent study, an advisory paper dealing with a problem that the agency's staff was too busy to resolve on its own and (2) delivered the paper without antecedent clearance from the staff or agency head, the committee members would properly have been deemed contractors. However, if the committee worked routinely subject to the scrutiny of the staff and with a significant amount of guidance from it, the members would be open to the charge that they actually served as SGE's and were subject to §§ 202-209. As appears from these examples, the question is one of degree.[18] The same is true in other areas of the law where the distinction between an employee and an independent contractor is recognized.[19]

Returning to Appendix C, it is fair to say that its precepts for determining whether a member of a committee is to be classified as an employee of the United States, and, therefore, becomes subject to the constraints of §§ 202-209, are validated by the definitions of "officer" and "employee" in the civil service code.

Once the sponsoring agency of a committee has determined whether the members are to be employees or representatives, the agency must mark its records accordingly. If the members are to be carried as employees, either with or without compensation, the agency must also classify them on its records either as SGE's or regular employees, depending on the expected frequency and duration of their periods of duty.[20]

### 3. *Individuals Outside the Government Who Advise an Official Informally*

A Federal official may occasionally receive unsolicited, informal advice from an outside individual or group of individuals regarding a particular matter or issue of policy that is within his official responsibility. Or he may himself bring up an agency matter or policy issue informally with one or more outsiders in order to obtain their views. An incident of this sort sometimes prompts the inquiry whether the outsiders have become SGE's of the agency. In general, the answer is that they have not, for they are not possessed of appointments as employees nor do they perform a Federal function.

However, as so often happens in considering the applicability of the conflict-of-interest laws, a generality is insufficient here and a *caveat* is in order. An official should not hold informal meetings more or less regularly with a nonfederal individual or group of individuals for the purpose of obtaining information or advice for the conduct of his office. If he does so, he may invite the argument that willy-nilly he has brought them within the range of 18 U.S.C. §§ 202-209. The following passage from Manning's *Federal Conflict of Interest*, at pp. 29-30, makes the point well:

> One does not become an "employee of the United States" merely by voicing an opinion on government matters to a federal official at a cocktail party. The distinction may be shadowy in a particular case, and each situation must be judged on its own facts. Formalities can play an important part. In the ordinary situation, a person will not be considered to be a consultant-employee if he does not bear a formal appointment, is not enrolled on the personnel roster of the relevant agency, has no government personnel file in his name, and has not been sworn in or signed the customary oath of a government employee. Other factors that might be relevant can be conjectured. Is the person's advice solicited frequently? Is it sought by one official, who may be a personal friend, or impersonally by a number of persons in a government agency that needs expert counsel? Do meetings take place during office hours? Are they conducted in the government office, and does, perhaps, the adviser maintain a desk or working materials in government facilities?
>
> Of recent years, careful counsel have become increasingly conscious that the edges of the government employment relationship are blurred and that relatively little contact with government operations may be needed to open the risk of classification as an "employee of the United States" subject to the disabilities of the conflict of interest laws.

### Federal Advisory Committee Act (FACA)

FACA is of interest here mainly because of its recognition that in addition to Congress not only the President but also the heads of Departments or agencies have the inherent power to establish advisory committees.[21] Although specifying necessarily different formal procedures for the establishment of the three types of committees, the Act makes no substantive distinctions among them relative to their powers or functions. On the other hand, it requires with respect to all three that membership "be fairly balanced in terms of the points of view represented and the functions to be performed by the committee."[22] This language asserts a standard of fairness but is short of being a command that every advisory committee must consist of individuals who represent the interests of persons or entities outside the Government.

## Examples of Advisory Committees

Federal advisory committees were few in number before World War II but have since become more widely used, especially in large Departments and agencies with complex programs. Congress is responsible for the creation of an appreciable number of them, notably in the collection of agencies that now comprise the Department of Energy. It will be useful to examine a few congressionally founded committees located there and elsewhere, along with others brought into being by the President or Department heads, in order to differentiate those whose members are not employees of the United States from those whose members are in that class.

*Energy Research Advisory Board (ERAB)*

The Secretary of Energy is authorized by the provisions of 42 U.S.C. § 7234 (Supp. III) "to establish in accordance with the Federal Advisory Committee Act such advisory committees as he may deem appropriate." The statute provides authorization for the Secretary to pay the travel expenses of committee members but omits authorization for compensating them.

Section 7234 contains a provision making 15 U.S.C. § 776, an earlier piece of energy legislation, applicable to advisory committees chartered by the Secretary or transferred to his Department. Section 776 requires that the Secretary

> endeavor to insure that each [of his advisory committees] is reasonably representative of the various points of view and functions of the industry and users affected, including those from residential, commercial and industrial consumers, and shall include, where appropriate, representation from both State and local governments, and from representatives of State regulatory utility commissions, selected after consultation with the respective national associations.

ERAB is a committee organized under 42 U.S.C. § 7234, as supplemented by 15 U.S.C. § 776, and the Secretary's notice of establishment embodies language similar to that quoted above.[23] It is apparent, therefore, that ERAB is a body of persons who, in the language of Appendix C, "speak for firms, or an industry, or for labor or agriculture, or for any recognizable group of persons, including, on occasion, the public at large."[24] Accordingly, the members of ERAB are not Federal employees (SGE's) and not within the coverage of 18 U.S.C. §§ 202-209.

The following admonition that appears in Appendix C, at C-5, should be borne in mind by the Department of Energy with regard to ERAB and other representative advisory committees, as well as by other Departments and agencies that utilize committees of that kind:

> [A]n advisory group may of necessity be composed largely or wholly of persons of a common class or group whose employers [or clients] may benefit from the advice given . . . . In all these circumstances, particular care should be exercised to exclude his employer's or client's contracts or other transactions with the Government from the range of the . . . adviser's duties.

*Solar Photovoltaic Energy Advisory Committee (SPEAC)*

SPEAC, which also serves the Secretary of Energy, differs in its origin from ERAB since it is a committee established directly by Congress, 42 U.S.C. § 5588 (Supp. III), rather than by a Department or agency head under authority given by Congress. SPEAC has 13 members, including 11 appointed by the Secretary from "industrial organizations, academic institutions, professional societies or institutions, and other sources as he sees fit," and two members of the public appointed by the President. These provisions of themselves do not characterize SPEAC as a representative committee. However, 42 U.S.C. § 5588(d) provides that 42 U.S.C. § 7234, the statute under which ERAB was organized and which brings 15 U.S.C. § 776 into play, is applicable to SPEAC, thus making it possible for the Secretary to organize it as a

representative committee, like ERAB. In fact, the Department of Energy has made SPEAC a separate component of ERAB.[25]

### *Federal Photovoltaic Utilization Program Advisory Committee (FPUPAC)*

FPUPAC was a temporary committee created by legisla-tion, 42 U.S.C. § 8277 (Supp. III), with a termination date of October 1, 1981. It was composed of the heads of certain Federal Departments and agencies specified by Congress plus other persons selected by the Secretary of Energy, whom it served. FPUPAC is included in this list of examples to contrast its nonfederal membership with that of SPEAC. Congress did not invoke the provisions of 42 U.S.C. § 7234 and 15 U.S.C. § 776 in founding FPUPAC. It went no further than instructing the Secretary to appoint nongovernmental persons

> to the extent necessary to assure that the membership of the committee will be fairly balanced in terms of the point [sic] of view represented and the functions to be performed by the committee.

This language was taken from section 5(b)(2) of the Federal Advisory Committee Act and, as stated above, does not call for setting up a representative committee. In its notice of the establishment of FPUPAC, the Energy Department made the following statement:[26]

> The advice and recommendations of the Advisory Committee will not be inappropriately influenced by . . . any special interest, *but will instead be the result of the Advisory Committee's independent judgment*. (Emphasis added.)

The nonfederal members of the committee were, therefore, SGE's of the Energy Department during their service and were within the reach of 18 U.S.C. §§ 202-209.

### *High Energy Physics Advisory Panel (HEPAP)*

### *DOE/NSF Science Advisory Committee (SAC)*

These Department of Energy committees established by the Secretary are of particular interest because their respective members have been directed to act as independent advisers rather than in the representative fashion spelled out by 42 U.S.C. § 7234 *cum* 15 U.S.C. § 776. The Secretary has written the persons appointed to either of the committees as follows:[27]

> each member is asked to serve as an individual, to exercise his judgment in the best interests of the national [program of his committee] and not to represent any special or parochial interests.

This instruction places the members of the committees in the ranks of the SGE's and thus binds them by the proscriptions of §§ 202-209. Since the language of 15 U.S.C. § 776, *supra*, is precatory in essence, it does not preclude the Energy Department from the issuance of the instruction.

### *Intergovernmental Advisory Council on Education (IACE)*

IACE is included as an example of a congressionally ordained committee all of whose members are appointed by the President. It was originated by 20 U.S.C. § 3423 (Supp. III), a provision of the Department of Education Organization Act, for the purpose of providing assistance and recommendations to the President and the Secretary of Education. The committee has 20 members of whom six must be elected state and local officials, five must represent "public and private elementary and secondary education," five must represent "public and private postsecondary education" and four are members of the public, "including parents of students and students." In making his appointments the President is required to consult with representatives of the groups from which the four clusters of members are to be selected. These statutory directives are clear indicia that IACE is a representative body. *Cf*. Appendix C.

*National Professional Standards Review Council (NPSRC)*

The carter of this body is section 1163 of the Social Security Act, as amended, 42 U.S.C. § 1320c-12. NPSRC consists of 11 physicians not otherwise in the employ of the United States who are appointed by the Secretary of Health and Human Services. The specifications of section 1163 for membership are such as to make the 11 physicians the representatives of their practicing colleagues throughout the nation. Nevertheless, the members are employees of the Government because section 1163 provides that they are entitled to receive compensation at a daily rate not in excess of that of GS-18. The factor of compensation is decisive.[28]

*President's Commission on Housing (PCH)*

This advisory committee was brought into being by the President on his own by means of Executive Order 12310 of June 17, 1981. Section 2 provides simply that it is to have "not more than twenty-two (22) members from private life and from state and local governments who shall be appointed by the President." The Order, which in general instructs PCH to advise the President and the Secretary of Housing and Urban Development concerning the develop- ment of a national housing policy, directs that the members serve without compensation but with payment for travel expenses.

Despite the lack of pay for their work, it is evident that the members of PCH are employees of the Government. There is nothing in the Executive Order to characterize them as representatives of outside interests and it is unquestionable that they perform a Federal function.

*National Petroleum Council (NPC)*

NPC is one of the oldest non-statutory advisory committees now functioning. It presently serves the Secretary of Energy but was created by the Secretary of the Interior in 1946 "as a source for advice on all matters related to oil and gas."[29] Its membership is drawn for the greatest part from the petroleum industry and is representative of the industry's various segments.[30]

Since the Interior Department deliberately set up NPC as a representative advisory committee and did not provide compensation to its members, it never considered them to be Federal employees. This position was confirmed by the Justice Department in 1962, while the forerunners of 18 U.S.C. §§ 202-209 and President Kennedy's Memorandum of February 9, 1962, *supra*, were still in force.[31]

*Labor Research Advisory Council (LRAC)*

*Business Research Advisory Council (BRAC)*

These councils were formed by the Secretary of Labor in an exercise of his inherent powers of management -- *i.e.*, without statutory command or authorization -- to advise the Commissioner of Labor Statistics in his Department.

The Secretary's notice of the establishment of LRAC states:[32]

> Council membership and participation in the Council and its committees are broadly representative of the union organizations in the United States. These include representation from organizations of all sizes of membership, with national coverage which reflects the geographical, industrial sectors of the economy.

This pronouncement characterizes LRAC's membership as representational and places it beyond the thrust of sections 202-209.

The notice of establishment of BRAC presents a contrasting description of membership:[33]

Council membership is selected to assure a technically competent group of economists, statisticians and industrial relations experts who represent a cross section of American business and industry. The members serve in their individual capacities, not as representatives of their companies or organizations.

Whatever the degree of contradiction produced by the use of "represent" in the first sentence, the second sentence fixes the status of BRAC's members. They are employees of the Labor Department and subject to the restraints of sections 202-209 on SGE's.

## Conclusions

From the foregoing discussion, it will be seen that Congress, the President and the heads of executive Departments and agencies all have the power to establish advisory committees. Incident to each exercise of that power, the host Department or agency of a committee must determine whether the nonfederal members will or will not be employees of the United States for the purposes of 18 U.S.C. §§ 202-209, and, if employees, whether they will or will not be SGE's. Passing the payment of compensation, which entails employee status, whether that status or the alternative is intended by Congress, the President or a parent Department or agency is to be ascertained from the language used in the enabling legislation, Executive Order, committee charter or other pertinent document to describe the role of the committee members. The choices are two: (1) the use of words to command the members to exercise individual and independent judgment, or (2) the use of words to characterize them as the representatives of individuals or entities outside the Government who have an interest in the subject matter assigned to the committee. Where the language does not articulate a deliberate choice, it is fair to conclude that a member is an employee of the United States, for that is the usual status of someone appointed by an officer or agency of the Government to serve it. See the example of the President's Commission on Housing, *supra* at p. 12.

---

1. There is no substantive difference between an appointee providing advisory service individually and one doing so as a member of a committee. Advisory groups are formed by Departments and agencies to carry out collegially the same functions as experts perform working singly. *Cf*. H. Rep. No. 2894, 84th Cong., 2d Sess. 5 (1956).

2. *See* 42 Op. A.G. 111, at 112, 115 (1962). *See also United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 552 (1961), where the Supreme Court held that an intermittent consultant to the Bureau of the Budget (a precursor of the Office of Management and Budget) who took no oath of office, had no tenure and received no salary was an "officer or agent" of the United States within the compass of 18 U.S.C. § 434, the statute replaced in 1962 by 18 U.S.C. § 208.

3. For example, 18 U.S.C. § 281, the antecedent of the current 18 U.S.C. § 203, was in general construed to prevent a privately employed person who served an agency as an intermittent consultant or adviser, or as a member of an advisory committee, from representing his private employer before any Federal agency regardless of the subject matter involved. *See* 42 Op. A.G. 111 at 121-124.

4. *See*, for example, 42 U.S.C. § 1314(h), 42 U.S.C. § 2203 and 50 U.S.C. App. § 2160(c).

5. S. Rep. No. 2213, 87th Cong., 2d Sess. 7 (1962).

6. Procedures and rules for the designation of SGE's by the Departments and agencies of the executive branch are set forth in the *Federal Personnel Manual*, Chapter 735, Appendix C, which is entitled "Conflicts of Interest Statutes and Their Effects on Special Government Employees (Including Guidelines for Obtaining and Utilizing the Services of Special Government Employees)" (hereafter referred to as

"Appendix C").

7. The term "employee" will be used hereafter to include an officer unless the context indicates otherwise.

8. *See* n. 6, *supra*.

9. 3 C.F.R., 1959-1963 Comp. p. 818.

10. *Id.*, at p. 824. This paragraph was the first published expression by the Government of the difference in status of employee-advisers and representative-advisers under the conflict-of-interest statutes.

11. *Id.*, at p. 834.

12. *Id.*, at p. 842.

13. 3 C.F.R., 1964-1965 Comp. p. 306.

14. 30 Fed. Reg. 12529.

15. See the first sentence of Subpart 1, *supra*.

16. *Cf*. B. Manning, *Federal Conflict of Interest Law* 32 (1964). *See also* 37 Op. A.G. 204 (1933).

17. B. Manning, *supra*, at 32.

18. *Id*.

19. *See*, for example, *United States v. Orleans*, 425 U.S. 807 (1976) (tort claims); *NLRB v. Hearst*, 322 U.S. 111 (1944) (labor).

20. Appendix C, paragraphs (a)-(e).

21. 5 U.S.C. app. I, § 3(2).

22. 5 U.S.C. app. I, § 5(b)(2) and (c).

23. 43 Fed. Reg. 24130, June 2, 1978.

24. Page 2, footnote 6, *supra*.

25. Letter from the Secretary of Energy to Anthony W. Adler, dated May 12, 1980.

26. 44 Fed. Reg. 27234, May 9, 1979.

27. *E.g.*, letters to Dr. Martin L. Perl, of HEPAP, dated November 5, 1981, and Prof. Herman Feshbach, Chairman, SAC, dated March 16, 1981.

28. *See* n. 10, *supra*.

29. *Metcalf v. National Petroleum Council*, 553 F.2d. 176, 177 (C.A.D.C. 1977). This case, in which the plaintiff attempted to raise an issue under the "fairly balanced" membership requirement of FACA, section 5(b)(2), was disposed of by the Court on the ground that the plaintiff had no standing to sue.

30. *Id.*, at 179.

31. Letter from Deputy Attorney General Katzenbach to Assistant Secretary of the Interior Kelly, August 11, 1962.

32. 45 Fed. Reg. 80599, December 5, 1980.

33. *Id*.