**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )

**ASSOCIATION OF AMERICAN**     )
**PHYSICIANS AND SURGEONS, INC.,**  )
                                )

      **Plaintiff,**          )
                                )

      **v.**               )    **Civil Action No. 06-0319 (ESH)**
                                )

**U.S. DEPARTMENT OF HEALTH**    )
**AND HUMAN SERVICES,** *et al.*,    )
                                )

      **Defendants.**        )
_____)

## MEMORANDUM OPINION

The Association of American Physicians and Surgeons, Inc. ("the Association") has sued the United States Department of Health and Human Services ("HHS" or "the Department") and its Secretary, Michael O. Leavitt, challenging the establishment and composition of the American Health Information Community and related bodies under the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2, §§ 1 *et seq.*  Before the Court are defendants' Motion for Judgment on the Pleadings and plaintiff's Motion for Partial Summary Judgment. Because plaintiff lacks standing to bring its claims, the Court will grant defendant's motion and deny plaintiff's motion.

## BACKGROUND

The various bodies challenged in this case concern the government's "Health IT" initiative -- a program dedicated to the development of "an interoperable health information technology infrastructure" for the purpose of "improv[ing] the quality and efficiency of health care[.]"  (*See* Compl. ¶ 42 (quoting Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004)

(creating the position of National Health Information Technology Coordinator within HHS).) Each of these entities is discussed herein.

I.    **American Health Information Community**

On July 14, 2005, HHS's Office of the National Coordinator for Health Information Technology announced the establishment of the American Health Information Community ("AHIC"), a FACA committee formed to "advise the Secretary and recommend specific actions to achieve a common interoperability framework for health information technology (IT) and serve as a forum for participation from a broad range of stakeholders to provide input on achieving interoperability of health IT." Notice, 70 Fed. Reg. 40,703 (Jul. 14, 2005). (*See* Compl. ¶ 45 (citing notice).) The committee's formation was accompanied by Secretary Leavitt's formal determination -- "after appropriate consultation between th[e] Department and General Services Administration" -- that the AHIC was "in the public interest in connection with the performance of duties imposed on the Department by law, and that such duties c[ould] best be performed through the advice and counsel of such a group." (*See* Compl. ¶ 46.) According to the same determination, "it [was] not feasible for the Department or any of its existing committees to perform [AHIC's] duties" and "a satisfactory plan for appropriate balance of committee membership ha[d] been submitted." (*See id.*)

As established, the AHIC was limited to seventeen voting members, each appointed by the Secretary. *See* Notice, 70 Fed. Reg. at 40,703. According to the Association, the Secretary used this authority to "select[] a panel of 'yes-men' and 'yes-women'" who were "already committed to the [agency's] agenda" of expanding health information technology and, as a result, unmoved by the privacy concerns predominant among the public and clinicians. (*See* Compl. ¶ 49 ("[T]he experience of AAPS and its members indicates that people and clinicians in

the United States consider Defendants' Health IT agenda frightening."); *id.* ¶¶ 53, 78 (citing an August 2000 Gallup poll indicating that more than seventy percent of Americans opposed unpermitted access to their medical records).)  The AHIC's "ostensible representative of patients and consumers[,]" the Association asserts, is affiliated with a group dedicated to the chronically ill -- individuals, it claims, who do not share the typical patient's views regarding third-party access to medical information.  (*See* Compl. ¶ 51.)  Similarly, the Association alleges that "[t]he ostensible representative of practicing physicians" on the AHIC is also a member of the Certification Commission for Health Information Technology, demonstrating a "deep[] commit[ment] to the goals of Defendants' Health IT initiatives," instead of to the views of practicing physicians on issues such as patient privacy and the costs of implementing a health IT system.  (*See* Compl. ¶ 50.)  This imbalance, the Association contends, has resulted in AHIC ignoring the interests of patients and practicing physicians.  (*See* Compl. ¶ 52.)

## II.    AHIC Subcommittees

In furtherance of its functions, the AHIC has established a number of subcommittees devoted to particular aspects of health information technology development.  Four have been identified by the Association: Consumer Empowerment, Chronic Care, Electronic Health Records, and Biosurveillance.  (*See* Compl. ¶ 57.)  Each is composed both of AHIC members and nonmembers.  (*See id*.)  Each, the Association contends, was convened in a manner inconsistent with FACA's requirements for the formation of advisory committees.  (*See id.*)

## III.    Other Bodies

According to the Association, the AHIC is not alone in advising HHS on matters relating to health information technology.  (*See id.* ¶ 62.)  Since 1944, the National Committee on Vital and Health Statistics ("NCVHS") -- "appointed from among persons who have distinguished

3

themselves in the fields of health statistics, electronic interchange of health care information,

privacy and security of electronic information . . . , integrated computerized health information

systems . . . , consumer interests in health information, health data standards," and other areas, 42

U.S.C. § 242k(k)(2) -- has advised HHS and its predecessors.  (*See* Compl. ¶ 62 (citing 42

U.S.C. § 242k).)  Four subcommittees further the NCVHS's work: National Health Information

Infrastructure; Populations; Privacy and Confidentiality; and Standards and Security.  (*See id*.)

The Association alleges that the NCVHS continued to function following the expiration of its

charter on January 16, 2006.  (*Id.*)

Finally, the Association has identified four so-called "Contractual Panels" dedicated to

health information technology.  (*See* Compl. ¶ 67.)  In August 2004, plaintiff alleges, HHS hired

a consulting firm to form a Health Information Technology Leadership Panel composed of

executives from major American corporations and dedicated to evaluating the proper roles of

government and the private sector in the development of a "Health IT" infrastructure.  (*See id.*

¶ 44.)  In October 2005, the Association asserts, HHS contracted with George Washington

University to form a Health IT Adoption Initiative involving an expert consensus panel, the

development of guidelines to measure technological saturation in the profession, and the

production of an annual report.  (*See id.* ¶ 63.)  At the same time, plaintiff alleges, HHS

contracted with RTI International for the purpose of establishing the National Health Information

Security and Privacy Collaboration, a partnership between various experts and the National

Governor's Association.  (*See id.* ¶ 64.)

## IV.    The Complaint

In a six-count complaint, the Association challenges this scheme as inconsistent with

FACA's requirements.  In Count I, the Association contends that the AHIC is neither "fairly

4

balanced" nor sufficiently independent of the Department, in violation of Section 5 of the statute. (Compl. ¶¶ 84-85 (citing 5 U.S.C. app. 2, §§ 5(b)(2)-(3), (c)).)  In Count II, the Association argues that the Department brought about the formation of the various "Contractual Panels" in contravention of FACA procedures and thereby acted *ultra vires*, since the statute provides the only means by which such bodies may be established.  (*Id.* ¶ 87.)  In Count III, the Association challenges the establishment of the AHIC's Consumer Empowerment, Chronic Care, Electronic Health Records and Biosurveillance subcommittees, contending that each required HHS to again comply with FACA's requirements for the creation of new advisory committees because each subcommittee included non-AHIC members.  (*Id.* ¶ 90.)  In Count IV, the Association maintains that the formal determinations made by the Secretary in support of the AHIC's formation are "too conclusory to withstand judicial review" in light of the "raft" of bodies dedicated to "Health IT" and the Secretary's failure to specify which of HHS's "duties" the committee's work furthered.  (*Id.* ¶ 93.)  In Count V, the Association alleges that the AHIC does not include "[a]t least one member [who is] an expert on matters pertaining to privacy and security protections of individually identifiable health information[,]" contrary to the requirements of its charter.  (*Id.* ¶ 96.)  Finally, in Count VI, the Association contends that the Department violated Section 14(b)(3) of the statute by maintaining NCVHS beyond the expiration of its charter.  (*Id.* ¶ 99.) Based on these claims, plaintiff seeks a declaratory judgment that the Department's handling of the various "Health IT" bodies violated FACA, making their work "invalid for all regulatory purposes[,]" as well as an injunction barring further work by the bodies until the requirements of FACA have been satisfied and prohibiting HHS's use of their work product.  (*Id.* ¶ 101.)

## ANALYSIS

In moving for judgment on the pleadings, defendants argue that the Association lacks standing to bring any of its claims; that the Association's challenge to the composition of the AHIC under FACA is nonjusticiable; and that the Association's other FACA claims are without merit. Only the first of these contentions needs to be addressed.

## I.    Standard

Under Federal Rule of Civil Procedure Rule 12(c), judgment on the pleadings is appropriate where "the moving party demonstrates that no material fact is in dispute and that it is 'entitled to judgment as a matter of law.'" *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988)); *see also* 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1368 (3d ed. 2004). In making this determination, a court must "'view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.'" *Peters*, 966 F.2d at 1485 (quoting *Jablonski*, 863 F.2d at 290-91). A court "may[,]" moreover, "inquire by affidavits or otherwise . . . into the facts as they exist . . . when a question of [its] jurisdiction is raised." *Land v. Dollar*, 731, 735 n.4 (1947). Entry of judgment under Rule 12(c) is inappropriate "if there are allegations in the complaint which, if proved, would provide a basis for recovery." *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987). "A plaintiff's bare conclusions of law, or sweeping and unwarranted averments of fact," however, are inadequate to defeat such a motion. *Id.*

## II.    Standing

The "irreducible constitutional minimum of standing" consists of three elements, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), each of which must be established by a plaintiff to ensure that it has "'alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [its] behalf.'"  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal quotations omitted); *see also Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing these elements[,]" though "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'").

> First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (internal citations omitted).  These requirements apply whenever an organization asserts standing to sue, whether on its own behalf or on behalf of its members.  *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)).  Thus, where an organization asserts standing in its own name, it must establish its own "injury in fact" -- a "'concrete and demonstrable injury to [its] activities.'"  *Id.* at 1427 (quoting *Havens Realty Corp.*, 455 U.S. at 379).  Where an organization asserts standing in a representative capacity, it must establish that the requisite

injury was suffered by at least one of its members. *See Natural Res. Def. Council v. EPA*, No. 04-1438, slip. op. at 7-8 (D.C. Cir. Aug. 29, 2006) ("In order for this court to have Article III jurisdiction, [an organization must] establish that at least one of its members has standing to sue in his own right, the interests the association seeks to protect are germane to its purpose, and individual members need not participate in the lawsuit themselves.") (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

In opposing defendants' motion, the Association sets forth four ill-defined categories of "injury" to establish its standing to bring the present action on either an institutional or representative basis: procedural injury; the "economic" harm that might befall the Association's members were HHS to require broad use of health information technologies by practicing physicians; the "programmatic" harm that might be suffered by the Association as a result of impaired advocacy; and the "informational" harm stemming from the Department's failure to provide it with relevant committee charters. (*See* Pl.'s Opp'n at 13-21.)

## A.    Procedural Injury

According to the Association, in failing to establish and operate the challenged bodies in compliance with FACA, the Department deprived it -- and, presumably, its members -- of procedural rights owed under the statute. (*See* Pl.'s Opp'n at 14-15.) In light of these violations, the Association contends, the concrete injuries it has alleged must be subjected to less demanding scrutiny with regard to both their immediacy and redressability. (*See id.* at 15.)

While each element of standing's "irreducible constitutional minimum" must be satisfied in every suit, they are modified somewhat in so-called "procedural-rights cases." *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996). As noted by the Supreme Court in *Lujan*, "[t]he person who has been accorded a procedural right to protect his concrete interests

can assert that right without meeting all the normal standards for redressability and immediacy."

504 U.S. at 572 n.7; *see also Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157

(D.C. Cir. 2005) ("Where plaintiffs allege injury resulting from violation of a *procedural* right

afforded to them by statute and designed to protect their threatened concrete interest, the courts

relax -- while not wholly eliminating -- the issues of imminence and redressability[.]") (emphasis

in original).  Procedural standing, therefore, requires that the plaintiff have a procedural right --

one "'*designed* to protect some threatened concrete interest *of his*[.]'"  *Id.* at 1157 (emphasis in

original) (quoting *Lujan*, 504 U.S. at 573 n.8.).  Where the plaintiff demonstrates the existence of

such a right, "the primary focus of the standing inquiry is not the imminence or redressability of

the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized

injury has sued a defendant who has caused that injury."  *Fla. Audubon*, 94 F.3d at 664.

Procedural standing, as a result, further requires a related concrete injury -- an injury that is itself

the "ultimate basis of [the plaintiff's] standing."  *Lujan*, 504 U.S. at 573 n.8; *see also Fla.

Audubon*, 94 F.3d at 668 ("[T]he showing of injury necessary to determine whether a procedural-

rights plaintiff has standing is not satisfied by the existence of a mere procedural violation[.]").

To invoke federal jurisdiction, in other words, a procedural-rights plaintiff must demonstrate a

causal connection between "the government's substantive action that breached the procedural

requirement" and "the asserted injury to the plaintiff's particularized interest."  *Fla. Audubon*, 94

F.3d at 668-69; *see also Ctr. for Law and Educ.*, 396 F.3d at 1160 (noting that while the court in

a procedural-rights case "assumes the causal relationship between the procedural defect and the

final agency action[,]" a procedural-rights plaintiff "must still demonstrate a causal relationship

between the final agency action and the alleged injuries").  Absent such a concrete injury, a court

is faced with a "generally available grievance about government" inadequate to state a case or

controversy under Article III.  *See Lujan*, 504 U.S. at 573-74; *Fla. Audubon*, 94 F.3d at 664

("[I]n order to show that the interest asserted is more than a mere 'general interest [in the alleged

procedural violation] common to all members of the public,' the plaintiff must show that the

government act performed without the procedure in question will cause a distinct risk to a

particularized interest of the plaintiff.") (internal citation omitted).

 The Association's assertions of procedural standing fail this test, for, like the plaintiffs in

*Center for Law and Education*, it has not identified "a procedural right *sufficient for standing*[.]"

*See* 396 F.3d at 1157 (emphasis in original).  In that case, organizational and individual plaintiffs

challenged the composition of a negotiated rulemaking committee formed under the "No Child

Left Behind Act," which provided that the body was to "'includ[e] representation from all

geographic regions of the United States, in such numbers as will provide an equitable balance

between representatives of parents and students and representatives of educators and education

officials[.]'"  396 F.3d at 1154 (quoting 20 U.S.C. § 6571(b)(3)(B)).  In holding that this

"equitable balance" provision "clearly did not create procedural rights designed to protect the[]

concrete interests" of the plaintiff organizations, the Court reasoned that the organizations'

interests were nowhere mentioned in the act, which at best gave "implicit protection" to parents,

students, teachers, and education officials.  *Id.* at 1157-58.  Similarly, in holding that the same

provision "did not clearly create" such a right in the individual plaintiff -- a parent -- the Court

noted that the statute did not "endorse" litigation regarding the committee's formation and,

regardless, the act's provisions did "not offer any promise of purposeful protection of the

concrete interests of students and parents."  *Id.*

 The absence of such a promise is all the more pronounced in this case.  While FACA

provides that advisory committees are "to be fairly balanced in terms of the points of view

represented and the functions to be performed by the advisory committee[,]" *see* 5 U.S.C. app. 2, § 5(b)(2), nothing in this requirement suggests an intent to secure the concrete interests of all groups who can assert a stake in a committee's deliberations. A congressional desire to ensure that the views of interested parties are "fairly heard and considered," as the Court noted in *Center for Law and Education*, "is not persuasive evidence of protective design" -- even where the statute in question specifies the groups to be heard. *See* 396 F.3d at 1158 (internal quotations omitted). The purely "advisory" function of FACA committees, moreover, undermines any suggestion of such design. Whereas the committee at issue in that case was an integrated part a "complex process for crafting federal and state regulations that *would affect* parents' and students' interests," *see id.* at 1157-58 (emphasis added), the bodies challenged here do not play such an instrumental role in the development of Department policy. *See* 5 U.S.C. app. 2, § 2(b)(6) ("[T]he function of advisory committees should be advisory only, and that all matters under their consideration should be determined, in accordance with law, by the official, agency, or officer involved."). Because FACA accordingly does "not offer any promise of purposeful protection of the concrete interests" asserted by the Association, *see Ctr. for Law and Educ.*, 396 F.3d at 1158, the Association cannot assert procedural standing here.

The insufficiency of FACA's "procedures" for procedural standing purposes is further evident from a comparison of the alleged procedural injury here with that asserted in *Lujan*. There, in discussing the class of procedures "designed to protect some threatened concrete interest" of the plaintiff, the Court offered two examples: "the procedural requirement for a hearing prior to denial of [the plaintiff's] license application" and "the procedural requirement for an environmental impact statement before a federal facility is constructed next door to [the plaintiff.]" 504 U.S. at 572, 573 n.8. In such instances, the allegedly violated procedure is a

prerequisite to the substantive government action responsible for the plaintiff's particularized injury.  *See Fla. Audubon*, 94 F.3d at 664; *see also id.* at 668-69 (noting that procedural standing requires a "'particularized injury' resulting from the government's substantive action that breached the procedural requirement"); *Nat'l Parks Conservation Assoc. v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) (describing "an agency's failure to prepare a statutorily required environmental impact statement before taking action with potential adverse consequences to the environment" as "the archetypal procedural injury").  In contrast, the Association has not alleged the violation of any such requirement.  Put simply, the government action anticipated by the Association -- the Department's adoption of health information technology initiatives potentially inconsistent with the economic and programmatic interests of the organization and its members -- does not require the prior approval of the advisory bodies challenged here.  *See* 5 U.S.C. app. 2, § 9(b) (providing that "[u]nless otherwise specifically provided by statute or Presidential directive, advisory committees shall be utilized solely for advisory functions" and, accordingly, "[d]eterminations of action to be taken and policy to be expressed with respect to matters upon which an advisory committee reports or makes recommendations shall be made solely by the President or an officer of the Federal Government").

The Association's assertion of procedural standing also fails because of the absence of a related, concrete injury.  For, as discussed herein, none of the concrete harms alleged by the organization is sufficient to demonstrate the requisite injury in fact.

**B.    Economic Injury**

In the organization's view, the Department "expressly intend[s] to use the federal government's 'market power' as a health-care payer to impose or coerce Health IT on the medical profession and patients as soon as possible" -- an initiative that "will impose financial

burdens on [its] members[,]" many of whom work in small practices, by requiring that they purchase and obtaining training on the systems involved. (Compl. ¶ 32; *see also id.* ¶ 21 ("Defendants' Health IT initiatives seek to build the infrastructure and record that Defendants need to alter fundamentally the practice of medicine."); ¶ 55 (quoting the Secretary as stating that it was his intention to "weigh very heavily" the AHIC's advice and "to act"); Pl.'s Mot. Ex. 1 ¶ 14 ("Orient Decl.") (discussing the potential costs of a "government-imposed Health IT regime").) As a result of these burdens, the Association asserts that "[a]ll" of its members "have standing to avoid the financial burden of additional requirements[,]" particularly those who would "retire or forgo Health-IT mandated forms of medical practice" were the anticipated policies adopted. (Compl. ¶ 32.)

HHS, of course, is distinct from the advisory bodies challenged by the Association as imbalanced or otherwise in contravention of FACA. The Association contends, however, that the various committees are nothing more than "a series of interlocking rubber-stamp alter egos" (Pl.'s Opp'n at 2), all "committed to the Defendants' agenda." (Compl. ¶ 53.) With the approval of the AHIC and other bodies, the Association suggests with notable imprecision, the Department "*could*" forego rulemaking and compel physician compliance with its technological initiatives "through federal procurement." (Pl.'s Opp'n at 20 (emphasis added); Compl. ¶ 32.) Moreover, the Association asserts that HHS's consultation with an imbalanced AHIC will result in anticompetitive effects once it elects to implement its "unlawful Health IT policies." (Pl.'s Opp'n at 21; Compl. ¶ 80.)

As evidenced by the Association's need to rely on conjecture regarding the AHIC's likely advice and the Department's likely policies, the economic injuries alleged by the organization are far too speculative to support standing in this case. "Allegations of possible future injury do

not satisfy the requirements of Art. III[.]"  *Whitemore v. Arkansas*, 495 U.S. 149, 158 (1990) ("A

threatened injury must be 'certainly impending' to constitute injury in fact.") (internal quotations

omitted).  But, plaintiff has offered nothing more.  While the Association may itself be

convinced that the Department will soon adopt a set of damaging requirements, its allegations do

not demand such a conclusion.  The organization's assertions of economic injury, rather, echo

those rejected by the D.C. Circuit in *Metcalf v. National Petroleum Council*, 553 F.2d 176 (D.C.

Cir. 1977), where the plaintiffs contended that an industry imbalance on the National Petroleum

Council "cause[d] it to make certain biased recommendations, which in turn cause[d]

government agencies to adopt policies favoring the petroleum industry, which in turn cause[d]

the [plaintiffs] to be injured as consumers and citizens."  *See id.* at 185.  The Association's

theory of financial injury, like those set forth by the *Metcalf* plaintiffs, is "speculative and

conjectural *in the purest sense*."  *See id.* at 186 (emphasis in original) (rejecting as speculative

plaintiffs' contention that the committee's allegedly industry-biased advice would result in the

reduced availability of alternative energies, higher oil prices, and other injuries); *see also*

*Sanchez v. Pena*, 17 F.Supp. 2d 1235, 1237 (D.N.M. 1998) (concluding that plaintiffs had failed

to allege anything more than speculative injury where the asserted harm stemmed from

committee "domination by members who may be unwilling to raise the same issues that

Plaintiffs would raise").  Even were one to accept, as the Association has alleged, that the

Secretary "intend[s] . . . to act" on the issue of health information technology and that the

Department "intend[s] to use the federal government's 'market power'" in developing the use of

such a system (*see* Compl. ¶¶ 32, 55), the shape (and corresponding impact) of any resulting

scheme remain unknown.  The Department could, of course, adopt in the future an onerous set of

technological requirements.  But to date, the organization cannot demonstrate that such

requirements are "'certainly impending[.]'" *See Whitemore*, 495 U.S. at 158.  Its allegations of economic injury are accordingly insufficient to demonstrate an injury in fact.

The Association's assertions of financial harm also fail the redressability prong of standing.  *See The Wilderness Soc'y v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006) ("The redressability inquiry poses a simple question: '[I]f plaintiffs secured the relief they sought, . . . would [it] redress their injury'?") (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1233 (D.C. Cir. 1996).)  Despite the Association's apparent confidence that a reconstituted AHIC -- one purged, perhaps, of the patient and physician representatives the organization views as inadequate to represent patients and physicians (*see* Compl. ¶¶ 50-51) -- would offer different advice to the Department, there is no reason to believe that this would be so.  *Cf. Fertilizer Inst. v. EPA*, 938 F.Supp. 52, 55 (D.D.C. 1996) (holding that plaintiff's claimed injury was not "'fairly traceable'" to an alleged committee imbalance as there was "no reason to believe that the Committee would do anything differently with one or two more industry representatives serving on it").  Moreover, even if a reconstituted AHIC were to offer recommendations consistent with those favored by the Association, it requires "a series of tenuous inferences" to conclude that the Department would then act in a manner that would avoid the economic injuries alleged.[1]  *See Physicians' Educ. Network, Inc. v. HEW*, 653 F.2d 621, 624 (D.C. Cir. 1981) (rejecting plaintiff's assertion of economic injury where there was no reason to believe that rescission of an allegedly biased committee report would result in remedial congressional action); *Public Citizen v. HHS*, 795 F.Supp. 1212, 1222 (D.D.C. 1992) (holding that plaintiffs' alleged injuries were not

---

[1] Notably, the Association offers a divergent set of inferences in an attempt to demonstrate standing, contending that the Department has expressed an unwavering "intention" to force health information technology on unwilling physicians while nonetheless suggesting that an alternate set of advisory bodies would avoid such an end.  (*See*, *e.g.*, Compl. ¶ 19-20.)  This inconsistency alone speaks to the speculative nature of the Association's asserted injuries.

redressable where the repeal of a challenged recommendation appeared "inconsequential" and Congress, the subject of the recommendation, was "astute enough to make its own determination" about the bias of the responsible committee). The AHIC, in short, "exists to *advise* and *not to decide*" -- it is but "*one source* of information on which [HHS] can draw in making *its* own policy decisions or in making recommendations to the Congress." *See Metcalf*, 553 F.2d at 182 (emphasis in original).

      The Association's assertions of financial harm are therefore inadequate to establish standing.

### C.    Programmatic Injury

      The contours of the Association's alleged "programmatic" injury are difficult to discern. It appears to assert that "[b]y denying the public (and thus AAPS) certain FACA-conferred statutory benefits within FACA's zone of interests," the Department has impaired the Association's advocacy on behalf of its members, and thereby inflicted an injury sufficient for purposes of standing. (Pl.'s Opp'n at 15-17; *see also id.* at 15 (asserting, without elaboration, that "HHS has imposed various programmatic injuries on AAPS").) As an organization engaged in "the 'real world' of Washington policy making," in other words, the Association contends that it is entitled "to assert advocacy-based standing to challenge duplicative and overlapping FACA committees[,]" the "denial of information" due under the statute,[2] and the "bias[]" inherent in the allegedly imbalanced bodies. (*Id.* at 16-17 (quoting *Cummock v. Gore*, 180 F.3d 282, 291 (D.C. Cir. 1999)); *see also* Compl. ¶¶ 22-25 (addressing the Association's intended participation in any reconstituted committee and the resulting benefits in terms of an unbiased work product); ¶ 26 (asserting that the Association is an "intended beneficiary of FACA's protection of the public

---

[2] The Association's contention that "informational injury" alone is sufficient to establish its standing is discussed *infra* Section II.D.

interest" as a result of its advocacy); ¶ 28 (indicating that the Association "intends to challenge and/or advocate against efforts to mandate or coerce adoption of Defendants' Health IT policies . . . [o]n behalf of its members"); ¶ 29 (asserting that the requested declaratory and injunctive relief would provide the Association with grounds to challenge the Department's Health IT initiatives); Orient Decl. ¶¶ 18-20.)

The Association's invocation of such "advocacy-based standing" does not withstand scrutiny. In order to demonstrate the sort of "'personal stake'" sufficient to support federal jurisdiction, an organization must allege a "concrete and demonstrable injury to [its] activities . . . with [a] consequent drain on the organization's resources[.]" *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp.*, 455 U.S. at 379). "A mere 'setback to the organization's abstract social interests' is inadequate to establish standing." *Nat'l Treasury Employees Union*, 101 F.3d at 1427, 1429 (quoting *Havens Realty Corp.*, 455 U.S. at 379). Rather, "[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions." *American Legal Foundation v. FCC*, 808 F.2d 84, 91 (D.C. Cir. 1987). Absent a "direct conflict" between the challenged action and an organization's "mission," there can be no institutional standing -- "[i]f a defendant's conduct does not conflict directly with an organization's stated goals, it is entirely speculative whether the defendant's conduct is impeding the organization's activities." *Nat'l Treasury Employees Union*, 101 F.3d at 1429-30.

The Association's allegations do not meet this standard. Unlike those cases in which the plaintiff organization asserted that the challenged action "perceptibly impaired" its essential activities, thereby demanding greater expenditures to secure the organization's goals, *see Havens Realty Corp.*, 455 U.S. at 379, the Association has not alleged any "inhibition of [its] daily

17

operations[.]" *See Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789

F.2d 931, 938 (D.C. Cir. 1986); *cf. id*. at 379-80 (institutional standing where the defendant

apartment owner's violations of the Fair Housing Act were alleged to have "perceptibly impaired

[the plaintiff organization's] ability to provide counseling and referral services for low- and

moderate-income homeseekers"); *Fair Employment Council of Greater Washington, Inc. v. BMC

Mktg.Corp.*, 28 F.3d 1268, 1278 (D.C. Cir. 1994) (institutional standing where the defendant

employment agency's allegedly discriminatory practices were alleged to have required the

plaintiff organization to devote more resources to counseling, outreach and education programs);

*Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28-31 (D.C. Cir. 1990) (institutional standing

where the defendant condominium owner's allegedly discriminatory advertisements were

claimed to have required the plaintiff housing organizations to increase their educational and

counseling efforts). While the Association has noted its "inten[t] . . . to advocate against efforts

to mandate or coerce adoption of [the] policies" it believes the Department will adopt (Compl.

¶ 28), this allegation is insufficient for purposes of standing. The D.C. Circuit "has not found

standing when the only 'injury' arises from the effect of the [challenged action] on the

organizations' lobbying activities (as opposed to the effect on non-lobbying activities):

'[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to

establish Article III standing.'" *Ctr. for Law and Educ.*, 396 F.3d at 1161 (quoting *Nat'l

Treasury Employees Union*, 101 F.3d at 1429); *see also Sierra Club*, 405 U.S. at 739 ("[A] mere

'interest in a problem,' no matter how longstanding the interest and no matter how qualified the

organization is in evaluating the problem, is not sufficient[.]"). Moreover, the Association's

anticipated response to the actions it expects the Department will undertake cannot provide the

"actual or imminent" injury required under Article III.[3]  *See Nat'l Taxpayers Union*, 68 F.3d at

1433 (plaintiff organization failed to demonstrate the requisite injury where it advanced "entirely

speculative" assertions regarding the impact of an increased tax rate on the organization's

fundraising activities).

Because the Association has alleged no "injury both concrete and specific to the work in

which [it is] engaged[,]" *see Action Alliance of Senior Citizens of Greater Philadelphia*, 789

F.2d at 938, its asserted programmatic injuries are inadequate to establish standing.

### D.    Informational Injury

The Association also alleges that the Department denied it "access to FACA-required

information," thereby inflicting an injury sufficient for purposes of standing.  (Pl.'s Opp'n at 14.)

According to plaintiff, it "sought" the charters of the challenged subcommittees and "Contractual

Panels" and -- in "failing to prepare and file such charters" -- the Department "denied . . . that

information[.]"  (Pl.'s Mem. in Supp. at 2.)  This, the Association contends, "is enough to

provide standing."  (*Id.*)  Again, the Association is mistaken.[4]

While it is clear that "a refusal to provide information to which one is entitled under

FACA constitutes a cognizable injury sufficient to establish Article III standing[,]" *Byrd v. EPA*,

---

[3] Equally unpersuasive is the Association's related suggestion that it has standing due to the possibility that the challenged bodies will produce "misinformation" that will be republished in "third party, independent media" that cannot be sued because of various government reporting privileges.  (*See* Pl.'s Opp'n at 17-19.)  This is nothing but "conjecture."  *See Whitemore*, 495 U.S. at 158 ("A threatened injury must be 'certainly impending' to constitute injury in fact."); *see also Lujan*, 504 U.S. at 560-61 (requiring that an injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court").

[4] To the extent the Association's alleged informational injury extends to documents that might later be "made available to or prepared for or by" the challenged subcommittees and "Contractual Panels," *see* 5 U.S.C. app. 2, § 10(b), it is again too speculative to establish standing.

174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Public Citizen v. United States Dep't of Justice*, 491

U.S. 440, 449 (1989) ("As when an agency denies requests for information under the Freedom of

Information Act, refusal to permit appellants to scrutinize the ABA Committee's activities to the

extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue.")), the

Association has not demonstrated such a refusal.  Under Section 10(b) of the statute, upon which

plaintiff relies (*see* Pl.'s Mem. in Supp. at 2),

> the records, reports, transcripts, minutes, appendixes, working
> papers, drafts, studies, agenda, or other documents which were
> made available to or prepared for or by each advisory committee
> shall be available for public inspection and copying at a single
> location in the offices of the advisory committee or the agency to
> which the advisory committee reports until the advisory committee
> ceases to exist.

5 U.S.C. app. 2, § 10(b).  Absent from this provision is any reference to the charters relied on by

the Association.[5]  Such instruments, instead, are addressed only in Section 9(c) of FACA, which

prohibits committee action until "an advisory committee charter has been filed with . . . the

Administrator, in the case of Presidential advisory committees, or . . . with the head of the

agency to whom any advisory committee reports and with the standing committees of the Senate

and of the House of Representatives having legislative jurisdiction of such agency[,]" as well as

the Library of Congress.  *Id.* § 9(c).  In contrast to Section 10(b), Section 9(c), which allows for

congressional oversight of those committees established under the act, *see Metcalf*, 553 F.2d at

178, does not provide the sort of "explicit[]" right to information required to support the

---

[5] The Association's assertion of informational injury is similar to that in *Common Cause v. FEC*,
108 F.3d 413 (D.C. Cir. 1997), where the complaint's passing reference to the Federal Election
Campaign Act's reporting requirements betrayed the plaintiff's desire not for the disclosure of
information but rather an order requiring the Federal Election Commission to "'get the bad
guys'" -- relief the organization had no standing to pursue.  *See id.* at 418.

Association's assertion of informational injury.[6]  *See Am. Farm Bureau v. EPA*, 121 F.Supp. 2d 84, 97 (D.D.C. 2000) ("Informational standing arises 'only in very specific statutory contexts' where a statutory provision has 'explicitly created a right to information.'") (quoting *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994)); *cf. Cummock*, 180 F.3d at 289 (informational standing where the plaintiff was "denied her requests for information that [the advisory committee] was required to produce" under Section 10(b)); *Byrd*, 174 F.3d at 243 (informational injury resulted from the agency's denial of access to "the panel's written comments and pre-meeting notes," disclosure of which was required under Section 10(b)); *Food Chemical News v. HHS*, 980 F.2d 1468, 1469 (D.C. Cir. 1992) ("[U]nder section 10(b) of FACA, an agency is generally obligated to make available for public inspection and copying all materials that were made available to or prepared for or by an advisory committee.").

## CONCLUSION

The Association admits that it filed this suit "to avert what [HHS] has stated it intends to do to [the organization's] members[.]"  (Pl.'s Opp'n at 19.)  This concession reveals the very defect in plaintiff's standing claim, for the harm the organization anticipates is rooted in actions that have not happened yet and are independent of the conduct challenged here.  Moreover, the Association's inability to pursue this action is by no means troublesome.  "[B]ecause Article III

---

[6] Moreover, it does not appear that the Association has "unsuccessfully demand[ed] disclosure" under FACA, *see Public Citizen*, 491 U.S. at 449-50, having alleged only that it "did not locate" the charters at issue.  (*See* Compl. Ex. 1 ¶ 3 (Decl. of Lawrence J. Joseph).)  In the absence of a demonstration that it requested but was "denied specific agency records[,]" the Association's alleged injury appears too generalized to establish standing.  *See. id.* ("The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure under FACA does not lessen appellants' asserted injury, any more than the fact that numerous citizens might request the same information under the Freedom of Information Act entails that those who have been denied access do not possess a sufficient basis to sue."); *Cummock*, 180 F.3d at 290 (holding that the plaintiff "suffered an injury under FACA insofar as the Commission denied her requests for information that it was required to produce").

standing is always an indispensable element of the plaintiff's case, neither [the courts] nor the Congress can dispense with the requirement -- even if its application renders a FACA violation irremediable in a particular case." *Natural Resources Defense Council v. Pena*, 147 F.3d 1012, 1020 (D.C. Cir. 1998).

Since the Court concludes that the Association lacks standing to sue, it will grant defendants' Motion for Judgment on the Pleadings and deny plaintiff's Motion for Partial Summary Judgment.


                                                          s/
                                         _____
                                         ELLEN SEGAL HUVELLE
                                         United States District Judge

Date:  October 6, 2006